# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

|  |  |
|---|---|
| STATE OF TEXAS; STATE OF MONTANA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF KANSAS; STATE OF KENTUCKY; STATE OF INDIANA; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, | Civ. Action No. _____ |
| *Plaintiffs*, |  |
| v. |  |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; ANTONY J. BLINKEN, in his official capacity as Secretary of the Department of State; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security; SCOTT DE LA VEGA, in his official capacity as Acting Secretary of the Interior; JENNIFER GRANHOLM, in her official capacity as Secretary of the Department of Energy; JANE |  |

NISHIDA, in her official capacity as
Acting Administrator of the
Environmental Protection Agency;
PETE BUTTIGIEG, in his official
capacity as Secretary of Transportation;
and the UNITED STATES OF
AMERICA,

     *Defendants.*

## COMPLAINT

## I. INTRODUCTION

1.  When the States ratified the Constitution, they ceded the power to regulate inter-state and international commerce to Congress, U.S. Const. art. I, § 8, cl. 3, which must act through the process of bicameralism and presentment. *Id.* § 7. This process may "often seem clumsy, inefficient, even unworkable," but was designed to protect both the liberty and property of individuals and the prerogative of sovereign States. *See, e.g.*, *I.N.S. v. Chadha*, 462 U.S. 919, 958-59 (1983). The President has certain prerogatives to act on behalf of the United States in foreign affairs. But as far as domestic law is concerned, the President must work with and abide by the limits set by Congress—whether he likes them or not.[1]

2.  This Administration has sought to leverage its power regarding U.S. *foreign* policy to unilaterally contradict Congress's stated *domestic* policy regarding one of

---

[1] For a discussion of the difference between the President's ability to bind the United States as a matter of international law and as a matter of domestic law, see generally Bradford Clark, *Domesticating Sole Executive Agreements*, 9393 Va. L. Rev. 1574 (2007).

the most significant energy projects in a generation: the Keystone XL Pipeline. This it may not do. On behalf of many of the States through which Keystone XL runs—beginning within the United States in Montana in the north and terminating in Texas in the south, the States of Montana and Texas bring this suit to prevent the Administration from circumventing limits placed on it by the Constitution, Administrative Procedure Act, and congressionally enacted national policy in this critical energy matter.

3.   Keystone XL is part of a larger system of pipelines, which was designed by TC Energy Corporation to transport approximately 830,000 barrels of oil from where it is produced in Canada and Montana to pre-existing refineries in Houston. Keystone XL is that piece of the pipeline that cross the United States-Canadian border in Philips County, Montana. The U.S. government has studied the safety, environmental impact, and economic benefits of Keystone XL for years. It repeatedly concluded that the pipeline would have a negligible impact on the climate but significant impact on the economy and American energy independence.

4. In 2019, consistent with multiple acts of Congress, President Trump approved the construction of the 1.2 mile stretch of Keystone XL that crosses the border.[2] That construction is now effectively complete.[3]

---

[2] Presidential Permit of March 29, 2019 Authorizing TransCanada Keystone Pipeline, L.P., To Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada, 84 Fed. Reg. 13101 (April 3, 2019), https://www.govinfo.gov/content/pkg/FR-2019-04-03/pdf/2019-06654.pdf.

[3] *Id.*

5.   Within hours of taking office, President Biden issued an Executive Order that purports to revoke the permit on the grounds that he has "an ambitious plan" to "reduce harmful emissions and create good clean-energy jobs" and that this completed pipeline would "not be consistent with [his] Administration's economic and climate imperatives."[4] The order itself relies on a permit provision that purports to allow such revocation by agreement from the Company holding the permit. But it cites no statutory or other authorization permitting the President to change energy policy as set by Congress in this manner.

6.   Revocation of the Keystone XL pipeline permit is a regulation of interstate and international commerce, which can only be accomplished as any other statute can: through the process of bicameralism and presentment. The President lacks the power to enact his "ambitious plan" to reshape the economy in defiance of Congress's unwillingness to do so. To the extent that Congress *had* delegated such authority, it would violate the non-delegation doctrine. But Congress has not delegated such authority: It set specific rules regarding what actions the President can take about Keystone XL and when. The President, together with various senior executive officials, violated those rules. The action should be set aside as inconsistent with the Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq.*

## II. PARTIES

6.   Plaintiffs are the States of Montana, Texas, Alabama, Arkansas, Georgia, Kentucky, Indiana, Louisiana, North Dakota, Oklahoma, South Carolina,

---

[4] Exec. Ord. No. 13990, 86 Fed. Reg. 7037, 7041 (January 20, 2021).

South Dakota, Utah, and Wyoming (collectively, the "States"). They are sovereign States of the United States of America, represented by their respective Attorneys General, the States' chief legal officers who bear the duty and authority to represent the States in court.

7.     Defendant Joseph R. Biden, Jr. is named in his official capacity as President of the United States. President Biden issued Executive Order 13990, which purported to revoke the March 2019 Permit for Keystone XL.

8.     Defendant Antony J. Blinken is named in his official capacity as Secretary of the Department of State. The Department of State communicates and coordinates with the Canadian government regarding commercial issues affecting the U.S.-Canada relationship. Pursuant to Executive Orders 13337 and 13867, the Secretary of State has been responsible for assessing Keystone XL permit requests. Based on information and belief, the Secretary is also responsible for implementing Executive Order 13990. *See, e.g.*, Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, § 501(a), 125 Stat. 1280 (the "2011 Act")Exec; Exec. Order No. 13337, 69 Fed. Reg. 25299 (Apr. 30, 2004).

9.     Defendant Merrick B. Garland is named in his official capacity as Attorney General of the United States. The Attorney General is the chief law enforcement officer of the United States and directs litigation on its behalf.

10.    Defendant Alejandro Mayorkas is named in his official capacity as Secretary of the Department of Homeland Security. The Department of Homeland Security is the agency primarily responsible for law enforcement at the nation's

borders. The Department of Homeland Security oversees the two agencies devoted to border concerns, U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement.

11.     Defendant Scott de la Vega is named in his official capacity as Acting Secretary of the Department of the Interior. The Department of Interior oversees the Bureau of Land Management, an agency that manages public lands in the United States. Portions of the Keystone XL, including the border-crossing segment, would traverse federal property.

12.     Defendant Jennifer Granholm is named in her official capacity as Secretary of the Department of Energy.

13.     Defendant Jane Nishida is named in her official capacity as Acting Administrator of the Environmental Protection Agency.

14.     Defendant Pete Buttigieg is named in his official capacity as Secretary of the Department of Transportation.

15.     Defendants Garland, Mayorkas, De la Vega, Granholm, Nishida, and Buttigieg, together with Secretary Blinken, will be referred as the "Cabinet Defendants." To the extent that Secretary Blinken asserts that enforcing Executive Order No. 13990 falls outside his jurisdiction, that responsibility would fall within the jurisdiction of one or more of the other Cabinet Defendants. *See* ExecExec. Order No. 13337, 69 Fed. Reg. 25299.

16.     Defendant United States of America includes all government agencies and departments responsible for enforcement of the provisions in Executive Order

13990 relating to the Keystone XL and is sued under 28 U.S.C. § 1346 and 5 U.S.C. §§ 702–703.

### III. JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

18.    The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 1361, 2201–02.

19.    Venue lies in this district pursuant to 28 U.S.C. § 1391 because Plaintiff the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

20.    The States have standing, both in their own rights, as sovereign, and in a *parens patriae* capacity. The Plaintiff States expect that cancellation of Keystone XL will lead to significant loss in tax revenue. As discussed in further detail below, Keystone XL was expected to—indeed, already has—generated significant economic value. For example, the larger pipeline of which Keystone XL is a small piece called for the construction of living camps for workers along the route. These camps would generate the equivalent of one full year of property-tax revenue, or about $4 million, for their host counties. They would also generate short-term revenues from sales and use taxes totaling approximately $66 million across the affected States. Construction could last for up to two years. Though a significant amount of this construction was completed before the President unilaterally canceled a key 1.2-mile segment of the

system, substantial work remained to be done. As a result, substantial tax revenues were lost.

21.     The Plaintiff States have sovereign interests in stewarding and preserving the territories within their borders. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007). Moreover, traditionally, decisions about the siting of oil pipelines, even interstate oil pipelines, have been made by State governments if the State governments choose to exercise a pipeline siting authority. *See, e.g.*, S.D. Codified Laws § 49-41B-4.1 (requiring a State permit and the approval of the State legislature prior to construction of a "trans-state" transmission facility, defined to include pipelines). The transnational portion of the pipeline over which the President purports to exercise jurisdiction is only one tiny piece of a larger network of pipelines. The unilateral decision to revoke the permit for that piece interferes with the States' traditional authority to regulate pipelines within their borders.

22.     States also have *parens patriae* interests in the physical and economic well-being of their residents in general, which will suffer because of the decision to revoke the Keystone XL permit. *Massachusetts*, 549 U.S. at 519; *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). The Plaintiff States and their residents are participants in foreign and international commerce and therefore have quasi-sovereign interests in maintaining the constitutionally prescribed separation of powers between Congress and the President as it relates to the regulation of foreign and interstate commerce. *Alfred L. Snapp*, 458 U.S. at 607–08. And more concretely, Keystone XL was the hub of a system that was expected to create high-paying union

jobs across numerous States. Approximately 12,000 of the 42,100 total jobs needed to construct and operate the Keystone XL, would be located in Montana, South Dakota, Nebraska, and Kansas.

23.    The Executive's unilateral decision to revoke the Keystone XL permit is contrary to the constitutional structure to which the States agreed at the time of ratification. The Executive's decision also encroaches upon the States' abilities to steward and control the lands within their borders. Once fully constructed and operational, the Keystone XL would have provided tens of millions of property-tax dollars to the Plaintiff States and their local governments.

24.    The decision likewise harms the physical and economic well-being of the States' residents, communities, businesses, and workers. The States have standing to seek a remedy for those harms and vindicate the substantial reliance interests their constituencies have justifiably cultivated based on the previous government decision to greenlight the Keystone XL project.

## IV. FACTUAL BACKGROUND

### A. The Keystone System and the Keystone XL Pipeline

25.    TC Energy owns 2,687 miles of interconnected petroleum pipelines in the United States and Canada ("Keystone System"). The primary pipeline artery, the Keystone Pipeline ("Keystone I Pipeline") originates in Alberta, Canada, travels eastward into Manitoba, and enters the United States in North Dakota. From the border, the Keystone I pipeline travels south, through South Dakota, and reaches a junction at Steele City, Nebraska. From Steele City, Keystone I's primary spur runs

east through Missouri to delivery and refining points in Illinois. The other spur from Steele City—designed especially to freight Keystone XL oil—runs through Cushing, Oklahoma and southward to state-of-the-art refineries on the Gulf Coast, including refineries in Houston and Port Arthur, Texas. This portion of the Keystone System has been operational for several years—but because the Keystone XL is not yet online, the southernmost terminals and regional refineries are processing oil in quantities far below capacity.

26.     At issue here is the Keystone XL project, proposed by TC Energy in 2008. Like the Keystone I Pipeline, the Keystone XL originates in Alberta, and, as proposed, will travel through Montana, South Dakota, Nebraska, Kansas, and Oklahoma to the Gulf Coast, where it would terminate in Houston and Port Arthur, Texas. When operational, the Keystone XL at full capacity would transport upwards of 830,000 barrels of Alberta and Montana crude oil per day to the United States interior and Gulf Coast. Specific to this case is the government authorization TC Energy needs to build Keystone XL facilities at the international border in northern Montana. The area covered by the authorization extends from the border about 1.2 miles to and including the first pipeline isolation valve in Montana. Though a tiny piece of the larger Keystone project, it is the fulcrum around which XL turns.

27.     Keystone XL was expected to transmit hundreds of thousands of barrels of crude oil to a large refining hub near the Gulf Coast and supplement refining capacity in Illinois, ensuring a reliable domestic and global energy source. Economic modeling also reflected that Keystone XL's construction and operation would create

and sustain thousands of jobs, bolster U.S. energy independence and global leadership, advance commercial relations with Canada, infuse high poverty areas with much-needed tax revenues, and—as compared to transmitting the same oil via rail, truck, or ship—reduce greenhouse gas emissions.

**B. TC Energy's Early Efforts to Obtain Federal Authorization Prove that Keystone Would Benefit the American Economy Without Harming the Environment.**

28.    In 2004, the Bush Administration issued Executive Order No. 13337, which purported to delegate to the Secretary of State the authority to "expedite reviews of permits as necessary to accelerate the completion of energy production and transmission products."

29.    TC Energy first applied for a permit from the Secretary of State to construct and operate the cross-border facilities in 2008. For the next three years, The State Department conducted an expansive and lengthy environmental review of the proposed Keystone XL project, concluding three times in April 2010, April 2011, and August 2011, that the Keystone XL would not materially affect greenhouse gas emissions or alter the amount of extracted and combusted crude oil on the world market.

30.    During this process, TC Energy adopted dozens of State Department-requested conditions for the design, construction, and operation of the Keystone XL. Nonetheless, the State Department in November 2011 concluded it could not authorize the cross-border Keystone XL facilities without additional information.

31.    In December 2011, Congress passed the 2011 Act, Pub. L. No. 112-78, 125 Stat. 1280. Section 501 of the 2011 Act required the President to grant TC

Energy's application to construct and operate the Keystone XL cross-border facilities or report to Congress why he believed the project disserved the national interest within 60 days of the law's enactment. If the President failed to grant the permit or to make a negative national-interest determination within that time, the Act provided that the Keystone XL permit "shall be in effect by operation of law." 2011 Act, Pub. L. 112-78, § 501(b)(3), 125 Stat. at 1289-90.

32.     On January 18, 2012, President Barack Obama—who had signed the 2011 Act only weeks earlier—issued a statement concurring with the State Department's recommended denial of the Keystone XL permit.[5] As part of the statement, despite years of study, President Obama decried "the rushed and arbitrary deadline insisted on by Congressional Republicans [that] prevented a full assessment of the pipeline's impact, especially the health and safety of the American people, as well as our environment."[6] The State Department issued an order denying the permit on January 31, 2012. The President and State Department indicated that they would consider a renewed permit application in the future. President Obama's 2012 denial was not based on the conclusion that Keystone XL disserved the national interest.

33.     In May 2012, TC Energy renewed its State Department application for a Keystone XL cross-border permit.

_____

[5] Press Release, President Barack Obama, Statement by the President on the Keystone XL Pipeline (Jan. 18, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/01/18/statement-president-keystone-xl-pipeline.

[6] *Id.*

34.     The State Department twice more concluded that the proposed Keystone XL would not materially affect greenhouse gas emissions or significantly impact the rate of extraction or demand for crude oil.

35.     The State Department also studied in detail the potential impact of Keystone XL on the American economy. Its "analysis recognize[d] three distinct components." At the first level, "*[d]irect economic activity* associated with construction includes all jobs and earnings at firms that are awarded contracts for goods and services, including construction, directly by Keystone."(emphasis added).[7] Though substantial, these benefits were dwarfed by indirect and induced economic activity. "*Indirect economic activity* includes all goods and services purchased by these construction contractors in the conduct of their services," including "the goods and services purchased to produce inputs such as concrete, fuel, surveying, welding materials, and earth-moving equipment."(emphasis added).[8] Finally, induced economic activity "includes the spending of earnings received by employees working for either the construction contractor or for any supplier of goods and services required in the construction process. Examples of induced activities include spending by access road construction crews, welders, employees of pipe manufacturers, and ranchers providing beef for restaurants and construction camps."

---

[7] *See* U.S. Department of State, Executive Summary: Final Supplemental Environmental Impact Statement for the Keystone XL Project, 19–20 (Jan. 2014), https://2012-keystonepipeline-xl.state.gov/documents/organization/221135.pdf .

[8] *Id.*

36.     The State Department concluded that the Keystone XL project would be a boon to the pipeline States and non-pipeline States alike. As detailed by the U.S. State Department's January 2014 Final Supplemental Environmental Impact Statement ("2014 FSEIS") and its December 2019 Final Supplemental Environmental Impact Statement ("2019 FSEIS"), the construction and operation of the Keystone XL would bring significant benefits to the Plaintiff States and their local communities.[9]

37.     During construction, the State Department concluded, proposed Keystone XL spending would support approximately 42,100 jobs, and approximately $2 billion in earnings throughout the United States. It would especially bring much needed jobs to seventeen areas (census tracts or block groups) in the proposed Keystone XL project area that were identified as minority and/or low-income populations. 2014 FSEIS 4.10-5. For instance, five of the six Montana counties through which Keystone XL would travel are designated high-poverty areas.

38.     And, the State Department found, these benefits would not end with construction. Once operational, Keystone XL would generate tens of millions of dollars in tax revenue for Plaintiff States and their local communities, including county governments and school districts as well as other taxing entities. Operation of

---

[9] *See* U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone XL Project (Jan. 2014), https://www.keystonepipeline-xl.state.gov/finalseis/index.htm; U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone XL Project (Dec. 2019), https://www.state.gov/wp-content/uploads/2019/12/Vol-I-Keystone-Final-SEIS-Cover-through-Chapter-11_508-December-2019.pdf.

the electrical power infrastructure would also increase the revenues of the members of local electrical cooperatives in Montana, who would benefit by selling large amounts of electrical power to the Keystone XL.

39.    Still unsatisfied, in 2015 the State Department sought the views of several other Cabinet agencies as contemplated in Executive Order No. 13337.

40.    On November 6, 2015, President Obama announced that his Administration would again deny the renewed Keystone XL cross-border permit.[10] Though the State Department had concluded that the Keystone XL would increase national energy security, meaningfully benefit the economy, and promote a stronger and more collaborative U.S.-Canada working relationship, the President determined that approving the project would undercut the U.S.'s global leadership in fighting climate change. At no time did he explain this conclusion given his Administration's repeated findings the Keystone XL would not materially increase greenhouse gas emissions or the amount of extracted crude oil. To the contrary, the State Department noted that the pipeline was an environmentally superior method of transporting oil compared to alternatives like trucks, trains, and tankers.

## C. President Trump Approves Keystone XL, Which Is Substantially Completed During His Term in Office.

41.    Days after assuming office, President Donald Trump issued a Presidential Memorandum inviting TC Energy to resubmit its application for the

---

[10] Press Release, President Barack Obama, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), https://obamawhitehouse.archives.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline.

cross-border permit and ordering his Administration to expedite consideration of the application.[11]

42.    On January 26, 2017, TC Energy once again renewed its application.

43.    The State Department on March 23, 2017 granted the permit "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada at Morgan, Montana, for the import of crude oil from Canada to the United States."[12]

44.    In November 2018, a federal district court enjoined the permit, holding that the State Department failed to adequately consider relevant information as required by the Administrative Procedure Act and the National Environmental Policy Act. *See Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018).

45.    On March 29, 2019, the President issued a new Keystone XL cross-border permit. For clarity, the March 29, 2019 order revoked the March 23, 2017 State Department order.[13]

---

[11] Memorandum on Construction of the Keystone XL Pipeline, Jan. 24, 2017, 82 Fed. Reg. 8663 (Jan. 30, 2017), https://www.govinfo.gov/content/pkg/FR-2017-01-30/pdf/2017-02035.pdf.

[12] Notice of Issuance of a Presidential Permit to TransCanada Keystone Pipeline, L.P., Public Notice 9941, 82 Fed. Reg. 16467 (April 4, 2017), https://www.federalregister.gov/documents/2017/04/04/2017-06646/notice-of-issuance-of-a-presidential-permit-to-transcanada-keystone-pipeline-lp.

[13] Presidential Permit Authorizing TransCanada Keystone Pipeline, 84 Fed. Reg. 13101 (Apr. 3, 2019).

46.     On April 10, 2019, the President issued Executive Order No. 13867, which modified and superseded Executive Order No. 13337. It instructed the Secretary of State to adopt procedures that would allow for permits to be approved within 60 Days of receipt. Based on a diligent search, it appears that Executive Order No. 13867 remains in effect.

47.     The portion of the Keystone XL pipeline that crosses the United States' northern border with Canada was substantially completed before the end of 2020.

## D. President Biden Unilaterally Revokes the Keystone XL Cross-Border Permit After Construction of the Pipeline Segment Is Substantially Complete.

48.     Notwithstanding the significant reliance interests that had developed, President Biden signed an Executive Order entitled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis" within hours of taking office.[14] In Section 6, the President announced that he was revoking President Trump's March 29, 2019 permit. The rationale supporting the decision was scant, and is reproduced here in full:

> (b) In 2015, following an exhaustive review, the Department of State and the President determined that approving the proposed Keystone XL pipeline would not serve the U.S. national interest. That analysis, in addition to concluding that the significance of the proposed pipeline for our energy security and economy is limited, stressed that the United States must prioritize the development of a clean energy economy, which will in turn create good jobs. The analysis further concluded that approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action.

> (c) Climate change has had a growing effect on the U.S. economy, with

---

[14] *See* Exec. Order 13990, 86 Fed. Reg. 7037 (January 20, 2021).

climate-related costs increasing over the last 4 years. Extreme weather events and other climate-related effects have harmed the health, safety, and security of the American people and have increased the urgency for combatting climate change and accelerating the transition toward a clean energy economy. The world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution.

(d) The Keystone XL pipeline disserves the U.S. national interest. The United States and the world face a climate crisis. That crisis must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory. At home, we will combat the crisis with an ambitious plan to build back better, designed to both reduce harmful emissions and create good clean-energy jobs. Our domestic efforts must go hand in hand with U.S. diplomatic engagement. Because most greenhouse gas emissions originate beyond our borders, such engagement is more necessary and urgent than ever. The United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action and put the world on a sustainable climate pathway. Leaving the Keystone XL pipeline permit in place would not be consistent with my Administration's economic and climate imperatives.

49.     Just a few years earlier, President Obama had bemoaned that 60 days was insufficient to fully determine whether Keystone XL served the national interest—despite years of exhaustive environmental and economic reviews uniformly concluding that (a) Keystone XL would not materially affect greenhouse gas emissions or increase the amount of crude oil on the world market, (b) Keystone XL would provide a safer and more environmentally sound method of transporting crude oil, and (c) Keystone XL would positively affect the U.S. economy. Yet mere hours into his first day in office, President Biden affirmatively concluded that the Keystone XL project disserved the national interest because it would send the "wrong message" about his Administration's climate action trajectory.

**E. The Plaintiff States' Injuries from the President's Unilateral Decision to Revoke the Keystone XL Permit**

50.     President Biden did not consult with the Plaintiff States before making this decision, nor did he consider the far-reaching consequences his decision would impose on Plaintiffs.

51.     The pipeline States, as well as their counties, local communities, and school districts stood to gain tens of millions of dollars in tax revenue from the construction and operation of the Keystone XL. The total estimated property tax from the Keystone XL project in the first full year of operations would be approximately $55.6 million spread across 27 counties in *just* three States—Montana, South Dakota, and Nebraska.

52.     These revenues would particularly benefit poorer rural areas, providing a much-needed influx of resources to fund important public and community services. Property tax revenue during operations would be substantial for many counties, with an increase of an estimated 10 percent or more in 17 of the 27 counties with Keystone XL facilities. In Montana, the estimated property tax from the proposed Project in the first full year of operations, as a percent of actual property tax revenue in 2010, would range from 27 percent in Phillips County to 117 percent in McCone County. 2014 FSEIS § 4.10-34. The Keystone XL project would provide an estimated $26 million per year in combined tax revenue to Fallon, Prairie, Dawson, McCone, Valley, and Phillips counties. 2014 EIS, Figure 4.10.1-4.[15]

---

[15]                                                     https://2012-keystonepipeline-xl.state.gov/documents/organization/221186.pdf.

53.     The President's decision will eliminate the approximately 3,700 Montana-based construction jobs that would have garnered approximately $127 million in employment earnings—more than half a percentage point of *all* Montana's annual employment earnings.   Montana would collect approximately $8.5 million from taxes levied on that income.  *See* Mont. Code §15-30-2103.

54.     In addition to the direct impact of taxes, surrounding States stood to receive substantial economic benefits from the construction and operation of the Keystone XL. The Plaintiff States, local communities, workers, businesses, and utilities have made significant investments in anticipation of hosting, constructing, and servicing the pipelines and its attendant installations. Thousands of workers—many unionized—in the pipeline States were engaged to participate in the Keystone XL's construction, and many would be employed permanently to maintain the pipeline. Without the trans-border piece of the pipeline, the remaining system is largely without function. Those jobs, investments, and business opportunities will be lost.

55.     Revocation of the Keystone XL permit will cost the Plaintiff States and their communities tens of millions of dollars in annual tax revenue from the regulators, residents, and businesses facilitating the refining, transportation, and exportation of crude oil that would be moved and delivered by Keystone XL. As long as Keystone XL remains inoperative, these States' residents and businesses lose the opportunity to refine, transport, and export the Keystone XL oil.  If the President's

unilateral decision is legally effective, those jobs and business opportunities will never materialize.

56.     Cancelling Keystone XL also adversely impacts Texas's and Louisiana's refinery industry, and its associated employment base. Though it will not result in reduced production in Canada, eliminating Keystone XL will deprive these States' refineries of alternative crude oil inputs and increase the costs of transporting alternative inputs to their refining locations. Specifically, recent increases in U.S. oil production from hydraulic fracturing lead to light and very light crude. Numerous Texas and Louisiana refineries, however, are designed to refine medium or heavy crude—the very kind Keystone XL would transport. They currently rely on oil from politically unstable locations of the world like Mexico and Venezuela, and importation from those countries imposes significant transportation costs. Cancelling Keystone XL will endanger the supply of crude for these refineries and have a devastating effect on the local job market. Three of the six contractors responsible for constructing the Keystone XL project were from the Gulf Coast.

57.     As in Montana, cancelling Keystone XL will negatively impact Gulf States' public revenues now and over time. For example, due to its location, Louisiana has one of the most significant pipeline networks in the world. Cancelling Keystone XL will terminate employment for Louisiana workers and contractors participating in Keystone XL's development and construction. This will reduce Louisiana income taxes and local/state sales taxes that would have been paid from the economic activity resulting from the development and construction of the pipeline.

58.     Finally, cancelling Keystone XL will have ripple effects that adversely impact the economy and environment in non-pipeline States as well. As the State Department repeatedly recognized, the Keystone XL project does not materially affect the amount of crude oil extracted in Western Canada. Any oil that is not transported via the Keystone XL, will be transported on trains, trucks, and ships. Economically, this will diminish capacity and increase costs associated with transporting other commodities, including agricultural products and consumer goods. Environmentally, cancelling Keystone XL will also be counterproductive. Hundreds of thousands of gallons of oil that would have flowed through the pipeline by operation of physics will now traverse the States' territories in trucks and trains. Trucks and trains must burn fuel to transport fuel. This will result not only in increased emissions but also higher wear-and-tear on the States' highway systems, and an increased risk of traffic accidents.

## V. CLAIMS FOR RELIEF

59.     Unless otherwise specified, the below claims are asserted against each of the Defendants in their official capacities. All of the forgoing allegations are incorporated into each count as if fully repeated therein. To the extent there is any perceived inconsistency between the below claims for relief, the States expressly plead them in the alternative. The States further reserve the right to amend the complaint at an appropriate time.

### COUNT I:

**Declaratory Judgment under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 that the President's Revocation of the Keystone XL Pipeline Violates the U.S. Constitution's Separation of Powers**

22

60.     Even if Congress had never spoken on the issue of authorizing cross-border oil pipeline permits, the President would lack the unilateral un-delegated power to revoke the Keystone XL permit.

61.     The decision to provide or withhold permission to construct and operate an oil pipeline across the international border with Canada is a regulation of international and interstate commerce. Under the Constitution, the power to regulate international and interstate commerce resides with Congress—not the President. U.S. Const. art I, § 8, cl. 3.

62.     Congressional power to regulate foreign commerce is "exclusive and plenary." *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933). The words of the Commerce Clause "comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend." *Gibbons v. Ogden*, 22 U.S. 1, 193-94 (1824).

63.     When Congress has so far left some matter of foreign or interstate commerce unregulated, such "inaction" in regulating a particular commercial issue "is equivalent to a declaration that inter-State commerce shall be free and untrammelled." *Welton v. Missouri*, 91 U.S. 275, 282 (1875). The same rule prevents the Executive from attempting to fill the regulatory gap—even in times of a national emergency. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643 (1952) (Jackson, J., concurring) (rejecting the idea that because "Congress sees fit to rely on

free private enterprise … the Executive … [may] seize the facility for operation upon Government-imposed terms").

64.     The President is the Commander in Chief of U.S. armed forces. U.S. Const. art II, § 2, cl. 1. He also may exercise, in coordination with the United States Senate, certain other powers related to foreign affairs. *Id.* art. II, § 2, cl. 2. The Supreme Court has observed that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936). But in the same breath, the Court has reaffirmed that the President's foreign affairs powers, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.* at 320.

65.     "The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Thus, "it is essential the congressional role in foreign affairs be understood and respected." *Id.*

66.     President Biden's decision to revoke the Keystone XL permit exceeded the scope of his authority under Article II of the Constitution. Executive Order 13990 does not cite any statutory authority to revoke a transnational pipeline permit. No such authority was contained in the 2011 Act, which gave the President a one-time, binomial choice: approve the pipeline or explain to Congress why he would not based on the national interest within 60 days.

67. The Executive Order invokes a climate crisis, but "imperatives of events" have not prevailed such that the President's unenumerated powers entitle him to supersede the enumerated power of Congress to regulate—and in this case disrupt—foreign and interstate commerce. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

68. The Executive Order invokes a term in the 2019 permit granted by the Trump Administration purporting to give the President "sole discretion" to revoke the permit. But Plaintiff States are not aware of any principle of law that allows the President to arrogate power to himself through some sort of pseudo-contract with a private party. To the contrary, the Supreme Court has stated that the separation of powers is so significant that the political branches may not even agree amongst *themselves* to reallocate that authority. *Chadha*, 462 U.S. at 958-59. Let alone can the Executive do so by an arrangement with a private party.

69. Nor is it any response to say that past Presidents have issued cross-border permits. Since the Administration of Ulysses S. Grant, Presidents have recognized their subsidiary role to Congress in granting cross-border permits. Foreign Cables, 22 Op. Att'y Gen. 13 (1898) (discussing the President's powers vis-a-vis the landing of foreign submarine cables). Where a claim of executive power is "expressed in broad terms," but that same power has in practice been "exercised quite narrowly," courts will find Congressional acquiescence only where the claimed power has been both exercised by the executive and implicitly approved by the Congress. *See Kent v. Dulles*, 357 U.S. 116, 127-28 (1958); *see also Medellin v. Texas*, 552 U.S. 491, 531

(2008) (confining claim of acquiescence to the "narrow set of circumstances" directly supported by past practice).

70.    As to the power to deny the Keystone XL permit, Congress has not "acquiesced in this particular exercise of Presidential authority." *Medellin*, 552 U.S. at 528. "[T]he validity of the President's action … hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action." *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981); *see id.* at 687 (noting that courts examine whether Congress has "enacted legislation, or even passed a resolution, indicating its displeasure" with the President's action).[16]

71.    President Biden's actions will cause massive disruptions to the free and untrammeled flow of foreign and interstate commerce, and improperly arrogated commercial regulatory powers Congress alone possesses. U.S. Const. art. I, § 8, cl. 3. His decision—and any attempt by government officials to enforce it—therefore violates the Constitution's separation of powers.

72.    "The Judicial Branch appropriately exercises [constitutional review] … where the question is whether Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S.

---

[16] By contrast, President Trump's approval of the permit is consistent with past practice because it put into effect the repeatedly expressed preferences of Congress. *See* Keystone Pipeline Approval Act, S. 1, 114th Cong., 1st Sess. §§ 1, 2(a) (2015); H.R. 5682, 113th Cong., 2d Sess. § 1 (2014); American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2, 113th Cong., 2d Sess. § 103 (2014); Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. §3 (2013); North American Energy Access Act, H.R. 3548, 112th Cong., 2d Sess. § 201-204 (2012); Temporary Payroll Tax Cut Continuation Act of 2011, P.L. 112-78, Title V.

189, 197 (2012) (quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991)). Federal courts can and do issue prospective relief to enforce the separation of powers. *See generally, Medellin*, 552 U.S. 491; *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Youngstown*, 343 U.S. 579; *Panama Ref. Co.*, 293 U.S. 388 (1935). The Court should do the same here and declare the revocation unlawful and void.

## <u>COUNT II:</u>

**Declaratory Judgment under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 that the President May Not Unilaterally Revoke the Keystone XL Pipeline Because Congress Expressly Granted it By Operation of Law**

73.     As set forth above, the decision to provide or withhold permission to construct and operate the Keystone XL Pipeline at the international border is a regulation of international and interstate commerce. And under the Constitution, the power to regulate international and interstate commerce resides with Congress—not the President. U.S. Const. art I, § 8, cl. 3.

74.     In 2011, Congress expressly directed the President to grant the Keystone XL cross-border permit or explain within 60 days why he thought it would disserve the national interest. *See* 2011 Act, Pub. L. No. 112-78, § 501(b)(3), 125 Stat. at 1289-90. If the President failed to grant or report his negative recommendations to Congress within 60 days, Congress would grant the Keystone XL permit by operation of law. *Id*. The President failed to grant the permit or report negative recommendations to Congress within the prescribed time period. President Obama instead purported to deny the Keystone XL permit without concluding it disserved the national interest, complaining that the 60-day time frame prescribed in the

statute he signed into law provided an insufficient amount of time to make a national interest determination.  But that was not an option Congress provided.

75.    Because Congress authorized the Keystone XL permit by operation of law, the President sortied far beyond his constitutional precincts by purporting to unilaterally revoke it.

76.    The President's decision cannot be sustained as an exercise of his Commander in Chief powers, other powers enumerated in Article II of the Constitution, or any implied power to control the border for the Nation's safety, security, or integrity.  Nor has the President articulated any such basis for this action.

77.    The President's decision is contrary to law and an affront to the separation of powers.  This Court should declare that his decision is therefore unlawful and void. *See Zivotofsky*, 566 U.S. at 197; *Medellin*, 552 U.S. at 528; *Youngstown*, 343 U.S. at 588-89; *Panama Ref. Co.*, 293 U.S. at 418-19.

## COUNT III:

### Declaratory Judgment Under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 that the Cabinet Defendants' Implementation of the Revocation Exceeds their Statutory Authority

78.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Actions by the Secretary of State and the other Cabinet Defendants to effectuate Executive Order No. 13990 are contrary to law and in excess of their statutory authority.

79.    Even if the President's foreign-affairs powers could, in theory, allow him to declare that a transnational permit should be revoked, any actions by the Cabinet

Defendants to enforce that declaration is contrary to statute and, therefore, unlawful. The Executive's powers "fluctuate[] depending upon their disjunction or conjunction with those of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). "[W]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, and the Court can sustain his actions only by disabling the Congress from acting upon the subject." *Medellín*, 552 U.S. at 525 (internal quotation marks omitted). More fundamentally, a federal agency only has those powers granted to them by Congress and cannot act contrary to statute.

80.    Here, the President has purported to act unilaterally, revoking prior authorization for the construction and operation of the Keystone XL. His actions are not directly subject to review under the Administrative Procedure Act. However, under Executive Order Nos. 13337 and 13867, permitting decisions are effectuated by the Secretary of State either alone or in conjunction with the other Cabinet Defendants, who *are* subject to the strictures of the APA.

81.    Congress has delegated limited powers to regulate certain aspects of international oil pipelines to specific Executive Agencies, but those delegations do not extend to cross-border siting of oil pipelines.

82.    For instance, in the Hepburn Act of 1906, Congress expanded the Interstate Commerce Act of 1877 to apply to international oil pipelines and authorized the Interstate Commerce Commission (ICC) to set rates that pipeline operators can charge for the transport of oil by pipelines. Pub. L. No. 59-337, § 1, 34 Stat. 584, 584 (as amended). Congress transferred the ICC's jurisdiction to the

Federal Energy Regulatory Commission (FERC) in the Department of Energy Organization Act, Pub. L. 95-91, § 101, 91 Stat. 565 (1977) (codified at 42 U.S.C. § 7111 *et seq.*), and amended FERC's authority in the Energy Policy Act of 1992, 49 U.S.C. § 112 *et seq.* (since repealed).

83.　The initial federal legislation governing fossil fuel pipeline safety was the Natural Gas Pipeline Safety Act of 1968, Pub. L. 90-481, 82 Stat. 720. This pipeline safety legislation was amended in 1979 to include liquid fuels, Pub. L. No. 96-129, 93 Stat. 989, and has been since been amended on a number of occasions, including by the Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985. This is what is often referred to as the "Pipeline Safety Act."

84.　The Pipeline Safety Act preempts certain state regulations of pipelines, but it does not authorize the Cabinet Defendants to act. Specifically, it states:

> A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.

49 U.S.C. § 60104(c). Nevertheless, the Pipeline Safety Act also specifically states that "[t]his chapter does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." *Id.* § 60104(e). Far from authorizing the Cabinet Secretaries to act on Keystone XL, any action that Secretary Buttigieg takes in response to the President's order is *directly* contrary to this statute.

85.     Actions by the remaining Cabinet Secretaries are also in excess of their statutory authority. In the statutes listed above or others, Congress could have authorized the State Department to issue permits allowing transport of crude oil between the United States and Canada and for pipeline construction, connection and operation, but it did not. This stands in sharp contrast with other statutes in which Congress has expressly granted authority for the Executive to address border crossings. For example, Congress delegated to the Executive authority over transboundary natural gas pipelines in the Natural Gas Act, 15 U.S.C. § 17 *et seq.* (1938); transboundary bridges in the International Bridge Act, 33 U.S.C. § 535(b) (1972); and international telegraph cables in the Kellogg Act, 47 U.S.C. § 34 *et seq.* (1921). By contrast, there is no congressional act regarding border crossings for oil pipelines, implying that Congress has never delegated to any of the Cabinet Defendants the authority they would need to block Keystone XL.

86.     Far from granting the Executive broad power to approve or disapprove of cross-border pipelines, Congress authorized specific pipeline systems. In 1973, Congress authorized construction of the Trans-Alaska Pipeline System ("TAPS"). 43 U.S.C. § 651 *et seq.* (1973). The TAPS was a matter of "foreign commerce" for Congress despite the fact that it crossed no international borders. *State v. Brown*, 850 F. Supp. 821, 827–28 (D. Alaska 1994), *dismissed sub nom. State of Alaska v. Brown*, 86 F.3d 1163 (9th Cir. 1996). Similarly, in the Public Utility Regulatory Policies Act, 43 U.S.C. § 2001 *et seq.* (1973), Congress delegated to the President the authority to

choose the preferred route of an east-west pipeline and to give it preferential treatment in the permitting process.

87.    The 2011 Act is similar to Congress's past practice: It created a default rule whereby Keystone XL should be authorized unless the President made specified findings. Importantly, he did not exercise either of those statutory dictates. But as there appears to be *no other statute* authorizing the Executive to approve or deny Keystone XL, the Plaintiff States retain the power to approve the siting of pipelines within its sovereign territory.

88.    These statutes demonstrate that Congress never delegated to the Executive the power to regulate the siting of oil pipelines. Moreover, any action that the Cabinet Defendants take in response to the President's order would be contrary to statute. As a result, such actions should be declared unlawful and set aside under 5 U.S.C. § 706.

## <u>COUNT IV</u>:

### Declaratory Judgment under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 that Revocation of the Keystone XL Violates the Non-Delegation Doctrine and thus Contrary to Law

89.    To the extent that the President or Cabinet Defendants point to a general authority to regulate the environment or conduct foreign relations actually conferred on them by Congress, such a theory runs afoul of the nondelegation doctrine. Our system of government is built around the single, overarching principle that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST No. 47, at 298 (Madison) (C. Rossiter, ed. 1961). To protect against such

accumulation of power, the Constitution vests "All legislative Powers [t]herein granted" in Congress. U.S. Const. art. I, § 1. And the Supreme Court has long held that "Congress . . . may not transfer to another branch 'powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. 1, 42 (1825)).

90.    Legislative power has been defined as the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated." THE FEDERALIST No. 78, at 464 (Hamilton); *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) (defining it as the power to "prescribe general rules for the government of society"). Whether, and to what extent, the transport of fossil fuels should be restricted on the grounds of environmental impact is such a legislative decision.

91.    Congress may allow the Executive discretion to determine how law should be applied to particular facts. But general, substantive policies governing our nation *must* be passed by the legislature and signed by the President. *E.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *cf. Dep't of Transp. v. Ass'n of Am. R.Rs.* ("*Amtrak*"), 575 U.S. 43, 55-56 (2015) (reaffirming principle and remanding for further consideration).

92.    To determine whether such an improper delegation has occurred, courts look to a number of factors including the scope of the delegation, the nature of the question being delegated, and past congressional practice. Congress may allow the Executive, which is vested with its own power to execute the law, to fill in the details of how a statute functions on a-day-to-day basis, *Gundy*, 139 S. Ct. at 2129, or to find

that the law has been triggered by "certain fact[s] being established," *Miller v. City of N.Y.*, 109 U.S. 385, 393 (1883). But Congress may *not* allow the Executive to "pass a prohibitory law," or allow commercial policy "to be dealt with as he pleased." *Panama Ref.*, 293 U.S. atat 414, 418; *A.L.A. Schechter Poultry*, 295 U.S. at 537-38.

93.    As discussed above, pipeline siting decisions are routinely addressed directly by Congress. This is hardly surprising: They have ripple effects throughout the entire economy. Where Congress has allowed the President to make decisions regarding pipeline location, it has been in the nature of fact-finding (*e.g.*, which of a predetermined set of options is preferable). Whether to allow the pipeline at all given potential environmental impacts is a fundamentally legislative decision, which cannot be delegated.

94.    As discussed above, following a reasonably diligent search, Plaintiff States are aware of no statute specifically authorizing the President to revoke the Keystone XL permit in the manner demonstrated here. *Cf.* 15 U.S.C. § 717b(a) (permitting the Department of Energy to permit the export of *natural gas* "with such modification and upon such terms and conditions as the [Department] may find necessary or appropriate"). To the extent that the defendants rely on a more general law supposedly allowing them to take this action, this application of that law violates the nondelegation doctrine.

## COUNT V:

### Declaratory Judgment under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 that the Revocation Was Arbitrary and Capricious

95.    In addition to being unlawful for the reasons discussed above, the Cabinet Secretaries' actions to effectuate the revocation should be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A). Moreover, the Supreme Court has recognized "a long history of judicial review of illegal executive action, tracing back to England" that arises out of the inherent equitable powers of the Court unless the Congress has expressly acted to remove it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Plaintiff States are aware of no congressional action removing this Court's ability to award relief against any defendant for his or her unlawful actions.

96.    Though the scope of arbitrary-and-capricious review—particularly under the APA—is "narrow," the Court must overturn an agency action that did not "examine[] the relevant data and articulate[] a satisfactory explanation for its action." *Dep't of Commerce of N.Y.*, 139 S. Ct. 2551, 2578 (2019) (Thomas, J., concurring in part and dissenting in part). Failure to consider obvious policy alternatives or changed factual circumstances can render a decision arbitrary. *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-51 (1983); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739-42 (1996).

97.    The Cabinet Defendants' actions fail to satisfy this standard in myriad ways. Cabinet Defendants' actions implicate numerous reliance interests, will lead to thousands of Americans losing their jobs, and have the possibility of depriving States

and local governments of millions of dollars in revenues. Yet, far from providing a reasoned explanation for why they are taking their actions, they have not provided any reason at all—even to say that they are acting because the President told them to.

98.     Assuming the Cabinet Defendants can use the President's explanation as a sort of regulation-by-proxy, that too would be insufficient. The President's decision to prohibit international and interstate commerce by revoking the Keystone XL permit rests on his desire to "position [the U.S.] to exercise vigorous climate leadership in order to achieve a significant increase in global climate action and put the world on a sustainable climate pathway." Essentially, the President purports to unilaterally shutter Keystone XL to send a climate-friendly signal to the international community and secure a stronger negotiating position in his efforts to combat climate change. Congress has never allowed the President to encroach upon its powers over international and interstate commerce in order to facilitate the President's pursuit of such vague objectives.

99.     Moreover, this explanation fails to account for other important factors that both the 2011 Act deemed relevant and that have arisen in the intervening decade. In particular, the necessary facilities for Keystone XL *have already been constructed*. Nevertheless, the Executive now seeks to reverse course based on optics alone. The Executive Order says nothing about existing reliance interests and very little about economics at all. Indeed, in the face of years of economic studies about the likely impact of Keystone XL on the economy and *lack* of any such impact on the

environment, the Executive Order cites little more than campaign slogans about climate change and aspirations to create green jobs. This is insufficient under the APA.

## COUNT VI:

### Declaratory Judgment Under 5 U.S.C. § 706 that the Cabinet Defendants' Implementation of the Revocation Is Void For Failure to Go Through Notice and Comment As Required By the APA

100.   Finally, in addition to being substantively unlawful for the reasons described above, the Cabinet Defendants' actions to implement the revocation of the Keystone XL permit must be set aside as agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

101.   Though Executive Order No. 13990 set general policy regarding Keystone XL, on information and belief, that policy is implemented through the actions of the Secretary of State or other Cabinet Defendants. Exec. Order No. 13867, 84 Fed. 15,491, 15,492 (Apr. 10, 2019) (revoking Executive Order No. 13337).

102.   Each of the Cabinet Defendants is or manages an "agency" as that term is defined in the APA, 5 U.S.C. § 551(1), and the Keystone XL permit is a "rule" under the APA, *id*. § 551(4). The revocation of that permit is also a "rule" under the APA, *id*.

103.   With exceptions that are not applicable to the actions of the Cabinet Defendants, agency rules must go through notice-and-comment rulemaking. *Id*. § 553.

104.     The  Cabinet  Defendants  failed  to  properly  engage  in  notice-and-comment rulemaking before taking action to implement the Executive Order without observing the procedure required by law.

## VI. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a.     Declare that Defendants lack the legal authority to prohibit TC Energy from constructing and operating the Keystone XL cross-border facilities other than through the lawful exercise of statutory authority;

b.     Declare that the President's decision in Section 6 of Executive Order 13990, "Revoking the March 2019 Permit for the Keystone XL Pipeline," is unconstitutional and unlawful, and lacks legal effect;

c.     Declare that Defendants have no lawful basis to take any action to enforce or implement the decision purporting to revoke TC Energy's permit to construct and operate Keystone XL cross-border facilities;

d.     Preliminarily and permanently enjoin Defendants from taking any action to enforce, implement, or otherwise put into effect the decision revoking TC Energy's permit to construct and operate Keystone XL cross-border facilities;

e.     Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f.     Award such other and further relief as the Court deems equitable and just.

Respectfully submitted this the 17th day of March, 2021,

| | |
|---|---|
| Austin Knudsen | Ken Paxton |
| Attorney General of Montana | Attorney General of Texas |
| | |
| Kristin Hansen | Brent Webster |
| Lieutenant General | First Assistant Attorney General |
| | |
| /s/ David M.S. Dewhirst | Judd E. Stone II |
| David Dewhirst | Solicitor General |
| Solicitor General | |
| | Patrick Sweeten |
| | Deputy Attorney General |
| Office of the Attorney General | |
| 215 North Sanders | /s/ Ryan D. Walters |
| P.O. Box 201401 | Ryan D. Walters |
| Helena, MT 59620-1401 | Special Counsel |
| Tel: (406) 444-4145 | Special Litigation Unit |
| David.Dewhirst@mt.gov | Texas Bar No. 24105085 |
| **Counsel for the State of Montana** | Southern District of Texas Bar No. 3369185 |
| | |
| | Lanora C. Pettit |
| | Assistant Solicitor General |
| | |
| | Office of the Attorney General |
| | P.O. Box 12548 (MC 009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-4139 |
| | Fax: (512) 474-2697 |
| | Patrick.Sweeten@oag.texas.gov |
| | Judd.Stone@oag.texas.gov |
| | Ryan.Walters@oag.texas.gov |
| | Lanora.Pettit@oag.texas.gov |
| | **Counsel for the State of Texas** |

39

*Additional Counsel*

STEVE MARSHALL
  *Attorney General*

*/s/* Edmund G. LaCour Jr.
EDMUND G. LACOUR JR.
  *Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
**Counsel for the State of Alabama**

MARK BRNOVICH
  *Attorney General*

/s/ Robert J. Maker
ROBERT J. MAKER
  *Assistant Attorney General*
2005 N. Central Ave.
Phoenix AZ 85004
Robert.Makar@azag.gov
**Counsel for the State of Arizona**

LESLIE RUTLEDGE
  *Attorney General*

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI*(ADMISSION APPLICATION FORTHCOMING)
  *Solicitor General*
VINCENT M. WAGNER
  *Deputy Solicitor General*
Office of Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
**Counsel for the State of Arkansas**

CHRIS CARR
  *Attorney General*

/s/ Andrew A. Pinson
ANDREW A. PINSON
  *Solicitor General*
Office of the Attorney General
40 Capitol Sq SW
Atlanta, Georgia 30334
Tel: (404) 458-3409
apinson@law.ga.gov
***Counsel for the State of Georgia***


THEODORE E. ROKITA
  *Attorney General*

/s/Thomas M. Fisher
THOMAS M. FISHER (PRO HAC APPLICATION FORTHCOMING)
  *Solicitor General*
Office of the Attorney General
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
***Counsel for the State of Indiana***


DEREK SCHMIDT
  *Attorney General*

/s/ Brant M. Laue
BRANT M. LAUE
  *Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8539
brant.laue@ag.ks.gov
***Counsel for the State of Kansas***

DANIEL CAMERON
  *Attorney General*

/s/Victor B. Maddox
VICTOR B. MADDOX
  *Assistant Deputy Attorney General*
S. CHAD MEREDITH
  *Solicitor General*
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
502.696.5300
Victor.Maddox@ky.gov
***Counsel for the State of Kentucky***


JEFF LANDRY
  *Attorney General*

/s/Elizabeth B. Murrill
ELIZABETH B. MURRILL
  *Solicitor General*
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA  70804
Tel: (205) 326-6085
murrille@ag.louisiana.gov
***Counsel for the State of Louisiana***


LYNN FITCH
  *Attorney General*

/s/Krissy C. Nobile
KRISSY C. NOBILE (PRO HAC VICE APPLICATION FORTHCOMING)
  *Deputy Solicitor General*
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
krissy.nobile@ago.ms.gov
***Counsel for the State of Mississippi***

ERIC SCHMITT
  *Attorney General*

/s/ D. John Sauer
D. JOHN SAUER
  *Solicitor General* (pro hac vice application forthcoming)
Office of Attorney General
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
***Counsel for the  State of Missouri***

DOUG J. PETERSON
  *Attorney General*

/s/ James A. Campbell
JAMES A. CAMPBELL\*
  *Solicitor General*
JUSTIN D. LAVENE\*
  *Assistant Attorney General*
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
justin.lavene@nebraska.gov
***Counsel for the State of Nebraska***

WAYNE STENEHJEM
  *Attorney General*

 /s/  Matthew A. Sagsveen
MATTHEW A. SAGSVEEN
  *Solicitor General*
State Bar ID No. 05613
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Tel: (701) 328-3640
masagsve@nd.gov
***Counsel for State of North Dakota***

DAVE YOST
*Attorney General*

/s/  Benjamin M. Flowers
BENJAMIN M. FLOWERS (*pro hac vice* application pending)
  *Solicitor General*
Office of the Attorney General
30 E. Broad St., Floor 17
Columbus, OH 43215
Benjamin.Flowers@ohioattorneygeneral.gov
**Counsel for the State of Ohio**


MIKE HUNTER
  *Attorney General*

/s/ Mithun Mansinghani
MITHUN MANSINGHANI
  *Solicitor General*
Office of the Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
mithun.mansinghani@oag.ok.gov
**Counsel for the State of Oklahoma**


ALAN WILSON
  *Attorney General*

/s/ J. Emory Smith, Jr.
J. EMORY SMITH, JR.
  *Deputy Solicitor General*
Office of the Attorney General
P.O. Box 11549
Columbia, South Carolina  29211
Tel: (803) 734-3680
ESmith@scag.gov
**Counsel for the State of South Carolina**

JASON RAVNSBORG
  *Attorney General*

/s/ Jeffery J. Tronvold
JEFFREY J. TRONVOLD
  *Deputy Attorney General*
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501 - 8501
(605) 773-3215
Jeffery.Tronvold@state.sd.us
**Counsel for the State of South Dakota**


SEAN REYES
  *Attorney General*

/s/ Melissa A. Holyoak
MELISSA A. HOLYOAK (ADMISSION RENEWAL FORTHCOMING)
  *Solicitor General*
Office of the Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
**Counsel for the State of Utah**


PATRICK MORRISEY
  *Attorney General*

/s/ Lindsay S. See
LINDSAY S. SEE (PRO HAC APPLICATION FORTHCOMING)
  *Solicitor General*
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.See@wvago.gov
**Counsel for the State of West Virginia**

BRIDGET HILL
  *Attorney General*

<u>/s/ Travis Jordan</u>
TRAVIS JORDAN (PRO HAC APPLICATION FORTHCOMING)
  *Assistant Attorney General*
Office of the Attorney General
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895
travis.jordan@wyo.gov
***Counsel for the State of Wyoming***