**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

STATE OF TEXAS, et al.,

*Plaintiffs*,

v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States, et al.,

*Defendants*.

No. 3:21-cv-00065

**DEFENDANTS' MOTION TO DISMISS
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT AND SUMMARY ....................................................1

BACKGROUND ........................................................................................................4

I.   THE EXECUTIVE'S EXERCISE OF AUTHORITY OVER BORDER-CROSSING FACILITIES AND THE PERMITTING PROCESS .........................4

II.  TC ENERGY'S PERMIT APPLICATIONS .............................................................7

    A.   The 2008 Application and the 2011 Tax Cut Act..........................................7

    B.   The 2012 Application and the Vetoed Keystone XL Pipeline Approval Act.................................................................................................9

    C.   The Executive's 2015 Denial of the 2012 Keystone XL Application .........10

    D.   The 2017 and 2019 Presidential Permits ....................................................11

    E.   The President's Revocation of the 2019 Permit ..........................................12

    F.   TC Energy's Termination of the Keystone XL Project ...............................13

STANDARD OF REVIEW ......................................................................................13

ARGUMENT ..........................................................................................................14

I.   THIS COURT LACKS JURISDICITON TO GRANT THE RELIEF SOUGHT BY PLAINTIFFS ...............................................................................14

    A.   This Case is Moot ......................................................................................14

    B.   This Court Lacks Jurisdiction to Enter the Relief Sought Against the President of the United States ...............................................................16

        1.   Judicial review of the President's action is not available under the APA. ................................................................................16

        2.   The Court cannot otherwise enter declaratory or injunctive relief against the President............................................................17

    C.   The Court Lacks Jurisdiction to Enter Relief Against the Agency Defendants .................................................................................................19

1.     Plaintiffs fail to tie any alleged injury to the Agency
       Defendants. ...................................................................................19

2.     Plaintiffs fail to allege the requisite agency action for APA
       review against the Agency Defendants. ...........................................23

3.     Plaintiffs cannot proceed by asserting claims under the
       Declaratory Judgment Act. ..............................................................25

D.    Plaintiffs Otherwise Lack Standing with Respect to all
      Defendants ......................................................................................26

1.     Plaintiffs fail to allege an injury in fact. ..........................................27

       a.     Plaintiffs fail to allege injuries to their sovereign
              interest. ..................................................................................27

              i.     Loss of Tax Revenues ..................................................27

              ii.    Sovereign Interest in Preserving Their
                     Territories ...................................................................31

       b.     Plaintiffs cannot assert *parens patriae* standing...................32

2.     Plaintiffs fail to establish redressability...........................................36

II.    VENUE IS IMPROPER IN THIS DISTRICT BECAUSE TEXAS
       LACKS STANDING ...................................................................................37

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF ...................................38

A.    Plaintiffs Fail to State A Separation-of-Powers Claim..............................38

1.     The President has constitutional authority to regulate
       border-crossing facilities. ................................................................38

2.     Historical practice confirms the President's authority over
       border-crossing facilities. ................................................................40

3.     Congress has acquiesced in the President's authority over
       cross-border facilities.......................................................................44

       a.     Congress has expressly recognized the President's
              permitting authority over the Keystone XL cross-
              border facilities.......................................................................44

b.     Legislation regulating other types of cross-border facilities similarly confirms Congress's acceptance of the President's permitting authority over oil pipelines. ...............................................................45

c.     Legislation regulating commodities transported through cross-border facilities further reflects congressional acquiescence here. ...........................................47

4.    There is no conflict between the political branches' respective authorities. ........................................................................48

a.     Justice Jackson's tripartite framework for evaluating executive authority. ................................................49

b.     The President's revocation of the Keystone XL Permit falls in the continuum of either the first or second *Youngstown* categories. .........................................50

5.    Congress's acquiescence is further reflected in legislative activities that did not result in legislation. ........................................52

6.    The Executive's exercise of discretion in revoking the permit is unreviewable. ...............................................................55

B.    Plaintiffs Fail to State a Non-delegation Claim ...........................................58

CONCLUSION ....................................................................................59

## TABLE OF AUTHORITIES

**Cases**

*6th St. Bus. Partners LLC v. Abbott*,
  No. 1:20-cv-706, 2020 WL 4274589 (W.D. Tex. July 24, 2020) ..................................21

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ..........................................................................................................59

*Alabam ex rel. Graddick v. Tennessee Valley Auth.*,
  636 F.2d 1061 (5th Cir. 1981) ..........................................................................................32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ...................................................................................3, 32, 34, 35

*Allen v. Wright*,
  468 U.S. 737 (1984) ..........................................................................................................36

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ............................................................................................................15

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ........................................................................................39, 41, 53

*Arias v. DynCorp*,
  752 F.3d 1011 (D.C. Cir. 2014) ........................................................................................28

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) ............................................................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................................14

*Banner Health v. Sebelius*,
  797 F. Supp. 2d 97 (D.D.C. 2011) ....................................................................................25

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014) ................................................................................25

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................14

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................23

*Big Time Vapes, Inc. v. FDA*,
  963 F.3d 436 (5th Cir. 2020) .............................................................................4, 59

*Bob Jones University v. United States*,
  461 U.S. 574 (1983) ................................................................................................54

*Carney v. Adams*,
  141 S. Ct. 493 (2020) ..............................................................................................34

*Center for Biological Diversity v. U.S. Dep't of the Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ................................................................................32

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................................19

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ...........................................................................................39, 55

*City News & Novelty, Inc. v. Waukesha*,
  531 U.S. 278 (2001) ................................................................................................15

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................................26

*Coastal Habitat All. v. Patterson*,
  601 F. Supp. 2d 868 (W.D. Tex. 2008) ....................................................................19

*Comm. on the Judiciary of the U.S. House of Representatives v. Miers*,
  542 F.3d 909 (D.C. Cir. 2008) ................................................................................18

*Common Cause v. Biden*,
    748 F.3d 1280 (D.C. Cir. 2014) ...................................................................19

*Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*,
    704 F.3d 413 (5th Cir. 2013) ......................................................................15

*Ctr. for Democracy & Tech. v. Trump*,
    No. 1:20-cv-01456, 2020 WL 7318008 (D.D.C. Dec. 11, 2020)...................17

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ....................................................................................56

*Dalton v. Specter*,
    511 U.S. 462 (1994) ..............................................................................23, 55

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ........................................................................... *passim*

*Dep't of Transp. v. Ass'n of Am. R.R.s*,
    575 U.S. 43 (2015) ......................................................................................59

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
    133 F. Supp. 3d 70 (D.D.C. 2015) ..........................................................38, 46

*El Paso Cnty v. Trump*,
    982 F.3d 332 (5th Cir. 2020) ............................................................... *passim*

*Ergo Sci., Inc. v. Martin*,
    73 F.3d 595 (5th Cir. 1996)..........................................................................17

*Florida v. Mellon*,
    273 U.S. 12 (1927) ......................................................................................28

*Florida v. Weinberger*,
    492 F.2d 488 (5th Cir. 1974).........................................................................32

*Franchise Tax Bd. Of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
   463 U.S. 1 (1983) ................................................................................................26

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ...................................................................... *passim*

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980) ...........................................................................................24

*Greene Cnty. Planning Bd. v. Fed. Power Comm'n*,
   528 F.2d 38 (2d Cir. 1975) ................................................................................38

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ...............................................................................58, 59

*Haig v. Agee*,
   453 U.S. 280 (1981) ...........................................................................48, 55, 57

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ...........................................................................................55

*Harris Cnty. v. MERSCORP Inc.*,
   791 F.3d 545 (5th Cir. 2015) ............................................................................26

*Harris v. Wal-Mart Stores Tex., LLC*,
   No. 3:19-CV-00248, 2020 WL 4726757 (S.D. Tex. May 6, 2020) ...............30

*Hodges v. Abraham*,
   300 F.3d 432 (4th Cir. 2002) ............................................................................32

*Hooks v. Landmark Indus., Inc.*,
   797 F.3d 309 (5th Cir. 2015) ............................................................................14

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) ............................................................................36

*Howington v. United States*,
   No. 3:17-CV-149, 2018 WL 6651783 (S.D. Tex. Mar. 5, 2018) ...................30

*In re S. Recycling, L.L.C.*,
  982 F.3d 374 (5th Cir. 2020) ........................................................14

*Indiana v. EPA*,
  796 F.3d 803 (7th Cir. 2015) .......................................................32

*Indigenous Envtl. Network v. Biden*,
  4:19-cv-00028-BMM (D. Mont. 2019) .......................................11, 13, 15, 36

*Indigenous Envtl. Network v. U.S. Dep't of State*,
  347 F. Supp. 3d 561 (D. Mont.), *order amended and supplemented*, 369 F.
  Supp. 3d 1045 (D. Mont. 2018), and *appeal dismissed and remanded*, No. 18-
  36068, 2019 WL 2542756 (9th Cir. June 6, 2019) .......................................11

*INS v. Chadha*,
  462 U.S. 919 (1983) ........................................................53, 54

*Inst. of Certified Practitioners, Inc. v. Bentsen*,
  874 F. Supp. 1370 (N.D. Ga. 1994) ...............................................37

*Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) .....................................................28, 32

*JSLG, Inc. v. City of Waco*,
  504 F. App'x 312 (5th Cir. 2012) ................................................16

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472 (1990) .............................................................15

*Lichterman v. Pickwick Pines Marina, Inc.*,
  No. 1:07-cv-256, 2010 WL 717840 (N.D. Miss. Feb. 22, 2010) ...................16

*Louisiana v. U.S. Army Corps of Eng'rs*,
  834 F.3d 574 (5th Cir. 2016) .....................................................24

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..........................................................19, 26

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................23

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...........................................................31, 33

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ...........................................................32, 33

*Medellin v. Texas*,
  552 U.S. 491 (2008) ...........................................................49, 52

*Miller v. Albright*,
  523 U.S. 420 (1998) ................................................................37

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ...........................................2, 17, 18

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017) ....................................................34

*Missouri v. Illinois*,
  180 U.S. 208 (1901) ................................................................32

*Mistretta v. United States*,
  488 U.S. 361 (1989) .........................................................4, 41, 58

*Nevada v. Burford*,
  918 F.2d 854 (9th Cir. 1990) ....................................................32

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ..............................................18, 22

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ................................................................40

*Norris v. Hearst Tr.*,
   500 F.3d 454 (5th Cir. 2007) ...................................................................14

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),
   542 U.S. 55 (2004) .............................................................................23, 25

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) ...................................................................21

*Panama Ref. Co. v. Ryan*,
   293 U.S. 388 (1935) .................................................................................59

*Pennie v. Obama*,
   255 F. Supp. 3d 648 (N.D. Tex. 2017) .....................................................19

*Pennsylvania v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 176) ...................................................................28

*Pub. Utils. Comm'n of Cal. v. FERC*,
   100 F.3d 1451 (9th Cir. 1996) .................................................................16

*Quicken Loans Inc. v. United States*,
   152 F. Supp. 3d 938 (E.D. Mich. 2015) ...................................................25

*Qureshi v. Holder*,
   663 F.3d 778 (5th Cir. 2011) .........................................................2, 23, 25

*Raines v. Byrd*,
   521 U.S. 811 (1997) .................................................................................26

*Renne v. Geary*,
   501 U.S. 312 (1991) .................................................................................14

*Role Models Am., Inc. v. White*,
   317 F.3d 327 (D.C. Cir. 2003) .................................................................24

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) .................................................................18

*Schooner Exch. v. McFaddon*,
  11 U.S. (7 Cranch) 116 (1812) ....................................................................39

*Sierra Club v. Clinton*,
  689 F. Supp. 2d 1147 (D. Minn. 2010) ........................................................38

*Sierra Club v. EPA*,
  322 F.3d 718 (D.C. Cir. 2003) ....................................................................33

*Simon v. E. Ky. Welfare Rts.Org.*,
  426 U.S. 26 (1976) ......................................................................................36

*Skelly Oil Co. v. Phillips Petroleum Co.*,
  339 U.S. 667 (1950) ....................................................................................26

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ....................................................................................33

*Spacil v. Crowe*,
  489 F.2d 614 (5th Cir. 1974) ......................................................................57

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) ......................................................................57

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................26

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ..............................................................16, 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ....................................................................................14

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................................32

*Touby v. United States*,
  500 U.S. 160 (1991) ...................................................................................58

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ...............................................................................24

*United States v. Becton,*
  632 F.2d 1294 (5th Cir. 1980) ....................................................................33

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ...................................................................................39

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ...................................................................................56

*United States v. La Compagnie Francaise Des Cables Telegraphiques*,
  77 F. 495 (S.D.N.Y. 1896) ...................................................................42, 46

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) ...................................................................................40

*United States v. Pink,*
  315 U.S. 203 (1942) ...................................................................................57

*United States v. Western Union Tel.*,
  272 F. 311 (S.D.N.Y.), *aff'd, by* 272 F. 893, 894 (2d Cir. 1921), *rev'd and dismissed by stipulation of the parties*, 260 U.S. 754 (1922) ........................................46

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) .................................................................................26

*Vill. of Elk Grove Vill. v. Evans*,
  997 F.2d 328 (7th Cir. 1993) ......................................................................16

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ......................................................................33

*Whitfield v. City of New Orleans*,
    431 F. Supp. 3d 818 (E.D. La. 2019) ............................................................14

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................................58

*Wyoming ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ............................................................................32

*Wyoming v. Dep't of Interior*,
    674 F.3d 1220 (10th Cir. 2012) ..........................................................................28

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ............................................................................................28

*Yosowitz v. Covidien LP*,
    182 F. Supp. 3d 683 (S.D. Tex. 2016) ...............................................................14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................... *passim*

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ..........................................................................39, 40, 49, 52

**Attorney General Opinions**

Cuba-Cables,
    22 Op. Att'y Gen. 408, 1899 WL 536 (1899) ......................................................5

Cuba-Cables,
    22 Op. Att'y Gen. 514, 1899 WL 562 (1899) ......................................................5

Diversion of Water from the Niagara River,
    30 Op. Att'y Gen. 217, 1913 WL 685 (1913) ................................................5, 47

Foreign Cables,
    22 Op. Att'y Gen. 13, 1898 WL 427 (1898) ...........................................5, 42, 57

Granting of License for the Construction of a Gas Pipeline,
  38 Op. Att'y Gen. 163, 1935 WL 1371 (1935) ........................................................5, 47

Wireless Telegraphy-International Agreement,
  24 Op. Att'y Gen. 100, 1902 WL 789 (1902) .................................................................5

**Constitutional Provisions**

U.S. Const. art. I, § 1 ..........................................................................................................54

U.S. Const. art. I, § 7 ....................................................................................................53, 54

**Statutes**

5 U.S.C. § 551 ..............................................................................................................16, 23

5 U.S.C. § 701 ....................................................................................................................23

5 U.S.C. § 704 ....................................................................................................................23

5 U.S.C. § 706 ....................................................................................................................16

15 U.S.C. § 717b .................................................................................................................47

16 U.S.C. § 824a .................................................................................................................47

28 U.S.C. § 1391 ...........................................................................................................37, 38

28 U.S.C. § 1406 .................................................................................................................38

28 U.S.C. § 2201 .................................................................................................................25

28 U.S.C. § 2202 .................................................................................................................25

33 U.S.C. § 403 ............................................................................................................20, 21

33 U.S.C. § 535b .................................................................................................................46

33 U.S.C. § 1344 .................................................................................................................20

34 U.S.C. § 20913 ...............................................................................................................59

Act of May 27, 1921, ch. 12, 42 Stat. 8 (1921) ...............................................................46

Federal Power Act, ch. 285, 41 Stat. 1063 (1920) ............................................47

Natural Gas Act, ch. 556, 52 Stat. 821 (1938) ................................................47

Temporary Payroll Tax Cut Continuation Act of 2011,
    Pub. L. No. 112-78, 125 Stat. 1289 ..................................... *passim*

The International Bridge Act of 1972, Pub. L. No. 92-434, 86 Stat. 731 (1972),
    33 U.S.C. §§ 535-535j..................................................................46

**Legislative Materials**

Dep't of State Report to Congress ("Tax Cut Act Report") .........................................8, 51

H.R. 2, 113th Cong., 2d Sess. (2014) ..............................................10

H.R. 3, 113th Cong., 1st Sess. (2013) ..............................................10

H.R. 28, 114th Cong. (2015)................................................................10

H.R. 1487, 114th Cong (2015)............................................................10

H.R. 3548, 112th Cong., 2d Sess. (2012). ........................................10

H.R. 5682, 113th Cong., 2d Sess. (2014) ........................................10

H. Rep. 67-71 (1921) ...........................................................................46, 47

Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015) ..................9, 51

Report of the Veto of S. 1, the Keystone XL Pipeline Approval Act,
    161 Cong. Rec. S. 1073 (daily ed. Feb. 24, 2015) ....................................9, 10

S. 791, 114th Cong. (2015) ..............................................................10

S. 1228, 114th Cong. (2015) ............................................................10

Unauthorized Landing of Submarine Cables in the United States,
    H. Rep. 67-71 (1921)..................................................................46

**Rules**

Fed. R. Civ. P. 12(b)(1)...................................................................................13

Fed. R. Civ. P. 12(b)(3)...................................................................................38

Fed. R. Civ. P. 12(b)(6)...................................................................................13

**Executive Authorities**

82 Fed. Reg. 8663 (Jan. 24, 2017) ............................................................11, 51

82 Fed. Reg. 16,467 (Apr. 4, 2017) ..................................................................11

84 Fed. Reg. 13,101 (Apr. 3, 2019) ...............................................................5, 43

EO 8202, 4 Fed. Reg. 3243 (July 15, 1939) ..............................................6, 43, 47

EO 10485, 18 Fed. Reg. 5397 (Sept. 3, 1953) ..........................................5, 43, 47

EO 10530, 19 Fed. Reg. 2709 ( May 12, 1954)..........................................5, 43

EO 11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) ...................................... *passim*

EO 12038, 43 Fed. Reg. 4957 (Feb. 3, 1978) ......................................6, 43, 47, 57

EO13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004)........................................ *passim*

EO 13867, 84 Fed. Reg. 15,491 (Apr. 10, 2019)......................................6, 43, 44

EO 13990, 86 Fed. Reg. 7037 (Jan. 25, 2021)......................................... *passim*

U.S.-Canada oil pipeline permit issued by President John F. Kennedy,
   Oct. 18, 1962 ...............................................................................................43

U.S.-Canada oil pipeline permit issued by President Lyndon B. Johnson,
   Jan. 22, 1968................................................................................................43

**Other Authorities**

2 John Bassett Moore, Digest of International Law (1906)...........................5, 43

9 Marjorie M. Whiteman, Digest of International Law (1968) ....................................5, 43

Final Supplemental Environmental Impact Statement for the Keystone XL Project,
    Executive Summary, Jan. 2014 ("2014 EIS"), https://2012-
    keystonepipelinexl.state.gov/documents/organization/221135.pdf ...............................9

IV G.H. Hackworth, Digest of International Law (1942)..............................................5, 43

Keystone XL, Pipeline route, https://www.keystonexl.com/maps/ ..............................9, 30

May 3, 2021, Letter from TC Energy to Army Corps of Engineers...........................21, 24

May 4, 2021, Letter from Army Corps of Engineers to TC Energy...........................21, 24

President Ulysses Grant's Seventh Annual Message to Congress,
    *reprinted in* Papers Relating to the Foreign Relations of the United
    States, Vol. 1, 44th Cong. 1st Sess., H.R. Ex. Doc. 1,
    Pt. 1 (Dec. 6, 1875) ......................................................................4, 5, 41, 42

Press Release, the White House, *President Biden Invites 40 World Leaders to
    Leaders Summit on Climate* (March 26, 2021),
    https://www.whitehouse.gov/briefingroom/statementsreleases/2021/03/26/presid
    ent-biden-invites-40-world-leaders-to-leaders-summit-on-climate/..............................13

Record of Decision and National Interest Determination for Keystone XL Pipeline
    (Nov. 3, 2015) ("2015 ROD"), https://2012-keystonepipeline-
    xl.state.gov/documents/organization/249450.pdf. ...........................................7, 8, 10, 57

Record of Decision and National Interest Determination for Keystone XL Pipeline
    (Mar. 23, 2017) ("2017 ROD"),
    https://www.state.gov/wpcontent/uploads/2019/02/
    Record-of-Decision-and-National-Interest-Determination.pdf.............................8, 9, 31

Robert H. Jackson, *Problems of Statutory Interpretation*,
    8 F.R.D. 121 (1949) ...........................................................................................54

Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015),
    https://obamawhitehouse.archives.gov/the-press-office/2015/11/06/statement-
    president-Keystone-XL-pipeline ...................................................................................11

TC Energy, News Release, https://www.tcenergy.com/announcements/
    2014/2014-01-22gulf-coast-project-begins-delivering-crude-oil-to-
    nederland-texas/...................................................................................................9, 13, 15

## INTRODUCTORY STATEMENT AND SUMMARY

This case concerns whether the President has the power to revoke a Presidential permit authorizing the construction, maintenance, and operation of oil pipeline cross-border facilities at the Nation's border.  In 2019, President Trump issued such a Presidential permit to TransCanada (now TC Energy) for the 1.2-mile cross-border segment of the proposed Keystone XL Pipeline in the United States.  That permit provided that it "may be terminated, revoked, or amended at any time at the sole discretion of the President." Presidential Permit of March 29, 2019 ("2019 Permit"), Art. 1, 84 Fed. Reg. 13,101 (Apr. 3, 2019).  Pursuant to that provision, and exercising the same power President Trump did when issuing the permit, President Biden revoked the Presidential permit on January 20, 2021.  Executive Order No. ["EO"] 13990, § 6 (c), 86 Fed. Reg. 7037, 7041 (Jan. 25, 2021). The President's action follows more than 150 years of Executive practice of regulating cross-border facilities based on the Executive's Commander-in-Chief and foreign affairs powers under Article II of the Constitution.

Nonetheless, twenty-three States bring this suit to challenge the President's authority to revoke the permit, contending that the permitting decision concerns only international and interstate commerce, and is thus committed exclusively to Congress under the Commerce Clause of the Constitution.  Plaintiffs, however, do not question President Trump's authority to issue a permit for the Keystone XL Pipeline in the first place, nor can they dispute the long history of congressional acquiescence in the President's authority to regulate cross-border facilities.  Plaintiffs allege that they and their residents are harmed by TC Energy's inability to build and operate the Keystone XL Pipeline and seek declaratory and injunctive relief against the President as well as ten agency heads ("Agency Defendants") in an attempt to redress those asserted harms.

The case is now moot.  On June 9, 2021, upon a comprehensive review of its options, TC Energy took the significant step of terminating the project.  The company announced that it will not pursue any permits for, or perform any construction activities in furtherance of, the project now or in the future, but will instead work to ensure a safe termination of the project.  Given TC Energy's decision, Plaintiffs no longer have any legally cognizable interest in the outcome of this litigation, nor is this Court capable of granting any effective relief to Plaintiffs.  The Court should therefore dismiss the case as moot.

This Court is otherwise without subject matter jurisdiction to hear this case.  It lacks jurisdiction to enter the relief sought against the President because not only is the Administrative Procedure Act ("APA") inapplicable to the President, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), but the Supreme Court also has long held that a federal court has "no jurisdiction of a bill to enjoin the President in the performance of his official duties," *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 500-01 (1866).  For similar reasons, a federal court likewise may not issue a declaratory judgment against the President.  As for the ten Agency Defendants, Plaintiffs fail to tie any alleged injury to them, but merely speculate that those defendants would implement the permit revocation. Plaintiffs also fail to identify any final agency action taken by those defendants or their agencies—a necessary predicate to a finding of subject matter jurisdiction.  *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

In any event, even if TC Energy had not terminated the pipeline, Plaintiffs would have no standing to sue.  They assert that revoking the permit would prevent TC Energy from constructing and operating the Keystone XL Pipeline, thereby causing them to lose tax revenue and infringing on their ability to act as stewards over their territories.  But a "loss of general tax revenues as an indirect result of federal policy," like the one alleged here, "is not a cognizable injury in fact," *El Paso Cnty. v. Trump*, 982 F.3d 332, 339 (5th

2

Cir. 2020).  Nor would the *absence* of the pipeline interfere with Plaintiffs' authority to act as stewards over their own territories.  Plaintiffs' alternative attempt to establish *parens patriae* standing to protect the economic well-being of their residents likewise fails.  The Supreme Court has made clear that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez ("Snapp")*, 458 U.S. 592, 610 n.16 (1982).  And now that TC Energy has definitively terminated the Keystone XL Pipeline project, Plaintiffs' asserted injuries clearly can no longer be redressed by an order of this Court.

Additionally, the Amended Complaint fails to state a claim upon which relief can be granted.  It is well established that the President's Article II powers encompass the authority to control border crossings into the United States.  The Supreme Court has recognized that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned … may be treated as a gloss on 'Executive Power' vested in the President" by Article II, § 1 of the Constitution.  *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)).  Presidents have long exercised authority over a wide range of physical connections between the United States and foreign countries, and Congress in turn has affirmed or accepted this authority by requiring Presidential approval for certain types of border crossings and by leaving undisturbed the Presidential permitting requirement for others.  Congress has enacted no law to displace that authority.  On the contrary, the only law regarding any oil pipeline border crossing expressly affirmed President Obama's constitutional authority to grant or deny the then-pending permit application for the Keystone XL Pipeline.  In light of this history of allocation of authority between the political branches, the President clearly had the authority to revoke the permit.

Equally without merit is Plaintiffs' argument that Section 501 of the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280 ("Tax Cut Act"), had already granted the Keystone XL permit by operation of law, precluding the President's action here.  The Act sought to expedite President Obama's decision on an earlier application, and had no operative effect after he denied the permit.  Since then, the actions of TC Energy, Congress, and Presidents Trump and Biden also belie Plaintiffs' assertion that the Tax Cut Act has long granted the permit.

Plaintiffs' non-delegation challenge fares no better.  The non-delegation doctrine provides that "Congress generally cannot delegate its legislative power to another Branch" without providing an intelligible principle for the exercise of discretion.  *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  "A nondelegation inquiry always begins (and often almost ends) with statutory interpretation[.]"  *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020).  The doctrine simply does not apply here because the President did not revoke the 2019 permit based on any statutory authority delegated to him by Congress; rather, he acted pursuant to his inherent constitutional authority.

For these reasons, and the reasons set forth below, the Amended Complaint should be dismissed.

## BACKGROUND

## I. THE EXECUTIVE'S EXERCISE OF AUTHORITY OVER BORDER-CROSSING FACILITIES AND THE PERMITTING PROCESS

Presidential authority to control a physical connection between the United States and a foreign country was exercised at least as far back as 1869 by President Grant, when a private company sought to lay a telegraph cable from France.  *See* President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in* Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th Cong. 1st Sess., H.R. Ex. Doc. 1, Pt. 1 (Dec. 6,

1875) (Ex. 1), at XIII-XIV.  Although the first submarine telegraph cable from a foreign country had landed upon the shores of the United States two years earlier pursuant to an exclusive license granted by Congress, *see* Foreign Cables, 22 Op. Att'y Gen. 13, 15, 1898 WL 427 (1898), no statutory framework existed for the approval or regulation of other such cables.  Recognizing that the federal government must act to control the establishment of any physical connection between the United States and a foreign country, and in the absence of congressional action, President Grant imposed conditions on the laying of the cable from France to ensure that its landing and operation would be in the interest of the United States.  *See* President Grant's Seventh Annual Message to Congress at XV-XVI.

Thereafter, with one partial exception explained below, Presidents have regularly asserted and exercised authority to control physical connections between the United States and a foreign country, including cross-border facilities for oil pipelines.  *See* Foreign Cables, 22 Op. Att'y Gen. 13, 18-25; Cuba-Cables, 22 Op. Att'y Gen. 408, 1899 WL 536 (1899); Cuba-Cables, 22 Op. Att'y Gen. 514, 1899 WL 562 (1899); Wireless Telegraphy-International Agreement, 24 Op. Att'y Gen. 100, 1902 WL 789 (1902); Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217, 1913 WL 685 (1913); Granting of License for the Construction of a Gas Pipeline, 38 Op. Att'y Gen. 163, 1935 WL 1371 (1935).  *See also* 9 Marjorie M. Whiteman, Digest of International Law 917-32 (1968) (Ex. 2) (documenting various permits including eight oil pipeline permits between 1941 and 1966); IV G.H. Hackworth, Digest of International Law 247-56 (1942) (Ex. 3); 2 John Bassett Moore, Digest of International Law 452-66 (1906) (Ex. 4).

Presidents have also issued Executive Orders regulating the permitting process for specific types of cross-border facilities and sometimes delegating their permitting authority to various agency heads.  *See, e.g.*, EO 10530, 19 Fed. Reg. 2709 (May 12, 1954) (submarine cables); EO 10485, 18 Fed. Reg. 5397 (Sept. 3, 1953) (natural gas pipelines

5

and electricity transmission lines), as amended by EO 12038, 43 Fed. Reg. 4957 (Feb. 3, 1978); *see also* EO 8202, 4 Fed. Reg. 3243 (July 15, 1939) (same).  For example, in 1968, President Johnson issued Executive Order No. 11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968), to establish "a systematic method" for issuing cross-border permits, recognizing that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country."  The Order delegated authority to the Secretary of State, with certain consultation requirements, to grant or deny permits in the "national interest" for a wide range of border-crossing facilities, including oil and other pipelines. *See id.* § 1(a), (d)-(f).  In 2004, President Bush issued Executive Order No. 13337, 69 Fed. Reg. 25,299 (Apr. 30, 2004), to revise some of the procedural requirements of Executive Order No. 11423 and to expand the categories of facilities subject to the permitting process. *See id.* § 2(a).  As will be discussed below, TC Energy's first application for the Keystone XL Pipeline was submitted pursuant to the process described in Executive Order No. 13337.

In 2019, President Trump revoked Executive Order Nos. 11423 and 13337, opting for a permitting process whereby "[a]ny decision to issue, deny, or amend a permit" for covered cross-border infrastructure is to "be made solely by the President."  EO 13867 § 2(i), 84 Fed Reg. 15,491, 15,491-92 (Apr. 10, 2019).  The Executive Order explained that "Presidents have long exercised authority to permit or deny the construction, connection, operation, or maintenance of infrastructure projects at an international border of the United States," but in President Trump's view, the permitting process had become "unnecessarily complicated." *Id.* § 1.  Thus, the Secretary of State would no longer make permitting decisions, but would instead advise the President whether the issuance of a permit would "serve the foreign policy interests of the United States." *Id.* § 2(g), (h).

## II. TC ENERGY'S PERMIT APPLICATIONS

### A. The 2008 Application and the 2011 Tax Cut Act

In 2008, TC Energy filed its first permit application to build the cross-border facilities—a 1.2-mile pipeline segment from the U.S.-Canada border to the first pipeline isolation valve in Phillips County, Montana, Am. Compl. ¶¶ 30, 33, ECF No. 71—for the Keystone XL Pipeline. The pipeline would transport medium or heavy crude oil produced in the Western Canadian Sedimentary Basin from Alberta, Canada into the United States. *Id.* ¶¶ 62, 66; Record of Decision and National Interest Determination for Keystone XL Pipeline (Nov. 3, 2015) ("2015 ROD") at 6-7.[1] The then-proposed Keystone XL Pipeline would extend from Alberta to Steele City, Nebraska, and then from Cushing, Oklahoma, to the Gulf Coast regions (Nederland, Texas). 2015 ROD at 8. The Keystone XL Pipeline would connect with the Keystone I Pipeline, which also originates in Alberta, Canada, but enters the United States in North Dakota and reaches the junction in Steele City. Am. Compl. ¶ 29. From Steele City, one of the Keystone I Pipeline spurs travels through Missouri to Illinois, while the other spur runs from Steele City to Cushing. *Id.* The portion from Steele City to Cushing, called the Cushing Extension Project, is not part of the Keystone XL project. 2015 ROD at 7.

In reviewing the permit application, the State Department considered the potential impacts of the project on environmental and cultural resources in a manner consistent with statutes such as the National Environmental Policy Act of 1969, the National Historic Preservation Act of 1966, and the Endangered Species Act of 1973. *See, e.g.*, 2015 ROD at 2, 3. As originally proposed, the pipeline route would have "traverse[d] a substantial portion of the Sand Hills Region of Nebraska," Record of Decision and National Interest

---

[1] *Available at* https://2012-keystonepipeline-xl.state.gov/documents/organization/249450.pdf.

Determination for Keystone XL Pipeline (Mar. 23, 2017) ("2017 ROD")[2] at 9, which is a terrain with a high concentration of wetlands of special value. *See* Dep't of State Report to Congress ("Tax Cut Act Report") (Ex. 5) at 2 n.2. Because of widespread opposition to the proposed route through that region, TC Energy agreed to move the route, and Nebraska enacted a law directing its environmental agency to review potential alternative routes. *Id.* at 3. The State Department in turn determined that information about proposed alternative routes was needed for the Secretary of State, or his delegate, to fully evaluate the 2008 application. 2017 ROD at 9.

In December 2011, Congress passed the Tax Cut Act, requiring the President to "grant a permit under Executive Order No. 13337" within 60 days of the Act "for the Keystone XL pipeline project application filed on September 19, 2008 (including amendments)," Tax Cut Act, § 501(a), unless the "President determine[d] that the Keystone XL pipeline would not serve the national interest," *id.* § 501(b)(1). The President denied the specified application the following month without prejudice to TC Energy's re-filing it. Tax Cut Act Report at 1. The President explained that granting the permit at that time would not serve the national interest because the 60-day time period was inadequate to conduct the necessary analysis due to TC Energy's need to change the route. *Id.* at 1, 5.

Thereafter, TC Energy decided to proceed with construction of the portion extending from Cushing, Oklahoma to Nederland, Texas, because this purely domestic segment, called the Gulf Coast Pipeline, did not require a Presidential permit and TC Energy determined that it had independent economic utility. 2017 ROD at 9; 2015 ROD at 8. As noted above, even without the Gulf Coast Pipeline, which was completed in 2014,

---

[2] *Available at* https://www.state.gov/wp-content/uploads/2019/02/Record-of-Decision-and-National-Interest-Determination.pdf.

the existing Keystone I Pipeline was already transporting oil from Alberta to Illinois and Oklahoma.  Am. Compl. ¶ 29.   TC Energy later also constructed a 48-mile extension from the Gulf Coast Pipeline to the Houston refining market.[3]

## B.  The 2012 Application and the Vetoed Keystone XL Pipeline Approval Act

In May 2012, TC Energy filed a new permit application based on a new route that avoided Nebraska's Sand Hills region.   Am. Compl. ¶ 37; 2017 ROD at 9.   With construction of the Gulf Coast Pipeline already underway, the U.S. portion of the revised Keystone XL project would have approximately 875 miles of pipeline starting from the Canadian border in Montana, passing through South Dakota, and then ending in Steele City, Nebraska,[4] and would deliver up to 830,000 barrels per day of crude oil to Steele City.  2017 ROD at 7-8; *see also* Final Supplemental Environmental Impact Statement for the Keystone XL Project, Executive Summary, Jan. 2014 ("2014 EIS"), at 6-7.[5]   In reviewing TC Energy's new application, the State Department conducted a broad range of consultations with state, local, tribal, and foreign governments and other federal agencies. 2017 ROD at 2; *see also id.* at 6-7.  It also solicited public comments, ultimately receiving more than 4.5 million public comments throughout all stages of its review.  *See id.* at 5.

In January 2015, while that review was ongoing, Congress passed the Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015) (Ex. 6), in an attempt to directly approve the Keystone XL permit.  *See id.* § 2(a); *see also* Am. Compl. ¶ 97 n.15.  That enactment was vetoed by the President, however, and never became law.  Report of the Veto of S. 1,

---

[3] *See* TC Energy, News Release, https://www.tcenergy.com/announcements/2014/2014-01-22gulf-coast-project-begins-delivering-crude-oil-to-nederland-texas/.

[4] *See* Keystone XL, Pipeline route, https://www.keystonexl.com/maps/.

[5] *Available at* https://2012-keystonepipelinexl.state.gov/documents/organization/221135.pdf.

the Keystone XL Pipeline Approval Act, 161 Cong. Rec. S. 1073 (daily ed. Feb. 24, 2015). Subsequent Bills seeking to authorize the Keystone XL permit or to remove the Presidential permitting requirement similarly never became law.[6]

### C. The Executive's 2015 Denial of the 2012 Keystone XL Application

In 2015, the Secretary of State denied the Keystone XL application, after considering factors such as foreign policy, energy security, and environmental, cultural, and economic impacts. 2015 ROD at 2-3, 8-32. The Secretary concluded that the project would have "negligible-to-limited benefit to energy security" and "minimal" impact on prices for refined petroleum products. *Id.* at 29. The Secretary concluded that any short-term advantage of the project did not outweigh the fact that an approval "would undermine the United States' successful foreign policy engagement in efforts to combat climate change on a global scale." *Id.* at 30. Even if the pipeline "by itself is unlikely to significantly impact the level of [greenhouse gas]-intensive extraction of oil sands crude or the continued demand for heavy crude oil at refineries in the United States," the Secretary determined that "it is critical for the United States to prioritize actions that are not perceived as enabling further [greenhouse gas] emissions globally." *Id.* at 29.

President Obama agreed that the Keystone XL Pipeline would not "make a meaningful long-term contribution to our economy," "lower gas prices for American consumers," or "increase America's energy security." *See* Statement by the President on

---

[6] *See* American Energy Renaissance Act of 2015, S. 791 and H.R. 1487, 114th Cong.; Keystone for a Secure Tomorrow Act, H.R. 28, 114th Cong. (2015); North American Energy Infrastructure Act, S. 1228, 114th Cong. (2015); H.R. 5682, 113th Cong., 2d Sess. § 1 (2014); American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2, 113th Cong., 2d Sess. § 103 (2014); Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. §3 (2013); North American Energy Access Act, H.R. 3548, 112th Cong., 2d Sess. (2012).

the Keystone XL Pipeline (Nov. 6, 2015).[7]  He emphasized that the United States "[was]
now a global leader when it comes to taking serious action to fight climate change" and
"approving this project would have undercut that global leadership." *Id.*

### D. The 2017 and 2019 Presidential Permits

In January 2017, President Trump invited TC Energy to re-submit its application.
82 Fed. Reg. 8663 (Jan. 24, 2017).  The Under Secretary of State for Political Affairs issued
a Presidential permit two months later.  82 Fed. Reg. 16,467-69 (Apr. 4, 2017).  The
decision, however, was vacated by the U.S. District Court for the District of Montana.
*Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont.), *order
amended and supplemented*, 369 F. Supp. 3d 1045 (D. Mont. 2018), and *appeal dismissed
and remanded*, No. 18-36068, 2019 WL 2542756 (9th Cir. June 6, 2019).

In March 2019, President Trump issued a new permit that superseded and revoked
the 2017 permit.  The permit provided that it "may be terminated, revoked, or amended at
any time at the sole discretion of President of the United States (the 'President'), with or
without advice provided by any executive department or agency (agency)."  2019 Permit,
Art. 1(1).  The permit further specified that "[u]pon the termination, revocation, or
surrender of this permit, unless otherwise decided by the President, the permittee, at its
own expense, shall remove the Border facilities within such time as the President may
specify." *Id.*, Art. 3.  Challenges to that permit remain in litigation.  *See Indigenous Envtl.
Network v. Biden*, 4:19-cv-00028-BMM (D. Mont.).

---

[7] *Available at* https://obamawhitehouse.archives.gov/the-press-office/2015/11/06/statement-president-Keystone-XL-pipeline.

**E. The President's Revocation of the 2019 Permit**

On January 20, 2021, President Biden revoked the 2019 permit "in accordance with Article 1(1) of the Permit." EO 13990, § 6(a). The President found that the Keystone XL Pipeline "disserves the U.S. national interest" because the "United States and the world face a climate crisis," and leaving the permit in place "would not be consistent with [the] Administration's economic and climate imperatives." *Id.* § 6(d). The Executive Order cites the "exhaustive review" conducted by the State Department in 2015, and notes President Obama's determination that "approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action." *Id.* § 6(b).

The Executive Order also explains that over the last four years, climate-related costs have increased and "[e]xtreme weather events and other climate-related effects have harmed the health, safety, and security of the American people," "increas[ing] the urgency for combatting climate change and accelerating the transition toward a clean energy economy." *Id.* § 6(c). In the President's view, "[t]he world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution." *Id.* The climate crisis "must be met with action on a scale and at a speed commensurate with the need to avoid setting the world on a dangerous, potentially catastrophic, climate trajectory"; "[o]ur domestic efforts must go hand in hand with U.S. diplomatic engagement." *Id.* § 6(d). "Because most greenhouse gas emissions originate beyond our borders," the President explained, "such [diplomatic] engagement is more necessary and urgent than ever" and "[t]he United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action[.]" *Id.*

Since revoking the permit, the President has convened a summit with 40 global leaders to "galvanize efforts by the major economies to tackle the climate crisis" and to "underscore the urgency – and the economic benefits – of stronger climate action."  *See* Press Release, the White House, *President Biden Invites 40 World Leaders to Leaders Summit on Climate* (Mar. 26, 2021).[8]

### F. TC Energy's Termination of the Keystone XL Project

On June 9, 2021, TC Energy announced that "after a comprehensive review of its options, and in consultation with its partner, the Government of Alberta, it has terminated the Keystone XL Pipeline Project."  TC Energy News Release (June 9, 2021).[9]  In a filing made in *Indigenous Envtl. Network v. Biden*, 4:19-cv-00028-BMM (D. Mont.), the company represented that because "it has *definitively* terminated" the project, it "will not pursue any permits for the Project, nor will it perform any construction activities in furtherance of the Project now or at any time in the future."  Status Report at 3, ECF No. 167 (emphasis added).  Rather, the company will work to ensure a safe termination of and exit from the project.  Given this decision, it further explained that "[n]o President will unilaterally issue another permit for the Keystone XL Project, which no longer exists."  *Id.*

### STANDARD OF REVIEW

Defendants move to dismiss the Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim.  Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Rule 12(b)(1) dismissal is required if the court "lacks the statutory or constitutional power

---

[8] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/26/president-biden-invites-40-world-leaders-to-leaders-summit-on-climate/.

[9] *Available at* https://www.tcenergy.com/announcements/2021-06-09-tc-energy-confirms-termination-of-keystone-xl-pipeline-project/.

to adjudicate the case." *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015).  The plaintiff bears the burden of "demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 316 (1991).  In assessing its jurisdiction, a court may rely upon: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020).

In evaluating Defendants' motion to dismiss under Rule 12(b)(6), this Court must accept all factual allegations in the complaint as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), but not the legal conclusions, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).   Moreover, this Court "must consider … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court may "take judicial notice of matters of public record," *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007), such as government records and websites, *Whitfield v. City of New Orleans*, 431 F. Supp. 3d 818, 823 (E.D. La. 2019); *see also Yosowitz v. Covidien LP*, 182 F. Supp. 3d 683, 688 (S.D. Tex. 2016) ("Courts in this jurisdiction have recognized that judicial notice of publicly-available documents … which were matters of public record directly relevant to the issue at hand is appropriate.").

## ARGUMENT

## I.   THIS COURT LACKS JURISDICTION TO GRANT THE RELIEF SOUGHT BY PLAINTIFFS

### A.  This Case Is Moot

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies," and do not have "the power 'to decide questions that

14

cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted).  "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013).

Here, intervening circumstances preclude the Court from providing any meaningful relief to Plaintiffs.  After Plaintiffs filed this lawsuit, TC Energy unequivocally announced that it "has terminated the Keystone XL Pipeline Project" following a "comprehensive review of its options."  TC Energy News Release (June 9, 2021).  According to the company, it "will not pursue any permits for the Project, *nor will it perform any construction activities in furtherance of the Project now or at any time in the future*." *Indigenous Envtl. Network v. Biden*, 4:19-cv-00028-BMM (D. Mont.), ECF No. 167, Status Report at 3 (emphasis added); *see also id.* ECF No. 170 (discussing that TC Energy has abandoned the project).

TC Energy has thus made clear that regardless of how this Court rules, the company will not construct or operate the Keystone XL Pipeline.  Because Plaintiffs' suit seeks to facilitate construction of a project that its owner has permanently abandoned, Plaintiffs lack a legally cognizable interest in the outcome of this case, and any relief the Court grants to Plaintiffs would be purely advisory in nature and entirely ineffective.  *See, e.g.*, *City News & Novelty, Inc. v. Waukesha*, 531 U.S. 278, 283 (2001) (First Amendment challenge

to licensing scheme for adult businesses became moot when the company "ceased to operate as an adult business and no longer [sought] to renew its license"); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 331 (7th Cir. 1993) (lawsuit seeking to enjoin Army Corps from granting permit for radio tower construction was moot, where radio tower operator "decided not to go forward with the project"); *Pub. Utils. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996) (challenge to agency grant of certificate authorizing expansion of natural gas pipeline became moot when the company "determined not to proceed" with the project); *Lichterman v. Pickwick Pines Marina, Inc.*, No. 1:07-cv-256, 2010 WL 717840, at *5 (N.D. Miss. Feb. 22, 2010) (challenge to agency action and environmental assessment of project became moot when the project was terminated). *Cf. JSLG, Inc. v. City of Waco*, 504 F. App'x 312, 318 (5th Cir. 2012) ("Here, because JSLG closed its business and became a defunct corporation unable to apply for an SOB license, it no longer has a cognizable interest in declaring the City of Waco's SOB ordinance facially unconstitutional."). The Court should thus dismiss the case as moot.

## B. This Court Lacks Jurisdiction to Enter the Relief Sought Against the President of the United States

### 1. Judicial review of the President's action is not available under the APA.

In Counts I, II and IV, Plaintiffs seek relief under the APA, 5 U.S.C. § 706, as against the President. *See* Am. Compl. ¶¶ 87-99, 101-05, 119. Elsewhere in the Amended Complaint, Plaintiffs also assert that "the Keystone XL permit is a 'rule' under the APA" and "[t]he revocation of that permit is also a 'rule' under the APA," *id.* ¶ 134 (citing 5 U.S.C. § 551(4)). But Presidents Trump and Biden, who respectively issued and revoked the 2019 permit, are not agencies within the meaning of the APA. *Franklin*, 505 U.S. at 800-01; *see also* 5 U.S.C. § 551(4), (5). The President's revocation of the 2019 permit, therefore, is not subject to judicial review under the APA, and Plaintiffs have conceded as

much, *see* Am. Compl. ¶ 109 (the President's "actions are not directly subject to review under the [APA]").  Plaintiffs' APA claims against the President thus should be dismissed.

### 2. The Court cannot otherwise enter declaratory or injunctive relief against the President.

As Plaintiffs' counsel conceded during the June 7, 2021, hearing before Magistrate Judge Edison,[10] this Court also has no power to issue any injunctive relief against the President.  In *Mississippi v. Johnson*, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  71 U.S. at 501; *see also id.* at 500.[11]  A plurality of the Court later reiterated that principle in *Franklin v. Massachusetts*.  *See* 505 U.S. at 802-03; *see also* 505 U.S. at 827-28 (Scalia, J., concurring) (explaining that, under *Johnson*, courts may not impose injunctive relief against the President in his official capacity because the rule is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history").  Since *Johnson*, no court has issued a permanent

---

[10] As the Fifth Circuit has held, "the district court, as a matter of federal procedure, is entitled to rely on statements made by counsel in open court."  *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 599–600 (5th Cir. 1996).

[11] The Supreme Court has not considered the significant separation-of-powers concerns that would arise from an injunction requiring the performance of a purely "ministerial" duty—*i.e.*, a duty in which "nothing is left to discretion."  *See Johnson*, 71 U.S. at 498-99. As the D.C. Circuit recognized, it is "painfully obvious" why courts should be "hesitant to grant such relief" because doing so "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  In any event, the relief sought in this case cannot fairly be described as purely "ministerial" because the revocation reflects the President's discretionary determination that leaving the permit in place would disserve the national interest.  *See* EO 13990, § 6; *see also Ctr. for Democracy & Tech. v. Trump*, No. 1:20-cv-01456, 2020 WL 7318008, at *8 (D.D.C. Dec. 11, 2020), *appeal filed*, No. 21-5062 (D.C. Cir.) (dismissing complaint for failure to establish standing, and explaining that challenged Executive Order "represents an exercise of the President's official duties, rather than a ministerial act").

injunction against the President in his official capacity where he was the sole defendant,[12] and the requested injunctive relief against the President here is similarly improper. *See Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ("A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions.") (citing *Johnson*, 71 U.S. at 499).

The Court should likewise deny Plaintiffs' request for declaratory relief as against the President, as "[i]t is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827-28 (Scalia, J., concurring); *accord Newdow*, 603 F.3d at 1012-13 (explaining that "declaratory relief" against the President for his non-ministerial conduct "is unavailable") (citing *Johnson*, 71 U.S. at 499)).   Moreover, with respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985).   Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996); *see also Sanchez-Espinoza*, 770 F.2d at 208 n.8 (same).   Thus, this Court cannot enter any relief as against the President.

---

[12] This lawsuit is effectively a direct action against the President's decision to revoke the permit at issue, as none of the Agency Defendants are proper parties to this suit. *See infra*, Section I.C.

### C. The Court Lacks Jurisdiction to Enter Relief Against the Agency Defendants

#### 1. Plaintiffs fail to tie any alleged injury to the Agency Defendants.

The Court should also dismiss Plaintiffs' claims against the Agency Defendants. As will be discussed further below, Article III standing requires that a plaintiff allege a "causal connection between the [alleged] injury and the conduct complained of," meaning "the injury has to be fairly … traceable to the challenged action *of the defendant*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added). Even if a plaintiff adequately alleges an injury in fact, the plaintiff lacks standing if he attributes that injury to the wrong defendant. *Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014) ("The causation element requires that a proper defendant be sued."); *see also Coastal Habitat All. v. Patterson*, 601 F. Supp. 2d 868, 877 (W.D. Tex. 2008). Here, the President is the sole official responsible for the permit revocation in accordance with the terms of the 2019 permit. Plaintiffs offer no basis to conclude that their alleged injuries stemming from the Keystone XL Pipeline not being built are fairly traceable to any of the ten Agency Defendants. This is particularly the case now that TC Energy has terminated the Keystone XL project.

Plaintiffs assert that the Agency Defendants are responsible for "effectuating," "enforcing," or "implementing" Executive Order No. 13990, Am. Compl. ¶¶ 9, 19, 107, 114, 126, 128, 132-33, 136, but "[s]uch boilerplate allegations of causation are inadequate to demonstrate causation," *Pennie v. Obama*, 255 F. Supp. 3d 648, 661-62 (N.D. Tex. 2017). Nor can Plaintiffs remedy this deficiency. Executive Order No. 13990 does not call for or contemplate any role for the Agency Defendants in the revocation, and the revocation became final once the President issued the Executive Order. *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (discussing Executive Order

pursuant to which "[t]he Secretary of Labor is charged with implementing and enforcing the Order"). By its plain terms, the Executive Order is self-executing, requiring TC Energy itself to cease constructing, connecting, operating or maintaining the proposed Keystone XL Pipeline at the international border. *See* EO 13990, § 6; *see also* 2019 Permit (specifying that upon the revocation of the permit, "unless otherwise decided by the President, the permittee, at its own expense, shall remove the Border facilities within such time as the President may specify"). The revoked permit itself made clear that all federal requirements with which TC Energy needed to comply in order to construct, maintain, or operate the Keystone XL Pipeline for the 1.2-mile cross-border segment are separate and distinct from the permit. *See* 2019 Permit, Art. 6(1) (providing that "[t]he permittee is responsible for acquiring any right-of-way grants or easements, permits, and other authorizations as may become necessary or appropriate"). Executive Order No. 13990 revoking the permit correspondingly provides that the revocation should not be construed to "impair or otherwise affect … the authority granted by law to an executive department or agency, or the head thereof," *id.* § 8(i). Thus, even if any regulatory process relevant to TC Energy's obligation to obtain "right-of-way grants or easements, permits, and other authorizations" is impacted by the revocation, such collateral consequence is properly viewed as a separate and distinct action.

Plaintiffs do not advance their argument by alleging that the Army Corps of Engineers "implemented" Executive Order No. 13990 when, on May 4, 2021, it withdrew from review an application filed by TC Energy under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344. Am. Compl. ¶ 54. The Army Corps' action relates to a separate authorization that would be required for portions of the pipeline to be built—namely, permission to discharge dredged or fill material into navigable waters, 33 U.S.C. § 1344(a), and to obstruct navigable waters

20

of the United States, 33 U.S.C. § 403.  It does not cover the 1.2-mile cross-border facilities for which the Presidential permit was revoked by Executive Order No. 13990.  That is, the Army Corps' suspension of its own administrative process was not a necessary step in the revocation of the permit for the border crossing.  Indeed, the communications between the Army Corps and TC Energy indicate that the Army Corps was suspending its permitting process not to "implement" the Executive Order, but rather, to account for TC Energy's then uncertainty about the future of the Keystone XL project in light of the revocation.  *See* May 4, 2021, Letter from the Army Corps to TC Energy (Ex. 7); May 3, 2021, Letter from TC Energy to the Army Corps (Ex. 8).  The Army Corps expressly permitted TC Energy to "submit an updated application for this project in the future," if the company decided to pursue the project (May 4, 2021, Letter from the Army Corps to TC Energy), which, it no longer does.  While this exchange certainly took account of the President's revocation of the permit, the revocation was complete and done beforehand.

In addition to failing to show that their alleged injuries are traceable to the Army Corps or any of the other Agency Defendants, Plaintiffs also fail to show that an injunction preventing the Agency Defendants from taking any actions would redress Plaintiffs' asserted injuries.  This is so because under Executive Order No. 13990, TC Energy had an independent obligation to cease constructing, maintaining, or operating the 1.2 mile cross-border segment of the Keystone XL Pipeline, and the Agency Defendants have no enforcement roles.  *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (injunction vacated because "[t]he governor and attorney general have no power to redress the asserted injuries"); *6th St. Bus. Partners LLC v. Abbott*, No. 1:20-cv-706, 2020 WL 4274589, at *4 (W.D. Tex. July 24, 2020) ("Texas law does not explicitly grant [Governor] Abbott the power to enforce compliance with [the Executive Order].  And if Abbott lacks

21

that power, Plaintiffs cannot establish that he caused their enforcement-based injury or that enjoining certain activities by Abbott would redress their injury.").

Plaintiffs cannot avoid this conclusion by relying on *Franklin v. Massachusetts*, where, as discussed above, *see supra* Section I.B.2, a plurality of the Supreme Court did not decide "whether injunctive relief against the President was appropriate" because the alleged injury in that case was "likely to be redressed by declaratory relief against the Secretary [of Commerce] alone." 505 U.S. at 803. That ruling does not mean that a plaintiff may randomly select a collection of Executive Branch officials in the hope that one or some of them might later take an action related to the President's decision. To the contrary, in *Franklin*, "the Commerce Secretary was legally responsible for providing the President with advice and information on which he would base his final decision," such that "declaratory relief applicable to the Secretary's legal duty would make it 'likely' the President would take the action desired by the plaintiffs, even if he was not obligated to do so." *Newdow*, 603 F.3d at 1013 (discussing *Franklin*, 505 U.S. at 803). Here, by contrast, "there is no corresponding advisory relationship" between the President and any of the named agency officials pursuant to Executive Order No. 13990, *id.*, and more importantly, unlike in *Franklin*, the President has already made the decision here. Plaintiffs are therefore unable to demonstrate that their alleged injuries are redressable by any relief directed against the Agency Defendants, and those defendants should be dismissed.

### 2. Plaintiffs fail to allege the requisite agency action for APA review against the Agency Defendants.

Counts III, V, and VI assert APA claims against the Agency Defendants, alleging that these defendants' purported "actions … to effectuate" or "implement" Executive Order No. 13990 exceed their statutory authority, are arbitrary and capricious, and fail to comply with notice-and-comment requirements. Am. Compl. ¶¶ 107, 126, 136. Plaintiffs,

however, fail to identify any final agency actions for purposes of judicial review under the APA. And the law in this circuit is clear that "[i]f there is no final agency action, a federal court lacks subject matter jurisdiction." *Qureshi*, 663 F.3d at 781.

The APA expressly limits judicial review to "final agency action." 5 U.S.C. § 704; *see also Dalton v. Specter*, 511 U.S. 462, 469 (1994) (final agency action is "the prerequisite to review under the APA"). An "agency action" is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §§ 551(13), 701(b)(2). While these categories are further defined in the APA, *see id.* §§ 551(4), (6), (8), (10), (11), they all "involve circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm."). Further, an agency action is not "final" unless it "mark[s] the consummation of the agency's decision-making process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Franklin*, 505 U.S. at 797 ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

As an initial matter, even if the President had required the Agency Defendants to implement the revocation, final agency action still would be lacking because it is *the President's* revocation decision that affects the rights and obligations of the regulated party, TC Energy. *See Dalton*, 511 U.S. at 469-70 (no final agency in suit seeking "to enjoin the Secretary of Defense … from carrying out a decision by the President to close the Philadelphia Naval Shipyard" because the action that "[would] directly affect the military bases is taken by the President"). To be sure, Plaintiffs may challenge a final agency action

23

distinct from the revocation.  But the only concrete agency action Plaintiffs identify—the Army Corps' May 4, 2021, administrative withdrawal of a permit application from TC Energy, Am. Compl. ¶ 54—is not a final agency action.

First, the withdrawal does not mark the completion of the agency's decision-making process on the application, but is interlocutory in nature.  "Agency action may mark the consummation of the agency's decisionmaking process if the agency action 'is not subject to further agency review,' which occurs when the agency has 'asserted its final position on the factual circumstances underpinning' the agency action[.]'"  *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 581 (5th Cir. 2016) (citations omitted)).  Here, TC Energy itself agreed that "a formal suspension of the Corps' review of its application would be appropriate until TC Energy addresses the Corps' inquiry regarding purpose and need [for the permit]."  May 3, 2021, Letter from TC Energy to the Army Corps.  And in suspending the application, the Army Corps made clear that TC Energy "may submit an updated application for this project in the future" should it decide to pursue the project.  May 4, 2021, Letter from the Army Corps to TC Energy.  Such action is not the consummation of the agency's decision-making process because the agency did not deny the application.  *Cf. Franklin*, 505 U.S. at 796 (decisions that are "tentative" are not final).

Second, the withdrawal had no "direct and appreciable legal consequences," *U.S. Army Corps of Eng'rs v. Hawkes Co*., 136 S. Ct. 1807, 1814 (2016), or "a direct and immediate … effect on the day-to-day business" of TC Energy, *FTC v. Standard Oil Co*., 449 U.S. 232, 239 (1980).  Indeed, TC Energy's correspondence with the agency indicates that the withdrawal was meant to preserve TC Energy's ability to "continue to consider [its] path forward."  May 4, 2021, Letter from Army Corps of Engineers to TC Energy.  Yet, in an APA case, "the question is whether *the agency* has imposed an obligation, denied a right, or fixed some legal relationship."  *Role Models Am., Inc. v. White*, 317 F.3d 327,

331 (D.C. Cir. 2003) (emphasis added).  Accordingly, the requisite finality is lacking as to the Army Corps' action.

As for the remaining Agency Defendants, Plaintiffs fail to allege a single agency action, let alone final agency action, taken by them that could be the focal point for judicial review.  Rather, the Amended Complaint is replete with vague and conclusory references to "actions" that these Agency Defendants have allegedly taken, fail to take, or may take in the future to implement Executive Order No. 13990.  *See, e.g.*, Am. Compl. ¶¶ 107, 108, 113, 117, 126, 132, 136.  In fact, the Amended Complaint is devoid of any allegations about any specific actions of any of these Agency Defendants.  *See id.*  ¶¶ 9-19.  "Plaintiffs' vague and non-specific allegations challenging the [Agency Defendants'] overall 'implementation' … plainly 'lack the specificity requisite for agency action.'"  *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 110 (D.D.C. 2011) (quoting *SUWA*, 542 U.S. at 66); *see also Quicken Loans Inc. v. United States*, 152 F. Supp. 3d 938, 946 (E.D. Mich. 2015) ("Like the 'free-floating allegations' in *Banner* that triggered dismissal of claims 'untethered to any discrete agency action,' … Quicken's opaque allegations about Defendants' 'conduct,' 'conclusions,' 'adoption,' or 'application' require the same result."); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (APA "requires more" than "amorphous description of [agency's] practices").  In the absence of a final agency action, this Court lacks subject matter jurisdiction to review Plaintiffs' APA challenges against these Agency Defendants.  *See Qureshi*, 663 F.3d at 781.

### 3.  Plaintiffs cannot proceed by asserting claims under the Declaratory Judgment Act.

For each of their APA claims, Plaintiffs also rely on the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  *See* Am. Compl. ¶¶ 106-17, 125-36.  But "the operation of the Declaratory Judgment Act is procedural only."  *Franchise Tax Bd. Of State of Cal. v.*

*Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 15 (1983).  Although the Act "enlarged the range of remedies available in the federal courts," it did not create a cause of action, or a new right, to seek those remedies.  *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *see also Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 552-53 (5th Cir. 2015).  Thus, the Act does not salvage Plaintiffs' APA claims.

<div align="center">* * *</div>

For the foregoing reasons, this Court should dismiss the Agency Defendants from this suit, and need not proceed further.

### D.  Plaintiffs Otherwise Lack Standing with Respect to all Defendants

Plaintiffs in any event fail to establish standing as to all defendants.  "One element of the [Article III] case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue."  *Raines v. Byrd,* 521 U.S. 811, 818 (1997).  To satisfy the "irreducible constitutional minimum of Article III standing," *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021), Plaintiffs must "clearly … allege facts demonstrating" that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560).  Because Article III "serves to prevent the judicial process from being used to usurp the powers of the political branches," the standing inquiry is "especially rigorous" where, as here, reaching the merits would force the Judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09 (2013).

**1. Plaintiffs fail to allege an injury in fact.**

**a. Plaintiffs fail to allege injuries to their sovereign interest.**

**i.   Loss of Tax Revenues**

Plaintiffs fail to carry their burden of meeting all three prongs of the Article III standing requirement.   To begin, Plaintiffs fail to show a cognizable injury in fact. Plaintiffs allege that they have standing in their own right because, even though they were not directly affected by the revocation of TC Energy's permit, "cancellation of the Keystone XL will lead to significant loss in tax revenue," Am. Compl. ¶ 24.   They claim that living camps for workers along the pipeline route would "generate short-term revenues from sales and use taxes totaling approximately $66 million across the affected States," *id.*, and that revocation will cost "tens of millions of dollars in annual tax revenue" from those involved in the refining, transport, and export of crude, *id.* ¶ 60.   They also allege potential loss of income taxes they could have collected from the construction workers, *id.* ¶ 58, and generally assert that the construction and operation of the pipeline will generate tax revenues and provide economic benefit for Plaintiffs.   *See id.* ¶¶ 42, 59.   And they argue that absent the Keystone XL Pipeline, Gulf Coast refineries will have "increased costs and therefore lower margins," leading to reduced franchise tax revenue for Texas.   *Id.* ¶ 83.

Plaintiffs' "theory of economic injury [thus] boils down to a single alleged harm: the loss of general tax revenues."   *El Paso*, 982 F.3d at 339.   But the Fifth Circuit recently held that "a loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact," *id.* at 339, because "federal policies will inevitably have an economic impact on local governments," *id.* at 340.   *El Paso* involved a military base with an "[u]nquestionably … substantial impact" on the county's economy.   *Id.* at 338.   The county sued to challenge the cancellation of a construction project at the base, alleging that the project "would necessarily generate taxes through workers staying at hotels, buying

supplies, and spending money at local establishments," *id.*, and that the cancellation "denies the county the opportunity for an economic benefit," *id.* at 339.   The court held that the county had no standing to sue.   Although "[i]t is inevitable that any reduction in expenditure at a military base will have an economic impact on the local and state economy … and cause a reduction in general tax revenues," the court held that such "incidental and attenuated harm is insufficient to grant a state or county standing." *Id.* at 341.

   *El Paso* accords with established precedent.[13]   For example, in *Florida v. Mellon*, 273 U.S. 12 (1927), the Supreme Court held that the State had no standing to challenge a federal statute where the State's injury "rest[ed] upon the allegation that the [statute] [would] have the result of inducing potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate." *Id.* at 17-18.   The Court found "the anticipated result purely speculative, and, at most, only remote and indirect." *Id.* at 18.   Instead, "[a] direct link" between the challenged action and the collection of tax revenues, "such as the loss of a *specific* tax revenue, is necessary to demonstrate standing." *El Paso*, 982 F.3d at 340.

   In *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), Wyoming challenged an Oklahoma law requiring Oklahoma utility companies that had previously purchased virtually all their

---

[13] *See, e.g.*, *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) ("Lost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing."); *Wyoming v. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (suit by State challenging Federal Government's actions with respect to national parks, which State claimed reduced sales tax; holding that general "impairment of state tax revenues [is] not … recognized as sufficient injury-in-fact to support state standing" in suit against the Federal Government because of "the unavoidable economic repercussions of virtually all federal policies"); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353-54 (8th Cir. 1985) (State lacked Article III injury from general decline in tax revenue as a result of federal government's implementation of disaster relief programs); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (same).

coal from Wyoming companies to instead use Oklahoma-mined coal. The Supreme Court found that Wyoming had standing to sue because the statute directly resulted in Wyoming's loss of hundreds of thousands of dollars in severance taxes from specific Wyoming companies affected by the statute. *See id.* 445 ("since the effective date of the Act, Wyoming has lost severance taxes in the amounts of $535,886 in 1987, $542,352 in 1988, and $87,130 in the first four months of 1989"). In so holding, the Court distinguished the case from those involving federal actions that had injured a state's economy and "thereby caused a decline in general tax revenues." *Id.* at 448. This distinction is necessary because, as the Fifth Circuit explained in *El Paso*, "[o]therwise, a state … could have standing even if diminution of tax receipts is largely an incidental result of the challenged action," 982 F.3d at 339, sparking unwarranted litigation against the federal government, *id.* at 340.

Plaintiffs' alleged economic injury suffers from other fatal flaws as well. For example, they allege that their counties and other local taxing authorities potentially will lose tax revenues. *See, e.g.*, Am. Compl. ¶ 24 (alleging host counties' loss of property tax from the "living camps for workers"); *id.* ¶¶ 56-57 (alleging property tax implications for counties); *id.* ¶ 42 (alleging unspecified tax revenue for the "local communities, including county governments and school districts, as well as other taxing entities"). But Plaintiffs make no claim to those third parties' tax revenues, and even if they had, the purported loss in revenues would still be too indirect and attenuated to establish injury to Plaintiffs' sovereign interests, as discussed above.

Some of Plaintiffs' claims of economic injury are also implausible and contradicted by Plaintiffs' own allegations. For example, the proposed Keystone XL Pipeline only runs from Montana to Nebraska, and yet, Plaintiffs seek to assert injury to Louisiana on the basis that the termination of the project "will terminate employment for Louisiana workers and contractors participating in Keystone XL's development and construction"—leading

to a reduction of "Louisiana income taxes and local and state sales taxes." *Id.* ¶ 78.  This Court "is neither obligated to reconcile nor accept the contradictory allegations" in deciding the motion. *Harris v. Wal-Mart Stores Tex., LLC*, No. 3:19-CV-00248, 2020 WL 4726757, at *13 (S.D. Tex. May 6, 2020).   Further, Plaintiffs assert that Gulf Coast refineries were designed to process heavy crude like the type from Alberta, and that "[m]any Gulf Coast refiners are able to maintain profitable margins when they can take advantage of the price spread between light and heavy crude oil."  Am. Compl. ¶¶ 72-73; *id.* ¶ 75 (alleging that heavy crudes from Canada "offer considerable potential to improve operating margins").  Yet Plaintiffs recognize that "[a]ny oil that is not transported via the Keystone XL, will be transported on trains, trucks, and ships," *id.* ¶ 84, and crude oil is available from other sources, *see id.* ¶¶ 74, 76.  Indeed, the Amended Complaint also acknowledges that the existing Keystone I pipeline from Alberta (through North Dakota, South Dakota, Nebraska, Kansas, and Oklahoma) to the refineries in Houston and Nederland, Texas, "has been operational for several years," Am. Compl. ¶ 29; *see also* Keystone XL, Pipeline route, https://www.keystonexl.com/maps/.  Plaintiffs' conjecture about future potential supply issues from elsewhere, or the relative future costs of crude and the means to transport it, "depend on" countless "third-parties' decisions" and thus "are too speculative to confer standing."  *Howington v. United States*, No. 3:17-CV-149, 2018 WL 6651783, at *2 (S.D. Tex. Mar. 5, 2018).

In sum, Plaintiffs have failed to allege the requisite "concrete and particularized injury" to their fiscs to have Article III standing in their own right.  Even Plaintiffs themselves recognize the speculative nature of their claimed injury, alleging that the revocation has "the *possibility* of depriving States and local governments of millions of dollars in revenue."  Am. Compl. ¶ 128 (emphasis added).

### ii.    Sovereign Interest in Preserving Their Territories

Plaintiffs also allege that the revocation injures their "sovereign interests in stewarding and preserving the territories within their border," including "decisions about the siting of oil pipelines." Am. Compl. ¶ 25. Plaintiffs do not explain why that is so, when the revocation merely means that the Keystone XL Pipeline will no longer be constructed and/or operated in Montana, South Dakota, and Nebraska—the three states the pipeline was proposed to run through. It is implausible that the *absence* of the pipeline would interfere with those three States' authority over their territories.

Notably, the Executive Branch's prior permitting process did not even determine the siting of the pipeline, only whether granting the permit would be in the national interest given the route TC Energy has chosen, among numerous other factors. *See* 2017 ROD at 9-10. The permit, which governs only the 1.2-mile cross-border segment of the proposed Keystone XL Pipeline, also made clear that TC Energy was "responsible for acquiring any right-of-way grants or easements, permits, and other authorization as may become necessary or appropriate" from either the federal government, the States, or other entities. 2019 Permit, Art. 6. That is, the revocation of the permit did not interfere with Plaintiffs' sovereign interests in controlling their territories.

*Massachusetts v. EPA*, 549 U.S. 497 (2007), on which Plaintiffs rely, *see* Am. Compl. ¶ 25, is not to the contrary. There, the Supreme Court held that Massachusetts had "alleged a particularized injury in its capacity as a landowner" to challenge the EPA's decision not to regulate greenhouse-gas emissions. 549 U.S. at 522. This was so because "[a]ccording to petitioner's unchallenged affidavits, global sea levels rose … over the 20th century as a result of global warming," which "ha[s] already begun to swallow Massachusetts' coastal land," and "the Commonwealth owns a substantial portion of the state's coastal property." *Id.*; *accord Ctr. for Biological Diversity v. U.S. Dep't of the*

31

*Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) (observing that the Supreme Court's finding of standing in *Massachusetts* was due to "Massachusetts's interests in ensuring the protection of the land and air within its domain, and its 'well-founded desire to preserve its sovereign territory'") (quoting *Massachusetts*, 549 U.S. at 519). Here, in contrast, there is no issue of preserving Plaintiffs' sovereign territory. If anything, the revocation would avoid any construction on any land within Plaintiffs' borders and obviate any potential risk of pipeline-related oil spills on such land.

### b. Plaintiffs cannot assert *parens patriae* standing.

Plaintiffs also assert standing "in a *parens patriae* capacity," Am. Compl. ¶ 24, alleging injuries to (1) their residents' interests "in maintaining the constitutionally prescribed separation of powers between Congress and the President as it relates to the regulation of foreign and interstate commerce," and (2) Plaintiffs' interests "in the physical and economic well-being of their residents," *id.* ¶ 26.

The Supreme Court, however, has made clear that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)); *accord Indiana v. EPA*, 796 F.3d 803, 809-10 (7th Cir. 2015); *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002); *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992); *Iowa ex rel. Miller*, 771 F.2d at 354-55; *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990).[14]   As the Court explained

---

[14] Any confusion that existed before *Snapp* on this question, *see, e.g.*, *Alabama ex rel. Graddick v. Tenn. Valley Auth.*, 636 F.2d 1061, 1064 (5th Cir. 1981); *Florida v. Weinberger*, 492 F.2d 488 (5th Cir. 1974), "must, of course, give way to the Supreme Court's clear statement in *Snapp*." *Burford*, 918 F.2d at 858. One judge in this Court has declined to follow *Snapp*'s clear statement on the basis that it is dictum. *See Texas v. United States*, 328 F. Supp. 3d 662, 696 (S.D. Tex. 2018) (Hanen, J.). However, "carefully

in *Massachusetts v. Mellon*, "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the State, which represents them as parens patriae." 262 U.S. at 485-86. Thus, while a State generally may sue to protect the health and well-being of its residents as *parens patriae*, it may not do so "to protect citizens of the United States from the operation" of federal law. *Id*. at 485; *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (State lacked standing as *parens patriae* to invoke the Due Process Clause or the Bill of Attainder Clause against the federal government to challenge federal law). This limitation is rooted in the proper allocation of authority between the state and federal governments: "[w]hen a state brings a suit seeking to protect individuals from [federal law], it usurps [the] sovereign prerogative of the federal government and threatens the general supremacy of federal law." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011). Here, because Plaintiffs seek to redress injuries to their citizens purportedly caused by the federal government, they have no *parens patriae* standing.

Plaintiffs again seek to rely on *Massachusetts v. EPA* in support of their *parens patriae* theory of standing. Am. Compl. ¶ 26. But in that case, Congress had explicitly authorized judicial review of the State's challenge to EPA's action—namely a denial of a petition for rulemaking to regulate greenhouse gas emissions. As the Court said in that case, "[t]hat authorization is of critical importance to the standing inquiry: Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." 549 U.S. at 516; *see also id.* at 520 n.17 ("there

---

considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative," *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003). Thus, the Fifth Circuit has recognized that while it is generally "not bound by dicta," "[d]icta of the Supreme Court are, of course, another matter." *United States v. Becton,* 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

is a critical difference between allowing a State to protect her citizens from the operation of federal statutes … and allowing a State to assert its rights under federal law (which it has standing to do)") (internal quotation marks omitted).  Whereas Massachusetts asserted its right under a statutory provision specifically authorizing Massachusetts' suit to challenge the EPA's denial of the State's petition for rulemaking, Plaintiffs can identify no similar statute granting a similar procedural right to sue in the circumstances here.

In any event, even if Plaintiffs could bring *parens patriae* suits against the federal government, their asserted quasi-sovereign interests are still insufficient to establish standing.  First, the asserted injury to their citizens allegedly stemming from the President's purported violation of constitutional separation-of-powers principles is at best an abstract injury that amounts to no more than a "generalized grievance," rather than the necessary "concrete, particularized," injury to establish standing.  *Carney v. Adams*, 141 S. Ct. 493, 499 (2020).  The asserted injury also does not lend itself to *parens patriae* standing, which may be asserted in suits to abate a public nuisance, maintain access to natural resources, and protect residents from the effects of discrimination or from another state's discriminatory economic policies, *Snapp*, 458 U.S. at 602-04, but not to redress alleged improper distribution of powers between the political branches of the federal government.

Second, while a State may maintain a *parens patriae* suit to protect the economic well-being of its citizens, the State must be "more than a nominal party" and the alleged injury to its citizens must be suffered by "a sufficiently substantial segment of its population," not simply an "identifiable group of individual residents."  *Snapp*, 458 U.S. at 607; *see, e.g.*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653–55 (9th Cir. 2017) (allegation of price impact on eggs not sufficient to establish a substantial effect on the general population because such ordinary consumer commodity "lacks the central economic significance to a state" and because egg farmers "directly affected" by the

34

challenged laws were "capable of pursuing their own interests"); *cf. Snapp*, 458 U.S. at 609 (although only 787 jobs were at stake, Puerto Rico had a quasi-sovereign interest in protecting its residents against the "political, social, and moral damage" of "invidious discrimination … along ethnic lines" in an employment scheme in which Puerto Rico participated with states).   But the Amended Complaint contains no such allegations. Although Plaintiffs allege that the revocation impacts Texas's and Louisiana's residents in the refinery industry, *see* Am. Compl. ¶ 61, Montana residents in "local electrical cooperatives," *id.* ¶ 42, and workers who otherwise would work on constructing the Keystone XL Pipeline (that is, from Montana to Steele City, Nebraska) or on constructing living camps for such workers during the two years the pipeline was expected to be built, *id.* ¶ 24, these "identifiable group[s] of individual residents" hardly constitute "a sufficiently substantial segment of [those States'] populations."   *Snapp*, 458 U.S. at 607. Those groups, moreover, plainly are capable of pursuing their own interests.

The alleged injuries to Texas's and Louisiana's refinery industries suffer from a more fundamental defect: they lack the requisite specificity and concreteness, given Plaintiffs' acknowledgement that the existing Keystone I pipeline—from Canada to Steele City, Nebraska to the Gulf Coast refineries—has been functional for years, the Gulf Coast refineries are operational, and oil not transported via the Keystone XL Pipeline will instead be transported through other means.   *See* Am. Compl. ¶¶ 29, 76, 84.   Similarly lacking specificity and concreteness are Plaintiffs' allegations of potential economic ripple effects from the revocation, such as the loss of "jobs, investments, and business opportunities," *id.* ¶ 59.   For example, they claim that their residents will lose unspecified "significant investments" made in anticipation of the pipeline's construction and operation, *id.*, yet they fail to identify any such investments.   Although Plaintiffs allege that the Gulf Coast refineries are designed for, and capable of, processing heavy crude oil, *id.* ¶ 73, Plaintiffs

do not allege that the refineries were built because of the proposed Keystone XL Pipeline. And they admit that the Keystone I Pipeline has already been transporting crude oil from Canada for years, *id.* ¶ 29, and other sources of crude oil are also available, *id.* ¶ 76. Finally, Plaintiffs' conclusory allegations regarding the potential impact using other modes of transportation would have on Plaintiffs likewise fail to establish an injury in fact because they ultimately rest on speculations. *See id.* ¶ 84; *Clapper*, 568 U.S. at 409 ("we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient") (internal quotation marks and citation omitted).

### 2. **Plaintiffs fail to establish redressability**.

Plaintiffs fail to establish standing for an additional reason: they fail to show "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso*, 982 F.3d at 341. "It is well settled that [a] claim of injury generally is too conjectural or hypothetical to confer standing when the injury's existence depends on the decisions of third parties." *Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015); *see also Allen v. Wright*, 468 U.S. 737, 739-40, 758 (1984); *Simon v. E. Ky. Welfare Rts.Org.*, 426 U.S. 26, 33, 42-44 (1976). Here, Plaintiffs' alleged injury, and whether any relief by this Court will redress that injury, depend on the "unfettered choices" of an independent actor not before the Court—TC Energy, *Lujan*, 504 U.S. at 562, and Plaintiffs must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury," *El Paso*, 982 F.3d at 341. Plaintiffs cannot do so here.

As discussed above, TC Energy has terminated the Keystone XL Pipeline project. The company has further represented that it "will not pursue any permits for the Project, nor will it perform any construction activities in furtherance of the Project now or at any time in the future." *Indigenous Envtl. Network v. Biden*, 4:19-cv-00028-BMM (D. Mont.),

ECF No. 167, Status Report at 3. Plaintiffs are therefore unable to plausibly allege that if they prevailed in this case, their alleged injuries would be redressed. Because they cannot establish redressability under Article III, this case should be dismissed. *Cf. El Paso*, 982 F.3d at 341 (holding that county failed to establish redressability, as it "ha[d] not alleged any facts demonstrating that it is likely that the DoD would exercise its discretion to go forward with the Fort Bliss project if the Government were enjoined from spending the diverted funds on border wall construction").

<p style="text-align:center">* * *</p>

In sum, Plaintiffs fail to demonstrate Article III standing to sue, and thus, this Court should dismiss the case for lack of subject matter jurisdiction.

## II.   VENUE IS IMPROPER IN THIS DISTRICT BECAUSE TEXAS LACKS STANDING

The above discussion demonstrates that Texas in particular fails to establish its standing to sue. Venue is therefore improper in this District unless Plaintiffs can point to another basis for venue here. *See Miller v. Albright*, 523 U.S. 420, 426-27 (1998) (Stevens, J.) (explaining that, when a Texas-based plaintiff was dismissed for lack of standing, "venue in Texas was therefore improper");[15] *Inst. of Certified Practitioners, Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) (holding that, where the only plaintiff that "reside[d] in the district … lack[ed] standing," venue was improper). Plaintiffs fail to show that a defendant resides here, *see* 28 U.S.C. § 1391(e)(1)(A), "a substantial part of the events or omissions giving rise to the claim occurred" here, *see id*. § 1391(e)(1)(B), or

---

[15] Although Justice Stevens's opinion for the Court was joined only by Chief Justice Rehnquist, the transfer of venue was discussed in three opinions for seven justices. While some were skeptical that the Texas-based plaintiff actually lacked standing, none disputed the straightforward conclusion that venue was improper if the Texas plaintiff in fact lacked standing. *See* 523 U.S. at 445-46, 448 (O'Connor, J., concurring in the judgment); *id.* at 473 (Breyer, J., dissenting).

a proper plaintiff resides here, *see id.* § 1391(e)(1)(C).  Accordingly, this Court should dismiss this action for improper venue, *see* Fed. R. Civ. P. 12(b)(3), or transfer it to "any district or division in which it could have been brought," 28 U.S.C. § 1406(a).

## III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF

### A. Plaintiffs Fail to State a Separation-of-Powers Claim

Plaintiffs argue the President's revocation of the Keystone XL permit violates separation-of-powers principles because the regulation of cross-border oil pipeline facilities is a matter exclusively within Congress's commerce powers, and because Congress supposedly granted the Keystone XL permit in 2011, precluding the President's action.  As discussed below, the President has independent constitutional authority over physical extensions into the United States, and has exercised that power for more than 150 years.  Although Congress may enact legislation to regulate border-crossing facilities, it has chosen to defer to the President.  There is no conflict between the political branches, and Plaintiffs' separation-of-powers challenges fail.

### 1.  The President has constitutional authority to regulate border-crossing facilities.

The President's authority to revoke the Keystone XL permit—like the authority to grant the permit in the first place—is rooted in his Commander-in-Chief and foreign affairs powers in Article II of the Constitution.  *See Greene Cnty. Planning Bd. v. Fed. Power Comm'n*, 528 F.2d 38, 46 (2d Cir. 1975); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70 (D.D.C. 2015); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1163 (D. Minn. 2010).  The extension of physical facilities from a foreign country into the United States necessarily implicates national security and foreign relations considerations.  As Commander in Chief, the President has the authority to protect the Nation's territorial integrity and prevent intrusions on U.S. sovereignty at the border.  *Cf. Schooner Exch. v.*

*McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute").  And, "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."  *United States v. Curtiss-Wright Exp. Corp*., 299 U.S. 304, 319 (1936).  While he is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).  As the Supreme Court recognized, "in foreign affairs the President has a degree of independent authority to act," *id.*, and "does not require as a basis for [his] exercise [of that power] an act of Congress," *Curtiss-Wright*, 299 U.S. at 320.  Thus, in the absence of contrary congressional legislation, the President has the constitutional authority to determine whether any border crossing comports with the national interest.

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), confirms the President's independent authority to act here.  The case involved a Presidential denial of a U.S. air carrier's request to engage in foreign air transportation.  *Id.* at 104.  The relevant statute precluded judicial review if the Presidential decision involved a foreign carrier but was silent as to U.S. carriers.  *Id.*  The Court observed that the "aerial navigation routes and bases" should be correlated to "our own national defenses" and that they also "raise[d] new problems in conduct of foreign relations."  *Id.* at 108.  Accordingly, the Court held that the challenged decision was within the President's constitutional authority because while Congress has foreign commerce power over such matters, the President "also possesses *in his own right* certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs," and the denial

at issue "dr[ew] vitality from either or both sources." *Id.* at 109-10 (emphasis added). Here, the President similarly drew his authority from both sources in revoking the permit.

**2. Historical practice confirms the President's authority over border-crossing facilities.**

"In separation-of-powers cases [the Supreme] Court has often 'put significant weight upon historical practice.'" *Zivotofsky*, 576 U.S. at 23 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)). "[A] systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned … may be treated as a gloss on Executive Power vested in the President by § 1 of Art. II" of the Constitution. *Dames & Moore*, 453 U.S. at 686. A "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent." *Id.*

In *United States v. Midwest Oil Co.*, 236 U.S. 459, 483 (1915), for example, the Supreme Court held that the President had the independent authority to withdraw from private acquisition certain public lands Congress had made available for occupation, exploration, and purchase. The Court said it "need not consider whether, as an original question" the President's Article II power encompasses the authority, because there was a "long-continued practice" since the beginning of our Government of Presidents reserving public lands from sale for various purposes "without express statutory [authority]—but under the claim of power so to do." *Id.* at 469; *see also id.* at 471-72. Although Congress had also withdrawn public lands from sale, it "did not repudiate the power claimed or the withdrawal orders made" by Presidents but had instead "uniformly and repeatedly acquiesced in the practice." *Id.* at 471; *see also id.* at 472-73 ("the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice" "is not reasoning in a circle, but the basis of a wise and quieting rule

that, in determining … the existence of a power, weight shall be given to the usage itself, [] even when the validity of the practice is the subject of investigation").

The Supreme Court followed this line of reasoning in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), which involved the President's authority to settle American citizens' claims against foreign governments.  Because "the practice goes back over 200 years and has received congressional acquiescence throughout its history," the Court reasoned, "the conclusion that the President's control of foreign relations includes the settlement of claims is indisputable."  *Id.* at 415; *see also Dames & Moore*, 453 U.S. at 679-81 ("Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement."); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "traditional ways of conducting government … give meaning to the Constitution").

Here, there is a long history of Presidents exercising authority over border-crossing facilities, and that practice is also sanctioned by the long-continued acquiescence of Congress giving decisive weight to the President's authority.  As early as 1869, President Grant exercised Executive authority over a submarine telegraphic cable connecting the United States with a foreign nation.  *See* President Grant's Seventh Annual Message to Congress, at XIII-XIV.  France had granted a company the exclusive right of telegraphic communication between France and the United States, and the company sought to lay a cable on U.S. shores.  President Grant explained that "[t]he right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States."  *Id.* at XV.  Because no congressional legislation governed the matter, President Grant was "unwilling … to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores."

41

*Id.*   President Grant therefore conditioned his permission on the removal of the monopolistic features of the concession granted by France.  *Id.*  President Grant later also urged Congress to enact legislation governing such cables and indicated that in the meantime, he intended to impose conditions on the landing of cables to ensure reciprocity, precedence of the transmission of official messages, the government's ability to fix the rates, and to avoid monopolistic or anticompetitive purposes.  *Id.* at XV-XVI.

Thereafter, Presidents Hayes, Garfield, Arthur, Cleveland (in his first term), and Benjamin Harrison also exercised authority to control the landing of foreign cables on U.S. territory.  *See* 22 Op. Att'y Gen. 13, 18-25; 2 Moore, Digest of International Law at 461. The only break in this continuous Executive position was during President Cleveland's second term, when the Secretary of State disclaimed authority to act on the application by a French company to land a cable at Coney Island, New York, from Haiti.  *See* 22 Op. Att'y Gen. 13, 23-24.  The Attorney General, however, quickly brought suit to prevent the landing and operation of the cable, *id.*, but the district court declined to issue an injunction because the cable had been laid.  *See United States v. La Compagnie Française Des Câbles Télégraphiques*, 77 F. 495, 496 (S.D.N.Y. 1896).

In 1898, the Acting Attorney General opined that the President had the power to control the landing of submarine cables on U.S. shores and must act to grant or deny the U.S. government's consent because "[t]he preservation of our territorial integrity and the protection of our foreign interests is intrusted, in the first instance, to the President."  22 Op. Att'y Gen. 13, 25-26.  He explained that because the President "has charge of our relations with foreign powers[,] [i]t is his duty to see that in the exchange of comities among nations we get as much as we give," and "pending legislation by Congress, to impose such restrictions as will forbid unjust discriminations, prevent monopolies, promote competition, and secure reasonable rates."  *Id.* at 26-27.

Presidents have since consistently exercised control over cross-border facilities, including oil pipelines. *See* 9 Whiteman, Digest of International Law 917-32 (documenting various permits including eight oil pipeline permits between 1941 and 1966); IV Hackworth, Digest of International Law 247-56; 2 Moore, Digest of International Law 452-66 (listing oil pipeline permits issued between 1918 and 1966). Presidential permits have made clear the Executive's discretion to revoke, terminate, or modify the permits at will. *See*, *e.g.*, U.S.-Canada oil pipeline permit issued by President John F. Kennedy, Oct. 18, 1962 (Ex. 9) at 2-3 ("this permit may be terminated at the will of the President of the United States or may be amended by the President of the United States at will"); U.S.-Canada oil pipeline permit issued by President Lyndon B. Johnson, Jan. 22, 1968 (Ex. 10) (same); 2019 Keystone XL Permit, Art. 1(1) ("This permit may be terminated, revoked, or amended at any time at the sole discretion of the President[.]").

Presidents also have issued Executive Orders affirming their constitutional authority to require permits and setting forth processes for permitting decisions. *See, e.g.*, EO 8202, *revoked and superseded by* EO 10485, *amended by* EO 12038 (electric power and natural gas facilities); EO 10530, § 5 (submarine cables). For example, in the first Executive Order governing oil pipelines, President Lyndon Johnson declared that "the proper conduct of the foreign relations of the United States requires that executive permission be obtained for the construction and maintenance at the borders of the United States of facilities connecting the United States with a foreign country." EO 11423. Noting his authority as President of the United States and Commander in Chief, he delegated to the Secretary of State the authority to determine whether cross-border permits should be issued or denied in the national interest. *Id.* § 1(a)-(e). More recently, President Trump opted to have permitting decisions for covered cross-border facilities "be made solely by the President." EO 13867, § 2(i).

### 3. Congress has acquiesced in the President's authority over cross-border facilities.

In the long history of Executive exercise of authority over cross-border facilities, Congress has never questioned the President's authority through a duly enacted law, but has either expressly affirmed or otherwise accepted the President's authority.

### a. Congress has expressly recognized the President's permitting authority over the Keystone XL cross-border facilities.

In 2011, Congress enacted Section 501 of the Tax Cut Act to expedite President Obama's deliberation on TC Energy's 2008 application for the Keystone XL permit. The provision required the President to "grant a permit under Executive Order No. 13337" within 60 days of the Act, unless the President determined, as he ultimately did, that granting the permit "would not serve the national interest." Tax Cut Act, § 501(a), (b)(1), 125 Stat. 1289-90. This provision expressly affirmed the President's permitting authority because not only did it refer to the then-applicable Executive permitting process set forth in Executive Order No. 13337, but it also recognized the President's expansive discretion in making permitting decisions under that process using a national interest standard. Although Congress also specified that inaction on the President's part would result in the permit being granted by operation of the Act, *id.* § 501(b)(3), even that default provision underscored the primacy of the President's authority because the provision would only come into play if the President chose not to act. And, in the two years since President Trump revoked Executive Order No. 13337 and issued Executive Order No. 13867, thereby revising the process for oil pipeline permitting decisions, Congress likewise "has not enacted legislation, or even passed a resolution, indicating its displeasure with" the President's claim of authority. *Dames & Moore*, 453 U.S. at 687.

**b. Legislation regulating other types of cross-border facilities similarly confirms Congress's acceptance of the President's permitting authority over oil pipelines.**

Congress has also explicitly affirmed the President's permitting authority with respect to other cross-border facilities. While those statutes do not specifically address oil pipelines, the "general tenor of Congress' legislation in this area" is relevant, as it demonstrates that in revoking the Keystone XL permit, "the President [was] acting … at least with the acceptance of Congress." *Dames & Moore*, 453 U.S. at 678.

*Dames & Moore v. Regan* is illustrative of this principle. There, the Supreme Court upheld the President's authority to settle Americans' claims against Iran to resolve the Iranian Hostage Crisis. Although the President's suspension of claims pending in American courts was not directly authorized by statute, the Court found two statutes "highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in th[e] case." *Id.* at 677. Given the "general tenor of Congress' legislation," *id.* at 678, the Court found "a history of congressional acquiescence in the conduct of the sort engaged in by the President." *Id.* at 678-79. The Court also noted that "Congress has consistently failed to object to this longstanding practice of claim settlement by executive agreement, even when it has had an opportunity to do so." *Id.* at 682 n.10; *id.* (Congress had "entertained legislation relating to congressional oversight of such agreements," but "took only limited action, requiring that the text of significant executive agreements be transmitted to Congress").

Congress's legislation over border-crossing facilities confirms Congress's acceptance of the President's permitting authority. As noted above, President Grant had urged Congress to enact legislation governing submarine cables. Congress did not act for almost four decades, and when it did so in 1921, it was only in response to the United States' unsuccessful attempt to enjoin a submarine cable from being laid between Barbados

and Miami Beach without the President's consent.  *See* Unauthorized Landing of Submarine Cables in the United States, H. Rep. 67-71, at 3-4 (1921) (Ex. 11).  President Wilson had dispatched a warship to stop the cable from being laid, and the company was forced to fasten the cable to a buoy off the coast of Miami while the parties litigated the issue.  *Id.* at 3.  The district court found the proposed cable landing authorized by a statute and under a federal franchise Congress granted to the company's predecessor.  *United States v. Western Union Tel.*, 272 F. 311, 318-20 (S.D.N.Y.), *aff'd, by* 272 F. 893, 894 (2d Cir. 1921), *rev'd and dismissed by stipulation of the parties*, 260 U.S. 754 (1922).

While the case was pending in the Supreme Court, Congress quickly enacted the Kellogg Act to require Presidential approval of the laying of submarine cables in the United States from a foreign country.  Act of May 27, 1921, ch. 12, 42 Stat. 8 (1921); H. Rep. 67-71, at 2-4 (1921).  The Act affirmed that the President could grant a permit if doing so would assist in "maintaining the rights or interests of the United States or of its citizens in foreign countries, or [would] promote the security of the United States."  42 Stat. 8, § 2.  The Act also granted federal court jurisdiction to hear motions "to compel, by injunction, the removal" of cables, *id.* § 3, thus addressing the situation presented in *La Compagnie Française Des Câbles Télégraphiques*, 77 F. 495, where the Attorney General's motion to enjoin the laying of a cable was found to be mooted by the cable's landing.

Congress likewise has expressly affirmed the President's permitting authority over international bridges.  The International Bridge Act of 1972, Pub. L. No. 92-434, 86 Stat. 731 (1972), 33 U.S.C. §§ 535-535j, requires Presidential approval for international bridges.  *See id.* § 535b.  It also tracks the Executive's procedures set out in Executive Order No. 11423, § 1(b), reflecting Congress's deference to the Executive's discretion in this area.  *See* 33 U.S.C. § 535b; *see also Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 102 (observing

that although the IBA requires presidential approval of international bridges, "[i]t is only EO 11423 that sets forth the procedures for the President's issuance of bridge permits").

The Kellogg Act and the International Bridge Act are highly relevant in the looser sense of indicating congressional acceptance of Presidential authority over border-crossing facilities. Both preserve the Executive's permitting authority, commit the permitting decisions to the President's sole discretion, and firmly indicate congressional acceptance of the President's authority in this area.

### c. Legislation regulating commodities transported through cross-border facilities further reflects congressional acquiescence here.

Congressional acquiescence in the President's permitting authority is also reflected in legislation regulating commodities that are transported through cross-border facilities. For example, in the Federal Power Act, ch. 285, 41 Stat. 1063 (1920), and the Natural Gas Act, ch. 556, 52 Stat. 821 (1938), which respectively regulate the transmission of electric energy from the United States to a foreign country, 16 U.S.C. § 824a(e), and the export and import of natural gas, 15 U.S.C. § 717b(a), Congress did not disturb the Presidential permitting requirements for the construction or maintenance of electric energy or gas pipeline facilities at the border. *See, e.g.*, Diversion of Water from Niagara River, 30 Op. Att'y Gen. 217 (1913) (electrical transmission); Granting of License for the Construction of a Gas Pipe Line, 38 Op. Att'y Gen. 163 (1935) (natural gas). Rather, the Presidential permitting requirements for such facilities have coexisted with, and are complementary to, regulatory requirements imposed by Congress. *See, e.g.*, EO 8202 (setting forth permitting procedures for cross-border transmission of electric energy and natural gas, and acknowledging the then-Federal Power Commission's separate responsibilities under the Federal Power Act and the Natural Gas Act); EO 10485 (similar); EO 12038 (similar).

\*       \*       \*

In sum, dating back to the nineteenth century, Presidents have exercised foreign affairs and Commander-in-Chief powers to require permits for cross-border facilities, and Congress has either expressly affirmed, or otherwise acquiesced in, the President's claim of authority.  To this day, Congress has not enacted any legislation governing the approval process of such facilities.  "[A]s a practical matter," this history "enable[s], if not invite[s] measures on independent presidential responsibility."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *cf. Haig v. Agee*, 453 U.S. 280, 291 (1981) ("in the areas of foreign policy and national security … congressional silence is not to be equated with congressional disapproval").  The President, therefore, had authority to revoke the Keystone XL permit, and did so according to its plain terms.  *See* 2019 Permit, Art. 1(1) (permit "may be … revoked … at any time at the sole discretion of the President").[16]

### 4. There is no conflict between the political branches' respective authorities.

Plaintiffs nevertheless argue that the President "improperly arrogated commercial regulatory powers Congress alone possesses" when he revoked the Keystone XL permit. Am. Compl. ¶ 98; *see also id.* ¶¶ 6, 88.  The regulation of cross-border facilities, however, is not purely a matter of commercial regulation; it fundamentally implicates foreign relations and national security considerations, as discussed above.  Because Congress has chosen to defer to the President's authority in this area, the challenged revocation does not present a conflict between the political branches' respective powers. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), which Plaintiffs cite, confirms this point.

---

[16] Contrary to Plaintiffs' argument, this provision is unequivocally not a "pseudo-contract with a private party," Am. Compl. ¶ 95, but reflects the longstanding practice that the grant, denial, revocation, or amendment of Presidential permits is committed to the President's discretion.

### a. Justice Jackson's tripartite framework for evaluating executive authority

In evaluating challenges to claims of Presidential power, the Supreme Court has applied Justice Jackson's tripartite framework from his concurrence in *Youngstown*, 343 U.S. at 635-38.  *See, e.g.*, *Zivotofsky*, 576 U.S. at 10; *Medellin v. Texas*, 552 U.S. 491, 524 (2008); *Dames & Moore*, 453 U.S. at 668-69.  First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637.  In this area, "congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." *Id*. Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject." *Id.* at 637-38.  As the Court later explained, executive action in any particular instance may fall "not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition." *Dames & Moore*, 453 U.S. at 669.

*Youngstown* itself fell within the third category because President Truman's action there—the seizure of the nation's steel mills to avert a strike threatening the war effort in Korea—was in conflict with duly enacted statutes. *Youngstown*, 343 U.S. at 586-87, n.5;

*id.* at 599-602 (Frankfurter, J., concurring); *id.* at 639 & nn.6-8 (Jackson, J., concurring); *id.* at 657, 660 (Burton, J., concurring); *id.* at 662 (Clark, J., concurring in judgment).  There was also no consistent historical Executive practice giving rise "to the kind of executive construction of the Constitution revealed in the *Midwest Oil* case," nor any "long-continued acquiescence of Congress giving decisive weight to a construction by the Executive of its powers."  *Id.* at 613 (Frankfurter, J., concurring).

> **b.  The President's revocation of the Keystone XL Permit falls in the continuum of either the first or second *Youngstown* categories.**

Plaintiffs maintain that the President's action "contradict[s] Congress's stated domestic policy regarding one of the most significant energy projects in a generation," Am. Compl. ¶ 2; *see also id.* ¶ 5 (complaining that no statute permits the President "to change energy policy as set by Congress").  But the only law they cite, the 2011 Tax Cut Act, sets forth no such domestic energy policy; it only required the President to act on TC Energy's "application filed on September 19, 2008 (including amendments)" within 60 days of the Act, as discussed above.  Tax Cut Act, § 501(a), (b)(1).  The Act plainly mandated action on a single application, and once President Obama denied the application, the Act ceased to have any operative effect.  It did not preclude future Presidential actions on future applications for the project, let alone reflect a congressional energy policy.

According to Plaintiffs, unbeknownst to anyone, the 2008 Keystone XL application was already granted by the Tax Cut Act, precluding the President's action here.  *See* Am. Compl. ¶¶ 100-105.  Plaintiffs rely on § 501(b)(3) of the Act, which provides that if the President did not grant the 2008 application or determine that the project disserves the national interest, "then not later than 60 days after the date of enactment of this Act, the permit for the Keystone XL pipeline … shall be in effect by operation of law."  Plaintiffs argue that § 501(b)(3) was triggered because President Obama purportedly did not comply

with a separate reporting provision of the Act, providing that "[i]f the President determines that the Keystone XL pipeline is not in the national interest," he shall submit a report "that provides a justification for determination, including consideration of economic, employment, energy security,  foreign policy, trade, and environmental factors."  Tax Cut Act, § 501(b)(2).  Instead of addressing those factors, the Executive's report explained that the 60-day time period was inadequate to conduct the necessary analysis because at the time, TC Energy and the State of Nebraska were still working to find an alternative route for the pipeline to avoid the environmentally sensitive terrain of the Sand Hills region.  Tax Cut Act Report at 2-3.

Contrary to Plaintiffs' argument, the contents of the Executive's report under § 501(b)(2) ("REPORTS") is irrelevant to § 501(b)(3) ("EFFECT OF NO FINDING OR ACTION").  Section (b)(3) plainly does not reference the reporting requirement in section (b)(2), let alone condition its operative effect on section (b)(2).  Rather, section (b)(3) is contingent on Presidential inaction—it is triggered only if the President both does not grant the 2008 application and does not determine the Keystone XL permit to be against the national interest.  President Obama, of course, determined that granting the application at that time would not be in the national interest.

Plaintiffs' argument is also belied by subsequent actions of TC Energy, the Executive Branch, and Congress itself.  TC Energy filed two more applications, one in 2012, which was denied by the Secretary of State, and another in 2017 upon President Trump's invitation, 82 Fed. Reg. 8663, which was granted by the Under Secretary of State for Political Affairs.  Congress itself passed the ultimately-vetoed Keystone XL Pipeline Approval Act of 2015, attempting to directly grant "the application filed on May 4, 2012." S. 1, 114th Cong., § 2(a).  And President Trump issued a new permit in 2019.  None of these actions would have been necessary had the permit already been issued in 2011.

51

Plaintiffs also seek to rely on *Zivotofsky v. Kerry*, 576 U.S. 1 (2015), and *Medellin v. Texas*, 552 U.S. 491, 527 (2008).  Both are *Youngstown* category three cases and neither helps Plaintiffs.  *Zivotofsky* involved a conflict between an Executive policy of declining to recognize any country's claim of sovereignty over Jerusalem and a statute intended to override that policy.  576 U.S. at 31-32.  The Supreme Court struck down the statute on the basis that the President has the exclusive constitutional authority to recognize foreign states.  *Id*.  The Supreme Court in *Medellin*, on the other hand, invalidated the President's attempt to enforce a non-self-executing treaty.  The Court reasoned that the Constitution vests in the Senate the authority to ratify treaties, and a non-self-executing treaty is "one that was ratified with the understanding that it is not to have domestic effect of its own force."  552 U.S. at 527.

Here, in contrast, there is no conflict between the Presidential action and any constitutionally sufficient congressional action.  Rather, the regulation of cross-border facilities falls within the "zone of twilight" in which the President and Congress have concurrent authority, and the distribution of power has long been settled by the President's exercise of authority and by congressional acquiescence.  *Youngstown*, 343 U.S. at 635, 637 (Jackson, J., concurring).  The President's action here thus falls along the continuum of the first *Youngstown* category, or at the very least, the second *Youngstown* category.  It clearly does not fall within the third *Youngstown* category because the Court need not "disabl[e] Congress from acting upon the subject" in order to sustain the President's action.  *Id.* at 637-38 (Jackson, J., concurring).

### 5.  Congress's acquiescence is further reflected in legislative activities that did not result in enacted laws.

Plaintiffs further argue that "[a]s to the power to deny the Keystone XL permit, Congress has not acquiesced in this particular exercise of Presidential authority."  Am.

Compl. ¶ 97; *see also id.* ¶ 96 (arguing that it is no response "to say that past Presidents have issued cross-border permits").  But even without congressional acquiescence, the President has independent constitutional authority to act, as discussed above, and that independent authority necessarily encompasses the authority to deny or revoke a permit, as expressly recognized in the permit that President Trump granted.  Congress also recognized as much in the Tax Cut Act when it acknowledged that "[t]he President shall not be required to grant the permit … if the President determines that the Keystone XL pipeline would not serve the national interest."  Tax Cut Act, § 501(b)(1).  Indeed, the Executive twice denied TC Energy's applications for the Keystone XL project.

Plaintiffs contrast President Biden's authority to revoke the 2019 permit with President Trump's authority to approve the permit, contending that the latter is "consistent with multiple acts of Congress," Am. Compl. ¶ 4, and "put into effect the repeatedly expressed preferences of Congress," *id.* ¶ 97 n.15.  In effect, Plaintiffs are arguing that President Biden has acted in contravention of the "will of Congress."  *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring).  But except for four "explicit and unambiguous" exceptions specified in the Constitution itself, *INS v. Chadha*, 462 U.S. 919, 955 (1983), Congress's will must be expressed through enacted laws and joint resolutions (*see* U.S. Const. art. I, § 7) that satisfy Bicameralism and Presentment.

Again, the only statute Plaintiffs cite is the Tax Cut Act, which, as discussed, recognized the President's broad discretion to grant or deny the 2008 application for the Keystone XL project.  The un-enacted bills and the vetoed Keystone Pipeline Approval Act cited by Plaintiffs, *see* Am. Compl. ¶ 97, n.15, do not express the will of Congress, and cannot displace Presidential authority.  *See Garamendi*, 539 U.S. at 429 (in holding that the President has claims settlement authority with foreign countries, Court observed that "Congress ha[d] done nothing to express disapproval of the President's policy," despite the

"repeate[d]" introduction of contrary legislation; because none of those bills had been enacted into law, "Congress has not acted on the matter addressed here"); *see also Chadha*, 462 U.S. at 951 ("the legislative power of the Federal government [must] be exercised in accord with a single, finely wrought and exhaustively considered, procedure" as set forth in Article I, §§ 1 and 7 of the Constitution).  Justice Jackson understood that Congress's will must be divined through the constitutionally-mandated process.  *See* Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121, 125 (1949).  Plaintiffs' attempt to give unsuccessful legislation the same practical effect as enacted laws fails.

Rather than evidencing congressional disapproval of Presidential action, the vetoed Keystone Pipeline Approval Act and the cited un-enacted bills reflect Congress's knowledge of the Executive's exercise of authority and the opportunity to act on that knowledge.  In *Dames & Moore*, the Court found congressional acquiescence in Executive practice based on both the enactment of related statutes and the fact that "Congress has consistently failed to object to this longstanding practice … even when it has had an opportunity to do so."  453 U.S. at 680-81 & n.10; *see also id.* at 685 & n.11 (noting that the rejected legislation would have required "congressional approval of executive agreements before they would be considered effective" or otherwise "limit[ed] the power of the President to enter into executive agreements").

Similarly, in *Bob Jones University v. United States*, in concluding that Congress had acquiesced in the Executive's interpretation of a provision of the Internal Revenue Code, the Court observed that Congress had held "[e]xhaustive hearings" on the issue at various times and "there ha[d] been no fewer than 13 bills introduced to *overturn* the IRS interpretation."  461 U.S. 574, 600 (1983) (emphasis added).  "In view of [Congress's] prolonged and acute awareness of so important an issue," the Court concluded that

"Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced in the [IRS' interpretation]."  *Id.* at 601.

### 6. The Executive's exercise of discretion in revoking the permit is unreviewable.

Plaintiffs also challenge the President's rationale for revoking the permit, both because the President cited "economic and climate imperatives" in making his decision, *see* Am. Compl. ¶ 5; and because Plaintiffs believe that the "Keystone XL would not materially affect greenhouse gas emissions," is a better method for transporting crude oil, and is beneficial to the economy, *id.* ¶ 53.  But once this Court determines that the President had the constitutional authority to revoke the permit, how the President exercised that authority is beyond the purview of the Judiciary.

The Supreme Court consistently has found the President's exercise of discretion unreviewable whether the discretion is derived from the Constitution or a statute.  In *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, for example, the President's exercise of inherent constitutional authority to deny an air carrier's request to engage in foreign air transportation was "not subject to judicial intrusion or inquiry," 333 U.S. at 111, because such a decision "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate," *id.* at 114; *accord Haig*, 453 U.S. at 292; *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).  As the Supreme Court explained, "the very nature of executive decisions as to foreign policy is political, not judicial"; such decisions are "delicate, complex, and involve large elements of prophecy" and have "long been held to belong in the domain of political power."  *Waterman*, 333 U.S. at 111.

Similarly, in *Dalton v. Specter*, 511 U.S. 462 (1994), the Court refused to review the President's decision under a statute to close certain military bases, explaining that,

> where a claim concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.

*Id.* at 474; *see also United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940) (challenge to President's factual basis for changing a tariff rate using procedures prescribed by Congress unreviewable); *Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 181 (1919) (Presidential action taken pursuant to congressional authorization allowing the President to assume control of any telephone lines "whenever he shall deem it necessary for the national security or defense" during war unreviewable).

Here, the President determined that "[t]he Keystone XL Pipeline disserves the U.S. national interest" because over the last four years "[e]xtreme weather events and other climate-related effects have harmed the health, safety, and security of the American people." EO 13990, § 6(c), (d). The President set forth his judgment that, "[t]he world must be put on a sustainable climate pathway to protect Americans and the domestic economy from harmful climate impacts, and to create well-paying union jobs as part of the climate solution." *Id.* § 6(d). And the President added that our domestic efforts "must go hand in hand with U.S. diplomatic engagement," which the President determined would be undermined if the permit were left in place. *Id.* § 6(d). "Because most greenhouse gas emissions originate beyond our borders," the President explained, such diplomatic engagement "is more necessary and urgent than ever," and "[t]he United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action[.]" *Id.* These types of judgments are inherently within the President's discretion.

Furthermore, the Supreme Court has long recognized that "matters relating to the conduct of foreign relations," such as the foreign policy judgment at issue here, "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Haig*, 453 U.S. at 292; *see also United States v. Pink,* 315 U.S. 203, 222-23 (1942) (same). The Fifth Circuit "has consistently followed the command that matters implicating foreign relations … are generally beyond the authority or competency of a court's adjudicative powers." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011). As the court said, "in the chess game that is diplomacy[,] only the executive has a view of the entire board and an understanding of the relationship between isolated moves." *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir. 1974).

Plaintiffs mistakenly believe that the President could not properly consider domestic economic imperatives in revoking the permit at issue. *See* Am. Compl. ¶ 5. Since President Grant conditioned the landing of a submarine cable from France in 1869, the Executive has reviewed permit applications holistically to ensure that the permitting decision is in the interest of the United States. President Grant himself imposed conditions on cable landings to forbid unjust discriminations, prevent monopolies, promote competition, and secure reasonable rates. 22 Op. Att'y Gen. 13, 26-27. Presidents Lyndon Johnson and George W. Bush required the Secretary of State to examine whether granting permits for oil pipelines and other border-crossing facilities would serve the "national interest." *See* EO 11423, § 1(d), (e); EO 13337, § 1(h); *see also* EO 12038 (using a "public interest" standard for natural gas and electric energy cross-border facilities). In denying TC Energy's application for a permit in 2015, the Secretary of State cited, among numerous other things, economic considerations. *See* 2015 ROD at 26, 30; *see id.* at 3 (listing various factors for the national interest determination). Congress was fully aware of the broad policy scope of the Executive's permitting decisions, and has long accepted it. *See, e.g.*, Tax Cut Act,

§ 501(b)(2) (identifying "economic, employment, energy security, foreign policy, trade, and environmental factors" as part of the Executive's national interest determination under Executive Order No. 13337).

In sum, Plaintiffs fail to state a separation-of-powers claim challenging the President's revocation of the Keystone XL permit.

### B. Plaintiffs Fail to State a Non-delegation Claim

Count IV of the Amended Complaint alleges that the permit revocation "runs afoul of the nondelegation doctrine" to the extent Defendants rely on "a general authority to regulate the environment or conduct foreign relations actually conferred on them by Congress." Am. Compl. ¶ 119. This challenge fails because, in revoking the permit, the President did not rely on any legislative grant of authority—a predicate to any non-delegation inquiry—but acted pursuant to his constitutional authority. *See* EO 13990, § 6.

The non-delegation doctrine "is rooted in the principle of separation of powers," *Mistretta*, 488 U.S. at 371, and provides that "Congress may not constitutionally delegate its legislative power to another branch of Government," *Touby v. United States*, 500 U.S. 160, 165 (1991). This limit on legislative action, however, is highly deferential; Congress need only "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Id*. Because of this highly deferential standard, the Supreme Court has found non-delegation violations only twice, and that was 86 years ago. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (discussing the two instances); *see also Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality op.) (rejecting the most recent non-delegation challenge).

Importantly, "[i]n a delegation challenge, the constitutional question is whether the *statute* has delegated legislative power to the [Executive]." *Whitman*, 531 U.S. at 472

(emphasis added).  "'A nondelegation inquiry always begins (and often almost ends) with statutory interpretation,' because [the court] need[s] 'to figure out what task [the statute] delegates and what instructions it provides.'"  *Big Time Vapes*, 963 F.3d at 443 (quoting *Gundy*, 139 S. Ct. at 2123)).  The cases Plaintiffs cite confirm as much.[17]  Because Plaintiffs acknowledge, as they must, that "no statute specifically authoriz[ed] the President to revoke the Keystone XL permit," Am. Compl. ¶ 124; *see also id.* ¶ 114 ("there is no congressional act regarding border crossings for oil pipelines"), their non-delegation challenge is not viable, and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion to dismiss.

Dated:  July 12, 2021

<div style="margin-left:40%">

Respectfully submitted

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

</div>

---

[17] *See Gundy*, 139 S. Ct. at 2129-31 (interpreting 34 U.S.C. § 20913(d)), cited in Am. Compl. ¶¶ 119, 122; *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 55-56 (2015) (interpreting Section 207(d) of the 2008 Rail Investment and Improvement Act), cited in Am. Compl. ¶ 121; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (section 3 of the National Industrial Recovery Act), cited in Am. Compl. ¶ 121; *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (section 9(c) of the Recovery Act), cited in Am. Compl. ¶ 122.

/s/ *Jean Lin*
JEAN LIN, Attorney in Charge
NY Bar 4074530, admitted *pro hac vice*
Special Litigation Counsel
STUART J. ROBINSON
KEVIN M. SNELL
Trial Attorneys
U.S. Dept. of Justice, Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2021, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN