**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| STATE OF TEXAS, STATE OF MONTANA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF KANSAS; COMMONWEATH OF KENTUCKY; STATE OF INDIANA; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WEST VIRGINIA; and STATE OF WYOMING, <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al., <br><br> *Defendants*. | Civ. Action No. 3:21-cv-00065 |

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 2

STANDARDS OF REVIEW ....................................................................................... 2

I.    THIS COURT HAS JURISDICTION....................................................................... 3

    A.    This Case Is Not Moot.......................................................................... 3

        1.    This Court Can Still Grant Effective Relief. ........................................ 4

        2.    In Any Event, this Case Meets a Traditional Mootness Exception. ........................................................................... 7

        3.    The Court Can Grant Declaratory Relief. ......................................... 11

    B.    Neither the President Nor the Agency Defendants Are Above the Law.. 13

        1.    Judicial Review is Available under the APA. .................................... 13

        2.    The President is Not Immune from Constitutional Challenges. ... 19

    C.    The Court Has Jurisdiction to Enter Relief Against Agency Defendants............................................................................................ 22

    D.    Plaintiffs Have Standing ..................................................................... 27

        1.    Plaintiffs Have Alleged Concrete and Particularized Injuries. ...... 27

            a.    The Executive Order Robs Plaintiffs of Specific Tax Revenues. ....................................................................... 28

            b.    Plaintiffs Have Special Solicitude Standing. ........................ 30

            c.    Plaintiffs Have Parens Patriae Standing. .............................. 31

                i.    Economic and Physical Well-Being ........................... 33

                ii.   Rightful status within the federal system ................. 35

2.      Plaintiffs' Injuries are Redressable. ........................................ 36

II.     VENUE IS PROPER ............................................................................... 37

III.    EXECUTIVE ORDER 13990 VIOLATES THE SEPARATION OF POWERS ..................... 40

A.      Congress Has Primacy Over Matters of Foreign Commerce 41

B.      Congress Expressly Authorized the Keystone XL Pipeline in 2011 ......... 43

C.      Even Absent Pub. L. 112-78, the President Lacks the Power to Unilaterally Revoke this Oil Pipeline Cross-Border Permit ...................... 46

1.      History of the Foreign Commerce Power ........................................ 48

a.      The Constitutional Convention .................................. 48

b.      The Early Republic .................................................... 49

c.      Cross-Border Instrumentalities ................................. 50

2.      Congress Has Not Acquiesced to Presidential Power over the Keystone XL ................................................................................ 55

3.      Revocation of a Duly Granted Permit Triggers Additional Constitutional Scrutiny .............................................................. 57

CONCLUSION ....................................................................................... 60

CERTIFICATE OF SERVICE .................................................................... 69

# TABLE OF AUTHORITIES

## Cases

*6th St. Bus. Partners LLC v. Abbott*,
   No. 1:20-CV-706-RP, 2020 U.S. Dist. LEXIS 130814 (W.D. Tex. July 24, 2020) .. 26

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ................................................................................. 15

*Abrams v. Heckler*,
   582 F. Supp. 1155 (S.D.N.Y. 1984)................................................... 31–32

*Adarand Constructors v. Slater*,
   528 U.S. 216 (2000) ................................................................................. 3

*Air One Helicopters, Inc. v. Fed. Aviation Admin.*,
   86 F.3d 880 (9th Cir. 1996) ............................................................ 14–15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) ........................................................... 31, 32, 35

*American School of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902) ................................................................................ 24

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) .............................................................................. 24

*Atlee v. Nixon*,
   336 F. Supp. 790 (E.D. Pa. 1972) ....................................................... 21

*Baker v. Carr*,
   369 U.S. 186 (1962) ....................................................................... 54, 58

*Bas v. Tingy*,
   4 U.S. (4 Dall.) 37 (1800) .................................................................... 50

*Bayou Liberty Ass'n v. United States Army Corps of Eng'rs*,
   217 F.3d 393 (5th Cir. 2000) ................................................. 7, 8, 9, 10

*Biden v. Knight First Amendment Inst. at Columbia Univ.*,
   141 S. Ct. 1220 (2021) ......................................................................... 20

*Bd. of Trustees v. United States*,
   289 U.S. 48 (1933) ............................................................................... 41

*Borders v. Reagan*,
   518 F. Supp. 250 (D.D.C. 1981) ......................................................... 21

*Brown v. United States,*
    12 U.S. (8 Cranch) 110 (1814) ............................................................ 50

*Cable News Network v. American Broadcasting Companies,*
    518 F. Supp. 1238 (N.D. Ga. 1981) ..................................................... 21

*California Bankers Ass'n v. Shultz,*
    416 U.S. 21 (1974) ............................................................................... 47

*Cargo of the Brig Aurora v. United States,*
    11 U.S. (7 Cranch) 382 (1813) ............................................................ 50

*Catholic Leadership Coalition of Texas v. Reisman,*
    764 F.3d 409 (5th Cir. 2014) .......................................................... 9, 10

*Chafin v. Chafin,*
    568 U.S. 165 (2013) ............................................................................ 3, 7

*Chamber of Commerce of the U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................... 13, 24

*Chas. T. Main Int'l v. United States,*
    509 F. Supp. 1162 (D. Mass. 1981) .................................................... 21

*Chicago & Southern Air Lines. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ................................................................ 53, 54, 59

*Church of Scientology of Cal. v. United States,*
    506 U.S. 9 (1992) ................................................................................... 4

*City of New York v. United States Dep't of Commerce,*
    739 F. Supp. 761 (E.D.N.Y. 1990) ..................................................... 21

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................................... 4

*Clinton v. Jones,*
    520 U.S. 681 (1997) ............................................................................. 19

*Connell v. Shoemaker,*
    555 F.2d 483 (5th Cir. 1977) ............................................................... 12

*Czyzewski v. Jevic Holding Corp.,*
    137 S. Ct. 973 (2017) ........................................................................... 28

*Dalton v. Specter,*
    511 U.S. 462 (1994) ...................................................................... 21–22

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ................................................................................ *passim*

*Darr v. Carter,*
    640 F.2d 163 (8th Cir. 1981) ............................................................... 21

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ............................................................ 24

*Davis v. FEC,*
    554 U.S. 724 (2008) ............................................................................. 28

*Dellums v. Bush,*
    752 F. Supp. 1141 (D.D.C. 1990) ....................................................... 21

*District of Columbia v. Trump,*
    291 F. Supp. 3d 725 (D. Md. 2018) ................................................... 20

*Doe # 1 v. Trump,*
    423 F. Supp. 3d 1040 (D. Ore. 2019) ................................................. 18

*Doe v. Nielsen,*
    No. 18-cv-02349-BLF (VKD), 2018 U.S. Dist. LEXIS 153199 (N.D. Cal. Sept. 7,
    2018) ..................................................................................................... 17

*Doe v. Trump,*
    No. 3:19-cv-1743-SI, 2020 U.S. Dist. LEXIS 65441 (D. Or. Apr. 13, 2020) ............ 14

*Doe v. United States,*
    853 F.3d 792 (5th Cir. 2017) .............................................................. 13

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) .............................................................. 14

*El Paso Cty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ........................................................ 28, 30

*Ellis v. Railway Clerks,*
    466 U.S. 435 (1984) ............................................................................... 3

*Ex parte Young,*
    209 U.S. 123 (1908) ............................................................................. 23

*Familias Unidas v. Briscoe,*
    544 F.2d 182 (5th Cir. 1976) .............................................................. 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................. 21, 22, 25

*Friedman v. Fed. Aviation Admin.*,
  841 F.3d 537 (D.C. Cir. 2016) ................................................................ 15, 16

*Friends of the River v. U.S. Army Corps of Eng'rs*,
  870 F. Supp. 2d 966 (E.D. Cal. 2012) ........................................................ 18

*Georgia v. Stanton*,
  73 U.S. (6 Wall.) 50 (1868) ....................................................................... 21

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) ................................................................... 41, 45, 51, 52

*Glenwood Springs Citizens' All. v. United States DOI*,
  Civil Action No. 20-cv-00658-CMA, 2021 U.S. Dist. LEXIS 44690, at *2–4 (D. Colo.
  Mar. 10, 2021) ..................................................................................... 14, 17

*Grand Canyon Tr. v. Williams*,
  No. CV13-8045, 2013 WL 12176992 (D. Ariz. Sept. 9, 2013) ...................... 17

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ..................................................................... 24

*Halperin v. Kissinger*,
  606 F.2d 1192 (D.C. Cir. 1979) ................................................................. 21

*Hanson v. Veterans Administration*,
  800 F.2d 1381 (5th Cir. 1986) ................................................................... 37

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) ..................................................................... 13

*Henderson v. Mayor of New York*,
  92 U.S. 259 (1875) ................................................................................... 41

*Holmes v. Energy Catering Servs., L.L.C.*,
  270 F. Supp. 2d 882 (S.D. Tex. 2003) ........................................................ 38

*Home Building & Loan Assn. v. Blaisdell*,
  290 U.S. 398 (1934) ................................................................................. 42

*Hood ex rel. Miss. v. Microsoft Corp.*,
  428 F. Supp. 2d 537 (S.D. Miss. 2006) ...................................................... 32

*In re Trump*,
  928 F.3d 360, 364 (4th Cir. 2019) ............................................................. 20

*Indigenous Environmental Network v. Biden*,
  4:19-cv-00028, at 11 (D. Mont. May 28, 2021) ............................................ 6

*Inst. of Certified Prac., Inc. v. Bentsen,*
   874 F. Supp. 1370 (N.D. Ga. 1994) .............................................................. 38, 39

*Japan Line, Ltd. v. Cty. of L.A.,*
   441 U.S. 434 (1979) ........................................................... 32–33, 41, 47

*John Doe, Inc. v. Gonzalez,*
   Civil Action No. 06-966 (CKK), 2006 U.S. Dist. LEXIS 44402  (D.D.C. June 29,
   2006) ............................................................................................................. 16

*Kansas ex rel. Hayden v. United States,*
   748 F. Supp. 797 (D. Kan. 1990) ............................................................... 31

*Kent v. Dulles,*
   357 U.S. 116 (1958) ..................................................................................... 48

*Kingdomware Techs., Inc. v. United States,*
   136 S. Ct. 1969 (2016) .................................................................................. 9

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
   928 F.3d 226 (2d Cir. 2019) ........................................................................ 20

*Knox v. SEIU, Local 1000,*
   567 U.S. 298 (2012) ..................................................................................... 3

*Kraft Gen. Foods v. Iowa Dep't of Revenue & Fin.,*
   505 U.S. 71 (1992) ....................................................................................... 47

*Lewis v. Cont'l Bank Corp.,*
   494 U.S. 472 (1990) ..................................................................................... 7

*License Tax Cases,*
   72 U.S. (5 Wall.) 462 (1867) ....................................................................... 47

*Little v. Barreme,*
   6 U.S. (2 Cranch) 170 (1804) ...................................................................... 50

*Lopez v. City of Hous.,*
   617 F.3d 336 (5th Cir. 2010) ....................................................................... 10

*Mach Mining, LLC v. E.E.O.C.,*
   135 S. Ct. 1645 (2015) ................................................................................. 15

*Make the Rd. New York v. Pompeo,*
   475 F. Supp. 3d 232 (S.D.N.Y. 2020) ......................................................... 25

*Maryland v. Louisiana,*
   451 U.S. 725 (1981) ..................................................................................... 36

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................................................................... *passim*

*Medellin v. Texas*,
552 U.S. 491 (2008) ............................................................................. 42, 46, 55

*Meltzer v. Bd. of Pub. Instruction*,
548 F.2d 559 (5th Cir. 1977) ........................................................................ 11

*Michelin Tire Corp. v. Wages*,
423 U.S. 276 (1976) ........................................................................................ 49

*Miller v. Albright*,
523 U.S. 420 (1998) ........................................................................................ 38

*Miller v. Christopher*,
870 F. Supp. 1 (D.D.C. 1994) ...................................................................... 39

*Minnesota Chippewa Townsend v. Carter*,
476 F. Supp. 1070 (N.D. Tex. 1979) .......................................................... 21

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ........................................................................ 20

*Murphy v. Ford*,
390 F. Supp. 1372 (W.D. Mich. 1975) ....................................................... 21

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014) ........................................................................................ 23

*Nash v. Texas*,
632 F. Supp. 951 (E.D. Tex. 1986) ............................................................. 11

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) .......................................................... 20, 21, 22

*Nat'l Urban League v. Ross*,
No. 20-CV-05799-LHK, 2020 U.S. Dist. LEXIS 165989 (N.D. Cal. Sept. 10,
2020) ........................................................................................................... 18–19

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
138 S. Ct. 617 (2018) ..................................................................................... 15

*Nat'l Distillers and Chemical Corp. v. Dep't of Energy*,
487 F. Supp. 34 (D. Del. 1980) .................................................................... 39

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ....................................................................... 5, 28, 36

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ........................................................................ 20–21, 21

*Nixon v. Sirica,*
    487 F.2d 700 (D.C. Cir. 1973) ........................................................... 21

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001) ............................................................. 26

*Panama Ref. Co. v. Ryan,*
    293 U.S. 388 (1935) ........................................................................ 22, 42

*Qureshi v. Holder,*
    663 F.3d 778 (5th Cir. 2011) ........................................................... 15, 16

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) ............................................................ 2–3

*Roe v. Wade,*
    410 U.S. 113 (1973) ............................................................................ 9

*Romero v. City of Grapevine,*
    888 F.3d 170 (5th Cir. 2018) .............................................................. 3

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................................. 39

*S. Recycling, L.L.C. v. Aguilar,*
    982 F.3d 374 (5th Cir. 2020) .............................................................. 2

*Sackett v. E.P.A.,*
    566 U.S. 120 (2012) ........................................................................... 17

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ........................................................................... 18

*Simmat v. U.S. Bureau of Prisons,*
    413 F.3d 1225 (10th Cir. 2005) .......................................................... 25

*Smilde v. Snow,*
    73 F. App'x 24 (5th Cir. 2003) ........................................................... 38

*Southern Pac. Terminal Co. v. ICC,*
    219 U.S. 498 (1911) ........................................................................... 10

*Spencer v. Kemna,*
    523 U.S. 1 (1998) ............................................................................. 3, 9

*Stark v. Wickard,*
   321 U.S. 288 (1944) ............................................................................ 24

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ............................................................................ 36

*Steffel v. Thompson,*
   415 U.S. 452 (1974) ............................................................................ 23

*Storer v. Brown,*
   415 U.S. 724 (1974) ............................................................................ 9

*Super Tire Eng'g Co. v. McCorkle,*
   416 U.S. 115 (1974) ........................................................................ *passim*

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................ 28

*Texas v. United States,*
   86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................. 31, 36, 39

*Texas v. United States,*
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................... *passim*

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................. 30, 31, 36, 37

*Texas v. United States,*
   No. 1:18-CV-00068, 2021 U.S. Dist. LEXIS 133114 (S.D. Tex. July 16, 2021) ....... 40

*Town of Chester v. Laroe Ests., Inc.,*
   137 S. Ct. 1645 (2017) ............................................................................ 40

*Tribe v. Carlucci,*
   358 F. Supp. 973 (D.D.C. 1973) ..................................................... 21

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ............................................................................ 13

*Trump v. Vance,*
   140 S. Ct. 2412 (2020) ............................................................................ 1

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   136 S. Ct. 1807 (2016) ..................................................................... 15, 16

*United States ex. rel. Turner v. Williams,*
   194 U.S. 279 (1904) ..................................................................... 41, 47

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ........................................................................... 41, 46

*United States v. Guy W. Capps, Inc.,*
   204 F.2d 655 (4th Cir. 1953) ........................................................ 45

*United States v. Holliday,*
   70 U.S. 407 (1865) ........................................................................ 41

*United States v. Lee,*
   106 U.S. 196 (1882) ..................................................................... 19

*United States v. Nixon,*
   418 U.S. 683 (1974) ............................................................... 19, 21

*United States v. W. Union Tel. Co.,*
   272 F. 311 (S.D.N.Y. 1921) ............................................. 52, 53, 60

*Vieux Carre Prop. Owners v. Brown,*
   948 F.2d 1436 (5th Cir. 1991) ...................................................... 7, 8, 9

*Wash. Utilities and Transp. Comm'n v. F.C.C.,*
   513 F.2d 1142 (9th Cir. 1975) ...................................................... 31

*Welton v. Missouri,*
   91 U.S. 275 (1875) ........................................................... 32, 47–48

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ..................................................................... 13

*Winsness v. Yocom,*
   433 F.3d 727 (10th Cir. 2006) ..................................................... 23

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992) ..................................................................... 28

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ............................................................... *passim*

*Zivotofsky v. Clinton,*
   566 U.S. 189 (2012) ..................................................................... 42

*Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ................................................... 41, 42, 45, 47

*Zweibon v. Mitchell,*
   516 F.2d 594 (D.C. Cir. 1975) ............................................... 54, 55

## Other Authorities

United States Code

  5 U.S.C. § 501(a) ............................................................................. 44
  5 U.S.C. § 501(b)(1) ........................................................................ 44
  5 U.S.C. § 501(b)(2) ........................................................................ 44
  5 U.S.C. § 501(b)(3) ........................................................................ 44
  5 U.S.C. § 551(6) ............................................................................. 13
  5 U.S.C. § 551(13) ........................................................................... 13
  5 U.S.C. § 704 ................................................................................. 15
  5 U.S.C. § 706 ................................................................... 13, 44, 45
  15 U.S.C. § 717b(a), (c) .................................................................. 53
  16 U.S.C. § 824(e) .......................................................................... 53
  28 U.S.C. § 1391(e)(1) .................................................................... 37
  33 U.S.C. § 535 ............................................................................... 53
  47 U.S.C. §§ 34–39 ......................................................................... 53

United States Constitution

  Art. I, § 8 ............................................................... 1, 41, 43, 46

Federal Register

  86 Fed. Reg. 7037 ...................................................................... 58, 60

La. Rev. Stat. Ann.

  § 47:32 ............................................................................................ 30
  § 47:601 .......................................................................................... 30

14D Charles Alan Wright, *et al., Federal Practice and Procedure* § 3815 (4th ed.) .......... 39

33 Charles Alan Wright, *et al., Federal Practice and Procedure* § 8304 (2d ed.) ............... 24

Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*,
  83 Notre Dame L. Rev. 1417, 1418 (2008) .................................................... 1

Kenneth Garger, *Company Behind Keystone XL pipeline seeks $15 billion damages from US*,
  N.Y. POST. (July 4, 2021) ................................................................ 7, 58

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
  104 Va. L. Rev. 933 (2018) ............................................................... 23

Jonathan Siegel, *Suing the President: Nonstatutory Review Revisited*,
  97 Colum. L. Rev. 1612, 1678–79 (1997) ................................................ 20, 21

Laura Krugman Ray, *Prerogative to Accountability: The Amenability of the President to Suit*,
  80 Ky. L.J. 739, 809 (1992) ........................................................... 21, 22

Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111
  YALE L. J. 231 (2001) ..................................................................... 50

William Powell, *Policing Executive Teamwork: Rescuing the APA from* Presidential Ad-
    ministration, 85 Mo. L. Rev. 71 (2020)................................................................. 23

American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2,
    113th Cong., 2d Sess. § 103 (2014)...................................................................... 56

Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. (2013).............................. 56

North American Energy Access Act, H.R. 4348, 112th Cong., 2d Sess. (2012) .............. 56

S. 1, 114th Cong., 1st Sess. (2015) ........................................................................ 56

Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. 112-78, 125 Stat.
    (Dec. 23, 2011)................................................................................................ *passim*

*Granting of License for the Constr. of a Gas Pipe Line,*
    38 Op. Att'y Gen. 163 (1935) ........................................................................... 52

*Foreign Cables,*
    22 Op. Att'y Gen. 13 (1898) ........................................................................ 50, 51

## INTRODUCTION

Who may regulate foreign and interstate commerce?  The Constitution says Congress.  U.S. CONST. ART. I, § 8.  Defendants argue otherwise—at least when it comes to revoking a transnational pipeline's permit to cross the peaceful Canadian border.  That power to destroy a massive commercial project with millions of reliant stakeholders resides in the President, they argue.  The principal dispute here, then, involves fundamental questions about the Constitution's separation of powers—the sinews of our republican freedoms.[1]  Defendants also argue the Court has no place in this dispute—that the President's action is unreviewable.  But that is wrong as a matter of precedent and principle.  The President is not above the law.  *See Trump v. Vance*, 140 S. Ct. 2412 (2020).

These weighty constitutional questions are not theoretical.  The Keystone XL Pipeline ("KXLP") is a lifeline for communities and industries across the Plaintiff States.  Undisputed analyses *from Defendants* confirm that the States and their communities would glean millions of dollars in direct, indirect, and induced revenue from the KXLP's construction and operation.[2]  The KXLP would steward the environment, boost our energy security, and strengthen poor and rural communities.

Hours into his tenure, President Biden revoked the KXLP cross-border permit,

---

[1] *See* Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008) ("Structure is everything.").

[2] *See* U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone XL Project (Jan. 2014) [hereinafter "2014 FSEIS"], https://2012-keystone-pipeline-xl.state.gov/finalseis/index.htm; U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone XL Project (Dec. 2019) [hereinafter "2019 FSEIS"], https://www.state.gov/wp-content/uploads/2019/12/Vol-I-Keystone-Final-SEIS-Cover-through-Chapter-11_508-December-2019.pdf.

1

thereby eliminating the abundant benefits Plaintiffs and their citizens justifiably pinned on the project.  If Defendants prevail, those losses may become permanent.

But this Court can and should stop this presidential power grab.  If it grants Plaintiffs' relief, the KXLP project will revive.  Removing the specter of capricious presidential power will incentivize TC Energy or another entity to complete and operate the pipeline.  Yet without the regulatory certainty only this Court can provide, Executive Order 13990 will remain a "continuing and brooding presence" that will bar all attempts to resurrect the KXLP.  *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974).  The unconstitutional Order has harmed and continues to harm Plaintiffs, and this Court can stop it.

Congress expressly approved the KXLP in 2011—removing the matter from presidential discretion.  But even if Congress had remained silent (it hasn't), the President lacks the independent power to cancel a cross-border pipeline project that raises no legitimate national security concerns.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

The President's Order is unconstitutional, and the motion to dismiss must fail.

## ARGUMENT

### STANDARDS OF REVIEW

To survive Defendants' 12(b)(1) motion, Plaintiffs need only demonstrate they have standing by preponderance of the evidence.  *S. Recycling, L.L.C. v. Aguilar*, 982 F.3d 374, 379 (5th Cir. 2020).  "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."  *Ramming v. United*

*States*, 281 F.3d 158, 161 (5th Cir. 2001).  Plaintiffs similarly survive Defendants' 12(b)(6) motion.  *See Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) ("a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (cleaned up).  And Plaintiffs agree, this Court must consider certain documents outside the complaint.  ECF 98 at 14.  The Complaint's factual allegations and Defendants' uncontested economic analyses are more than sufficient to avoid dismissal.

## I.  THIS COURT HAS JURISDICTION

### A.  This Case Is Not Moot.

This case is very much alive.  The party seeking to moot a controversy faces a "heavy burden."  *Adarand Constructors v. Slater*, 528 U.S. 216, 222 (2000) (per curiam).  "[A] case 'becomes moot only when it is *impossible* for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (emphasis added) (quoting *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012)); *see also Knox*, 567 U.S. at 307–08 ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.") (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984).  Defendants cannot meet that burden.

A favorable judgment will redress Plaintiffs' injuries.  *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  It will certainly lead to the resurrection of the KXLP by TC Energy or another entity.[3]  Until then, the Executive Order's looming presence will prevent the

---

[3] *See* Statement by National Security Advisor Jake Sullivan on the Need for Reliable and Stable Global Energy Markets, White House Briefing Room, Aug. 11, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/11/statement-by-national-security-advisor-jake-sullivan-on-the-need-for-reliable-and-stable-global-energy-markets/ ("Higher gasoline costs, if left unchecked, risk harming the

completion and operation of the Keystone XL. *See Super Tire*, 416 U.S. at 122. For reasons the federal government has long acknowledged, this imposes costly, ongoing injuries on the States. But this Court can end those injuries; in fact, the only way to end those injuries—to ensure that the KXLP disburses its massive economic, employment, and environmental benefits to the States—is to issue a judicial declaration dispelling the fiction that the President can unilaterally regulate foreign and domestic commerce contrary to the will of Congress.

### 1.  This Court Can Still Grant Effective Relief.

The Court can grant effective relief in this case by declaring the President's Order unlawful and enjoining Defendants from enforcing it. It's not a question of whether the "threatened injury [is] certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), but whether any "possible remedy" is available. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992). That remedy exists here.

Plaintiffs seek, inter alia, declaratory judgment that the unilateral cancellation of the KXLP cross-border permit was unlawful. But for Defendants' actions, that largely underground and completed segment traversing the U.S.-Canada border would enable

---

ongoing global recovery. The price of crude oil has been higher than it was at the end of 2019, before the onset of the pandemic."); Houston Keene, *Biden's energy sec says 'pipe is best way' to transport fuel, sparks backlash regarding Keystone XL pipeline*, FOX NEWS (May 12, 2012), https://www.foxnews.com/politics/jennifer-granholm-pipeline-comment-backlash ("'But it's – the pipe is the best way to go.'"); 2019 FSEIS at S-4 (primary purpose of KXLP is to transport up to 830,000 bpd); *See* Ylan Mui & Pippa Stevens, *White House calls on OPEC to boost oil production as gasoline prices rise*, CNBC (Aug. 11, 2021), https://www.cnbc.com/2021/08/11/as-gas-prices-rise-white-house-says-opec-action-is-simply-not-enough-calls-for-ftc-scrutiny.html ("[OPEC's] July agreement to boost production by 400,000 barrels per day … is 'simply not enough….'").

the KXLP to transport crude oil to vital U.S. refining centers.  *See* ECF 71 at ¶¶ 61–77.  Much of the KXLP is fully constructed and could again be operated by TC Energy or its competitors to transport hundreds of thousands of barrels of Canadian and American oil to the Gulf Coast.  ECF 71 at ¶¶ 51, 59–60; *cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding Article III satisfied where Plaintiffs' "theory of standing … relies … on the predictable effect of Government action on the decisions of third parties.").

In *Dep't of Commerce*, plaintiffs challenged the inclusion of a citizenship question on the decennial census questionnaire.  *Id.* at 2563.  They alleged that many noncitizens would refuse to complete the questionnaire due to fears about how the government would use the answers to the citizenship question.  *Id.* at 2565–66.  All the prospective injuries hinged on how the government's action (inserting the question) would predictably drive third party decisions (whether to complete the form).  *Id.* at 2565–66.  If those plaintiffs could obtain meaningful relief on that basis, the States can obtain relief here.

A project like the KXLP will unquestionably deliver significant financial returns for any company with the requisite capital resources.  *See* ECF 71 at ¶¶ 40, 42, 66–77, 83–84.  President Biden's requests to OPEC for increased production clearly show increased oil demand.[4]  Once operational, the KXLP will not only supply that demand, it will stimulate the States' economies, augment tax revenues, promote energy security, and curb dependence on geopolitical competitors.  *See* ECF 71 at ¶¶ 39–42, 56–84.

Recently, in an ongoing case related to President Trump's 2019 approval of the

---

[4] Mui & Stevens, *supra.*

KXLP's cross-border permit, a Montana federal district court remarked that, "[t]his case … involves a physical pipeline that today sits under the ground at the U.S.-Canada border." Order on Mootness, *Indigenous Environmental Network v. Biden*, 4:19-cv-00028, at 11 (D. Mont. May 28, 2021). Despite the facts that the permitted segment is completely constructed, President Biden's order succeeded President Trump's, and that TC Energy has terminated its plans to complete and operate the KXLP, the district court refused to dismiss the challenge as moot. Instead, the court found there was still a "live controversy," *id.* at 10, because it could "order[] TC Energy to remove that pipeline from the ground." *Id.* at 11. Even though the pipeline isn't currently transporting oil, the court could still grant some relief to the plaintiffs. Similarly, here the live controversy surrounds whether the order prohibiting the existing pipeline from operating is lawful.

The executive order significantly claims *sole* constitutional authority for granting and *revoking* all cross-border pipeline permits. ECF 71 at ¶ 52. If the Court doesn't correct that constitutional error, it's unlikely the KXLP or any other transnational pipeline will ever transport heavy crude to refining centers in Texas and Louisiana. At the mercy of such unchecked and fickle Presidential power, no entity is likely to again invest the considerable resources necessary to build and operate this type of project. And even if a subsequent Administration re-issued the permit, the President's day-one revocation proves there is no certainty against arbitrary revocations in the future. Knowing the President could pull the plug at any time and that judicial recourse would be foreclosed is more than enough to deter reasonable investors from undertaking the project.

TC Energy has terminated its plans to complete and operate the project for

precisely these reasons. The KXLP, however, is not dead. If the Court corrects the legal errors under which the Executive currently operates, some entity—perhaps even TC Energy—will resume the project, and its manifold benefits will flow to the States.

This case is not moot. If the Court grants Plaintiffs' requested relief, the KXLP will transport oil. And that's not wishful thinking—it's business reality. *See Chafin*, 568 U.S. at 172. In fact, this case becomes non-redressable only if the Court dismisses it.

### 2.  In Any Event, this Case Meets a Traditional Mootness Exception.

Even if the Court concludes that TC Energy's recent termination announcement moots this controversy, this case presents "issues capable of repetition, yet evading review." *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991) (citation omitted). The exception applies when: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. *Bayou Liberty Ass'n v. United States Army Corps of Eng'rs*, 217 F.3d 393, 398 (5th Cir. 2000).

The durational requirement is met because the unique and high-stakes circumstances surrounding the President's Order has not allowed the "challenged action … to be fully litigated prior to its cessation or expiration." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990). TC Energy endured over a decade of permitting, environmental review, and litigation before it began construction of the KXLP. ECF 71 at ¶¶ 30–50. The company invested an estimated $9 billion in the pipeline.[5] But less than two years after

---

[5] Kenneth Garger, *Company Behind Keystone XL pipeline seeks $15 billion damages from US*,

it obtained the permit, President Biden abruptly revoked it, leaving TC Energy with a $1.81 billion first-quarter loss.[6]  Its mounting losses were so severe that this case could not be litigated before the company was forced to discontinue the project.

But the costly regulatory crucible TC Energy endured, basic rudiments of the oil industry, and common sense all lead to an obvious conclusion: no company with share-holders could long withstand the flippant revocation of a previously granted (and hard-fought) permit upon which the entire transnational project relies.  When the government believes the President may monocratically dispatch multi-year, international, and inter-state commercial projects set to provide numerous benefits to the States based on two paragraphs of platitudinous rationale—or no rationale at all—then no such project is safe.  Affected industries will eschew or abandon development projects.  And the States will be left to suffer the results.  Plaintiffs maintain strong, live interests in this litigation, and judicial review should not be withheld *because* Defendants' unlawful actions were brutally effective.  *See Bayou Liberty,* 217 F.3d at 398 (expectation of future development made alleged harm capable of repetition); *Vieux Carre*, 948 F.2d at 1447–48 (same).

The KXLP bears similarity to other cases of short duration that evade review—labor strikes, pregnancy, and elections—where the circumstances "should not preclude

---

N.Y. POST. (July 4, 2021), https://nypost.com/2021/07/04/company-behind-keystone-xl-pipeline-seeks-15b-in-damages/.  The province of Alberta invested significantly as well.  *See Keystone XL is dead, and Albertans are on the hook for $1.3B*, CBC NEWS (Jun. 9, 2021), https://www.cbc.ca/news/canada/calgary/keystone-xl-termination-1.6059683.

[6] Nia Williams & Shariq Khan, *TC Energy posts C$1 bln quarterly loss on Keystone XL sus-pension*, REUTERS (May 7, 2021), https://www.reuters.com/world/americas/tc-energy-posts-c1-billion-quarterly-loss-keystone-xl-suspension-2021-05-07/.

challenge to state policies that have had their impact and that continue in force, unabated and unreviewed." *Super Tire*, 416 U.S. at 126–27 (labor strike); *see also Roe v. Wade*, 410 U.S. 113, 125 (1973) (pregnancy); *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (election law). Suppose a company in 2025 obtained a new cross-border permit to operate the KXLP from a new administration, and that permit was revoked by a subsequent admin-istration. That company—like TC Energy here—would face the task of honoring its fiduciary duties while sustaining a massive investment in a dormant project pending costly litigation. Business realities make the President's order one that evades review. *See Bayou Liberty*, 217 F.3d at 398; *Vieux Carre*, 948 F.2d at 1447–48.

There is also a reasonable expectation the States will be subjected to the same unlawful action again. *See Spencer*, 523 U.S. at 17. Plaintiffs need only show "a reasonable expectation that the challenged illegality will reoccur." *Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014) (quotations omitted).

The challenged illegality reoccurs every day as the Executive Order keeps the KXLP on ice. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (Article III is satisfied when "it is reasonable to expect that the [defendant] will refuse to apply" the Plaintiff's interpretation of the law, and the Court's adoption of this interpre-tation will guide future transactions between the parties). At issue here is the fate of a physical pipeline, not an abstract concept. It is in the ground, near complete, poised to transport oil, and sure to generate revenue. ECF 71 at ¶51. If Plaintiffs' arguments prevail here, it is reasonable, likely, and logical that TC Energy or another entity will restart the KXLP. It's also worth noting that, unless the Court grants Plaintiffs' relief,

the President could capriciously interfere with similar projects.

In *Bayou Liberty*, homeowners sued the Army Corps of Engineers for issuing a building permit to nearby retail stores. 217 F.3d at 395. Though the stores were completely constructed during the litigation, the Fifth Circuit concluded the case was not moot because there was an "expectation of future development in the … area that may create the types of problems with flooding and destruction … [plaintiffs] complained about." *Id.* at 398; *see also Lopez v. City of Hous.*, 617 F.3d 336, 340 (5th Cir. 2010) (pertinent inquiry was whether city had formed a policy that it would follow in future similar circumstances that are likely to repeat). Should the Plaintiffs prevail, the government's ability to arbitrarily shutter the KXLP \will be checked. But if not, both the KXLP and other similar projects will be surrendered to the tender mercies of regulatory whim.

Finally, the "capable of repetition yet evading review" exception was made for cases like this. *See Super Tire*, 416 U.S. at 122 (when case challenges governmental action, courts must broaden their considerations to determine whether "petitioners are adversely affected by government 'without a chance of redress'") (quoting *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911)); *see, e.g., Reisman*, 764 F.3d at 423 (focusing in election law cases on whether the issue will recur between the defendant and the other members of the public). The KXLP's many benefits cannot be realized unless a court declares it unlawful for the President to do as he did here. The States cannot be denied a forum simply because the unlawful government actions so severely damaged the initial project operator that it felt compelled to abandon *its* plans. In sum, this case should not be cut short because the challenged government action succeeded in driving one affected party

10

from the regulated activity—at least temporarily.

### 3. The Court Can Grant Declaratory Relief.

Even if the case is mooted for purposes of injunctive relief, the Court may still grant *declaratory* relief. *See Meltzer v. Bd. of Pub. Instruction*, 548 F.2d 559, 571–72 (5th Cir. 1977). As the Fifth Circuit explained in *Meltzer*, requests for declaratory relief are evaluated under a lesser mootness standard than injunctive relief. 548 F.2d at 571; *see also Familias Unidas v. Briscoe*, 544 F.2d 182, 189 (5th Cir. 1976); *Nash v. Texas*, 632 F. Supp. 951, 964 (E.D. Tex. 1986) ("The Supreme Court has explicitly recognized that when declaratory relief is sought, mootness should not preclude review of a statute that will be enforced in the future against the complainants."). The States have shared KXLP's long, sordid regulatory journey—from endless administrative review to approval, to Presidential approval and now revocation. That treatment will continue absent judicial relief.

In *Super Tire*, employers challenged New Jersey's policy of awarding public assistance to their striking employees through a state welfare program. 416 U.S. at 116–17. When the strike ended with a new collective bargaining agreement, the Court ruled that the case was not moot for purposes of declaratory relief because "the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Id.* at 122.

*Super Tire*'s rationale applies here. Plaintiffs challenge government decisions that affect the behavior of third parties. Like New Jersey's welfare policy after the labor strike, the Executive Order "has not evaporated or disappeared." *Id.* No entity may bring KXLP

11

online without the declaratory relief Plaintiffs have requested.  And that means the Executive Order continues to impose "substantial[ly] adverse effect[s] on the interests of the petitioning parties." *Id.*  The States continue to lose out on the economic, employment, environmental, and energy benefits they were expecting from the Keystone XL.  But unlike *Super Tire*—where the *plaintiff*s took the action that potentially mooted the case (by negotiating a new agreement with the third party)—Defendants' conduct here caused TC Energy to stop constructing and operating the KXLP.  That distinction make's *Super Tire*'s rationale even more applicable here.

The major constitutional questions in dispute and the Executive Order's ongoing consequences weigh heavily in plaintiffs' favor.  In *Connell v. Shoemaker*, 555 F.2d 483 (5th Cir. 1977), rental property owners challenged an order prohibiting soldiers from leasing units owned or managed by the plaintiffs due to racism allegations.  When the order lifted, the Fifth Circuit allowed the plaintiffs to continue seeking declaratory judgment because of the "continuing practical consequences" of the Army's policy.  *Id.* at 486–87 (noting that plaintiffs had "interests in various businesses engaged in retail sales of goods and services directly to the public in the area adjacent to Fort Hood").  Also significant to the Court was that the case involved a constitutional question.  *Id.* at 487.  The Executive Order's practical consequences for the States are tangible and ongoing.  Millions in revenue and economic benefits have disappeared and millions of barrels of oil per week are not flowing through the pipeline.  ECF 71 at ¶¶ 3, 56–60.  This case also raises the significant constitutional question of whether the President's Article II powers allow him to trump Congress's Article I foreign commerce powers and revoke the KXLP permit.

12

For these reasons, this case still presents a live case and controversy.

**B.  Neither the President Nor the Agency Defendants Are Above the Law.**

**1.  Judicial Review is Available under the APA.**

Agency actions that implement an executive order are also reviewable under the APA. *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."); *Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017) (finding final agency action reviewable under the APA, despite the fact that it was implementing an executive proclamation), *rev'd on other grounds, Trump v. Hawaii*, 138 S. Ct. 2392 (2018).

"[A]gency action" under 5 U.S.C. § 706 "includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act … thereof." 5 U.S.C. § 551(13). This list is expansive. It is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). "[T]he Supreme Court has explained that "'failure to act,' is … properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13).'" *Doe v. United States*, 853 F.3d 792, 799–800 (5th Cir. 2017) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)).

The term "order" is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other

than rule making but including licensing." 5 U.S.C. § 551(6). And "'license' includes the whole or a part of an agency permit," § 551(8), while "'licensing' includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license." § 551(9).

The Army Corps of Engineers' withdrawal of TC Energy's application for a permit is a failure to act on its application for a permit, and is therefore agency action reviewable by the Court. The withdrawal explicitly incorporated the Executive Order. *See* ECF 98-8. This Court may review the substantive validity of the withdrawal as it bases its decision on the Executive Order. *See Doe v. Trump*, No. 3:19-cv-1743-SI, 2020 U.S. Dist. LEXIS 65441, at *1-4 (D. Or. Apr. 13, 2020) (reviewing validity of presidential proclamation by way of APA review of agency rule incorporating the proclamation); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) ("It is the substantive rule of decision, not the Rule itself, that the Organizations have challenged under the APA, and insofar as DOJ and DHS have incorporated the [presidential] Proclamation by reference into the Rule, we may consider the validity of the agency's proposed action, including its 'rule … or the equivalent.'") (quoting 5 U.S.C. § 551(13)).

That TC Energy "requested" "suspension" of consideration of its application—in response to the Army Corps pointing to the Executive Order, ECF 98-9—does not take the agency's termination of that process from the realm of final agency action. *See, e.g., Air One Helicopters, Inc. v. Fed. Aviation Admin.*, 86 F.3d 880, 882 (9th Cir. 1996) (stating that "it is a common rule of judicial economy that we will not require a party to exhaust administrative procedures when exhaustion would be futile … Accordingly, we will treat

14

[the agency's letters denying action on application for registration of aircraft until applicant undertook some other action] as final agency action."); *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 542 (D.C. Cir. 2016) ("Where an agency has clearly communicated it will not reach a determination on a petitioner's submission due to petitioner's recalcitrance but simultaneously refuses to deny the petitioner's submission on those grounds, it has engaged in final agency action subject to this Court's review.").

Not only is the Army Corp's withdrawal an "agency action," it is "final." "Under the APA, an aggrieved party may file suit in a federal district court to obtain review of any final agency action for which there is no other adequate remedy in a court." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 626 (2018) (citing 5 U.S.C. § 704). "Congress rarely intends to prevent courts from enforcing its directives to federal agencies." *Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015) (quotations omitted). "For that reason, [the Supreme] Court applies a 'strong presumption' favoring judicial review of administrative action." *Id.*  In APA cases, this presumption is "guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149–50 (1967)).

Agency action is considered "final" under the APA where the action first, "mark[s] the consummation of the agency's decisionmaking process," and second, is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quotations omitted)

Defendants argue that the Army Corps' withdrawal of TC Energy's application is

not final agency action because "the withdrawal does not mark the completion of the agency's decision-making process on the application, but is interlocutory in nature." ECF 98 at 24. While an intermediate step in an administrative process "cannot be viewed as a 'consummation' of agency decision making," *Qureshi,* 663 F.3d at 781, that is not the situation here.  The Army Corps has not merely paused consideration of TC Energy's permit; it has "withdraw[n]" its application and required TC Energy to begin the process anew by "submit[ting] an updated application for this project in the future." ECF 98-8. "[A]dministrative inaction [that] has precisely the same impact on the rights of the parties as denial of relief" is final agency action despite the ability of TC Energy to submit a new application because "its actions suggest the [Army Corps] has made up its mind, yet it seeks to avoid judicial review by holding out a vague prospect of reconsideration." *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 543 (D.C. Cir. 2016); *John Doe, Inc. v. Gonzalez*, Civil Action No. 06-966 (CKK), 2006 U.S. Dist. LEXIS 44402, at *43 (D.D.C. June 29, 2006), *aff'd sub nom. John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561 (D.C. Cir. 2007) ("DEA's denial of Plaintiff's import permit application is not tentative; rather, the DEA has explicitly stated that the import permit request 'was being cancelled,'" and was therefore final agency action). This application process has been consummated, and legal consequences—the inability to perform the actions sought by the permit—flow from it.

Regardless, "discretion" to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal. *See Hawkes Co.*, 136 S. Ct. at 1814 ("The Corps may revise an approved [jurisdictional determination] within the five-year period based on 'new information.' That possibility, however, is a common characteristic of agency

16

action, and does not make an otherwise definitive decision nonfinal.") (citation omitted); *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.").

Defendants have resisted discovery to uncover any other final agency actions implementing the Executive Order, arguing that the Court should rule on their motion to dismiss on lack of subject matter jurisdiction due to there being no final agency action. The Magistrate Judge has ordered a stay on discovery pending resolution of the motion to dismiss.  ECF 99.

However, even in pure APA cases where discovery is not the norm, courts permit discovery to support a claim of subject matter jurisdiction.  *Glenwood Springs Citizens' All. v. United States DOI*, Civil Action No. 20-cv-00658-CMA, 2021 U.S. Dist. LEXIS 44690, at *2–4 (D. Colo. Mar. 10, 2021) (ordering limited discovery in an APA case regarding the "factual question as to whether Defendants engaged in any action that would be subject to review under the APA"); *Doe v. Nielsen*, No. 18-cv-02349-BLF (VKD), 2018 U.S. Dist. LEXIS 153199, at *7 (N.D. Cal. Sept. 7, 2018) (permitting limited jurisdictional discovery in an APA case where "discovery of the nature of the agency action issue is necessary in order for the parties and the Court to determine the scope of the administrative record to be produced"); *Grand Canyon Tr. v. Williams*, No. CV13-8045, 2013 WL 12176992, at *1 (D. Ariz. Sept. 9, 2013) (permitting written discovery for plaintiffs to develop facts to demonstrate final agency action).

It would be improper for the Court to dismiss Plaintiffs' APA claims on the ground

17

that there is no final agency action, when Defendants have yet to produce an administrative record or respond to any discovery. Courts have demanded the production of the administrative record before deciding reviewability. *Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 974–77 (E.D. Cal. 2012) (denying motion to dismiss APA claims before submission of administrative record because "[d]etermining whether the [challenged actions] are final agency actions in the instant case requires a review of the full administrative record because … 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of [the] action.") (quoting *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004)); *Ctr. for Popular Democracy Action v. Bureau of the Census*, No. 1:19-cv-10917 (S.D.N.Y. Jan. 9, 2020) (granting motion to expedite production of administrative record before deciding reviewability); *Doe # 1 v. Trump*, 423 F. Supp. 3d 1040, 1046 (D. Ore. 2019) (holding that production of administrative record was appropriate because the court required the administrative record to determine whether the agency action is final).

Instead of producing the administrative record of, for example, the Army Corps' decision to withdraw TC Energy's application, Defendants have submitted as exhibits a facially incomplete set of correspondence between the agency and TC Energy that fails to include the precipitating communication from the agency. ECF 98-8, 98-9 (referring to a "letter dated March 2, 2021" from the Army Corps that is not in the record here). Agencies are not permitted to defend their actions under the APA by way of post-hoc rationalizations outside the contemporaneous administrative record. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); s*ee also Nat'l Urban League v. Ross, No. 20-CV-05799-*

18

*LHK*, 2020 U.S. Dist. LEXIS 165989, at \*43 (N.D. Cal. Sept. 10, 2020) ("this Court cannot engage in APA review based on a new record made initially in the reviewing court, especially a declaration drafted for litigation, because the declaration would be an impermissible post hoc rationalization that does not reveal the agency's reasons for acting at the time of the action.") (cleaned up).

The Army Corps' withdrawal of TC Energy's application for a permit—based on the Executive Order making any subsidiary permits for the KXLP project futile—is a final agency action which the Court can review under the APA. Regardless, the Court should refuse to dismiss Plaintiffs' APA claims until examining the administrative record and any discovery on this issue.

## 2. The President is Not Immune from Constitutional Challenges.

Despite the Defendants' contrary claims, this Court may exercise jurisdiction over the President—he is not above the law. *See United States v. Nixon*, 418 U.S. 683 (1974); *United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."). The Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). This authority includes the power to restrain unconstitutional presidential action through injunctive and declaratory relief. *See id.*

Defendants claim that no court has issued a permanent injunction against the President in his official capacity in the absence of agency co-defendants. *See* ECF 98 at 17–18. But just two years ago the Second Circuit affirmed a permanent injunction against

19

President Trump for blocking Twitter followers.[7]   *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021); *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725, 752 (D. Md. 2018) ("'[I]t would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant.'") (quoting *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974), *rev'd on other grounds*, *In re Trump*, 928 F.3d 360, 364 (4th Cir. 2019)).   Indeed, lower courts have "permitted plaintiffs to proceed against the President by nonstatutory review" and "even issued injunctions to the President in such suits."[8]   As a practical matter, the President is most often named along with agency defendants—as he is here—because subordinate officers enforce his directives.   So while it might be somewhat rare for courts to review purely presidential acts, it is not unprecedented.   Such review is entirely appropriate here.

And the Defendants' 155-year-old chestnut doesn't convince otherwise.   *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).   Courts may—indeed should— proceed with prudence and circumspection when exercising jurisdiction over the President, but that doesn't give Presidents a judicial hall pass.   *See Nixon v. Fitzgerald*, 457 U.S.

---

[7] No agency co-defendants were named in *Knight*.

[8] Jonathan Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1678–79 (1997) (citing, e.g., Mackie v. Bush, 809 F. Supp. 144, 148 (D.D.C.), vacated as moot, 10 F.3d 13 (D.C. Cir. 1993); Nat'l Treasury Emps., 492 F.2d 587; Berry v. Reagan, No. CIV.A. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) vacated as moot, 732 F.2d 949, 949 (D.C. Cir. 1983)).

731, 753–54 (1982).  First, *Johnson* has been sharply narrowed, if not completely over-ruled.[9]

Second, the legitimate separation of powers concerns expressed in *Johnson*[10] have been diverted into different doctrinal terrain—namely absolute immunity, standing, and the political question doctrine.  *See, e.g., Fitzgerald*, 457 U.S. at 756 (recognizing presidential immunity from damages liability); Ray, *Prerogative to Accountability*, *supra*, at 810.

Finally, Defendants lean on dicta from a plurality opinion in *Franklin v. Massachusetts*, 505 U.S. 788 (1992).  Although the Court has failed to define the entire constitutional landscape, it is evident from later cases that *Johnson* and *Franklin* do not insulate Presidents from review.  *See Dalton v. Specter*, 511 U.S. 462, 469 (1994) ("In reaching our conclusion [in *Franklin*], we noted that the 'President's actions may still be reviewed for

---

[9] *See* Laura Krugman Ray, *Prerogative to Accountability: The Amenability of the President to Suit*, 80 Ky. L.J. 739, 809 (1992) ("In the years following [*Johnson*], the law has shifted from the idea that the President of the United States could not be sued to the idea that the President is accountable in the courts for his official conduct.").  *See generally* Ray, *Prerogative to Accountability*, *supra*, at 759-810 (discussing progression of *Youngstown*, 343 U.S. 579; *Nixon*, 418 U.S. 683; *Fitzgerald*, 457 U.S. 731; *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973); *Nat'l Treasury Emps.*, 492 F.2d 587; *Halperin v. Kissinger*, 606 F.2d 1192 (D.C. Cir. 1979); *Atlee v. Nixon*, 336 F. Supp. 790 (E.D. Pa. 1972); *Tribe v. Carlucci*, 358 F. Supp. 973 (D.D.C. 1973); *Murphy v. Ford*, 390 F. Supp. 1372 (W.D. Mich. 1975); *Minnesota Chippewa Townsend v. Carter*, 476 F. Supp. 1070 (N.D. Tex. 1979); *Darr v. Carter*, 640 F.2d 163 (8th Cir. 1981); *Chas. T. Main Int'l v. United States*, 509 F. Supp. 1162 (D. Mass. 1981); *Borders v. Reagan*, 518 F. Supp. 250 (D.D.C. 1981); *Cable News Network v. American Broadcasting Companies*, 518 F. Supp. 1238 (N.D. Ga. 1981); *Dellums v. Bush*, 752 F. Supp. 1141 (D.D.C. 1990); *City of New York v. United States Dep't of Commerce*, 739 F. Supp. 761, 764–68 (E.D.N.Y. 1990)).

[10] *Johnson* must also be placed in its unique historical context.  Southern states sued to enjoin President Johnson from enforcing the Reconstruction Act.  *See Suing the President*, *supra*, at 1693.  In a follow-up case challenging the *same* law—this time against the President's subordinates—the Court *still* refused to reach the merits, concluding they raised nonjusticiable "political questions."  *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 77 (1868).

constitutionality.'") (quoting *Franklin*, 505 U.S. at 801); *id.* at 474 ("[A]ssum[ing] … that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA.") (citing *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981).   To be sure, injunctive relief against the President is an "extraordinary" measure, but not novel.   There is almost always a subordinate cabinet official that the court may enjoin.   *See, e.g.*, *Youngstown*, 343 U.S. at 583 (majority opinion);[11]   But there are times— like this—where the President may be appropriately enjoined to stop a constitutional violation. *See, e.g.*, *Nat'l Treasury Emps.*, 492 F.2d at 615–16 (granting declaratory relief against the President for violating the Federal Pay Comparability Act).   In such a case, this Court necessarily has authority to grant injunctive relief against the Chief Executive.

## C. The Court Has Jurisdiction to Enter Relief Against Agency Defendants.

While presidential actions are not subject to review under the APA, *Franklin*, 505 U.S. at 801, they "may still be reviewed for constitutionality" by evaluating subordinate executive agency actions implementing them. *Id.* (citing *Youngstown*, 343 U.S. 579; *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 405 (1935)).

Although Defendants argue that "Executive Order No. 13990 does not call for or contemplate any role for the Agency Defendants in the revocation" and that "the Executive Order is self-executing," ECF 98 at 19, this is contrary to how the Executive Branch functions and to the agency actions evident here. "Because the President almost never

---

[11] *See also* Ray, *Prerogative to Accountability, supra*, at 763 (the *Youngstown* Court enjoined Commerce Secretary Sawyer "as a convenient way to reach the merits of the steel companies' challenge to President Truman's executive order without addressing the scope of *Mississippi v. Johnson.*").

personally executes his orders, injunctive relief against his subordinates" is the method to obtain review of the constitutionality of presidential actions.[12]  President Biden will not be personally policing the border in Northern Montana for violations of the Executive Order.  *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 523 (2014) (noting "the President's continuous need for the assistance of subordinates") (quotations omitted).

President Biden surely was able to *promulgate* the Executive Order without subordinate agency action—that is, he was able to issue the Executive Order himself (the issuance was "self-executing" in this sense).  But any injunctive relief would be forward-looking against any future enforcement actions for violations of its commands, not against the promulgation of the Executive Order itself.  Plaintiffs do not (and could not) seek relief against the Executive Order's issuance because courts do not wield a "writ of erasure" against adopted textual provisions, whether statutes or executive enactments.[13]

As with statutes, so it is with executive actions that have the force of law: this Court has no power to reverse the President's *issuance* of the Executive Order. The relevant "events" for purposes of injunctive relief are the current and future actions to enforce

---

[12] William Powell, *Policing Executive Teamwork: Rescuing the APA from* Presidential Administration, 85 Mo. L. Rev. 71, 103 (2020)

[13] *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936, 938 (2018) ("[t]he federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute … All [an] injunction does is prevent the named defendants from *enforcing* that law while the court's injunction remains in place.") (citing *Ex parte Young*, 209 U.S. 123 (1908)) (emphasis in original;); *cf. Steffel v. Thompson*, 415 U.S. 452, 469 (1974) ("Of course, a favorable declaratory judgment … cannot make even an unconstitutional statute disappear.") (citation omitted); *Winsness v. Yocom*, 433 F.3d 727, 728 (10th Cir. 2006) ("There is no procedure in American law for courts … to purge from the statute books, laws that conflict with the Constitution as interpreted by the courts.") (McConnell, J.).

the Executive Order, whether through denials of permits or to penalize violations of the Order's prohibitions of the maintenance and operation of the Keystone XL Pipeline across the border.  The Executive Order's issuance, solely by the President, is not the relevant target of judicial relief.

Federal courts have long exercised the power to enjoin federal officers from violating the Constitution or statutes. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"). Plaintiffs have a cause of action "at equity." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc).

As a result, even if the Court were to disagree with Plaintiffs' arguments relating to their APA claims, that would not affect their right to relief on their constitutional claim (Count I) or their claim that the Executive Order conflicts with a statute enacted by Congress (Count II). There is a long history of federal courts granting relief on such claims. *See, e.g.*, *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Stark v. Wickard*, 321 U.S. 288, 310 (1944). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of *ultra vires* actions recognized long before, in *McAnnulty*." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.*  Thus, Plaintiffs can bring a "non-statutory review action," 33 Charles Alan Wright, *et al., Federal Practice and Procedure* § 8304 (2d ed.), and courts have authority to review federal executive action that violates constitutional or statutory commands. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–32 (D.C. Cir. 1996).

24

As any injunctive relief looks forward to future agency action, these "non-statutory review" claims against the Cabinet Defendants here are not in any way dependent on the requirements of the APA, including that there be final agency action. *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 n.9 (10th Cir. 2005) (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

Defendants argue that Plaintiffs' injuries are not redressable because the Cabinet Defendants have no enforcement role regarding the Executive Order. ECF 98 at 19. But Plaintiffs have alleged that the Cabinet Defendants have regulatory responsibilities regarding the KXLP project that will necessarily require them to apply the Executive Order. *See* ECF 71 at ¶¶ 9–20. These allegations are sufficient to withstand a motion to dismiss. *See Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 252–53 (S.D.N.Y. 2020) (rejecting motion to dismiss for lack of standing on ground that agency defendants did not have responsibility for challenged actions because "Plaintiffs allege in their complaint, however, that HHS is responsible for implementing the [presidential] Proclamation … and that the Proclamation assigns to HHS a variety of responsibilities regarding its implementation and enforcement[.]" (citing *Franklin*, 505 U.S. at 828).

On this point, Defendants also cite inapposite cases involving State governments facing diffused law-enforcing power. ECF 98 at 21–22. President Biden is head of the Executive Branch, and the Cabinet Defendants are all subject to his direction, *see* U.S. Const. art. II, § 1, cl. 1; this is very different from cases where State executive officials were facing suits for injunctive relief where they had literally no control over those tasked

with enforcing the challenged provision. *See Okpalobi v. Foster*, 244 F.3d 405, 422–26 (5th Cir. 2001) (en banc) (civil enforcement scheme enforced by private plaintiffs); *6th St. Bus. Partners LLC v. Abbott*, No. 1:20-CV-706-RP, 2020 U.S. Dist. LEXIS 130814, at *7 (W.D. Tex. July 24, 2020) (while Texas governor is "empower[ed] to promulgate executive orders, [he is not empowered] to enforce them.").

Furthermore, the Cabinet Defendants here have already taken action to implement the Executive Order. As part of the overall KXLP project, TC Energy had submitted an application for an Individual Permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act. *See* ECF 71 at ¶ 54. After President Biden's revocation of the cross-border permit in the Executive Order, the Army Corps of Engineers initiated communication with TC Energy on March 2, 2021, which TC Energy described as a "letter … request[ing] that TC Energy provide the Corps with clarification regarding the Project's current purpose and need in light of Executive Order 13990, which revoked the previously issued Presidential Permit that is required to construct and operate the project at the international border." ECF 98-9.

Taking the hint, TC Energy asked that the Corps to "suspen[d] . . . review of its application" while it evaluated the continued viability of the Keystone XL Pipeline project in light of the Executive Order. ECF 98-9. The Corps then informed TC Energy that it would not merely "suspend" its consideration of the permit application, but "decided to administratively withdraw [its] application for a Department of the Army permit while [TC Energy] continue[d] to consider [its] path forward," terminating the process and requiring it to start over with a new application, if desired. ECF 98-8.

Defendants dismiss this agency action as a mere "collateral consequence" of the Executive Order, rather than an example of its implementation. ECF 98 at 20. They reason that "[t]he Army Corps' suspension of its own administrative process was not a necessary step in the revocation of the permit for the border crossing [in the Executive Order]." ECF 98 at 21. But this reverses the causation here: Plaintiffs' claim is not that the Army Corps' withdrawal of the application somehow caused the temporally earlier Executive Order, or was a necessary subsequent action to make the Executive Order effective; rather, the claim is that the Army Corps implemented the Executive Order by acting based on it, with the clear implication that TC Energy seeking further permits for the KXLP project would be futile. This supports the common-sense intuition that the Executive Order will be implemented by the same agencies that have been involved in regulatory approvals for the KXLP project for over a decade. Defendants' apparent contention that subordinate executive officials will ignore the Executive Order when making subsidiary determinations for the KXLP project is not viable either in theory or in fact. Injunctive and declaratory relief against the Army Corps and the other Cabinet Defendants would prevent implementation of an unlawful Executive Order without raising the separation-of-powers concerns of direct relief against the President.

**D. Plaintiffs Have Standing.**

### 1. Plaintiffs Have Alleged Concrete and Particularized Injuries.

With the stroke of a pen, the President robbed Plaintiffs and their citizens of millions of dollars in tax revenue and income. Defendants' own analyses confirm that Plaintiffs have cognizable injuries because they will suffer numerous direct and indirect

economic injuries as a result of Defendants' revocation of the permit for the KXLP.  *See Dep't of Commerce*, 139 S. Ct. at 2565–66 (finding states' alleged injuries sufficiently concrete and particularized when they predicted a census undercount based on illegal third-party acts motivated by fears that were legally impossible to realize); *El Paso Cty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("Economic injury is a quintessential injury upon which to base standing.") (quotations omitted).  Plaintiffs' standing theories are amply supported by *Defendants'* thorough economic analyses in the State Department's 2014 and 2019 FSEISs—which Defendants understandably make no attempt to refute.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); ECF 71 at ¶¶ 39–42, 56–60.  In sum, Plaintiffs' injuries are "concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Davis v. FEC*, 554 U.S. 724, 733 (2008).  The President's unlawful actions that have withheld the KXLP's economic and environmental benefits also give rise to standing under the special solicitude and *parens patriae* doctrines.  *See Massachusetts v. EPA*, 549 U.S. 497 (2007).

### a.  The Executive Order Robs Plaintiffs of Specific Tax Revenues.

Defendants' actions are causing Plaintiffs to lose millions in direct tax revenue from the KXLP's construction and operation.  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).  As in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), Defendants' revocation "directly affects" Plaintiffs' "ability to collect" specific taxes, including franchise taxes, property taxes, and income taxes.  *Id.* at 451; ECF 71 at ¶ 40–42, 56–58.  Defendants misapply the Fifth Circuit's decision in *El Paso*.  Unable to assert *parens patriae* standing

as a local government, El Paso County merely asserted that "the economy of the county at large will be harmed, resulting in a reduction in general tax revenues for the county." *Id.* at 340.  Here, however, Plaintiffs have alleged a "direct link between the state's status as a collector and recipient of revenues and the … action being challenged, such as the loss of a specific tax revenue to have standing." *Id.* at 341 (quotations omitted).

Plaintiffs Texas and Louisiana will suffer a significant loss in direct revenue.  ECF 71 at ¶ 61, 78.  The Gulf Coast region is one of the world's largest refining hubs and the most important buyer-processor of heavy crude produced globally.  ECF 71 at ¶ 65; 2019 FSEIS at S-4–5.  Heavy crude—delivered from Western Canada via the KXLP—offers the Gulf Coast's refineries optimal profit margins.  *See* ECF 71 at ¶¶ 61–77.  Without the KXLP's provision of this heavy crude, refineries must process other grades of oil, which increases costs, diminishes profit margins, and yields lower franchise taxes that will lower Texas state revenues.  *See* ECF 71 at ¶¶ 79–83.

Construction of the KXLP would directly support 42,100 jobs and create approximately $2 billion in earnings across multiple plaintiff states.  *See* ECF 71 at ¶ 41; 2014 FSEIS at ES-19.  Residents of Kansas, Nebraska, South Dakota, and Montana would get about 12,000 of those jobs.  2014 FSEIS at 4.10-17.  The halt in KXLP construction and operation directly reduces tax revenues in Kansas, Nebraska, and Montana, which assess state income taxes.  *See, e.g.,* ECF 71 at ¶ 58.  According to Defendants, the loss of taxes from construction materials and construction worker spending for basic living expenses such as food, housing, gasoline, and entertainment would cost South Dakota $46.5 million, Nebraska $16.5 million, and Kansas $2.7 million.  2014 FSEIS at 4.10-29–30.

Louisiana will also suffer significant revenue losses. ECF 71 at ¶ 78. The KXLP is the state's key to heavy crude and optimal refinery profits. *See* ECF 71 at ¶¶ 61–77; 2019 FSEIS at 1-20. Three of the six contractors building the KXLP were from the Gulf Coast Plaintiff states. ECF 71 at ¶ 77. Louisiana will now lose state corporation tax revenue based on the disappearance of this work. *See,* La. Rev. Stat. Ann. § 47:32, 47:601.

Once operational, the KXLP would generate tens of millions in direct tax revenue for several Plaintiffs. ECF 71 at ¶ 42. The 2014 FSEIS estimated that the KXLP would generate $55.6 million in annual property taxes across South Dakota, Nebraska, and Montana. ECF 71 at ¶ 56; 2014 FSEIS at ES-20. The Montana Department of Revenue now estimates "[i]n its first year of operation, the KXLP would generate an estimated $95,033,723 in property tax revenue across all jurisdictions in Montana." Ex. 1, Decl. of Doug Roehm at ¶ 11.[14] This includes "$15,343,164 in property tax revenue for the State of Montana in the first year of operation." *Id.* ¶11(a). Workers hired to permanently maintain the pipeline in certain states would also pay state income taxes. ECF 71 at ¶ 59; 2014 FSEIS at 4.10-31. These are the exact tax revenue damages required by *El Paso* to establish standing. *See El Paso*, 982 F.3d at 341.

### b. Plaintiffs Have Special Solicitude Standing.

Plaintiffs are entitled to special solicitude to preserve their quasi-sovereign interests. *See Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) (*Texas I*); *Texas v. United States*, 328 F. Supp. 3d 662, 691 (S.D. Tex. 2018) (*Texas III*). Defendants' revocation

---

[14] The Court may allow plaintiffs to submit affidavits furthering particularized allegations of fact in support of standing. *See Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983).

harmed Plaintiffs' quasi-sovereign interests because it affected their rights of foreign and interstate commerce.  *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  Plaintiffs, therefore, have an Article III interest in maintaining the constitutional separation of powers as it relates cross-border pipeline permitting.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607–08 (1982).

When they entered the Union, the States surrendered certain sovereign prerogatives, such as the right to regulate commercial relations with foreign powers and their sister States.  *See Massachusetts,* 549 U.S. at 519–20.  The Fifth Circuit held that Texas and other states could challenge federal immigration policy because they "cannot establish their own classifications of aliens, just as Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] cannot negotiate an emissions treaty with China or India."  *Texas I*, 809 F.3d at 153 (citation omitted); *see also id. at* 152–53 (noting DAPA would cause Texas to lose millions of dollars).  Plaintiffs, similarly, cannot negotiate a treaty with Canada or regulate the free flow of foreign commerce, including cross-border oil pipelines.

### c.  Plaintiffs Have Parens Patriae Standing.

"Parens patriae standing allows a state to sue a defendant to protect the interests of its citizens at large."  *Texas III*, 328 F. Supp. 3d at 694 (citing *Alfred L. Snapp*, 458 U.S. at 600–02).  "[A]n established line of cases … have held that states may rely on the doctrine of parens patriae to maintain suits against the federal government."  *Texas v. United States*, 86 F. Supp. 3d at 626 (*Texas II*) (citing *Wash. Utilities and Transp. Comm'n v. F.C.C.*, 513 F.2d 1142 (9th Cir. 1975); *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797

(D. Kan. 1990); *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984)), *aff'd*, 809 F.3d 134 (5th Cir. 2015).

"[T]he State … must have a 'quasi-sovereign interest' in the litigation to sue in its parens patriae capacity." *Hood ex rel. Miss. v. Microsoft Corp.*, 428 F. Supp. 2d 537, 542 (S.D. Miss. 2006) (citing *Alfred L. Snapp*, 458 U.S. at 607). Quasi-sovereign interests fall into two categories: (1) "the health and well-being—both physical and economic—of its residents in general"; and (2) "not being discriminatorily denied its rightful status within the federal system." *Id.* at 542–43 (quoting *Alfred L. Snapp*, 458 U.S. at 609).

*Alfred L. Snapp* does not, as Defendants claim, preclude *parens patriae* suits against the federal government. ECF 98 at 32. Like another court in this district noted, the language cited by Defendants in *Alfred L. Snapp* was dictum and the federal government was not a defendant in that case. *See Texas III*, 328 F. Supp. 3d at 696. And "[i]n *Massachusetts v. EPA*, the Court specifically rejected the argument that state *parens patriae* standing is categorically barred in suits against the federal government." *Id.* at 697 (citing *Massachusetts*, 549 U.S. at 520 n.17). *Massachusetts* clarified that *parens patriae* standing is prohibited where a state seeks to "protect her citizens from the operation of federal statutes," but not where it wishes "to assert its rights under federal law." 549 U.S. at 520 n.17.

First, Plaintiffs satisfy the *Massachusetts* standard because they challenge the President's revocation decision as a violation of the Constitution's systems of enumerated and separated powers. The States, moreover, seek to vindicate on behalf of their citizens the presumption, absent a contrary Congressional regulation, in favor of the free flow of commerce with foreign nations and among the states. *See* ECF 71 at ¶¶ 89–90; *Welton v.*

32

*Missouri*, 91 U.S. 275, 282 (1875) ("The fact that Congress has not seen fit to prescribe any specific rules to govern inter-State commerce … is equivalent to a declaration that inter-State commerce shall be free and untrammelled."); *see also Japan Line, Ltd. v. Cty. of L.A.*, 441 U.S. 434, 448 (1979) (federal uniformity is essential for foreign commerce).

Second, Plaintiffs satisfy the *Massachusetts* standard because they seek to vindicate the States' and their citizens' rights under a federal statute. "The [*Massachusetts*] Court suggested that this type of litigation, which 'turn[ed] on the proper construction of a congressional statute,' presented 'a question eminently suitable to resolution in federal court.'" *Texas III*, 328 F. Supp. 3d at 691 (quoting *Massachusetts*, 549 U.S. at 516). Plaintiffs also rights under the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. 112-78, 125 Stat. 1289–1290 (Dec. 23, 2011). The proper construction of Pub. L. 112-78 directly affects Plaintiffs and their citizens. *Massachusetts*, 549 U.S. at 516.

Plaintiffs are entitled to special solicitude and *parens patriae* standing.

### i.   Economic and Physical Well-Being

Defendants' revocation will devastate the well-being of Plaintiffs' communities and economies. KXLP's construction and operation would create and sustain thousands of jobs, bolster energy independence, and infuse high-poverty areas with much needed local tax revenue. *See* ECF 71 at ¶¶ 31, 38–42, 56–60, 84.

Defendants' own analyses—which they don't contest—demonstrate that direct economic activity is dwarfed by the substantial indirect and induced economic activity associated with the KXLP. ECF 71 at ¶¶ 39–42; 2014 FSEIS at ES-19-20. This indirect activity includes all goods and services that would be purchased by contractors such as

concrete, fuel, surveying, welding materials, and earth-moving equipment. 2014 FSEIS 4.10-14. Induced activity includes the spending of earnings that would be received by employees working for either contractors or for any supplier of goods and services, such as access road construction crews, welders, employees of pipe manufacturers, and food suppliers. ECF 71 at 39 (citing 2014 FSEIS at 4.10-14). Indirect and induced spending would total approximately $1.3 billion. 2014 FSEIS at 4.10-2.

These benefits would not end with construction. Once operational, the KXLP would generate tax revenue, jobs, and other economic benefits. ECF 71 at ¶¶ 39–42, 59–60. For example, for its first year of operation in Montana, the KXLP would generate: $30,202,721 in revenue paid directly to county governments; $5,070,018 in revenue for county schools; $27,784,235 in revenue for local schools; $2,234,333 in revenue for miscellaneous entities and fire districts; $5,499,483 for cities; and $8,899,769 in additional taxes and fees. Roehm Decl. at ¶ 11(b)-(g). These revenues would provide sorely needed resources to low income and rural areas. ECF 71 at ¶ 57. Several poor Montana counties would see their property tax revenues increase anywhere from 27% to 117%. ECF 71 at ¶ 57. South Dakota, Nebraska, and Kansas would see similar benefits. *See* 2014 FSEIS at 4.10-33–34. The Gulf States' general public revenues would grow over the short and long terms as well. *See* ECF 71 at ¶ 78. Plaintiffs and their communities would also gain tens of millions in annual tax revenue from the regulators, residents, and businesses that refine, transport, and export KXLP's crude oil. ECF 71 at ¶ 60.

Three smaller projects connected to the KXLP would affect numerous local economies. First, the Bakken Marketlink Project ("BMP") would transport North Dakota and

Montana oil from the Bakken formation to the KXLP.  Construction of the BMP would create an estimated 1,000 jobs and $59.4 million in earnings.  2014 FSEIS at 4.10-10.  The BMP would deliver up to 100,000 bpd of oil to Oklahoma and the Gulf Coast.  2014 FSEIS at ES-9.  Second, the Big Bend to Witten Transmission Line Project would provide reliable electricity for KXLP's continuing operation by constructing a new transmission line originating in South Dakota.  2014 ES at ES-9.   This would create 1,100 jobs and $47.6 million in earnings.  2014 FSEIS at 4.10-10.   Finally, electrical power for the KXLP would be obtained from local power providers.  Electrical distribution lines and substations would create approximately 3,100 jobs and $137 million in earnings.  2014 FSEIS at 4.10-10.  In Montana, the KXLP would have been the largest customer for several electrical co-ops, which would reduce rural consumers' energy bills.  *See* Ex. 2, Decl. of Tary Hanson at ¶ 6; Ex. 3, Decl. of Michael Hoy at ¶ 7.

The KXLP would generate enormous benefits for Plaintiffs.  But those benefits will never materialize if President Biden's Executive Order stands.

### ii.  Rightful status within the federal system

Each State "also has an interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp*, 458 U.S. at 607–08.  "In the context of *parens patriae* actions," the Court has explained, "this means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608.  Under the Court's caselaw, states may vindicate Commerce Clause interests as *parens patriae*.  For example, the Court said a state "need not wait for the Federal Government to vindicate the State's interest in the removal of barriers to the

participation by its residents in the free flow of interstate commerce." *Id.* at 608.

As discussed above, under *Massachusetts v. EPA*, the President's decision to revoke the KXLP affected Plaintiffs' quasi-sovereign interests by halting a major foreign and interstate commercial project.  *See Texas II*, 86 F. Supp. 3d at 625 (noting that *parens patriae* standing and special solicitude standing theories are "at least indirectly related"). And States have *parens patriae* standing to challenge violations of the Interstate Commerce Clause because they lack the power to control or interfere with interstate commerce. *See, e.g.,* M*aryland v. Louisiana,* 451 U.S. 725, 739 (1981) (direct injury to plaintiff states from discriminatory tax was supported by the states' interest in protecting citizens from substantial economic injury).  States, likewise, have the same interest in enforcing the Foreign Commerce Clause.  By ratifying the Constitution, states ceded their authority to regulate foreign and interstate commerce to Congress, so they must have some orderly mechanism to challenge harmful commercial regulations propounded by the wrong constitutional actor. *See Texas I*, 809 F.3d at 153–54 (citing *Massachusetts*, 549 U.S. at 519).  Defendants' have violated the Commerce Clause and have resultantly inflicted substantial economic injuries on the plaintiffs, their communities, and their citizens.

## 2.  Plaintiffs' Injuries are Redressable.

Finally, as discussed above, if this Court grants Plaintiffs' requested relief, it will redress Plaintiffs' injuries.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The KXLP—much of which is already constructed—would deliver strong returns for any company that chose to resume the project.  But as a matter of business sense, no company with the requisite investment capital would ever revive the KXLP project—not as long

as the President wields the unliteral authority to revoke permission for such projects without notice, process, or legitimate justification. *See Dep't of Commerce*, 139 S. Ct. at 2566. Doing so would likely violate the company's fiduciary responsibilities. That company would know that it could reasonably face the same fate as TC Energy.

The Fifth Circuit has found redressability under less-certain facts than this case. In *Hanson v. Veterans Administration*, 800 F.2d 1381 (5th Cir. 1986), a plaintiff claimed discriminatory appraisals undervalued his property, located in a racially mixed neighborhood. *Id.* at 1384. The $7,000 delta between the appraised value and contract price prevented plaintiff from securing necessary financing. *Id.* at 1385. Although it was uncertain whether a discrimination-free appraisal would result in a higher valuation, the Court found redressability because it "*might* permit [plaintiff] to purchase" the house. *Id.* at 1386 (emphasis added). Under that standard, and due to the clear economic benefits that would follow a favorable judgement, Plaintiffs' injuries are clearly redressable.[15]

Plaintiffs satisfy multiple theories of standing and this Court has jurisdiction to adjudicate these claims.

## II.    VENUE IS PROPER

Where, as here, "a defendant is an officer or employee of the United States," venue is proper "in any judicial district in which … the plaintiff resides [or where] a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of

---

[15] Plaintiffs note that special solitude standing lessens their redressability burden. *See Texas III*, 328 F. Supp. 3d. at 691 (citing *Texas I*, 809 F.3d at 159); *see also id.* ("at the very least, it appears to shore up weaknesses presented by attenuated causation and redressability arguments") (citing *Massachusetts*, 549 U.S. at 523).

property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1). In their First Amended Complaint, Plaintiffs alleged that "[v]enue lies [in the Southern District of Texas] because Plaintiff the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District." ECF 71 at ¶ 23.

Defendants attempt to bootstrap an argument against the standing of the State of Texas into the analysis of whether venue is proper in this District. ECF 98 at 37–38. This is erroneous for two reasons.

*First*, the conflation of standing with venue conflicts with the well-established rule that "venue [is] determined at the outset of litigation and [is] not affected by subsequent events." *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003); *see also Holmes v. Energy Catering Servs., L.L.C.*, 270 F. Supp. 2d 882, 885 n.1 (S.D. Tex. 2003) (concluding that "[u]nder section 1391, venue is determined when the suit is filed and is not affected by subsequent events such as the dismissal of a defendant, as occurred here"). Even if the Court found that Texas lacked standing, this would not affect the propriety of venue.

The cases cited by Defendants are inapposite. Defendants first cite *Miller v. Albright*, 523 U.S. 420 (1998). ECF 98 at 37. There, the district court found that venue was improper after the Texas-based plaintiff had already been dismissed for lack of standing. *Miller*, 523 U.S. at 426–27. Defendants state that of the nine justices, "none disputed the straightforward conclusion that venue was improper if the Texas plaintiff in fact lacked standing." ECF No. 98 at 37 n.15. But the propriety of the venue transfer was not before the Court, and the Texas-based plaintiff "never indicated any intent to challenge his

dismissal from the suit." *Miller*, 523 U.S. at 448 (O'Connor, J., concurring).

Defendants also rely on *Inst. of Certified Prac., Inc. v. Bentsen*, 874 F. Supp. 1370 (N.D. Ga. 1994), for the proposition that venue is improper where the only plaintiff that resided in the district lacks standing. ECF 98 at 37.  In that case, there were two plaintiffs, who the court labeled as "Institute" and "Shinn." *Bentsen*, 874 F. Supp. at 1371.  Having found that Institute lacked standing, the court held that venue was improper with respect to Shinn because the "plaintiff cannot manufacture venue by *adding the Institute as a party*." *Id.* at 1372 (emphasis added).  *Bentsen* cited *Nat'l Distillers and Chemical Corp. v. Dep't. of Energy*, 487 F. Supp. 34 (D. Del. 1980) in support; that case involved "a number of facts which strongly suggest that the transfer [of property] was made for the sole purpose of obtaining venue in this district," *id.* at 37, indicating the concerns of the *Bentsen* court. The district court in *Miller* also apparently faced collusive behavior. *See Miller v. Christopher*, 870 F. Supp. 1, 2 (D.D.C. 1994) (explaining that after the defendant moved to dismiss or transfer venue, the non-U.S. citizen plaintiff added her father, a Texas resident, as a co-plaintiff). There is no allegation of improper collusion here.[16]

*Second*, the Court need not even reach the question of whether Texas has standing because "[i]t is not necessary … for all Plaintiffs to demonstrate standing; rather, 'one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"

---

[16] Consultation with a leading treatise confirms this reading of these two cases. In Wright and Miller's *Federal Practice and Procedure*, the only two instances listed for venue being improper under § 1391(e) in cases involving multiple plaintiffs is where (1) venue is based on the joinder of a plaintiff with a frivolous claim, or (2) a plaintiff has been improperly and collusively joined for the purpose of creating venue in the district. 14D Charles Alan Wright, *et al., Federal Practice and Procedure* § 3815 (4th ed.).

*Texas II*, 86 F. Supp. 3d at 616, *aff'd*, 809 F.3d 134 (5th Cir. 2015) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

If "one of the Plaintiff States has standing, this Court need not analyze the standing of any other plaintiff." *Texas v. United States*, No. 1:18-CV-00068, 2021 U.S. Dist. LEXIS 133114, at *57 (S.D. Tex. July 16, 2021) (citing *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017). As Defendants assert that "Texas *in particular* fails to establish its standing to sue," ECF 98 at 37 (emphasis added), presumably they believe the claims of other Plaintiffs are stronger. As explained earlier, Texas has adequately alleged its standing under Article III. But if Montana's standing is the clearest to evaluate, there is no need to analyze the standing of other Plaintiffs, including Texas. Defendants' attempt to conflate the standing analysis with that for venue should not be entertained.

## III.   EXECUTIVE ORDER 13990 Violates the Separation of Powers

President Biden's revocation of the KXLP permit in Executive Order 13990 improperly encroaches on Congress's Article I powers to regulate foreign and interstate commerce. Congress regulates cross-border commercial instrumentalities like transnational oil pipelines. Congress expressly authorized the KXLP in 2011. Congress has repeatedly signaled its approval of the project. Congress has never acquiesced to the President's contrary policy preferences regarding the KXLP. And even if Congress had remained silent on the issue, the President lacks the constitutional power to unilaterally revoke a duly authorized cross-border permit absent some legitimate national security justification. No such justifications exist. So the President's residual foreign affairs powers are neither implicated nor strong enough to justify the President's action here. And

when the Executive Branch invades Congress's constitutional domain, the Court can and should restore proper constitutional balance.[17]

### A.  Congress Has Primacy Over Matters of Foreign Commerce

The Constitution vests the power to regulate foreign and interstate commerce in Congress—not the President.  U.S. CONST. art I, § 8, cl. 3.  Congress's foreign commerce power is "exclusive and plenary."  *Bd. of Trustees v. United States*, 289 U.S. 48, 56 (1933); *see also Japan Line*, 441 U.S. at 448 (suggesting that Congress's power over foreign commerce is greater than its domestic counterpart).  The Foreign Commerce Clause "comprehend[s] every species of commercial intercourse between the United States and foreign nations.  No sort of trade can be carried on between this country and any other, to which this power does not extend."  *Gibbons v. Ogden*, 22 U.S. 1, 193–94 (1824); *accord United States ex. rel. Turner v. Williams*, 194 U.S. 279, 290 (1904); *Henderson v. Mayor of New York*, 92 U.S. 259, 270 (1875); *United States v. Holliday*, 70 U.S. 407, 417 (1865).  As a constitutional matter, therefore, Congress possesses the authority to authorize, prohibit, and regulate a transnational oil pipeline cross-border permit.

The President is Commander-in-Chief and accordingly possesses certain implied Article II powers over foreign affairs.  "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936).  He has the sole power to negotiate treaties, nominate the Nation's ambassadors, engage in direct diplomacy, and recognize

---

[17] Plaintiffs drop their nondelegation claim.  *See* ECF 98 at 58.

foreign governments. *See Zivotofsky v. Kerry*, 576 U.S. 1, 13–14 (2015). The President also has broad authority to protect national security. *See Youngstown*, at 343 U.S. at 645 (Jackson, J., concurring). Defendants rely on the President's implied foreign affairs powers to justify his action here.

But this foreign affairs power does not swallow Congress's foreign commerce power. *See Zivotofsky*, 576 U.S. at 16 ("[M]any decisions affecting foreign relations—including decisions that may determine the course of our relations with recognized countries—require congressional action. Congress may 'regulate Commerce with foreign Nations ….'"; *Medellin v. Texas,* 552 U.S. 491, 524 (2008) ("The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'") (quoting *Youngstown*, 343 U.S. at 585) (majority opinion); *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 426 (1934) ("even the war power does not remove constitutional limitations safeguarding essential liberties"). The President's authority over foreign affairs is far from absolute and does not displace that of Congress—specifically when it relates to questions of foreign commerce.

But Defendants advance a near-absolute theory of Executive Power that would upend our constitutional order. And the President's unilateral revocation of the KXLP—which coopts commercial regulatory powers belonging to Congress—manifests that dangerous theory. In such instances, courts must enforce the separation of powers. *See, e.g., Zivotofsky v. Clinton*, 566 U.S. 189, 201(2012); *Medellin*, 552 U.S. at 523; *Youngstown*, 343 U. S. at 587; *Panama Ref. Co.*, 293 U. S. at 433.

Courts generally use Justice Jackson's *Youngstown* framework when evaluating

separation-of-powers challenges to Presidential action.  *See Medellin*, 552 U.S. at 524 (discussing *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).   This framework recognizes that "[p]residential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  *Youngstown*, 343 U.S. at 635.  Here, Congress has spoken clearly, and that should resolve the question.  But even if it failed to speak to the KXLP matter, the President may not annex Congress's Article I, § 8 powers and regulate foreign commerce as he, alone, sees fit.

### B.  Congress Expressly Authorized the Keystone XL Pipeline in 2011

"When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and courts can sustain his actions "only by disabling the Congress from acting upon the subject."  *Youngstown*, 343 U.S. at 637–38.  Congress has expressly and impliedly approved the KXLP permit—an implement of foreign and interstate commerce—so the President's foreign affairs powers must yield.

After years of administrative delay, the State Department in November 2011 announced it could not complete the necessary review to make a decision on the KXLP permit until at least the first quarter of 2013.[18]  One month later in response, Congress enacted Section 501 of the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. 112–78, 125 Stat. 1289–90 (Dec. 23, 2011), *which President Obama signed*.  Section 501 mandated that "not later than 60 days after the date of enactment of this Act, the

---

[18] President Obama touted Keystone's importance during a 2012 campaign event and suggested the delay in KXLP's approval was due to reviews of health and safety protocols. *See* Joe Wertz, *What Obama's Cushing Visit Means for Oklahoma and the Keystone Pipeline*, NPR (Mar. 23, 2012), https://stateimpact.npr.org/oklahoma/2012/03/23/what-obamas-cushing-visit-means-for-oklahoma-and-the-keystone-pipeline/.

President, acting through the Secretary of State, shall grant a permit under Executive Order No. 13337 ... for the Keystone XL pipeline project." *Id.* § 501(a). The only exception to this mandate was "if the President determines that the Keystone XL pipeline would not serve the national interest." *Id.* § 501(b)(1).

     If he reached a negative national interest determination, Section 501 required the President to submit a report to Congress that "provides a justification for [the] determination including consideration of economic, employment, energy security, foreign policy, trade, and environmental factors" "not later than 15 days after the date of the determination." *Id.* § 501(b)(2).  The statute then expressly dictated the "[e]ffect of no finding or action." *Id.* § 501(b)(3).  If "a determination is not made … and no action is taken by the President … not later than 60 days after the date of enactment of this Act, the permit for the Keystone XL pipeline … shall be in effect by operation of law." *Id.*

     Neither the President nor the State Department made the requisite determination that the KXLP disserved the national interest, and neither submitted the required report to Congress within the prescribed timeframe.  The State Department recommended that the President deny the application due to "the fact that the Department does not have sufficient time to obtain the information necessary to assess whether the project … is in the national interest."[19]  On the other hand, the announcement admitted the State Department was unable to "determine that the Keystone XL would not serve the national interest." *Id.*  Either way, the Department failed to produce a negative national interest

---

[19] Press Release, Denial of the Keystone XL Pipeline Application, U.S. Dep't of State, (Jan. 18, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/01/181473.htm.

determination and therefore didn't avail the administration of the exception Congress provided in § 501. *Id.* (emphasizing that the "denial" wasn't a national interest determination by "not preclude[ing] any subsequent permit application").

When President Obama accepted the State Department's recommendation, he painstakingly explained that his denial wasn't a negative national interest determination: "[t]his announcement is *not a judgment on the merits of the pipeline*, but the arbitrary nature of a deadline that prevented the State Department from gathering the information necessary to approve the project and protect the American people."[20]  And as noted above, the President never submitted the negative national interest report to Congress.  "We need more time" wasn't a statutory option.

The President failed to satisfy the terms of § 501(b).  As a result, the KXLP permit was granted by operation of law.  The Executive Order violates federal law because § 501 did not give the President power to revoke the KXLP.  His only discretionary authority was set forth in § 501(b)(1).   And the only conditions put on the permit were that the project comply with applicable federal laws and regulations.  *See* § 501(c).  Congress has constitutional authority over foreign commerce.  *Zivotofsky*, 576 U.S. at 16; *Gibbons*, 22 U.S. at 193–94.  The President's power over the KXLP consisted of Congress's delegation in § 501(b)(1).  *Youngstown*, 343 U.S. at 637–38; *United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953), *aff'd on other grounds*, 348 U.S. 296 (1955) (invalidating executive agreement regulating Canadian seed potato imports that conflicted with statute).

---

[20] Press Release, President Barack Obama, Statement by the President on the Keystone XL Pipeline (Jan. 18, 2012) (emphasis added), https://obamawhitehouse.archives.gov/the-press-office/2012/01/18/statement-president-keystone-xl-pipeline.

Executive Order 13990 is therefore contrary to law and unconstitutional.

### C.  Even Absent Pub. L. 112-78, The President Lacks the Power to Unilaterally Revoke this Oil Pipeline Cross-Border Permit.

"When the President acts in the absence of either a congressional grant or denial of authority, he can only rely upon his independent powers …." *Youngstown*, 343 U.S. at 637.  There, "the validity of the President's action … hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch." *Dames & Moore*, 453 U.S. at 668.  Courts consider whether Congress has "enacted legislation, or even passed a resolution, indicating its displeasure with the" action.  *Id.* at 687.

They also consider whether Congress has acquiesced in a "particular exercise of Presidential authority." *Medellin*, 552 U.S. at 528; *see also id.* at 531 (confining acquiescence inquiry to the "narrow set of circumstances" directly supported by past practice). But "past practice does not, by itself, create power." *Medellin*, 552 U.S. at 532.  Past practice—when systematic, unbroken, and unquestioned—"can raise a presumption that the action ha[s] been taken in pursuance of [Congressional] consent." *Id.* 531 (cleaned up). Defendants here cannot establish this presumption, nor can they overcome Congress's express opposition to this specific exercise of power.

The Supreme Court has observed that "[t]he President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." *Curtiss-Wright*, 299 U.S. at 319.  But in the same breath the Court reaffirmed that the President's foreign affairs powers, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.* at 320.  And the Constitution empowers Congress to both regulate foreign commerce and declare war.

U.S. CONST. art. II, § 8.  So while the President may be the Nation's sole representative with foreign nations, he doesn't dictate foreign policy alone.  Indeed, the President must even exercise his enumerated foreign affairs powers in concert with Congress.  *See id.* § 2 (requiring Senate consent to make treaties and commission Ambassadors).

Reaffirming these structural limitations on executive power, the Court has repeatedly explained that "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."  *Zivotofsky*, 576 U.S. at 21.  The *Zivotofsky* Court moreover noted "[i]t is essential that the congressional role in foreign affairs be understood and respected."  *Id.; id.* at 16; *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 46 (1974) ("The plenary authority of Congress over both interstate and foreign commerce is not open to dispute …."; *Turner v. Williams*, 194 U.S. at 290 ("[T]he power to regulate commerce with foreign nations … includes the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States …."; *License Tax Cases*, 72 U.S. (5 Wall.) 462, 470 (1866) (Congress may grant licenses to engage in interstate and international commerce).

The Foreign Commerce Clause is designed, in part, to prevent discriminatory actions that prevent the free flow of commerce.  *See, e.g., Kraft Gen. Foods v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 81 (1992) (states may not discriminate against foreign commerce with compelling justification); *Japan Line*, 441 U.S. at 434.  So Congress's inaction on foreign commercial regulation is not tantamount to acquiescence, but rather a conscious decision to promote the free flow of commerce.  The same is true for interstate commerce.  *See Welton v. Missouri*, 91 U.S. 275, 282 (1875) ("The fact that Congress has

47

not seen fit to prescribe any specific rules to govern inter-State commerce … is equivalent to a declaration that inter-State commerce shall be free and untrammelled.").

But no such "dormant" authority allows Presidents to unilaterally revoke a cross-border oil pipeline in a time of peace.  The KXLP is clearly a species of economic inter-course between nations.  Both the history of the Foreign Commerce Clause and the relationship between Congress and the Executive Branch in this arena demonstrate that the President lacked the independent authority to revoke the KXLP permit.

Defendants argue that the President may act as he did because Congress has ac-quiesced to the Executive Branch's supervision of this subject matter—whether to permit or reject cross-border projects.  ECF 98 at 44–48.  Yet where a claim of executive power is "expressed in broad terms," but that same power has in practice been "exercised quite narrowly," courts will find Congressional acquiescence only where the claimed power has been both exercised by the executive and implicitly approved by the Congress.  *See Kent v. Dulles*, 357 U.S. 116, 127–28 (1958).  Defendants have not, and cannot identify "a sys-tematic, unbroken, executive practice [of axing major international energy projects], long pursued to the knowledge of the Congress and never before questioned" "which may be treated as a gloss on 'Executive Power' vested in the President …."  *Dames & Moore*, 453 U.S. at 686 (quotations omitted).  Far from it.

### 1.  History of the Foreign Commerce Power

#### a.  The Constitutional Convention

The Framers entrusted Congress with the power to regulate foreign commerce, even when that regulation implicated other foreign affairs issues.  Due to defects in the

Articles of Confederation, the Philadelphia delegates in 1787 were particularly concerned with *who* would determine foreign policy and regulate foreign commerce. *See Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976) ("[A] compelling reason for the calling of the Constitutional Convention of 1787 … was the fact that the Articles [of Confederation] essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased."). By design, the Foreign Commerce Clause empowered Congress to establish national uniformity over commerce with foreign nations so that the country could act as a single economic unit. *See* 1 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 114 (Jonathan Elliot ed., 2d ed. 1836) (draft resolution of James Madison). When a Convention proposal would have required a supermajority vote by Congress to regulate foreign commerce, James Madison fought it *because* it would have undermined Congress's ability to retaliate against discriminatory tariffs imposed by a foreign country. *See* JOURNAL OF THE FEDERAL CONVENTION KEPT BY JAMES MADISON 629 (E.H. Scott ed., The Lawbook Exchange 2003). So even in areas where foreign commercial regulation and broader foreign policy issues overlapped, the Framers intended Congress—through the Foreign Commerce Clause—to hold the prevailing authority.

### b. The Early Republic

Congress controlled foreign commercial affairs in the early Republic even as presidential power expanded. Almost from its inception the U.S. implemented trade law that

guarded its economic security by restricting imports or exports with rival powers.[21]   Yet President Washington "respected Congress's significant foreign affairs prerogatives" and "never … regulated foreign commerce."[22]   Congress delegated broader powers to Presidents Adams, Jefferson, and Madison to wage economic warfare.[23]

Acting as an umpire, the Court in a series of cases upheld these congressional delegations, while checking executive impulses to expand their scope.  *See Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) (holding U.S. commander liable who seized a neutral ship in violation of a statute even though he had acted pursuant to a presidential order); *accord Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814); *The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382 (1813); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40–41 (1800). Courts in the early republic protected Congress's primacy over foreign commerce.

### c.  Cross-Border Instrumentalities

Defendants claim that—if history is guide—Presidents have mostly acted alone in approving or rejecting cross-border commercial instrumentalities.  But their history is incomplete, at best.

Look no further than their portrayal of President Grant after Congress authorized the first international cable connecting Cuba and Florida in 1867.  *See* ECF 98 at 4–5; 22 Op. Att'y Gen. 13, 15 (1898).  A French company proposed laying a cable from France to

---

[21] Harold Koh & John Yoo, *Dollar Diplomacy/Dollar Defense: The Fabric of Economics and National Security Law* 26 INT'L L. 715, 720 (1992).

[22] Saikrishna B. Prakash & Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111 YALE L. J. 231, 296 (2001).

[23] *See* Koh & Yoo, *supra*, 718–22.

the United States in 1869.  *Id.*  President Grant initially had reservations about the cable because the French government had given the company a monopoly on communications. *See id.* at 15–16.  Inconvenient to Defendants' argument is that President Grant's own words confirm he recognized congressional primacy in the area of cross-border cables: "[I]n the absence of legislation by Congress I was unwilling, on the one hand, to yield to a foreign state the right to say that its grantees might land on our shores while it denied a similar right to our people to land on its shores; and, on the other hand, I was reluctant to deny to the great interests of the world and of civilization the facilities of such communication as were proposed."  *Id.* at 16.  Grant's predicament acknowledged that *both action and inaction on the cable implicated Congress's foreign commerce power.*

The company ultimately dropped the monopoly rights, but President Grant recognized that "[t]he right to control the conditions for the laying of a cable within the jurisdictional waters of the United States, to connect our shores with those of any foreign state, pertains exclusively to the Government of the United States, under such limitations and conditions as Congress may impose."  *Id.* at 16.  Grant's words and deeds respected Congress's command of foreign (and interstate) commerce.

The Executive Branch subsequently did not object to the landing of foreign cables in 1877, 1879, and 1884, observing in 1877 that the power to impose the limited conditions asserted by President Grant had "met the approval of Congress … indicated by the tacit acquiescence of the Congress, and by the expressed approval of individual members of that body …."  22 Op. Att'y Gen. at 19.   In 1892 a French company again wanted to land a cable, this time in Virginia.  Secretary of State Gresham agreed that because

"[t]here is no Federal legislation conferring authority upon the President to grant such permission, and in the absence of such legislation, Executive action … would have no binding force." *Id.* at 23; *see also id.* at 24 (Secretary of State Olney in 1895 confirming that "in the absence of Federal legislation conferring authority upon the Executive to grant permission, this Department has no power to act in the matter.").

It was not until the late nineteenth/early twentieth century that the Executive began asserting broader authority. *See id.* at 27; *see also Granting of License for the Constr. of a Gas Pipe Line*, 38 Op. Att'y Gen. 163 (1935). But all three branches of government still recognized Congress's authority in this area.

When President Woodrow Wilson permitted a pipeline running between the U.S. and Canada in 1919, he made clear that the permit was subject to any action "by the Congress … confirming, revoking, or modifying in whole or in part the conditions and terms upon which this consent is granted." HEARING REPORT, CABLE LANDING LICENSES, UNITED STATES SENATE, SUBCOMMITTEE ON INTERSTATE COMMERCE 27 (1921).

Western Union in 1920 wished to extend a cable from Florida to a British affiliate offshore. The Executive Branch thought this violated the standard set by President Grant because the British affiliate was a monopoly owned by a foreign power and tried to block the company's action. Judge Augustus Hand noted that it was "most questionable whether the power of the President to regulate cable connection is expressed or implied in the Constitution." *United States v. W. Union Tel. Co.,* 272 F. 311, 318 (S.D.N.Y. 1921), *aff'd,* 272 F. 893, 893 (2d Cir. 1921). Judge Hand pointed out that the President's broad assertion of power over foreign commerce would permit him to block imports such as

opium, silk, steel, or even immigrants. *Id.* at 315; *see also id.* at 313 (rejecting "a failure by Congress to exercise its undoubted powers as proof that some other branch of the government has the right to do what Congress might readily have authorized").

Congress then passed the Kellogg Act, which delegated to the President power to make cable landing determinations subject to a statutory framework. *See* Act of May 27, 1921, ch. 12, 42 Stat. 8 (codified at 47 U.S.C. §§ 34–39); *see id.* §§ 34, 35.  Congress likewise enacted regulatory schemes for miscellaneous transmission facilities via the Federal Water Power Act, 41 Stat. 1063 (1920) (codified as amended at 16 U.S.C. § 824(e); natural gas pipelines via the Natural Gas Act, 52 Stat 822 (1938) (codified as amended at 15 U.S.C. § 717b(a), (c)); and international bridges via the International Bridge Act of 1972, 86 Stat. 731 (1972) (codified at 33 U.S.C. § 535).

In all these examples, Congress instructed the President to regulate cross-border commercial instrumentalities pursuant to *statutory authority*.  Yet Defendants portray these explicit and limited delegations as evidence that Congress has now acquiesced to the President's unilateral regulation of all cross-border concerns.  *See* ECF 98 at 45–48.  But that would have stark implications for the separation of powers—if Congress's specific delegations over certain cross-border facilities and commodities meant that it had abdicated its constitutional authority over all cross-border facilities and commodities.  Congress has not, as a matter fact, instructed the President to regulate all cross-border commercial instrumentalities as he sees fit; it defies logic to interpret Congress's retention of authority as an abandonment of it.  *See W. Union Tel. Co.,* 272 F. at 313.  Even if Congress had failed to regulate cross-border crude oil pipelines, the President would lack the

power to unilaterally revoke the KXLP cross-border permit.

Defendants rely heavily on dicta from *Chicago & Southern Air Lines. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), but for several reasons that case doesn't legitimize the President's unilateral revocation of the KXLP permit.  First, *Waterman*'s statements about the President's Commander-in-Chief powers were addressing national security concerns uniquely related to the rapid growth of commercial air travel after World War II.  *See id.* at 108 (noting that "aerial navigation routes and bases should be prudently correlated with facilities *and plans for our own national defenses*") (emphasis added).  It reasoned that air transportation "carr[ied] new threats" that made it fundamentally different from foreign commerce by rail, water, and vehicles, or communications by wire or radio.  *See id.* at 106–08; *see id.* at 111 (noting that the President "has available intelligence services whose reports are not and ought not to be published to the world").[24]

But neither President Biden nor Congress has identified any national security concerns related to the KXLP or Canada, one of our closest allies and trading partners.  The KXLP, moreover, enhances U.S. national security by securing energy from a reliable and stable ally.  *See* 2019 FSEIS at S-5 (shortfalls in crude oil from Venezuela, Mexico and

---

[24] *Waterman* also concluded that that the dispute's "national security" and "foreign relations" dimensions rendered it nonjusticiable as a political question.  *Id.* at 111.  But simply slapping those labels on a dispute doesn't make it unreviewable.  *See Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."); *Zweibon v. Mitchell*, 516 F.2d 594, 623 (D.C. Cir. 1975) ("[W]e see no reason to take the Waterman dicta as a Supreme Court statement that any issue that touches foreign affairs is to be immunized from judicial review, particularly when there are strong countervailing constitutional interests.").

other traditional suppliers increase U.S. energy security concerns).[25]  *Waterman*, therefore, supports the Plaintiffs' position—the President may have a bigger role to play in controlling cross-border commercial instrumentalities when *specific projects raise legitimate national security concerns*.  But that is not this case.

Finally, *Waterman* was decided primarily on statutory grounds.  *See Zweibon*, 516 F.2d at 623.  In his *Youngstown* concurrence, Justice Jackson—who authored *Waterman*—"[d]ismiss[ed] *Waterman* as an example of the 'wide definition of presidential powers under statutory authorization.'"  *Id.* (quoting *Youngstown*, 343 U.S. at 636 n. 2).

To the extent *Waterman* speaks to this dispute, it favors Plaintiffs' position.

### 2.  Congress Has Not Acquiesced to Presidential Power over the Keystone XL

Defendants' arguments depend largely on the theory of congressional acquiescence.  As discussed above, there has been no historical acquiescence.  But even zeroing in on the KXLP permit, specifically, it's impossible to conclude that Congress acquiesced to the President's revocation order.  *See Medellin*, 552 U.S. at 528 (President must demonstrate "acquiescence in this particular exercise of Presidential authority").

Section 501 of the Payroll Protection Act conclusively proves Congress was not acquiescing to presidential power over the KXLP.  *See* Part I(B), *infra*.  But Congress

---

[25] Having spurned our friendly neighbor's oil, President Biden now seeks it elsewhere. See Ken Thomas, *White House Urges OPEC to Boost Oil Output Amid Covid-19 Economic Recovery*, WALL ST. J. (Aug 11, 2011), https://www.wsj.com/articles/white-house-urges-opec-to-boost-oil-production-amid-covid-19-recovery-11628688236;  David  Blackmon, *OPEC+ Predictably Rejects Biden Plea For More Oil Production*, FORBES (Aug. 17, 2021), https://www.forbes.com/sites/davidblackmon/2021/08/17/opec-predictably-rejects-biden-plea-for-more-oil-production/?sh=58b6e52c2acd.

subsequently continued to voice its support for the KXLP project. *Dames & Moore*, 453 U.S. at 687.  Most forcefully—after President Obama's denied TC Energy's later application in 2015—Congress passed the Keystone Pipeline Approval Act (KPPA), which mandated that "[TC Energy] may construct, connect, operate, and maintain the pipeline and cross-border facilities described in the application filed on May 4, 2012." S. 1, 114th Cong., 1st Sess. §§ 1, 2(a) (2015).  Several similar examples abound.[26]

Defendants illogically claim that these post-2011 examples provide no insight into Congressional intent because President Obama refused to sign them.  ECF 98 at 54.  But that theory merely reaffirms Defendants' monolithic view of presidential power.  Of course, congressional actions short of enacted laws shed light on Congress's views when undertaking an acquiescence analysis.  That's clear in the caselaw.  Defendants cite *Dames & Moore*, but neglect to note that the Court in that case said that resolutions (which Presidents don't sign) were salient evidence of congressional intentions.  *See* 453 U.S. at 687.

*Dames & Moore* also doesn't support Defendants' view that the President's independent constitutional powers give him plenary control over foreign affairs.  At issue were executive orders authorized by the Trade With the Enemy Act following the 1979 seizure of the U.S. Embassy in Tehran.  453 U.S. at 659; *see id. at* 688 (finding significant that this involved a "major foreign policy dispute").  The limited holding concerned a

---

[26] *See also* H.R. 5682, 113th Cong., 2d Sess. § 1 (2014); American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2, 113th Cong., 2d Sess. § 103 (2014); Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. (2013); North American Energy Access Act, H.R. 4348, 112th Cong., 2d Sess. § 201-204 (2012).

narrow question of settlement of mutual claims by executive agreement between a hostile foreign government and the United States. *See id.* at 688 ("Finally, we re-emphasize the narrowness of our decision. We do not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities."). The Court even warned against the constitutional danger of plenary power. *See id.* at 688 ("[the] sheer magnitude of such a power, considered against the background of the diversity and complexity of modern international trade, cautions against any broader construction of authority than is necessary.") (quotations omitted). The Court found significant that Congress was enacting legislation to implement the agreements at issue, *id.* at 680–81, and had done nothing to disapprove to the agreements. *Id.* at 687. This is not at all analogous to the KXLP. Congress has never given the President power to regulate cross-border pipelines. And even if it did, the President would still be subject to the statutory limitations.

There can be no serious argument that Congress has acquiesced to the President's revocation of the KXLP permit.

### *3.* Revocation of a Duly Granted Permit Triggers Additional Constitutional Scrutiny

Defendants claim the President's discretion in revoking the permit is "unreviewable." ECF 98 at 55. But for the matter to fall within his unreviewable discretion, it must actually be a matter committed to him by the Constitution or Congress. When the President "'acts in absence of either a congressional grant or denial of authority" it enters what Justice Jackson called the "zone of twilight." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Even there, cross-border oil pipelines fall at an intersection between the Foreign Commerce Power in Article I and (potentially) the President's Commander-in-

Chief Power in Article II.  *Cf. Dames & Moore*, 453 U.S. at 688.  Due to this intersection, the courts necessarily cannot cede absolute discretion to the President.

Defendants claim that an international pipeline "implicates national security and foreign relations considerations" and that the President "has the authority to protect the Nation's territorial integrity and prevent intrusions at the border."  ECF 98 at 38.  If the KXLP implicates national security concerns, the Executive Order failed to mention them.  The Executive Order merely asserts that "approval of the pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take climate action."  Exec. Order 13990, 86 Fed. Reg. 7037.  It even concedes the KXLP itself is a purely *domestic* consideration when it states, "Our domestic efforts must go hand in hand with U.S. diplomatic engagement."  *Id.*

It certainly implicates foreign relations in some respect—TC Energy, a Canadian corporation, is seeking $15 billion from the U.S. because of the President's decision.[27]  But again, to the extent the KXLP implicates some foreign relations considerations, those undefined, implied powers cannot supersede the enumerated Foreign Commerce power vested in Congress.  *See Zivotofsky*, 576 U.S. at 16; *Youngstown*, 343 U.S. at 637–38.  And Plaintiffs agree the President has authority to prevent border intrusions.  But again, that authority stems from his Commander-in-Chief power, and the KXLP raises no legitimate national security concerns.  If the President can invoke his "territorial integrity" power in a situation like this—without a bona fide national security rationale—then he can wrest the power to regulate foreign commerce at any time.  *Dames & Moore*, 453 U.S. at 688.  In

---

[27] Garger, *supra.*

that scenario—the one Defendants champion here—Congress's Foreign Commerce power is reduced to a paper tiger.  *See Baker*, 369 U.S. at 211.

The President could only lawfully revoke the KXLP permit by identifying some problem within his Article II capacities to solve.  Simply asserting that the KXLP does not "comport[ ] with the national interest" does not suffice.  ECF 98 at 39; Pub. L. 112-78 § 501(b)(2) (justification for national interest determination includes "consideration of economic, employment, energy security, foreign policy, trade, and environmental factors").  Perhaps it would if Canada was a hostile power, or the pipeline connected Alaska and Russia.  *Cf. Dames & Moore*, 453 U.S. at 688 (finding significant that the issue involved "a major foreign policy dispute" with Iran); W*aterman*, 333 U.S. at 106–108, 111.  Indeed, Article II may empower the President to temporarily halt landings of cross-border commercial instrumentalities to protect the national security and ensure compliance with applicable law.  But after more than a decade of intensive government scrutiny and one White House approval, it's safe to say these are not good-faith bases for nixing the KXLP—which is why the President didn't bother mentioning them in the Order.  There's no legitimate Article II basis for the President's revocation decision.

President Biden's sole rationale is that allowing KXLP to be completed would undermine U.S. leadership on climate change, but that is not a national security interest.[28]  And given that President Biden recently (a) approved the Nord Stream 2 pipeline enabling Russia to transport natural gas directly to western Europe;[29] (b) requested in July

---

[28] President Biden's decision ultimately weakens U.S. national security.  *See, e.g.*, Ariel Cohen, *U.S. Loses, Russia and China Win With Keystone XL Closure*, FORBES (June 10, 2021).

[29] *Nord Stream 2 sanctions would be 'counter-productive' for European ties – Biden*, REUTERS

2021 that OPEC increase its oil production by 400,000 barrels per day;[30] and (c) made another request to OPEC for increased production on August 11,[31] it's unlikely any post hoc "national security" justification can survive even the lowest level of judicial scrutiny.

Practically, Defendants' argument that the global politics of climate change give the President carte blanche to commandeer Congress's foreign commerce powers lacks any intelligible limiting principle.  If there are foreign affairs and national security concerns associated with climate change that trump Congress's power in this area, then what is to stop the President from invoking those same considerations to shut down *interstate* oil pipelines?  *See W. Union Tel. Co.,* 272 F. at 315.  Defendants cannot be right, for that would signal a perilous concentration of power the Framers earnestly sought to prevent by giving Congress the power to regulate foreign and interstate commerce.

But in the end, Executive Order 13990 didn't address national security or foreign affairs problems.  The Order tellingly admits the revocation is an attempt to realigning *domestic* policy.  86 Fed. Reg. at 7037.  Whatever the motives, it trammeled foreign and interstate commerce.  And only Congress may do that.  The President's revocation order is therefore unlawful and unconstitutional.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

---

(May 25, 2021), https://www.reuters.com/business/energy/nord-stream-2-sanctions-would-be-counter-productive-european-ties-biden-2021-05-26/.

[30] Mui & Stevens, *supra.*

[31] Statement by National Security Advisor Jake Sullivan, *supra.*

Respectfully submitted this 23rd day of August, 2021:

| | |
|---|---|
| AUSTIN KNUDSEN<br>Attorney General of Montana | KEN PAXTON<br>Attorney General of Texas |
| Kristin Hansen<br>Lieutenant General | Brent Webster<br>First Assistant Attorney General |
| /s/ David M.S. Dewhirst<br>David M.S. Dewhirst (PRO HAC VICE)<br>Solicitor General | Judd E. Stone II<br>Solicitor General |
| | Patrick K. Sweeten<br>Deputy Attorney General for Special Litigation |
| Office of the Attorney General<br>215 North Sanders<br>P.O. Box 201401<br>Helena, MT  59620-1401<br>Tel: (406) 444-4145<br>David.Dewhirst@mt.gov<br>**Counsel for the State of Montana** | /s/ Ryan D. Walters<br>Ryan D. Walters<br>*Attorney-in-Charge*<br>Special Counsel<br>Texas Bar No. 24105085<br>S.D. Tex.  Bar No. 3369185 |
| | Lanora C. Pettit<br>Principal Deputy<br>Solicitor General |
| | Jeffrey M. White<br>Special Counsel<br>Texas Bar No. 24064380<br>S.D. Tex. Bar No. 3667169 |
| | Office of the Attorney General<br>P.O. Box 12548 (MC-009)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-2714<br>Fax: (512) 457-4410<br>Judd.Stone@oag.texas.gov<br>Patrick.Sweeten@oag.texas.gov<br>Ryan.Walters@oag.texas.gov<br>Lanora.Pettit@oag.texas.gov<br>**Counsel for Plaintiff State of Texas** |

*Additional Counsel for Plaintiffs*

STEVE MARSHALL
  *Attorney General*

*/s/*Edmund G. LaCour Jr.
EDMUND G. LACOUR JR. (PRO HAC VICE)
  *Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, AL 36130
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
**Counsel for the State of Alabama**

TREG R. TAYLOR
  *Attorney General*

*/s/*Gilman Dana S. Burke
GILMAN DANA S. BURKE (PRO HAC VICE APPLICATION FORTHCOMING)
  *Senior Assistant Attorney General*
RONALD W. OPSAHL (PRO HAC VICE APPLICATION FORTHCOMING)
  *Senior Assistant Attorney General*
Alaska Department of Law
1031 West 4th Ave., Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
dana.burke@alaska.gov
ron.opsahl@alaska.gov
**Counsel for State of Alaska**

MARK BRNOVICH
  *Attorney General*

/s/ Robert J. Maker
ROBERT J. MAKER (PRO HAC VICE)
  *Assistant Attorney General*
2005 N. Central Ave.
Phoenix AZ 85004
Robert.Makar@azag.gov
**Counsel for the State of Arizona**

LESLIE RUTLEDGE
  *Attorney General*

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI (PRO HAC VICE)
  *Solicitor General*
VINCENT M. WAGNER
  *Deputy Solicitor General*
Office of Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.bronni@arkansasag.gov
**Counsel for the State of Arkansas**

ASHLEY MOODY
  *Attorney General*

/s/ James H. Percival
JAMES H. PERCIVAL (PRO HAC VICE)
  *Deputy Attorney General for Legal Policy*
PL-01, The Capitol
Tallahassee, FL 32399
James.Percival@myfloridalegal.com
**Counsel for the State of Florida**

CHRIS CARR
  *Attorney General*

/s/ Andrew A. Pinson
ANDREW A. PINSON (PRO HAC VICE)
  *Solicitor General*
Office of the Attorney General
40 Capitol Sq SW
Atlanta, Georgia 30334
Tel: (404) 458-3409
apinson@law.ga.gov
**Counsel for the State of Georgia**

THEODORE E. ROKITA
  *Attorney General*

/s/ Thomas M. Fisher
THOMAS M. FISHER (PRO HAC VICE)
  *Solicitor General*
Office of the Attorney General
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
Tom.Fisher@atg.in.gov
**Counsel for the State of Indiana**

DEREK SCHMIDT
  *Attorney General*

/s/ Brant M. Laue
BRANT M. LAUE (PRO HAC VICE)
  *Solicitor General*
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, Kansas 66612
Tel: (785) 368-8539
brant.laue@ag.ks.gov
**Counsel for the State of Kansas**

DANIEL CAMERON
  *Attorney General*

/s/ Victor B. Maddox
VICTOR B. MADDOX (PRO HAC VICE)
  *Associate Attorney General*
S. CHAD MEREDITH
  *Solicitor General*
MARC MANLEY (PRO HAC VICE)
  *Assistant Attorney General*
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
502.696.5300
Victor.Maddox@ky.gov
**Counsel for the Commonwealth of Kentucky**

JEFF LANDRY
  *Attorney General*

/s/ Elizabeth B. Murrill
ELIZABETH B. MURRILL (PRO HAC VICE)
  *Solicitor General*
Office of the Attorney General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA  70804
Tel: (205) 326-6085
murrille@ag.louisiana.gov
**Counsel for the State of Louisiana**

LYNN FITCH
  *Attorney General*

/s/ Justin L. Matheny
JUSTIN L. MATHENY (PRO HAC VICE)
  *Deputy Solicitor General*
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
justin.matheny@ago.ms.gov
**Counsel for the State of Mississippi**

ERIC SCHMITT
  *Attorney General*

/s/ D. John Sauer
D. JOHN SAUER
  *Solicitor General* (PRO HAC VICE)
Office of Attorney General
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, MO 65102
(573) 751-8870
John.Sauer@ago.mo.gov
**Counsel for the State of Missouri**

DOUG J. PETERSON
  *Attorney General*

/s/ James A. Campbell
JAMES A. CAMPBELL (PRO HAC VICE)
  *Solicitor General*
JUSTIN D. LAVENE ((PRO HAC VICE)
  *Assistant Attorney General*
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
justin.lavene@nebraska.gov
**Counsel for the State of Nebraska**

WAYNE STENEHJEM
  *Attorney General*

 /s/ Matthew A. Sagsveen
MATTHEW A. SAGSVEEN (PRO HAC VICE)
  *Solicitor General*
State Bar ID No. 05613
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Tel: (701) 328-3640
masagsve@nd.gov
**Counsel for State of North Dakota**

DAVE YOST
*Attorney General*

/s/ Benjamin M. Flowers
BENJAMIN M. FLOWERS (PRO HAC VICE)
  *Solicitor General*
Office of the Attorney General
30 E. Broad St., Floor 17
Columbus, OH 43215
Benjamin.Flowers@ohioattorneygeneral.gov
**Counsel for the State of Ohio**

MIKE HUNTER
  *Attorney General*

/s/ Mithun Mansinghani
MITHUN MANSINGHANI
  *Solicitor General*
Office of the Attorney General
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
mithun.mansinghani@oag.ok.gov
**Counsel for the State of Oklahoma**


ALAN WILSON
  *Attorney General*

/s/ J. Emory Smith, Jr.
J. EMORY SMITH, JR. (PRO HAC VICE)
  *Deputy Solicitor General*
Office of the Attorney General
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-3680
ESmith@scag.gov
**Counsel for the State of South Carolina**


JASON RAVNSBORG
  *Attorney General*

/s/ Jeffery J. Tronvold
JEFFERY J. TRONVOLD (PRO HAC VICE)
  *Deputy Attorney General*
Office of the Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501 - 8501
(605) 773-3215
Jeffery.Tronvold@state.sd.us
**Counsel for the State of South Dakota**

SEAN REYES
  *Attorney General*

/s/ Melissa A. Holyoak
MELISSA A. HOLYOAK (ADMISSION RENEWAL FORTHCOMING)
  *Solicitor General*
Office of the Attorney General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
385.271.2484
melissaholyoak@agutah.gov
**Counsel for the State of Utah**


PATRICK MORRISEY
  *Attorney General*

/s/ Lindsay S. See
LINDSAY S. SEE (PRO HAC VICE)
  *Solicitor General*
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(304) 558-2021
Lindsay.See@wvago.gov
**Counsel for the State of West Virginia**


BRIDGET HILL
  *Attorney General*

/s/ Travis Jordan
TRAVIS JORDAN (PRO HAC VICE)
  *Assistant Attorney General*
Office of the Attorney General
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895
travis.jordan@wyo.gov
**Counsel for the State of Wyoming**

## CERTIFICATE OF SERVICE

I certify that on August 23, 2021, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David M.S. Dewhirst
David M.S. Dewhirst