**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| TEXAS, *et al.*, | ) |
| | ) |
|     *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | )   Case No. 3:21-cv-00065 |
| JOSEPH R. BIDEN, JR., in his official | ) |
| capacity as President of the United States, | ) |
| *et al.*, | ) |
| | ) |
|     *Defendants*. | ) |
| | ) |

**BRIEF OF THE ATTORNEY GENERAL OF SASKATCHEWAN**
**AS *AMICUS CURIAE***

Yasser A. Madriz
MCGUIREWOODS LLP
600 Travis Street, Suite 7500
Houston, TX 77002
Tel: (832) 255-6361
Fax: (713) 571-9652
ymadriz@mcguirewoods.com

Andrew F. Gann, Jr.
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1643
Fax: (804) 775-1061
agann@mcguirewoods.com

Michael Francisco
John S. Moran
MCGUIREWOODS LLP
888 16th Street, N.W., Suite 500
Washington, DC 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
mfrancisco@mcguirewoods.com
jmoran@mcguirewoods.com

*Attorneys for the Attorney General of*
*Saskatchewan*

## TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES ....................................................................1

INTRODUCTION  AND SUMMARY OF THE ARGUMENT ..............1

ARGUMENT .................................................................................................2

I.   THE PERMITTING AND CONSTRUCTION OF THE KEYSTONE
XL PIPELINE IS AN IMPORTANT MATTER OF FOREIGN
COMMERCE. ........................................................................................2

    A.   Pipeline capacity is necessary to support the sale of oil and gas
from Saskatchewan to the United States and other foreign
markets. ..........................................................................................3

    B.   Oil and gas represent an important sector of commerce between
Canada and the United States.........................................................6

II.   CANCELLATION OF THE KEYSTONE XL PIPELINE HAS
ADVERSE CONSEQUENCES FOR SASKATCHEWAN. .......................8

    A.   Upsetting Existing Reliance Interests for Tax and Royalty
Revenue. .........................................................................................8

    B.   Upsetting Reliance Interests for First Nations. ..............................10

    C.   Effects on the Oil & Gas Sector......................................................12

    D.   Effects on Other Industries..............................................................13

    E.   Environmental Care.........................................................................15

III.   A STABLE AND PREDICTABLE PROCESS FOR APPROVING
TRANS-BORDER PIPELINE PROJECTS IS IMPORTANT FOR
THE FUTURE OF FOREIGN COMMERCE. ..........................................16

CONCLUSION .............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Rice, Inc. v. Arkansas Rice Growers Co-op. Ass'n*,
    532 F. Supp. 1376 (S.D. Tex. 1982) ..................................................8

*Michigan v. Enbridge Energy Ltd.*,
    No. 1:20-cv-01142 (W.D. Mich. Filed May 11, 2021) .......................8

**Statutes**

Temporary Payroll Tax Cut Continuation Act of 2011,
    Pub. L. No. 112-78, 125 Stat. 1280 ..................................................18

**Constitutional Provisions**

U.S. CONST., Article I, § 8, cl. 3 ..........................................................2

**Other**

American Petroleum Institute, "Cross Border Petroleum Liquids
    Trade Study," ICF (April 6, 2021),
    https://www.api.org/-/media/Files/News/2021/04/ICF_Cross_
    Border_Analysis_Key_Takeaways.pdf ...............................................7

"Application for Special Permit to Design, Construct and Operate
    Proposed NPS 36-inch TransCanada Keystone XL Pipeline Project
    at 80% Specified Minimum Yield Strength (SMYS)," (Oct. 10,
    2008),
    https://www.regulations.gov/document/PHMSA-2008-0285-0001 ..................18

Art Hovey, "TransCanada Proposes Second Oil Pipeline," Lincoln
    Journal-Star (June 12, 2008),
    https://www.rigzone.com/news/oil_gas/a/149226/TransCanada_Pr
    oposes_Second_Oil_Pipeline/ ............................................................17

Balwinder Nimana, *et. al.*, *Life Cycle Analysis of Bitumen
    Transportation to Refineries by Rail and Pipeline*,
    51 J. of Envt'l Sci. & Tech. 680 (2016) ..............................................15

Canada, "Railway Investigation Report R12D0054" (July 6, 2013),
https://www.tsb.gc.ca/eng/rapports-
reports/rail/2013/r13d0054/r13d0054.html ......................................................16

CAPP, "2019 Crude Oil Forecast, Markets and Transportation,"
https://www.capp.ca/wp-content/uploads/2019/11/2019_Crude_
Oil_Forecast_Markets_and_Transportation-338794.pdf ....................................5

CBC News, "5 more victims identified in Lac-Mégantic," Jul. 17,
2013, https://www.cbc.ca/news/canada/montreal/5-more-victims-
identified-in-lac-m%C3%A9gantic-1.1306473.................................................16

Department of State, "Final Environmental Impact Statement for the
Proposed Keystone XL Project; Public Meetings,"
76 Fed. Reg. 53,525 .........................................................................................18

Department of State, "Final Environmental Impact Statement for the
Proposed Keystone XL Project,"
76 Fed. Reg. 55,155 .........................................................................................18

Department of State, "In the Matter of the Keystone XL Pipeline,"
77 Fed. Reg. 5,614 ...........................................................................................18

Department of State, "Notice of 30 Day Public Comment Period
Regarding the National Interest Determination for TransCanada
Keystone Pipeline, L.P.'s Presidential Permit Application,"
79 Fed. Reg. 6,984 ...........................................................................................19

Department of State, "Notice of Issuance of a Presidential Permit to
TransCanada Keystone Pipeline, L.P.,"
82 Fed. Reg. 16,467 .........................................................................................19

Department of State, Media Note, "Denial of Keystone XL Pipeline
Application" (Jan. 18, 2012),
https://2009-2017.state.gov/r/pa/prs/ps/2012/01/181473.htm...........................18

Executive Order 13,990, "Protecting Public Health and the
Environment and Restoring Science to Tackle the Climate Crisis,"
86 Fed. Reg. 7,037 (published Jan. 25, 2021) ...................................................20

Government of Saskatchewan, "Summary of Financial Statements,"
1 *Public Accounts 2019–20*,
https://publications.saskatchewan.ca/#/categories/4518 ...................................10

Media Advisory, "TC Energy and Natural Law Energy sign historic
MOU facilitating one of the largest Indigenous equity investments
of its kind in North American infrastructure" (Sept. 29, 2020),
https://www.tcenergy.com/announcements/2020/2020-09-29-tc-
energy-and-natural-law-energy-sign-historic-mou-facilitating-one-
of-the-largest-indigenous-equity-investments-of-its-kind-in-north/ .................11

Presidential Memorandum, "Construction of the Keystone XL
Pipeline,"
82 Fed. Reg. 8,663 ..............................................................................................19

Presidential Memorandum, "Implementing Provisions of the
Temporary Payroll Tax Cut Continuation Act of 2011 Relating to
the Keystone XL Pipeline Permit,"
77 Fed. Reg. 5,677 ..............................................................................................18

Presidential Permit, "Authorizing TransCanada Keystone Pipeline,
L.P., to Construct, Connect, Operate, and Maintain Pipeline
Facilities at the International Boundary Between the United States
and Canada,"
84 Fed. Reg. 13,101 ............................................................................................20

Saskatchewan Bureau of Statistics, Ministry of Finance, "Economic
Review 2019," (Mar. 2021),
https://publications.saskatchewan.ca/api/v1/products/86384/format
s/127631/download ..............................................................................................14

*Saskatchewan Hansard* (Debates and Proceedings),
N.S. Vol 59, No. 44A (April 18, 2018), at 3934,
http://docs.legassembly.sk.ca/legdocs/Legislative%20Assembly/H
ansard/28L2S/180418Debates.pdf......................................................................14

Secretary John Kerry, Press Statement, "Keystone XL Pipeline Permit
Determination" (Nov. 6, 2021),
https://2009-2017.state.gov/secretary/remarks/2015/11/249249.htm ................19

S.1, Keystone XL Pipeline Approval Act, 114th Cong. (2015),
https://www.congress.gov/bill/114th-congress/senate-bill/1 .............................19

iv

Saskatchewan, "Saskatchewan Agriculture Exports 2019," (June 2020),
https://publications.saskatchewan.ca/api/v1/products/107051/forma ts/119926/download ........................................................................14

The Washington Post (Jan. 8, 2016),
https://www.washingtonpost.com/news/monkey-cage/wp/2016/01/08/transcanada-is-suing-the-u-s-over-obamas-rejection-of-the-keystone-xl-pipeline-the-u-s-might-lose/ ................................19

White House, "Statement by the President on the Keystone XL Pipeline" (Nov. 6, 2015),
https://obamawhitehouse.archives.gov/the-press-office/2015/11/06/statement-president-Keystone-XL-pipeline.........................19

White House, "Statement by the President on the State Department's Keystone XL Pipeline Announcement" (Nov. 10, 2011),
https://obamawhitehouse.archives.gov/the-press-office/2011/11/10/statement-president-state-departments-keystone-xl-pipeline-announcement ..................................................................18

## STATEMENT OF THE ISSUES

*Amicus Curiae* takes no position on the merits on the legal issues to be decided by the Court but agrees with the Plaintiffs' presentation of the issues to be decided.

# INTRODUCTION
# AND SUMMARY OF THE ARGUMENT

The decision to cancel the permit for the Keystone XL Pipeline will be detrimental to the interests of Saskatchewan and its citizens. The Minister of Justice and Attorney General of Saskatchewan, Hon. Gordon Wyant, Q.C., respectfully submits this amicus curiae brief to advise this Court of Saskatchewan's interests, including international commerce concerns at issue in the case.

This brief helps explain the international impact of this dispute and highlights the foreign and international commerce concerns at stake. The Province of Saskatchewan has a population of 1,174,000 and shares a border of 393 miles with the United States. If Keystone XL does not operate as planned, there would be disruption, including long-term increased transit costs and diminished energy security. The alternatives will likely force oil transit away from a relatively safe, low-carbon, environmentally sound pipeline transportation to other means of transportation, including rail, which are relatively less safe and have greater environmental impact.

The cancelation of the Keystone XL Pipeline will impose significant harm to Saskatchewan, including the loss of thousands of future jobs and millions of dollars of government revenue, as well as billions of dollars in lost economic activity. The Keystone XL Pipeline would have allowed for safe, reliable transit of substantial volume of oil

through Saskatchewan, ultimately delivered to refineries in Texas. The international infrastructure would have provided additional capacity to bring natural resources from Saskatchewan to market. Canceling the pipeline will bring substantial harm to Saskatchewan and is profoundly unsettling for the stable, free flow of commerce between sovereign nations. Given the vital importance of the Keystone XL Pipeline to the interests of Saskatchewan, amicus curiae supports the Plaintiffs and urges the Court to act in a manner that will ensure that the Keystone XL Pipeline project is allowed to proceed.

## ARGUMENT

### I.   THE PERMITTING AND CONSTRUCTION OF THE KEYSTONE XL PIPELINE IS AN IMPORTANT MATTER OF FOREIGN COMMERCE.

The substantive claims in this case arise under the laws and Constitution of the United States. Saskatchewan does not take a position on the proper interpretation or application of U.S. law. Saskatchewan nevertheless believes that its perspective can aid the Court in adjudicating the important issues in this case concerning the permit to construct the trans-border Keystone XL Pipeline.

In particular, the Plaintiff States have raised the issue in this case whether the permitting decision for the Keystone XL Pipeline falls within the authority of the U.S. Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. CONST., art. I, § 8, cl. 3, and if so, whether the decision by President Joseph R. Biden, Jr. to revoke the permit is lawful. Saskatchewan believes the decision of the United States on whether to allow construction of the Keystone XL Pipeline specifically, and the construction of trans-border pipelines between the U.S. and Canada

more generally, presents a vitally important question concerning the regulation of foreign commerce.

> **A.  Pipeline capacity is necessary to support the sale of oil and gas from Saskatchewan to the United States and other foreign markets.**

Saskatchewan is a land-locked province.   As reflected in the map below, Saskatchewan is bordered to the north by the Northwest Territories, to the west by Alberta, to the east by Manitoba, and to the south by the U.S. States of Montana and North Dakota along the 49th parallel:



Given its geography, Saskatchewan relies on overland options to export resources.

Oil and gas represents the largest industrial sector in Saskatchewan and account for approximately 15% of GDP.  In 2019, it accounted for about $12.7 billion (CAD) of its GDP.  Southern Saskatchewan has four major production areas for oil and gas:



The Lloydminster area is located in the west-central portion of the province, bordering Alberta; the Kindersley area lies south of Lloydminster, also bordering Alberta; the Swift Current area lies south of Kindersley in the south-west corner of the province, bordering Alberta and Montana; and the Estevan area is located in the south-east corner of the province, bordering Manitoba and North Dakota.

Pipelines represent the most efficient, cost-effective, and environmentally sound way to transport oil resources from land-locked Saskatchewan to foreign markets in the United States and beyond.  Today, the supply of oil in Saskatchewan and neighboring Alberta far exceeds the combined capacity of local refineries and existing pipelines in Western Canada.  A 2019 study by the Canadian Association of Petroleum Producers (CAPP) projected that the pipeline-capacity shortage will only continue to grow without additional pipeline capacity.[1]

The Keystone XL Pipeline represented a critical piece of the long-term solution for Saskatchewan.  In a direct way, oil producers in Saskatchewan would gain greater and easier access to existing pipeline infrastructure that transports oil to the Gulf Coast of the United States.  For instance, a substantial portion of the oil produced in the Lloydminster area is transported through the Saskatchewan Gathering System and the Mainline System to Hardisty Terminal in Alberta.  It is possible to transport oil from Hardisty Terminal to the Gulf Coast through an interlocking series of pipelines.  But Keystone XL promised a much more direct route and, just as importantly, additional capacity.

In a less direct way, Keystone XL also represented a critical piece of the long-term solution for Saskatchewan because it promised to alleviate bottlenecking at Hardisty Terminal, which is Canada's premier shipping hub, and in the Great Lakes and Midwest region of the United States.  At present, Western Canadian producers do not have many

---

[1] CAPP, "2019 Crude Oil Forecast, Markets and Transportation," *available at* https://www.capp.ca/wp-content/uploads/2019/11/2019_Crude_Oil_Forecast_Markets_and_Transportation-338794.pdf

meaningful alternative markets beyond the Great Lakes and Midwest, but that region lacks sufficient local demand based on the available refineries, storage capacity, and access to additional pipelines for egress.  This bottleneck leads to significant challenges for efficiently bringing Western Canadian oil to market.  Not only would Keystone XL provide additional transportation capacity, which is sorely needed in Western Canada, but it would also provide greater access to the Gulf Coast region, which does not suffer from the same capacity limitations.  For example, in 2019, the lack of access to tidewater cost Saskatchewan producers roughly $1.9 billion in lost revenue and cost the Government of Saskatchewan about $130 million in lost taxes, royalties, and other revenue.

The potential benefits for Saskatchewan's producers if the Keystone XL Pipeline is fully operational are substantial.  Increased market access for Saskatchewan oil liquids would almost certainly yield higher prices.  Those higher prices would, in turn, provide for increased royalties and tax revenues for the provincial government.

As Saskatchewan's experience shows, whether to allow the construction of a trans-border pipeline—Keystone XL specifically or other future projects more generally—is a matter of critical importance to the regulation of commerce between the United States and foreign countries.  And in this case, the foreign commerce at issue is not just limited to commerce between the United States and Canada.

**B**.    **Oil and gas represent an important sector of commerce between Canada and the United States.**

The petroleum liquids sector has accounted for a substantial portion of all trade between the United States and Canada, according to analysis for the American Petroleum

Institute by consultants at ICF.[2]  The total trade has doubled over the past decade from 2.75 million barrels a day to 5.5 million barrels a day in 2019.  This trade represents between $59 billion and $126 billion a year, which represents between 10% and 20% of total U.S.-Canada trade in goods.  By way of reference, this trade in 2019 ($96 billion) represents nearly as much as the total trade in vehicles between the two nations ($102 billion) in the same year.

Due to the geography of Western Canada, a substantial volume of crude oil can reach the Midwest and Gulf Coast of the United States by pipeline, rail, and vessel with greater ease than it can reach eastern Canada.  In particular, these imports have contributed to the United States' ability to decrease its reliance on OPEC crude oil, where U.S. imports from OPEC have fallen by 70% over the past decade.  Even with current pipeline capacity constraints, Canadian crude oil represented 66% of oil in the Midwest United States region and 49% of oil in the Rocky Mountain region.  As of 2019, some 75% of Canadian oil production was exported to the U.S. market.  With heavy crude oil in particular, Canadian exports in 2019 accounted for 50% of the U.S. supply.  The sheer volume of oil exports from Canada to the United States has important implications for commerce between Canada and the United States as well as countries who import from the United States through the ports of the Gulf Coast or otherwise.

---

[2] American Petroleum Institute, "Cross Border Petroleum Liquids Trade Study," ICF (April 6, 2021), *available at* https://www.api.org/-/media/Files/News/2021/04/ICF_Cross_Border_Analysis_Key_Takeaways.pdf (last visited August 29, 2021).

## II.   CANCELLATION OF THE KEYSTONE XL PIPELINE HAS ADVERSE CONSEQUENCES FOR SASKATCHEWAN.

The prospect that the Keystone XL Pipeline will not be built has serious ramifications for Saskatchewan in the near and long term.

To start, there are significant reliance interests in Saskatchewan that will be undermined if the project is not completed.  Saskatchewan also anticipates a significant long-term impact on its oil and gas sector, with likely spill-over effects in other commercial industries that are important to Saskatchewan.  And there are also spill-over effects for the environment.

Saskatchewan raises these adverse effects to inform the Court's understanding of the commercial importance of the Keystone XL project and to assist the Court in evaluating the interests at stake in this litigation.  *Cf. Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982) (holding that "the public interest is served by enjoining [harms] which occur within that commerce subject to the lawful regulation of Congress"), *aff'd,* 701 F.2d 408 (5th Cir. 1983); *see also* Br. of *Amicus Curiae* The Government of Canada, in *Michigan v. Enbridge Energy Ltd.*, No. 20-cv-1142 (W.D. Mich.), filed May 11, 2021 (describing Canada's interest in preventing an international pipeline from being shut down).

### A.   Upsetting Existing Reliance Interests for Tax and Royalty Revenue.

There has already been significant investment in Saskatchewan related to Keystone XL—for the Province itself, for its citizens, for First Nations, and for the companies who do business in the Province.  The prospect that Keystone XL will not be completed has

already started to upset those expectations.

The Government of Saskatchewan has a strong interest in the completion and operation of the pipeline, which would have long-term beneficial impacts on the Saskatchewan economy, including both direct and indirect benefits to the residents of Saskatchewan.

The reliance interests of Saskatchewan's citizens are varied, ranging from those whose jobs and livelihoods were closely tied to the completion of the Keystone XL project to the province's citizenry as a whole, who stood to benefit from the project in the forms of tax revenue, royalties and surcharges, and long-term increases in the value of Saskatchewan's natural resources in international markets.

In particular, the financial benefits from Saskatchewan's oil and gas sector are directly infused into the Province's social services, infrastructure and economy through royalties, a variety of provincial taxes, and municipal taxes and fees.  This critical sector also provides substantial economic benefits through increasing direct and indirect employment as well as spending on goods and services.  This economic activity flows through to associated and complementary businesses connected to Saskatchewan's oil and gas sector.

In the 2019-2020 fiscal year, oil and gas production contributed $684.9 million in crown royalties, freehold production tax, and crown land sale revenue to the provincial government.  Over the last three years, Saskatchewan's oil and gas sector directly paid between $300 million to $400 million annually in various taxes.  The sector also produced other significant sources of government revenue from fuel taxes, surface lease rentals,

direct, indirect and induced personal income taxes, and increased provincial and corporate income taxes from businesses throughout Saskatchewan that benefit from a heathy oil and gas sector.  In addition, the oil and gas sector is a major customer base for the Crown Corporations in Saskatchewan, particularly SaskPower and SaskEnergy/TransGas, which contribute significant additional revenues to the Government of Saskatchewan through dividend payments.  Further, the oil and gas sector contributes a large volume of municipal taxes and fees.[3]

Saskatchewan's tax system is sensitive to the price that Saskatchewan oil producers receive for their product at the well-head, meaning after transportation costs have been accounted for.  The higher the price of oil that Saskatchewan oil producers receive for the sale of their product (net transportation costs), the higher the revenue to the government. This is significant in the context of available pipeline transportation relative to other forms of transportation, such as crude-by-rail or trucking, with both scenarios resulting in higher pipeline tolls or depressed prices.  As just one example, without increased pipeline capacity, it is possible for well-head oil prices to depress from producers being forced to sell at a discount in secondary markets.  That would result in decreased revenue to the provincial government.

**B.    Upsetting Reliance Interests for First Nations.**

The  Keystone  XL  project  also  generated  significant  reliance  interests  for  the

---

[3] Government of Saskatchewan, "Summary of Financial Statements," 1 *Public Accounts 2019–20* at 74, *available at* https://publications.saskatchewan.ca/#/categories/4518 (last visited Sept. 3, 2021).

province's First Nations (Indigenous bands).  As has been reported, in 2020, TC Energy and Natural Law Energy (NLE), a Treaty alliance of First Nations, reached an agreement for a long-term equity investment in the Keystone XL Pipeline.[4]  This MOU had support from five of the First Nations in Saskatchewan and Alberta.  NLE agreed to an equity investment of up to $1 billion in the Keystone XL pipeline.  According to Alvin Francis, Chief of Nekaneet First Nation (located in Saskatchewan) and president of NLE: "This is a historical moment for First Nations and TC Energy.  It's going to benefit many generations to come.  Thirty to forty years from now, Nekaneet First Nation members will see opportunities through this definitive agreement by creating inter-generational wealth for many generations to come."[5]  If Keystone XL were to be fully operational, the benefits to First Nations would be substantial.  In general, the energy industry spins off employment and business opportunities across Saskatchewan—including for many local and Indigenous communities—and is essential to the social and economic well-being of the Province.

Finally, the fate of the Keystone XL Pipeline is important not only to the companies who have already done business in Saskatchewan in connection with the project, but also to any company who might consider spending time, energy, and resources on a future

---

[4] Media Advisory, "TC Energy and Natural Law Energy sign historic MOU facilitating one of the largest Indigenous equity investments of its kind in North American infrastructure" (Sept. 29, 2020), *available at* https://www.tcenergy.com/announcements/2020/2020-09-29-tc-energy-and-natural-law-energy-sign-historic-mou-facilitating-one-of-the-largest-indigenous-equity-investments-of-its-kind-in-north/ (last visited Aug. 29, 2021).

[5] *Id*.; Media Advisory, "TC Energy and Natural Law Energy sign definitive agreement" (Nov. 17, 2020), *available at* https://www.tcenergy.com/announcements/2020/2020-11-17-tc-energy-and-natural-law-energy-sign-definitive-agreement/.

pipeline project in the province.  As discussed further below, *see* Part III *infra*, the tumultuous legal history of Keystone XL Pipeline casts a long shadow over future pipeline projects serving Western Canada and the United States.

For the United States to prohibit completion of Keystone XL now, and for the U.S. courts to sanction that prohibition, would upset significant reliance interests and jeopardize the ability of Saskatchewan and other stakeholders to attract investments in similar projects in the future.

### C.    Effects on the Oil & Gas Sector.

The prospect of cancelling the Keystone XL Pipeline threatens adverse consequences to Saskatchewan's oil and gas sector, as discussed in Part I *supra*.  Currently, Western Canada has a significant need for increased pipeline capacity.  The Keystone XL Pipeline represents a significant piece of the long-term solution.  Without it, Saskatchewan producers continue to face apportionment at Hardisty Terminal and bottlenecking in the Great Lakes and Midwest region of the United States.

In a very concrete way, blocking the Keystone XL project means effectively blocking Western Canadian oil from the Gulf Coast region of the United States and from the significant opportunities for foreign commerce that the region represents.  As discussed above, most Western Canadian oil that is currently transported to the Great Lakes and Midwest region faces a bottleneck which results in depressed prices.  The Keystone XL Pipeline offered a unique opportunity for Western Canadian oil because it would provide a "bullet" line from the Hardisty Terminal in Alberta to the Gulf Coast region of the United States.  From there, Western Canadian oil could be transported around the world.  This

prospective value could potentially mean the difference of several dollars per barrel on the wholesale market and in terms of well-head prices as well. *See supra*, at 6.

Pipelines offer the best opportunity to export oil and gas from Saskatchewan, but the inferior next-best alternative is crude-by-rail (CBR), a method by which crude oil is loaded onto tanker cars that are then affixed to trains and transported to the appropriate destination. There are many drawbacks to CBR, including those discussed below. But for producers themselves, the principal drawback is that CBR represents a substantially more costly method of transporting crude oil compared to pipeline transportation.

### D.   Effects on Other Industries.

The demand for CBR caused by limited pipeline capacity and the resulting apportionment has follow-on effects for other important industries in Saskatchewan. Those industries also rely on rail transport for their exports since Saskatchewan remains a land-locked province. While CBR represents a significantly more costly alternative to pipeline transportation for Western Canadian oil and gas, it remains an economical option under some circumstances. So long as CBR remains an economical option for Saskatchewan producers—notwithstanding its clear inferiority to pipeline transportation—it will squeeze out (or at least put economic pressure on) other potential cargo on the same transportation infrastructure.

The lack of increased pipeline capacity negatively impacts other industries by displacing capacity to ship by rail when rail is increasingly used for oil shipment. Saskatchewan is a farm province that ships substantial quantities of grain and potash by rail. Because rail is a limited commodity, using rail to ship oil necessarily decreases the

13

capacity to ship other commodities. The Premier of Saskatchewan, Hon. Scott Moe, discussed another pipeline project before the Legislative Assembly in 2018 and emphasized the tension between insufficient pipeline capacity and constricted rail capacity:

> [W]e are willing to do what it takes to ensure the start and the construction of that pipeline, Mr. Speaker, to get that energy product in that pipeline, Mr. Speaker, to get it off the rail so that we can get our agriculture, our potash, our lumber products on the rail, Mr. Speaker. If we are to continue to grow our economy, we need access to those ports, Mr. Speaker. We need access to that tidewater. We need access to those some 150 countries that we want to export products to each and every year.[6]

Increased use of crude-by-rail will impose pricing challenges for other major Saskatchewan sectors that are largely reliant on rail. Specifically, a sustained and major increase to crude-by-rail has negative implications for Saskatchewan's mining, forestry, manufacturing, and agriculture sectors' ability to cost-effectively move their products via rail. For instance:

- Saskatchewan is the world's largest producer of potash and in 2019 the value of potash sales was $6.3 billion; 99 per cent of which is shipped outside the Province on rail.[7]

- Saskatchewan is the world's largest exporter of canola meal, canola oil, canola seed, dry peas, lentils, flax, durum wheat, mustard seed, canary seed and oats, and in 2019 exported $12.9 billion in agri-food products, nearly all via rail.[8]

- Saskatchewan is home to significant forestry and manufacturing sectors, which rely on the rail sector to distribute and export product.[9]

---

[6] *Saskatchewan Hansard* (Debates and Proceedings), N.S. Vol 59, No. 44A (April 18, 2018), at 3934, *available at* http://docs.legassembly.sk.ca/legdocs/ Legislative%20Assembly/Hansard/28L2S/180418Debates.pdf (last visited Sept. 3, 2021).
[7] *See* Saskatchewan Bureau of Statistics, Ministry of Finance, "Economic Review 2019," at 4 (Mar. 2021), *available at* https://publications.saskatchewan.ca/api/v1/products/86384/ formats/127631/download (last visited Sept. 3, 2021).
[8] *See* Government of Saskatchewan, "Saskatchewan Agriculture Exports 2019," at 1 (June 2020), *available at* https://publications.saskatchewan.ca/api/v1/products/107051/formats/ 119926/download (last visited Sept. 3, 2021).
[9] *See* "Economic Review 2019," *supra*, at 28.

These harms to other economic sectors will likely be incurred with the increased crude-by-rail necessitated by the lack of increased pipeline capacity.

### E.    Environmental Care.

Finally, cancellation of the Keystone XL project will have negative consequences for the environment in Saskatchewan and beyond due primarily to sustaining high demand for CBR.  Saskatchewan is also committed to addressing climate change.

In December 2017, the Government of Saskatchewan announced a comprehensive climate strategy, *Prairie Resilience*, which included a goal of a 10% reduction in greenhouse gas emissions by 2030.[10]  A 2016 study by faculty at the Department of Mechanical Engineering at the University of Alberta highlights the environmental benefits of transporting crude oil by pipeline as opposed to by rail.[11]   The researchers modeled the life cycle emissions for crude oil transported from Alberta—Saskatchewan's neighboring province to the West—to refineries in the United States.[12]  Notably, the study concluded "that pipeline transportation produced between 61% and 77% fewer GHG emissions than by rail."[13]

Without increased pipeline capacity, chiefly through the Keystone XL Pipeline, Saskatchewan's oil and gas sector will be forced to increasingly rely on the environmentally dangerous crude-by-rail.  The Lac-Mégantic rail disaster in 2013 stands

---

[10] *See generally* Saskatchewan.ca/climate-change (last visited August 29, 2021).
[11] *See* Balwinder Nimana, *et. al.*, *Life Cycle Analysis of Bitumen Transportation to Refineries by Rail and Pipeline*, 51 J. of Envt'l Sci. & Tech. 680 (2016).
[12] *See id.* at 681.
[13] *Id.* at 680.

as a vivid example of the dangers of crude-by-rail.[14]  A train loaded with crude oil was left unattended in a small town in Quebec overnight.  The brakes failed and the train started moving downhill on a slight grade, eventually crashing in the town of Lac-Mégantic, killing 47 people and destroying the town center:



The derailment and explosion destroyed at least 40 buildings.  The disaster resulted in extensive environmental contamination, with conditions being so toxic that firefighters and other first responders in the first month were forced to limit work to 15-minute intervals due to heat and toxic conditions.[15]

## III.   A STABLE AND PREDICTABLE PROCESS FOR APPROVING TRANS-BORDER PIPELINE PROJECTS IS IMPORTANT FOR THE FUTURE OF FOREIGN COMMERCE.

In addition to the parties' merits arguments about the authority of the U.S. President

[14]*See generally* Transportation Safety Board of Canada, "Railway Investigation Report R12D0054" (July 6, 2013), *available at* https://www.tsb.gc.ca/eng/rapports-reports/rail/2013/r13d0054/r13d0054.html (last visited Sept. 3, 2021).
[15] "5 more victims identified in Lac-Mégantic," CBC News, Jul. 17, 2013, *available at* https://www.cbc.ca/news/canada/montreal/5-more-victims-identified-in-lac-m%C3%A9gantic-1.1306473.

16

to revoke the trans-border construction permit, the Court is also now presented with arguments about whether this litigation is moot—and if so, whether the Court may nevertheless reach the merits.  Saskatchewan does not take a position on the contours of U.S. law here either.  But Saskatchewan does hope that the Court will benefit from its perspective: that resolution of the issues presented in this case remain vitally important whether or not Keystone XL is ultimately completed.  Whatever happens with Keystone XL, trans-border pipelines will remain a critical priority for Saskatchewan to facilitate trade with the United States and other nations.  And so long as the permitting process for trans-border pipeline projects remains a matter of political ping-pong, it will be hard to see any project through to completion.

As described above, harms to Saskatchewan and its constituents flow directly from halting the Keystone XL project.  But other harms flow from the instability and unpredictability in the permitting process that have plagued Keystone XL and threaten to hinder future pipeline projects that would cross the U.S.-Canada border.

Keystone XL's history illustrates the challenge that any would-be developer of a trans-border pipeline project can expect to face absent further clarification:

- TransCanada first announced plans for the Keystone XL project more than a decade ago in the summer of 2008;[16]

- A few months later, in the fall of 2008, TransCanada submitted its first application to the U.S. State Department for a Special Permit to approve

---

[16] *See* Art Hovey, "TransCanada Proposes Second Oil Pipeline," Lincoln Journal-Star (June 12, 2008), *available at* https://www.rigzone.com/news/oil_gas/a/149226/ TransCanada_Proposes_Second_Oil_Pipeline/ (last visited August 29, 2021).

the extension project;[17]

- In 2011, the State Department issued a final Environmental Impact Statement determining that the project would not have significant adverse environmental impacts,[18] but nevertheless stated that it could not issue a permit without additional information;[19]

- One month later, in December 2011, the U.S. Congress passed a law directing the President either to grant the Special Permit or to report to Congress within 60 days why the project was not in the national interest;[20]

- On January 18, 2012, President Obama issued a presidential memorandum rejecting the 60-day deadline as "insufficient" and directing the State Department to deny the permit,[21] which it did on February 3, 2012;[22]

- Two years later, in May 2014, TransCanada submitted a new application for a Presidential Permit, which the State Department took nearly two years

---

[17] *See* TransCanada Keystone Pipeline LP, "Application for Special Permit to Design, Construct and Operate Proposed NPS 36-inch TransCanada Keystone XL Pipeline Project at 80% Specified Minimum Yield Strength (SMYS)" (Oct. 10, 2008), *available at* https://www.regulations.gov/document/PHMSA-2008-0285-0001 (last visited August 29, 2021).

[18] *See* Department of State, "Final Environmental Impact Statement for the Proposed Keystone XL Project; Public Meetings," 76 Fed. Reg. 53,525 (Aug. 26, 2011); Department of State, "Final Environmental Impact Statement for the Proposed Keystone XL Project," 76 Fed. Reg. 55,155 (Sept. 6, 2011).

[19] *See* Department of State, Media Note, "Denial of Keystone XL Pipeline Application" (Jan. 18, 2012) ("[O]n November 10, 2011, the Department announced that it could not make a national interest determination regarding the permit application without additional information."), *available at* https://2009-2017.state.gov/r/pa/prs/ps/2012/01/181473.htm (last visited Aug. 29, 2021); The White House, "Statement by the President on the State Department's Keystone XL Pipeline Announcement" (Nov. 10, 2011), *available at* https://obamawhitehouse.archives.gov/the-press-office/2011/11/10/statement-president-state-departments-keystone-xl-pipeline-announcement (last visited Aug. 29, 2021).

[20] *See* Temporary Payroll Tax Cut Continuation Act of 2011, § 501, Pub. L. No. 112-78, 125 Stat. 1280.

[21] Presidential Memorandum, "Implementing Provisions of the Temporary Payroll Tax Cut Continuation Act of 2011 Relating to the Keystone XL Pipeline Permit," 77 Fed. Reg. 5,677 (published Feb. 3, 2012).

[22] Department of State, "In the Matter of the Keystone XL Pipeline," 77 Fed. Reg. 5,614-02 (Feb. 3, 2012).

to publish for comment;[23]

- In 2015, the U.S. Congress passed another bill to approve the Keystone XL Project, but President Obama vetoed it;[24]

- Later that year, notwithstanding TransCanada's request to suspend its application, President Obama and the State Department announced that the permit was again denied;[25]

- In June 2016, TransCanada filed a NAFTA claim seeking $15 billion in damages over the permit denials;[26]

- Within days of taking office, on January 24, 2017, President Trump issued a presidential memorandum that invited TransCanada Keystone Pipeline, L.P. to submit a new application and directed the relevant federal agencies to give it expedited consideration;[27]

- On March 23, 2017, TransCanada was granted a Presidential Permit for Keystone XL;[28]

- Following two years of litigation in U.S. courts, President Trump issued a

---

[23] *See* Department of State, "Notice of 30 Day Public Comment Period Regarding the National Interest Determination for TransCanada Keystone Pipeline, L.P.'s Presidential Permit Application," 79 Fed. Reg. 6,984-01 (Feb. 5, 2014).

[24] *See* S.1 - 114th Congress (2015-2016): Keystone XL Pipeline Approval Act, S.1, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/senate-bill/1.

[25] *See* Secretary John Kerry, Press Statement, "Keystone XL Pipeline Permit Determination" (Nov. 6, 2015), *available at* https://2009-2017.state.gov/secretary/remarks/2015/11/249249.htm (last visited Aug. 29, 2021); The White House, "Statement by the President on the Keystone XL Pipeline" (Nov. 6, 2015), *available at* https://obamawhitehouse.archives.gov/the-press-office/2015/11/06/statement-president-Keystone-XL-pipeline (last visited Aug. 29, 2021).

[26] *See* Todd Tucker, "TransCanada is suing the U.S. over Obama's rejection of the Keystone XL pipeline.  The U.S. might lose," The Washington Post (Jan. 8, 2016), *available at* https://www.washingtonpost.com/news/monkey-cage/wp/2016/01/08/transcanada-is-suing-the-u-s-over-obamas-rejection-of-the-keystone-xl-pipeline-the-u-s-might-lose/ (last visited Aug. 29, 2021).

[27] Presidential Memorandum, "Construction of the Keystone XL Pipeline," 82 Fed. Reg. 8,663 (published Jan. 24, 2017).

[28] *See* Department of State, "Notice of Issuance of a Presidential Permit to TransCanada Keystone Pipeline, L.P.," 82 Fed. Reg. 16,467-02 (published April 4, 2017).

new permit for Keystone XL on March 29, 2019;[29] and

- Then, on his first day in office in 2021, President Biden revoked that permit,[30] which has given rise to this litigation.

For more than a dozen years, TransCanada diligently pursued a Presidential Permit—just one of many permits and approvals it needed from the U.S. government and from the States to complete Keystone XL.  As this history shows, any company that might consider building a trans-border pipeline will need to consider the likelihood of success in obtaining the necessary permission.  So long as uncertainty remains about the authority to grant and revoke those permits, it will have a chilling effect on investment in new projects.

The fundamental questions raised in this litigation—about the extent of the U.S. President's unilateral authority to block a pipeline project and the balance of powers among the branches of government—thus transcend the specific dispute over the Keystone XL Pipeline.  They have ongoing importance for Saskatchewan because they inform the prospects for future infrastructure development between the U.S. and Canada.  And that development remains critically important to Saskatchewan for all the reasons explained above.

---

[29] Presidential Permit, "Authorizing TransCanada Keystone Pipeline, L.P., to Construct, Connect, Operate, and Maintain Pipeline Facilities at the International Boundary Between the United States and Canada," 84 Fed. Reg. 13,101 (published Mar. 29, 2019).
[30] Executive Order 13,990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," 86 Fed. Reg. 7,037 (published Jan. 20, 2021).

## CONCLUSION

As noted above, the Saskatchewan takes no legal position on the merits of U.S. law bur urges the Court to consider the important foreign interests at stake in this litigation.

Respectfully submitted this 7th day of September, 2021.

**MCGUIREWOODS LLP**

*/s/  Yasser A. Madriz*
Yasser A. Madriz
MCGUIREWOODS LLP
600 Travis Street, Suite 7500
Houston, TX 77002
Tel: (832) 255-6361
Fax: (713) 571-9652
ymadriz@mcguirewoods.com

Michael Francisco*
John S. Moran*
MCGUIREWOODS LLP
888 16th Street, N.W., Suite 500
Washington, DC 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
mfrancisco@mcguirewoods.com
jmoran@mcguirewoods.com

Andrew F. Gann, Jr.*
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1643
Fax: (804) 775-1061
agann@mcguirewoods.com

*Attorneys for the Province of Saskatchewan*

*Motions for admission *pro hac vice* forthcoming