**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| STATE OF TEXAS, et al., | |
| *Plaintiffs*, | |
| v. | No. 3:21-cv-00065 |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.     THIS CASE SHOULD BE DISMISSED FOR LACK OF
      JURISDICTION ................................................................................................ 2

     A.    This Case Is Moot ................................................................................ 2

         1.    This Court cannot grant any effective relief. ..................... 2

         2.    Plaintiffs' claims are not capable of repetition yet evading
             review. ............................................................................... 5

         3.    Plaintiffs' request for declaratory relief does not revive this
             moot case. .......................................................................... 8

     B.    The Court Cannot Enter the Requested Relief Against the
        President. ............................................................................................ 9

     C.    The Court Lacks Jurisdiction to Enter Relief Against the Agency
        Defendants. ....................................................................................... 12

         1.    Plaintiffs' injuries are not tied to or redressable by the
             Agency Defendants. ......................................................... 12

         2.    Plaintiffs fail to allege the requisite final agency action for
             APA review against the Agency Defendants. .................... 15

     D.    Plaintiffs Otherwise Lack Standing with Respect to All Defendants. ........ 21

         1.    Plaintiffs cannot establish redressability in light of TC
             Energy's action. ............................................................... 21

         2.    Plaintiffs fail to allege an injury in fact. ........................... 22

             a.    Plaintiffs fail to allege injuries to their sovereign
                 interests ................................................................. 22

             b.    Plaintiffs cannot assert *parens patriae* standing. .................. 22

II.    VENUE IS IMPROPER IN THIS DISTRICT .......................................................... 25

III.   PLAINTIFFS FAIL TO STATE A SEPARATION-OF-POWERS
       CLAIM .............................................................................................................. 25

       A.    There Is No Conflict Between the Political Branches' Exercise of Their
             Respective Authorities. ............................................................................. 25

       B.    The President Has Authority to Revoke the Keystone XL Permit.............. 29

       C.    Congress Has Acquiesced in the President's Claim of Authority Over
             Cross-Border Oil Pipelines........................................................................ 32

       D.    The President's Exercise of Discretion is Unreviewable. ........................... 34

       CONCLUSION ...................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abrams v. Heckler*,
　582 F. Supp. 1155 (S.D.N.Y. 1984) ................................................................23

*Air One Helicopters v. FAA*,
　86 F.3d 880 (9th Cir. 1996) .............................................................................19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
　458 U.S. 592 (1982) ....................................................................................23, 24

*Allied Home Mortg. Corp. v. HUD*,
　618 F. App'x 781 (5th Cir. 2015) ....................................................................10

*Am. Ins. Ass'n v. Garamendi*,
　539 U.S. 396 (2003) .........................................................................................32

*Arias v. Wells Fargo Bank, N.A.*,
　No. 3:18-CV-00418-L, 2019 WL 2770160 (N.D. Tex. July 2, 2019) ..........10, 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
　575 U.S. 320 (2015) .........................................................................................15

*Bayou Liberty Association v. U.S. Army Corps of Engineers*,
　217 F.3d 393 (5th Cir. 2000) .............................................................................7

*Bennett v. Spear*,
　520 U.S. 154 (1997) .........................................................................................18

*Berry v. Reagan*,
　No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) .......................................11

*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
　141 S. Ct. 1220 (2021) .....................................................................................11

*Black Lives Matter D.C. v. Trump*,
　No. 20-cv-1469, 2021 WL 2530722 (D.D.C. June 21, 2021) ...........................15

*California v. Texas*,
   141 S. Ct. 2104 (2021) ...............................................................................13, 25

*California v. Trump*,
   --- F. Supp. 3d ---, No. CV 19-960 (RDM), 2020 WL 1643858
   (D.D.C. Apr. 2, 2020) ...........................................................................................25

*Chafin v. Chafin*,
   568 U.S. 165 (2013) .................................................................................................5

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ...........................................................................................31, 32

*Christopher P. v. Marcus*,
   915 F.2d 794 (2d Cir. 1990) ..................................................................................8

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992) .....................................................................................................8

*City News & Novelty, Inc. v. City of Waukesha*,
   531 U.S. 278 (2001) .................................................................................................3

*City of Houston v. HUD*,
   24 F.3d 1421 (D.C. Cir. 1994) ..............................................................................9

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...................................................................................................6

*Coastal Habitat All. v. Patterson*,
   601 F. Supp. 2d 868 (W.D. Tex. 2008), *aff'd*, 385 F. App'x 358
   (5th Cir. 2010) ......................................................................................................14

*Connell v. Shoemaker*,
   555 F.2d 483 (5th Cir. 1977)...............................................................................10

*Conyers v. Reagan*,
   765 F.2d 1124 (D.C. Cir. 1985) ............................................................................6

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ............................................................................23

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...........................................................................................30, 34

*Darby v. Cisneros*,
 509 U.S. 137 (1993) ....................................................................................20

*Department of Commerce v. New York*,
 139 S. Ct. 2551 (2019) ..................................................................................5

*Doe #1 v. Trump*,
 423 F. Supp. 3d 1040 (D. Or. 2019) ............................................................21

*Doe v. Trump*,
 No. 3:19-cv-1743, 2020 WL 1853657 (D. Or. Apr. 13, 2020) .........................19

*E. Bay Sanctuary Covenant v. Trump*,
 932 F.3d 742 (9th Cir. 2018) .......................................................................19

*eBay v. MercExchange, LLC*,
 547 U.S. 388 (2006) ....................................................................................15

*El Paso Cnty. v. Trump*,
 982 F.3d 332 (5th Cir. 2020) ..................................................................21, 22

*Energy Mgmt. Corp v. City of Shreveport*,
 397 F.3d 297 (5th Cir. 2005) .......................................................................25

*Escobar v. Barr*,
 824 F. App'x 300 (5th Cir. 2020) ...................................................................6

*Floyd v. District of Columbia*,
 129 F.3d 152 (D.C. Cir. 1997) .....................................................................16

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ...............................................................................11, 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*,
 561 U.S. 477 (2010) ....................................................................................15

*Friedman v. FAA*,
 841 F.3d 537 (D.C. Cir. 2016) ..........................................................16, 17, 18

*Friends of the River v. U.S. Army Corps of Eng'rs*,
 870 F. Supp. 2d 966 (E.D. Cal. 2012)............................................................21

v

*Geyen v. Marsh*,
    775 F.2d 1303 (5th Cir. 1985)...................................................................20

*Gov't of Province of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) .................................................................23

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) .................................................................15

*Hanson v. Veterans Admin.*,
    800 F.2d 1381 (5th Cir. 1986)............................................................21, 22

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    761 F. Supp. 2d 504 (S.D. Tex. 2011) .....................................................15

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
    971 F. Supp. 19 (D.D.C. 1997) .................................................................20

*Indigenous Envtl. Network v. Biden*, ("*IEN I*"),
    4:19-cv-00028 (D. Mont. 2019) ...........................................................3, 4

*Indigenous Envtl. Network v. U.S. Bureau of Land Mgmt.*, ("*IEN II*")
    |4:20-cv-115 (D. Mont. 2020) ...................................................................3

*INS v. Chadha*,
    462 U.S. 919 (1983) ..........................................................................27, 33

*James v. Life Ins. Co. of N. Am.*, No.,
    CIV.A. H-12-2095, 2014 WL 5878465 (S.D. Tex. Nov. 12, 2014) ..................21

*John Doe v. DEA*,
    484 F.3d 561 (D.C. Cir. 2007) ..........................................................18, 20

*John Doe, Inc. v. Gonzalez*,
    No. 06-cv-966, 2006 WL 1805685 (D.D.C. June 29, 2006).............................18

*Kansas ex rel. Hayden v. United States*,
    748 F. Supp. 797 (D. Kan. 1990) .............................................................23

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016) ...............................................................................7

*Kithe v. U.S. Atty. Gen.*,
  No. CIV.A. H-07-2678, 2007 WL 4378007 (S.D. Tex. Dec. 5, 2007)................9

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  302 F. Supp. 3d 541 (S.D.N.Y. 2018)....................................................11

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
  928 F.3d 226 (2d Cir. 2019).......................................................10, 11

*Libertarian Party v. Dardenne*,
  595 F.3d 215 (5th Cir. 2010)...........................................................7

*Lodsys Grp., LLC v. Brother Int'l Corp.*,
  No. 2:11-CV-00090-JRG, 2013 WL 5353004 (E.D. Tex. Sept. 24, 2013) ..........6

*Lopez v. City of Houston*,
  617 F.3d 336 (5th Cir. 2010)...........................................................8

*Mackie v. Bush*,
  809 F. Supp. 144 (D.D.C. 1993) ......................................................11

*Mackie v. Clinton*,
  10 F.3d 13 (D.C. Cir. 1993) ..........................................................11

*Make the Road New York v. Pompeo*,
  475 F. Supp. 3d 232 (S.D.N.Y. 2020)..............................................13, 14

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...............................................................23, 24

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ..................................................................23

*Medellin v. Texas*,
  552 U.S. 491 (2008) ..................................................................27

*Meltzer v. Bd. of Pub. Instruction of Orange Cnty.*,
  548 F.2d 559 (5th Cir. 1977)...........................................................9

*Meltzer v. Bd. of Pub. Instruction of Orange Cnty., Fla.*,
  577 F.2d 311 (5th Cir. 1978)...........................................................9

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
   774 F.3d 895 (6th Cir. 2014) ...............................................................................15

*Mills v. Green*,
   159 U.S. 651 (1895) ..............................................................................................8

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) .........................................................................................10, 11

*Missouri v. Biden*,
   No. 4:21-CV-00287-AGF, 2021 WL 3885590 (E.D. Mo. Aug. 31, 2021) ........24

*Missouri v. Illinois*,
   180 U.S. 208 (1901) ............................................................................................23

*Mistretta v. United States*,
   488 U.S. 361 (1989) ............................................................................................31

*Murphy v. Hunt*,
   455 U.S. 478 (1982) ..............................................................................................7

*Nat. Res. Def. Council v. Lujan*,
   768 F. Supp. 870 (D.D.C. 1991) .........................................................................29

*Nat. Res. Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ............................................................................28

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ............................................................................11

*Nevada v. Burford*,
   918 F.2d 854 (9th Cir. 1990) ...............................................................................23

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ............................................................................................12

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ......................................................................................30, 31

*Okpalobi v. Foster*,
   244 F.3d 405 (5th Cir. 2001) .........................................................................13, 14

*Page v. Biden,*
  No. 20-cv-104, 2021 WL 311002 (D.D.C. Jan. 29, 2021) ...................................11

*Paracelsus Senatobia Cmty. Hosp., Inc. v. Wetherbee,*
  129 F.3d 610 (5th Cir. 1997) .......................................................................8

*People Nat'l Bank v. Off. of Comptroller of Currency of U.S.,*
  362 F.3d 333 (5th Cir. 2004) .....................................................................18

*Qureshi v. Holder,*
  663 F.3d 778 (5th Cir. 2011) .....................................................................16

*Renal Physicians Ass'n v. HHS,*
  489 F.3d 1267 (D.C. Cir. 2007) .................................................................13

*Sackett v. EPA,*
  566 U.S. 120 (2012) ..................................................................................20

*Smilde v. Snow,*
  73 F. App'x 24 (5th Cir. 2003) ..................................................................25

*Spell v. Edwards,*
  962 F.3d 175 (5th Cir. 2020) .......................................................................6

*Spencer v. Kemna,*
  523 U.S. 1 (1998) .............................................................................6, 8, 10

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ..............................................................................15, 16

*Stenehjem v. Whitman,*
  No. A3-00-109, 2001 WL 1708825 (D.N.D. June 20, 2001) ............................23

*Super Tire Eng'g, Co. v. McCorkle,*
  416 U.S. 115 (1974) .............................................................................6, 8, 9

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ..............................................................................29

*Texas v. Biden,*
  --- F.4th---, No. 21-10806, 2021 WL 3674780 (5th Cir. Aug. 19, 2021) ...........24

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) .................................................................23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ...................................................................................20

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ......................................................................................30

*United States v. Nixon*,
    418 U.S. 683 (1974) ......................................................................................12

*United States v. Western Union Tel.*,
    272 F. 311 (S.D.N.Y. 1921) ...........................................................................30

*Vill. of Elk Grove Vill. v. Evans*,
    997 F.2d 328 (7th Cir. 1993) ..........................................................................4

*Vivian Tankships Corp. v. Louisiana*,
    254 F.3d 1080 (5th Cir. 2001) ......................................................................4, 7

*Washington Utilities & Transportation Commission v. FCC*,
    513 F.2d 1142 (9th Cir. 1975) ........................................................................23

*Wyoming ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ........................................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ...................................................................................12, 27

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ..........................................................................................27

**Attorney General Opinions**

Foreign Cables,
    22 Op. Atty. Gen. 13 (1898)...........................................................................30

**Constitutional Provisions**

U.S. Const. art. I, § 7.......................................................................................34

U.S. Const. art. I, § 1 ...................................................................................34

U.S. Const. art. II, § 1, cl.2 .........................................................................27

**Statutes**

5 U.S.C. § 704 ...............................................................................................19

33 U.S.C. § 535b ...........................................................................................26

Act of May 27, 1921, ch. 12, 42 Stat. 8, § 2 (1921) ................................26

International Bridge Act of 1972, Pub. L. No. 92-434, 86 Stat. 731 (1972) ..........26

Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78,
    125 Stat. 1280 ("Tax Cut Act") .................................................... *passim*

**Legislative Materials**

Keystone XL Pipeline Approval Act of 2015, S. 1, 114th Cong., § 2(a) ...............29

**Rules**

Fed. R. Civ. P. 72(a) .....................................................................................21

**Executive Authorities**

33 C.F.R. § 325.1 ..........................................................................................17

33 C.F.R. § 331.10 ........................................................................................16

84 Fed. Reg. 13101 (Mar. 29, 2019) (2019 Permit) ...............................31

Executive Order No.11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) .......................31

Executive Order No. 13337, 69 Fed. Reg. 25299 (Apr. 30, 2004) .........................33

Executive Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021) ................... *passim*

U.S.-Canada oil pipeline permit issued by President John F. Kennedy,
    Oct. 18, 1962, (ECF No. 98-10) .........................................................18

**Other Authorities**

Argus Media, *TC Energy pulls the plug on Keystone XL: Update*, (Jan. 9, 2021),
     https://www.argusmedia.com/en/news/ 2223344-tc-energy-pulls-the-plug-on-
     keystone-xl-update ...................................................................................3

Congressional Research Service, *Keystone XL Pipeline: The End of the Road?*
     (Jan.22, 2021), https://sgp.fas.org/crs/misc/IN11445.pdf ......................................3

Dep't of State Report to Congress ("Tax Cut Act Report")
     (ECF No. 98-6)..........................................................................................28

Jan. 28, 2021, Letter from Army Corps of Engineers to TC Energy...............17, 18

Feb. 8, 2021, Letter from TC Energy to Army Corps of Engineers ................17, 18

March 2, 2021, Letter from Army Corp of Engineers to TC Energy ..............17, 18

May 3, 2021, Letter from TC Energy to Army Corps of Engineers,
     (ECF No. 98-9)..........................................................................................18

May 4, 2021, Letter from Army Corps of Engineers to TC Energy,
     (ECF No. 98-8)..........................................................................................18

President Ulysses Grant's Seventh Annual Message to Congress, *reprinted in*
Papers Relating to the Foreign Relations of the United States, Vol. 1, 44th
Cong. 1st Sess., H.R. Ex. Doc. 1, Pt. 1 (Dec. 6, 1875), (ECF No. 98-2) ................3

Reuters, Fact Check (Mar. 12, 2021),
      https://www.reuters.com/article/factcheck-keystonepipelinexl-builtandpai/fact-
      check-though-keystone-xl-pipeline-had-secured-most-of-its-funding-it-was-
      only-8-constructed-idUSL1N2LA2SQ ..........................................................4, 5

## INTRODUCTION

The Court should dismiss this case as moot because TC Energy has terminated the Keystone XL Pipeline project and taken steps to effectuate that termination, including preparing to remove the pipeline in the 1.2-mile cross-border segment—the only portion subject to the Presidential permit at issue here—and relinquishing its right-of-way across the remainder of federal lands.  The Court accordingly cannot grant effective relief to Plaintiffs, and Plaintiffs also cannot establish their standing to sue.  Moreover, no exception to mootness applies because neither the permit nor the President's decision to revoke it was so inherently short in duration as to evade review and because this project-specific dispute is not reasonably likely to recur.  And Plaintiffs' request for declaratory relief—for the stated purposes of paving way for a hypothetical company to pursue a cross-border oil pipeline project in the future or enticing TC Energy to reverse its considered business decision—cannot supply a live controversy.  The requested declaration will have no impact on the now-terminated project and would amount to an impermissible advisory opinion.

Even if the Court were to conclude otherwise, dismissal is nonetheless warranted on multiple threshold grounds.  Plaintiffs have failed to rebut Defendants' showing that this Court lacks jurisdiction to enjoin the President's performance of discretionary duties or to issue declaratory relief against the President.  They also make no serious attempt to show that their asserted economic injury is tied to or can be redressed by any of the Agency Defendants, none of whom is charged with implementing Executive Order No. 13990, which revoked the Keystone XL permit.  And except for the Army Corps of Engineers, which has no jurisdiction over the 1.2-mile segment, Plaintiffs do not dispute that the other Agency Defendants have not engaged in final agency action reviewable under the Administrative Procedure Act.  As to the Army Corps, Plaintiffs' finality argument is based on the faulty premise that the agency's administrative withdrawal of TC Energy's permit

1

application relating to navigable waters of the United States completes the agency's decision-making process and implements Executive Order No. 13990.

Plaintiffs in any event fail to state a claim upon which relief can be granted. They have abandoned their non-delegation claim, *see* Pls.' Resp. in Opp'n to Defs.' Mot. to Dismiss ("Opp'n") at 41 n.17, ECF No. 107, and their opposition brief does not overcome the fatal flaw in their separation-of-powers claim—the lack of an actual conflict between the political branches' exercise of their respective powers. Plaintiffs are mistaken in asserting that Executive Order No. 13990 conflicted with Section 501 of the Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, 125 Stat. 1280 ("Tax Cut Act"), which purportedly granted the Keystone XL permit by operation of law. That law mandated action only as to an earlier, 2008 application and had no operative effect after President Obama denied that application. The assertion that the permit had been granted since 2011, unbeknownst to TC Energy, Congress, and Presidents Trump and Biden, also strains credulity. Finally, Plaintiffs' argument that the President lacks independent constitutional authority to revoke the Presidential permit is meritless, not least because of the 150-year history of Executive exercise of authority over cross-border facilities.

## ARGUMENT

### I.    THIS CASE SHOULD BE DISMISSED FOR LACK OF JURISDICTION

#### A.  This Case Is Moot.

##### 1.  This Court cannot grant any effective relief.

As Defendants previously explained, this case is moot because intervening circumstances—TC Energy's unequivocal termination of the Keystone XL Pipeline project—rendered this Court unable to provide Plaintiffs any effective relief. *See* Defs.' Mot. to Dismiss & Mem. of P. & A. in Supp. ("MTD") at 15, ECF No. 98.

2

Nevertheless, Plaintiffs argue that a decision in their favor "will certainly lead to resurrection" of the Pipeline, as "some entity—perhaps even TC Energy—[purportedly] will resume the project." Opp'n at 3, 7. Plaintiffs' speculation about the possible resumption of the project in the future is plainly insufficient to maintain federal jurisdiction. *See, e.g.*, *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001) ("[A] live controversy is not maintained by speculation that City News might be temporarily disabled from reentering a business that City News has left and currently asserts no plan to reenter."). TC Energy, for its part, has made clear that it "will not pursue any permits for the Project, nor will it perform any construction activities in furtherance of the Project now or at any time in the future." *Indigenous Envtl. Network v. Biden*, 4:19-cv-00028 (D. Mont.) ("*IEN*"), ECF No. 167, Status Report at 3. It has reinforced that position with its actions, including requesting the relinquishment of its right-of-way to cross federal lands, which the Bureau of Land Management ("BLM") has partially approved, except for the 1.2-mile segment at the border. *See IEN*, ECF No. 176, Status Report at 1-2. As for the 1.2-mile segment—the only completed portion in the United States[1]—BLM will approve TC Energy's request to relinquish its right-of-way for that segment once TC Energy has removed the pipeline and remediated the disturbed area pursuant to the company's decommissioning plan recently approved by BLM. *Id.* at 1-2. TC Energy "plans to begin ground-disturbing activities on September 22, 2021, and to complete removal of the pipeline and restoration of the land … in November 2021." *Id.*

Similarly insufficient is Plaintiffs' speculation that a hypothetical company may restart the project. Executive Order No. 13990 is project specific—it revoked the 2019 Presidential permit that was conferred only on TC Energy. A court decision regarding that

---

[1] Congressional Research Service, *Keystone XL Pipeline: The End of the Road?* at 2 (Jan.22, 2021), https://sgp.fas.org/crs/misc/IN11445.pdf; *see also* Argus Media, *TC Energy pulls the plug on Keystone XL: Update*, (Jan. 9, 2021), https://www.argusmedia.com/en/news/ 2223344-tc-energy-pulls-the-plug-on-keystone-xl-update.

Executive Order—especially concerning whether the order conflicted with the Tax Cut Act of 2011—therefore would have no impact on any other entity's ability to construct or operate a similar cross-border pipeline.  Any hypothetical new entity would need to obtain a new Presidential permit, as well as any other necessary federal or state permits or approvals, for its project.  *See Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 331 (7th Cir. 1993) (case moot where radio tower operator did not go forward with construction of project; explaining that although property owner was "armed with the Corps of Engineers' permission to build" and wanted to develop its property, the permit was "project-specific" and the court "could only speculate as to whether the Corps would grant a new permit"); *see also Vivian Tankships Corp. v. Louisiana*, 254 F.3d 1080, 2001 WL 563773, *2 (5th Cir. 2001) (table) (in applying capable-of-repetition-yet-evading-review doctrine, explaining that "[w]here the threat of future allegedly unconstitutional government action is two steps or more removed from a demonstrably definite action of the plaintiff, this court and the Supreme Court have found that government action too 'remote and speculative'").

A hypothetical new entity also would need to build a new pipeline because, contrary to Plaintiffs' repeated suggestions that the Keystone XL Pipeline is nearly finished and ready to pump oil, *see* Opp'n at 4-6, 9, 36, virtually *none* of the pipeline from the U.S.-Canada border to Steele City, Nebraska has been constructed.  *See* Reuters Fact Check (Mar. 12, 2021) (explaining that "about 8% of the planned 1,210-mile XL extension had been built," which includes pipeline laid in Canada).[2]

Moreover, Plaintiffs' assertion that a ruling is necessary for others to pursue similar projects in the future, *see* Opp'n at 6, is wholly at odds with Article III's proscription against advisory opinions.  It is well established that "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give

---

[2]    *Available at* https://www.reuters.com/article/factcheck-keystonepipelinexl-builtandpai/fact-check-though-keystone-xl-pipeline-had-secured-most-of-its-funding-it-was-only-8-constructed-idUSL1N2LA2SQ.

'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alteration in original) (citation omitted).

The cases Plaintiffs cite only underscore that this case is moot.  They point to an order in *IEN*, in which the court found that the suit challenging the 2019 Presidential permit was not moot because, among other things, the court could still grant effective relief by ordering the removal of the pipeline in the 1.2-mile border-crossing segment.  *See IEN*, May 28, 2021 Order at 6-7, 9-10, ECF No. 166.  Aside from the fact that TC Energy will soon be removing the pipeline in the 1.2-mile segment as discussed above, Plaintiffs here do not identify any equivalent remedy available for their claim; they do not suggest, for example, that the Court could actually require TC Energy to build the pipeline.  And in *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565, 2566 (2019), a suit challenging the inclusion of a citizenship question in the census, the Court could still grant effective relief, as the census had not yet occurred, and there "[was] no dispute that a ruling in favor of respondents would redress" their asserted injury.  Here, a decision by this Court would not and could not resuscitate the Keystone XL project.

## 2.  Plaintiffs' claims are not capable of repetition yet evading review.

Plaintiffs argue that even if this case is moot, this Court retains jurisdiction because the controversy is capable of repetition yet evading review.  *See* Opp'n at 7-11.  The Supreme Court has applied that doctrine "only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  It applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (modifications omitted).  Plaintiffs have the burden to prove both elements,

*see Spell v. Edwards*, 962 F.3d 175, 180 (5th Cir. 2020), but they fail to establish either.

Here, the President's revocation decision is not "'*by its very nature*' *short in duration,* 'so that it could not, or probably would not, be able to be adjudicated while fully "live."'" *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985). This case bears no resemblance to those involving labor strikes—"the great majority of" which, the Supreme Court explained, "do not last long enough for judicial review"—or those involving "pregnancy at nine months and elections spaced at yearlong or biennial intervals," the timing of which similarly "should not preclude challenge to state policies." *Super Tire Eng'g, Co. v. McCorkle*, 416 U.S. 115, 126 (1974). Plaintiffs fail to show that a challenge to a revocation of a cross-border permit is "always so short as to evade review." *Lodsys Grp., LLC v. Brother Int'l Corp.*, No. 2:11-CV-00090-JRG, 2013 WL 5353004, at *3 (E.D. Tex. Sept. 24, 2013). At best, they speculate that TC Energy "was forced to discontinue the project" in light of "severe" losses. Opp'n at 8. But that speculation does not mean that "[b]usiness realities make the President's order one that evades review." *Id.* at 9. Indeed, TC Energy had been pursuing the project since 2008, even when conflicting permit decisions were subject to challenge.

Plaintiffs likewise cannot establish that the "'the same legal issue … is likely to recur in future controversies between the same parties.'" *Escobar v. Barr*, 824 F. App'x 300, 301 (5th Cir. 2020) (emphasis removed) (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016)). Under this prong, Plaintiffs "must show either a demonstrated probability or a reasonable expectation, that they will be subject to the same [unlawful governmental] action again." *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010). "A 'mere physical or theoretical possibility' is not sufficient to satisfy this prong of the exception." *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

Here, Plaintiffs again speculate that it is "reasonable, likely, and logical that TC Energy or another entity will restart" the Keystone XL project if they prevail. Opp'n at 9. But as already explained above, the assertion is refuted by TC Energy's statement and

actions disavowing any intention to pursue the project, and is otherwise based on a chain of speculations about the actions of hypothetical third parties, which is clearly insufficient to fit within the mootness exception. *See Libertarian Party*, 595 F.3d at 217 (no reasonable expectation that the dispute will recur in suit challenging Secretary's decision to move election date due to hurricane; explaining that although the state "frequently encounters hurricanes and tropical storms," plaintiffs showed at most "opportunity" amounting to only a "physical or theoretical possibility" that the Secretary may repeat his actions); *Vivian Tankships*, 254 F.3d 1080 (table), 2001 WL 563773, at *2.

The cases Plaintiffs cite do not help them. *Kingdomware Technologies v. United States*, 136 S. Ct. 1969, 1976 (2016), involved a plaintiff who had received "many" "short-term contracts" from the agency, and it was "reasonable to expect" that the agency would apply its challenged interpretation "in a future procurement for the kind of services provided by" the plaintiff. Here, no similar circumstances exist such that a recurrence of the controversy can reasonably be expected. In *Bayou Liberty Association v. U.S. Army Corps of Engineers*, 217 F.3d 393, 398 (5th Cir. 2000), a case in which the mootness exception was held inapplicable, the court said in dicta that the plaintiff "ha[d] shown" "an expectation of future development" in the same area where a retail complex had been built that mooted the litigation, and such development "may create the types of problems … complained about by [the plaintiff] in the current litigation." Plaintiffs here can make no such showing. And in *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010), the exception did not apply because the plaintiffs did not challenge a policy that would be followed "in future similar circumstances." The same is true here; the revocation concerned only a specific permit for a specific project, and does not bind future Presidential actions on other cross-border permits or permit applications.

In sum, Plaintiffs fail to establish that this case presents an exception to mootness.

**3.  Plaintiffs' request for declaratory relief does not revive this moot case.**

Lastly, Plaintiffs are mistaken that their request for declaratory relief is sufficient by itself to create a live controversy. *See* Opp'n at 11-13. "It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)); *accord Paracelsus Senatobia Cmty. Hosp., Inc. v. Wetherbee*, 129 F.3d 610 (5th Cir. 1997).  As the Supreme Court has explained, "[courts] are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer*, 523 U.S. at 18; *see also Christopher P. v. Marcus*, 915 F.2d 794, 802 (2d Cir. 1990) ("A litigant may not use the declaratory judgment statute to secure judicial relief of moot questions.").  Thus, "[t]he question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Super Tire*, 416 U.S. at 121-22 (citation omitted).  Here, no declaratory relief can affect the instant matter, nor is there a controversy of sufficient immediacy or reality to justify declaratory relief.  As explained above, TC Energy has terminated the project and Plaintiffs merely hypothesize that an unknown third party may wish to pursue a similar project in the future.

Plaintiffs' claim that "requests for declaratory relief are evaluated under a lesser mootness standard than injunctive relief," Opp'n at 11, is wrong.  That proposition clearly runs directly counter to principles that limit federal court authority to adjudicate only live questions.  Moreover, although Plaintiffs rely on the panel decision in *Meltzer v. Board of Public Instruction of Orange County*, 548 F.2d 559 (5th Cir. 1977), they neglect to acknowledge that the Fifth Circuit, sitting *en banc*, largely vacated the panel decision regarding the availability of declaratory relief.  *See Meltzer v. Board of Public Instruction of Orange County*, 577 F.2d 311, 312 (5th Cir. 1978) (en banc) (per curiam).  The *en banc*

court found declaratory relief available only with respect to the school board's resolution requiring daily morning devotionals of Bible reading and prayer in public schools, as such readings and prayers continued to have a captive audience. *See* 548 F.2d at 572; 577 F.2d at 312. Here, in contrast, the pipeline project is not continuing but has been terminated.

Plaintiffs cite *Super Tire Engineering Co. v. McCorkle* to support their claim that there remains a live controversy. But that case challenged a "fixed and definite" state policy that was adopted "pursuant to regulations issued and administered by the named defendants," and that "pervade[d] every work stoppage, affect[ed] every existing collective-bargaining agreement, and [was] a factor lurking in the background of every incipient labor contract." 416 U.S. at 119, 123-24, 126 (footnote omitted). By contrast, Plaintiffs challenge only a revocation decision involving a specific permit. "[I]f the challenge to a specific [government] action is moot, and the plaintiff's declaratory judgment claim 'merely attacks [that] isolated agency action,' the plaintiff's claim is also moot[.]" *Kithe v. U.S. Atty. Gen.*, No. CIV.A. H-07-2678, 2007 WL 4378007, at *2 (S.D. Tex. Dec. 5, 2007) (quoting *City of Houston v. HUD*, 24 F.3d 1421, 1429 (D.C. Cir. 1994)).

*Connell v. Shoemaker*, 555 F.2d 483, 486-87 (5th Cir. 1977), another case Plaintiffs cite, is inapposite. That case found a "'live' controversy" as to the plaintiffs' due process claim because the plaintiffs' reputations—a cognizable liberty interest—continued to suffer due to the Army's prior determination and the plaintiffs argued that they were entitled to a hearing before that determination. *But see Allied Home Mortg. Corp. v. HUD*, 618 F. App'x 781, 787 (5th Cir. 2015) (casting doubt as to whether *Connell* remains good law, citing *Spencer*, 523 U.S. at 16 n.8). Here, there is no similar live controversy for this Court to provide any declaratory relief.

**B.  The Court Cannot Enter the Requested Relief Against the President.**

In addition to mootness, another reason the Court presently lacks jurisdiction is that it cannot enter the requested injunctive relief against the President, which necessarily

would enjoin the President from performing a discretionary duty.  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867).  *See* MTD at 17-18.  Plaintiffs also fail to seriously dispute Defendants' argument regarding declaratory relief.  *Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160, at *2 (N.D. Tex. July 2, 2019) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned.").

Despite Plaintiffs' counsel's prior concession, *see* MTD at 17 n.10, Plaintiffs now maintain that injunctive relief is available against the President.  But Plaintiffs misstate the holding of the case on which they primarily rely, asserting that "just two years ago the Second Circuit affirmed a permanent injunction against President Trump for blocking Twitter followers."  Opp'n at 19-20 (citing *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019)).  The district court in *Knight* specifically declined to issue injunctive relief against President Trump.  302 F. Supp. 3d 541, 579-80 (S.D.N.Y. 2018).  Nor did the Second Circuit expand the relief awarded by the district court.  928 F.3d at 230.  And in any event, the Supreme Court vacated the judgment in that case.  *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (mem.).

Plaintiffs also cite cases involving only temporary injunctive relief[3] or purely ministerial duties, *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 606 (D.C. Cir. 1974).  *See* Opp'n at 20.  Even assuming those decisions were correct, this case does not involve temporary injunctive relief nor does Plaintiffs' request for permanent injunctive relief involve a ministerial duty; rather, the challenged revocation reflects the President's discretionary determination that leaving the permit in place would disserve the national

[3] *See Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993) (temporary relief to preserve the court's jurisdiction or status quo with no discussion of *Johnson*), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993); *Berry v. Reagan*, No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) (same).

interest.  *See* EO 13990, § 6.  And even if the revocation involved ministerial duties, this Court should still exercise utmost restraint in deciding whether to enjoin a sitting President.  *See* MTD at 17 n.11.

Plaintiffs' attempts to cast doubt on the viability of *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), which held that "th[e] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties," are unavailing.  Plaintiffs first claim that "*Johnson* has been sharply narrowed, if not completely overruled."  Opp'n at 21.  That position is belied by courts' continued reliance on *Johnson*, including this year.  *See, e.g.*, *Page v. Biden*, No. 20-cv-104, 2021 WL 311002, at *3 (D.D.C. Jan. 29, 2021), *appeal filed*, No. 21-5038 (D.C. Cir. 2021).  The lower court cases Plaintiffs cite, *see* Opp'n at 21 n.9, cannot overturn Supreme Court precedent and in any event predate *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), which reaffirmed *Johnson*.  They also did not enjoin the President's performance of his official and discretionary acts.  Moreover, all three Supreme Court cases cited by Plaintiffs, *see* Opp'n at 21 n.9, are inapposite:  one involved an injunction against the President's subordinate, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952); one concerned a subpoena to provide information related to an ongoing criminal prosecution, *see United States v. Nixon*, 418 U.S. 683 (1974); and one held that a former President is entitled to absolute immunity from damages liability predicated on his official acts, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

Plaintiffs are thus left to argue that review is available because there is no subordinate official who could be enjoined from carrying out the President's directive.  *See* Opp'n at 21-22.  But the separation-of-powers concerns that forbid injunctive relief against the President do not dissipate where the President personally performs the challenged action—if anything, they are heightened.  As Justice Scalia's concurring opinion in *Franklin* explains, regardless of whether review of the legality of Presidential action can

be obtained by enjoining subordinate officials who attempt to enforce the President's directive, the court has no power to order declaratory or injunctive relief against the President. 505 U.S. at 829 ("[The Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees' constitutional claims should be dismissed."). In sum, the Court cannot grant the relief requested as against the President.

### C. The Court Lacks Jurisdiction to Enter Relief Against the Agency Defendants.

#### 1. Plaintiffs' injuries are not tied to or redressable by the Agency Defendants.

Defendants' opening brief also demonstrated that the Court lacks jurisdiction to enter relief against the Agency Defendants. Plaintiffs' alleged injuries were not caused by the Agency Defendants, and an injunction against the Agency Defendants would not redress those injuries (especially now that TC Energy has terminated the project). *See* MTD at 19-21. Plaintiffs' opposition does not compel a different conclusion.

First, Plaintiffs contend that they have established redressability by alleging that "the Cabinet Defendants have regulatory responsibilities regarding the KXLP project that will necessarily require them to apply the Executive Order." Opp'n at 25. But even if a plaintiff has established causation, it must still "make factual allegations showing that the relief it seeks will be likely to redress its injury." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1276, 1276 (D.C. Cir. 2007). Conclusory allegations such as that a given official is "responsible for implementing Executive Order 13990," Am. Compl. ¶ 9, ECF No. 71, leads a "cooperating agency with respect to the development of Keystone XL," *id.* ¶ 13, or "has certain duties under the Pipeline Safety Act that are implicated by the Keystone

Pipeline," *id.* ¶ 16, are insufficient to show that any injury is "likely to be redressed by the requested relief," *California v. Texas*, 141 S. Ct. 2104, 2113 (2021).

Second, Plaintiffs' efforts to distinguish the cases cited by Defendants on the ground that they concerned state rather than federal officials, *see* Opp'n at 24-25, are unavailing. As those opinions make clear, the salient question is not whether the official is part of a unitary Executive, *contra id.* at 25, but rather whether the requested relief can meaningfully redress the alleged injury, *see Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc). Here it cannot, because the Executive Order is self-executing and assigns no role to any agency, *cf. California*, 141 S. Ct. at 2116 ("They cannot enjoin the Secretary of Health and Human Services, because he has no power to enforce § 5000A(a) against them."), and because TC Energy has terminated the project.

The single case Plaintiffs cite, *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 252 (S.D.N.Y. 2020), undermines their claim. The court there held that the plaintiffs established standing to sue the Secretary of Health and Human Services ("HHS") regarding his implementation of a Presidential proclamation. The court relied on both the express language of the Proclamation assigning implementation, enforcement, and reporting responsibilities to HHS, as well as an agency statement that "HHS will continue to work with the State Department to implement the president's proclamation." *Id.* at 252. Plaintiffs can point to nothing similar here.

Turning to causation, Plaintiffs discuss only the Army Corps' administrative withdrawal of TC Energy's permit application relating to navigable waters of the United States, *see* Opp'n at 26-27, thus effectively conceding the lack of causation as to the other Agency Defendants. *See Coastal Habitat All. v. Patterson*, 601 F. Supp. 2d 868, 877 (W.D. Tex. 2008) ("The court must assess the plaintiff's standing to bring each of its claims against each defendant."), *aff'd*, 385 F. App'x 358 (5th Cir. 2010). Plaintiffs claim that

13

"the Army Corps implemented the Executive Order by acting based on it, with the clear implication that TC Energy seeking further permits for the KXLP project would be futile." Opp'n at 27.  But as Defendants have previously explained, *see* MTD at 19-20, Executive Order No. 13990 does not contemplate any role for the Agency Defendants, including the Army Corps, in the *revocation* of TC Energy's permit; the revocation became final upon the President's issuance of the Executive Order, *see* EO 13990, § 6.  The Army Corps' withdrawal, while a consequence of the Executive Order, pertained to a separate administrative process that cannot be said to have caused Plaintiffs' alleged injuries. Plaintiffs' "intuition that the Executive Order will be implemented by the same agencies that have been involved in regulatory approvals for the KXLP project[,]" Opp'n at 27, does not suffice because "Article III requires 'a causal connection between the *injury* and the *conduct* complained of.'"  *Okpalobi*, 244 F.3d at 426 (emphasis in original).[4]

Plaintiffs also argue that the Court can enter injunctive relief against the Agency Defendants because "Plaintiffs have a cause of action 'at equity.'"  Opp'n at 24.  But this contention is wrong, on two counts.  First, the Amended Complaint does not assert such a claim against the Agency Defendants, and "it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss[,]" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011).[5]  The same is true

---

[4] Plaintiffs also suggest that an injunction against the Agency Defendants is permissible because "President Biden will not be personally policing the border … for violations of the Executive Order." Opp'n at 23.  But at issue is whether the Agency Defendants have taken any action to implement the President's order, not whether they have border supervision duties.  And in any event the articles cited by Plaintiffs do not suggest that the Agency Defendants will be policing the border to ensure no violations of Executive Order.

[5] The circumstances of this case would not support an equitable cause of action.  An equitable injunction is a "judge-made remedy" available only in a "proper case," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and "[t]he decision

with respect to Plaintiffs' unpled *ultra vires* theory.  *See* Opp'n at 24 (referring to "*ultra vires* actions" against Federal officers).[6]  Second, Plaintiffs confuse the issue; whether a cause of action exists is a separate question from whether a court has Article III jurisdiction, and a court should not address the former until it assures itself of the latter.  *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998) (explaining that "the fundamental distinction between arguing no cause of action and arguing no Article III redressability" is that "the former argument is not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of federal rights" (cleaned up)); *Floyd v. District of Columbia,* 129 F.3d 152, 155 (D.C. Cir. 1997) (recognizing the distinction).

### 2.  Plaintiffs fail to allege the requisite final agency action for APA review against the Agency Defendants.

Defendants have explained that Plaintiffs cannot assert APA claims against the President.  *See* MTD at 16-17.  Plaintiffs do not contest that point, and therefore concede it, *see Arias*, 2019 WL 2770160, at *2.  Likewise, except for the Army Corps, Plaintiffs make no effort to show any Agency Defendant has taken any action, let alone a final agency

---

to grant or deny [] injunctive relief is an act of equitable discretion by the district court," *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  This is not a proper case for the Court's exercise of equitable discretion because Plaintiffs are not preemptively asserting a defense to a potential enforcement action against them by the Government, which is the paradigmatic situation where implied equitable claims against the Government have been recognized.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*, 561 U.S. 477, 487 (2010) (accounting firms subject to pervasive regulatory control by regulatory entity brought suit after a formal investigation of one of the firms was initiated); *see also Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("[a]s classically understood, anti-suit injunctions permit potential defendants in legal actions to raise in equity a defense available at law").

[6] Plaintiffs cannot meet the standard for *ultra vires* review, as they cannot establish that any Agency Defendant's decision "is patently a misconstruction of" a statute, "disregard[s] a specific and unambiguous statutory directive," or "violate[s] some specific command of a statute."  *Black Lives Matter D.C. v. Trump*, No. 20-cv-1469, 2021 WL 2530722, at *14 (D.D.C. June 21, 2021) (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

action, reviewable under the APA.  Accordingly, dismissal of the APA claims against those defendants is warranted.  *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011).

Dismissal of the APA claims against the Army Corps is also warranted because the Army Corps' administrative withdrawal of TC Energy's permit application relating to navigable waters of the United States—the only focus of Plaintiffs' argument, *see* Opp'n at 15-17—does not constitute final agency action.  *Cf.* 33 C.F.R. § 331.10 ("The final Corps decision on a permit application is the initial decision to issue or deny a permit[.]").  Notably, even if the Court were to find the administrative withdrawal a final denial of the application, the denial would still have no real-world consequences because the Army Corps clearly cannot compel TC Energy to file another application or grant the application that TC Energy no longer wishes to pursue.

Citing *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016), Plaintiffs contend that the withdrawal completed the agency's decision-making process "because '[the Army Corps'] actions suggest [it] has made up its mind," while "holding out a vague prospect of reconsideration.'"  Opp'n at 16 (quoting *Friedman*, 841 F.3d at 543).  Yet *Friedman* shows the comparative weakness of Plaintiffs' claim.  There, in response to a petitioner's refusal to provide information regarding his application for a medical certificate, the agency "set deadlines, counted down towards them, and then allowed them to pass without discussion."  *Friedman*, 841 F.3d at 543.  The court said that "the Agency has placed Friedman in a holding pattern—preventing him from obtaining any explicitly final determination on his application and thwarting the Court's interest in reviewing those agency actions that, in practical effect if not formal acknowledgement" meet the finality standard.  *Id.* at 542.

By contrast, the Army Corps' actions did not amount to a similar constructive final denial.  Following the issuance of Executive Order No. 13990, the Army Corps reached out to TC Energy to ask "whether there [was] a change in the purpose and need for the

16

Project in light of EO 13990," and "whether [TC Energy] plans to withdraw its current permit application and resubmit a new application based on this new information."  Jan. 28 2021, Letter from the Army Corps to TC Energy (attached as Ex. A); *see also* 33 C.F.R. § 325.1(d)(1) (requiring an applicant to "include a complete description of the proposed activity including … the location, purpose and need for the proposed activity").  TC Energy responded that "[it] [did] not plan to withdraw its current application" but would provide additional information about its plans.  Feb. 8, 2021, Letter from TC Energy to the Army Corps (attached as Ex. B).  The Army Corps in turn responded it understood TC Energy would need some time before deciding "on next steps with respect to the Project[,]" but the agency needed clarification on the purpose and need for the Project so that the agency could continue to process the application.  March 2, 2021, Letter from the Army Corps to TC Energy (attached as Ex. C).  The Army Corps further explained that it would consider the application withdrawn if TC Energy did not provide the additional information within 60 days, but made clear that "[a]dministrative withdrawal would not preclude [TC Energy] from reinitiating the application process in the future."  *Id.*  TC Energy subsequently suggested that the Army Corps suspend review of its permit application, Ex. 8 to MTD at 2, ECF No. 98-9, and the Army Corps did so, again confirming that TC Energy "may submit an updated application for this project in the future," Ex. 7 to MTD at 2, ECF No. 98-8.  This correspondence thus does not "establish a constructive denial of [TC Energy's] application," *Friedman*, 841 F.3d at 541, but rather reflects an interlocutory step in the agency's decision-making process.[7]

---

[7] Plaintiffs complain that Defendants did not attach to their motion certain correspondence between TC Energy and the Army Corps.  *See* Opp'n at 18.  The referenced correspondence is unnecessary to resolve the final agency action issue, but in any event, Defendants have attached it to this reply.  *See* Exs. A-C.

The other case cited by Plaintiffs—*John Doe, Inc. v. Gonzalez*, No. 06-cv-966, 2006 WL 1805685, at *13 (D.D.C. June 29, 2006)—is even less helpful to their argument.  In that case, although the district court did not definitively decide the finality question, the D.C. Circuit found on appeal that the agency had concluded its decision-making process because the agency, unlike the Army Corps here, "affirmatively denied Doe's permit application," "candidly acknowledged before the district court that its position would not change in further administrative proceedings," and "agree[d] its decision denying Doe's permit is 'final.'"  *John Doe v. DEA*, 484 F.3d 561, 566-67 (D.C. Cir. 2007).

Even if Plaintiffs had shown the completion of the Army Corps' decision-making process, they cannot show that the agency's withdrawal is an action "by which rights or obligations have been determined, or from which legal consequences will flow"—the second prong of the finality test.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).  They assert that "legal consequences—the inability to perform the actions sought by the permit—flow from it."  Opp'n at 16.  That argument conflates a withdrawal and a denial.  *See People Nat'l Bank v. Off. of Comptroller of Currency of U.S.,* 362 F.3d 333, 336-37 (5th Cir. 2004) (noting that a "non-final agency order is one that 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action").  It also ignores the reality, reflected in the correspondence between TC Energy and the Army Corps, that the withdrawal was meant to preserve TC Energy's ability to "continue to consider [its] path forward."  ECF No. 98-8 at 2.  Plaintiffs additionally have no answer to Defendants' point that it is the *President's* revocation decision that affects the rights and obligations of TC Energy.  *See* MTD at 23.

Plaintiffs' remaining arguments on finality are without merit.  First, Plaintiffs assert that "[a]gency actions that implement an executive order are also reviewable under the APA."  Opp'n at 13.  Even assuming the Army Corps' withdrawal "implement[s]"

Executive Order No. 13990, which it does not, *see* MTD at 20-21, it is still subject to the APA's finality requirement. *See* 5 U.S.C. § 704. And as noted, Plaintiffs cite no agency actions, let alone final ones, for any other Agency Defendant.

Second, according to Plaintiffs, "[t]he withdrawal explicitly incorporated the Executive Order" and "[t]his Court may review the substantive validity of the withdrawal as it bases its decision on the Executive Order." Opp'n at 14. That argument is factually flawed; while the Army Corps referred to Executive Order No. 13990 in its correspondence with TC Energy, the withdrawal did not "incorporate" the Order but merely allowed TC Energy to consider its next steps and to resubmit an application if appropriate. ECF No. 98-8 at 2; ECF No. 98-9 at 2. Moreover, neither case cited by Plaintiffs (at Opp'n at 14) indicates that the withdrawal at issue here meets the APA's finality standard. *See Doe v. Trump*, No. 3:19-cv-1743, 2020 WL 1853657 (D. Or. Apr. 13, 2020) (considering motion to compel production of administrative record); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (challenge to asylum regulation).

Third, Plaintiffs attempt to rely on *Air One Helicopters v. FAA*, 86 F.3d 880, 882 (9th Cir. 1996), is unavailing. That case that did not involve an applicant requesting the agency to suspend review of its application, and in any event, the case has been criticized for tying finality to the distinct concept of futility, *see Indep. Petroleum Ass'n of Am. v. Babbitt*, 971 F. Supp. 19, 28 (D.D.C. 1997), *aff'd*, 235 F.3d 588 (D.C. Cir. 2001). Indeed, both the Supreme Court and the Fifth Circuit have recognized that "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality." *Darby v. Cisneros*, 509 U.S. 137, 144 (1993); *see also Geyen v. Marsh*, 775 F.2d 1303, 1308 n.6 (5th Cir. 1985) (similar). The Court here should be particularly reluctant to allow a prudential doctrine related to exhaustion to shore up a jurisdictional deficiency related to finality. *Cf. John Doe*, 484 F.3d at 567 ("[E]ven if exhaustion, ripeness, and

finality may be difficult to distinguish in some contexts, they must be carefully delineated when, as here, finality is a statutory jurisdictional prerequisite rather than merely a precaution related to concreteness and institutional capacity.").

Fourth, Plaintiffs assert that the Army Corps' "'discretion' to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal." Opp'n at 16. Defendants have not argued otherwise; rather, they have explained that no final decision has been reached by the Army Corps within the meaning of the APA. The cases cited by Plaintiffs (in Opp'n at 16-17) are not to the contrary. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813-14 (2016) (agency's jurisdictional determination was final given that "[i]t is issued after extensive factfinding by the Corps" and "is typically not revisited if the permitting process moves forward"); *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (compliance order was final because it was "not subject to further Agency review," required plaintiffs to restore property and provide access and records to agency, exposed plaintiffs to enforcement proceedings, and limited plaintiffs' ability to obtain a permit).

Finally, Plaintiffs argue that "[i]t would be improper for the Court to dismiss Plaintiffs' APA claims on the ground that there is no final agency action, when Defendants have yet to produce an administrative record or respond to any discovery." Opp'n at 17-18.[8] Yet Plaintiffs had no response to the precedent cited by Defendants that refutes Plaintiffs' position. *See* MTD at 25. And the cases on which Plaintiffs rely, *see* Opp'n at 18, are inapposite, as they involved challenges to identified agency actions, not fishing

---

[8] Plaintiffs' attempt to relitigate the Court's order staying discovery pending resolution of Defendants' motion to dismiss is improper. *See* Opp'n at 17-19; Order, ECF No. 99. They fail to comply with Fed. R. Civ. P. 72(a), which requires objections to a magistrate judge's order be filed within 14 days. *See James v. Life Ins. Co. of N. Am.*, No. CIV.A. H-12-2095, 2014 WL 5878465, at *2 (S.D. Tex. Nov. 12, 2014) ("[a] party may not assign as error a defect in the order not timely objected to").

expeditions to discover a purported final agency action that might survive a Rule 12 motion. *See Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 974-77 (E.D. Cal. 2012) (challenge to engineer technical paper, white paper, and policy guidance letter); *Doe #1 v. Trump*, 423 F. Supp. 3d 1040, 1045 (D. Or. 2019) (granting motion to compel administrative record as to State Department because of indicia of that agency's implementation of Executive Order but denying the motion as to other agencies because "[t]here is no evidence before the Court of agency action" by those agencies).

### D.  Plaintiffs Otherwise Lack Standing with Respect to All Defendants.

#### 1.  Plaintiffs cannot establish redressability in light of TC Energy's action.

As previously explained, Plaintiffs fail to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact," *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020), *cert. denied*, 20-298, 2021 WL 2742797 (U.S. July 2, 2021), in light of TC Energy's termination of the Keystone XL project. *See* MTD at 36-37; *see also supra* Parts A, C.1. Plaintiffs' assertion that another company may apply for a permit in the future to build a similar pipeline fails to show that this Court can redress their alleged injuries now because the assertion is based on pure speculation and lacks sufficient immediacy. *See, e.g.*, *El Paso*, 982 F.3d at 341. This case bears no resemblance to *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1384, 1386 (5th Cir. 1986), which Plaintiffs cite, where the court held that the plaintiffs' injury—an inability to purchase a home that was fairly traceable to a low appraisal—was "likely to be redressed by" the requested relief of enjoining discriminatory appraisal practices. Here, in contrast, the Court cannot grant any relief that would redress Plaintiffs' alleged injury, given TC Energy's decision to terminate the Keystone XL project.

### 2. Plaintiffs fail to allege an injury in fact.

#### a. Plaintiffs fail to allege injuries to their sovereign interest.

Plaintiffs likewise have not established a cognizable injury to its sovereign interests. *See* MTD at 27-30.  They abandon their theory that Executive Order No. 13990 injures their "sovereign interests in stewarding and preserving the territories within their border," Am. Compl. ¶ 25, and for good reason, as such an allegation does not establish a cognizable injury in fact, *see* MTD at 31.  And they cannot rely on their alleged loss of tax revenues to establish standing.  Although Plaintiffs claim to have identified the necessary "direct link" between their alleged loss of tax revenue and the termination of the Keystone XL project, Opp'n at 29, their alleged losses are as indirect as those rejected in *El Paso*.  982 F.3d at 339 (rejecting county's argument that a cancelled "$20 million construction project within the county would necessarily generate taxes through workers staying at hotels, buying supplies, and spending money at local establishments" and would also "den[y] the county the opportunity for an economic benefit").  Indeed, even that alleged harm is contradicted by Plaintiffs' own allegations, including that oil not transported by the Keystone XL Pipeline will be transported by other means, and that crude oil is available from other sources.  *See* Am. Compl. ¶¶ 74, 76, 84; MTD at 30.

#### b. Plaintiffs cannot assert *parens patriae* standing.

Plaintiffs also fail to establish *parens patriae* standing.  The Supreme Court spoke clearly in announcing that in general a "'State does not have standing as *parens patriae* to bring an action against the Federal Government.'"  *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)).  *See* MTD at 42.  Quoting *Texas v. United States*, 86 F. Supp. 3d 591, 626 (S.D. Tex. 2015), Plaintiffs insist that an "'established line of cases'" shows that States can maintain *parens patriae* standing against

the Federal Government.  *See* Opp'n at 31.  But the viability of cases on which *Texas* relied "must be questioned."  *Stenehjem v. Whitman*, No. A3-00-109, 2001 WL 1708825, at \*2 (D.N.D. June 20, 2001).  To begin, *Texas* cited *Washington Utilities & Transportation Commission v. FCC*, 513 F.2d 1142 (9th Cir. 1975), a case that was subsequently overruled.  *Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990).  And two years after *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990), another case cited by *Texas*, the Tenth Circuit followed *Snapp* and held that "the State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens." *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).  As for *Abrams v. Heckler*, 582 F. Supp. 1155, 1159-60 (S.D.N.Y. 1984), yet another case cited by *Texas*, it relied in part on the now-overruled *Washington Utilities* decision.

Similarly without merit is Plaintiffs' assertion that they can establish *parens patriae* standing under *Massachusetts v. EPA*, 549 U.S. 497 (2007).  *See* Opp'n at 32-33.  As the D.C. Circuit has found, that case does not alter the "longstanding precedent that a State in general lacks parens patriae standing to sue the federal government."  *Gov't of Province of Manitoba v. Bernhardt*, 923 F.3d 173, 183 (D.C. Cir. 2019).  Indeed, "[b]ecause Massachusetts sued to remedy its own injury rather than that of its citizens, *Massachusetts v. EPA* is not a parens patriae case."  *Id.* at 182; *see also id.* ("Nor does the text of footnote seventeen [in *Massachusetts*] support Missouri's proposed exception."); *accord Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009).

Again relying on *Massachusetts*, Plaintiffs claim that they can "seek to vindicate the States' and their citizens' rights under a federal statute"—namely the Tax Cut Act.  *See* Opp'n at 33.  But in *Massachusetts*, Congress explicitly authorized judicial review of the State's challenge to the agency's action through the Clean Air Act, which the Supreme Court said was of "critical importance" as "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed

before." *Massachusetts*, 549 U.S. at 516 (internal quotation marks and citation omitted). The Tax Cut Act does not provide a similar procedural right. Nor does the APA because, as previously demonstrated, the APA lacks applicability here.

In addition, notwithstanding Plaintiffs' assertion to the contrary, they cannot establish *parens patriae* standing by alleging a violation of separation of powers and the supposed impact on the free flow of commerce. Plaintiffs' assertion is at best an abstract injury amounting to a generalized grievance, *see* MTD at 34, and as Defendants previously explained and Plaintiffs fail to rebut, Plaintiffs' asserted injury flowing from a separation-of-powers claim does not lend itself to *parens patriae* standing, *see id*. Moreover, Plaintiffs do not rebut Defendants' showing that Plaintiffs are merely "nominal parties" and that the groups Plaintiffs identify as being injured are capable of pursuing their own interests. *See id.* at 34-35 (quoting *Snapp*, 458 U.S. at 607).

Finally, the idea that States "are entitled to special solicitude" in a way that materially alters the analysis is unavailing. *See* Opp'n at 30-31. To be sure, the Fifth Circuit recently held that Texas could be entitled to special solicitude, and noted that such solicitude "means redressability is easier to establish for certain state litigants than for other litigants." *Texas v. Biden*, --- F.4th ---, No. 21-10806, 2021 WL 3674780, at *6 (5th Cir. Aug. 19, 2021). But the Fifth Circuit ultimately found that Texas could establish redressability regardless of any special solicitude. *Id.* Here, "even giving Plaintiffs the benefit of doubt that the solicitude doctrine may afford, Plaintiffs cannot establish redressability or any of the other Article III requirements," *Missouri v. Biden*, No. 4:21-CV-00287-AGF, 2021 WL 3885590, at *10 (E.D. Mo. Aug. 31, 2021) (distinguishing *Texas v. Biden*), *appeal filed*, No. 21-3013 (8th Cir. Sept. 8, 2021).

In any event, while the precise meaning of "special solicitude" is elusive, it cannot be read to override the rule announced in *Snapp* and *Mellon* that applies specifically to States. And in the most recent Supreme Court decision about state standing, *California v. Texas*, 141 S. Ct. 2104 (2021), the Court had little trouble reversing the Fifth Circuit to

conclude that States lacked standing—without citing *Massachusetts v. EPA*, or even acknowledging the "special solicitude" on which Plaintiffs' argument so heavily depends. Indeed, "the special-solicitude and procedural-injury doctrines do not—and cannot—alter the irreducible constitutional minimum of standing." *California v. Trump*, --- F. Supp. 3d ---, No. CV 19-960 (RDM), 2020 WL 1643858, at *7 (D.D.C. Apr. 2, 2020).

## II.   VENUE IS IMPROPER IN THIS DISTRICT

Plaintiffs resist the conclusion that venue is lacking in this district, citing the "rule that 'venue [is] determined at the outset of litigation and [is] not affected by subsequent events.'" Opp'n at 38 (quoting *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003)).  They further argue that not all plaintiffs need to demonstrate standing.  *See* Opp'n at 39-40. Defendants agree with both propositions, but neither is relevant.  As Defendants have explained, when venue hinges on a plaintiff's standing, courts have required the plaintiff to establish its standing, *see* MTD at 37, which too is determined at the outset of litigation, *Energy Mgmt. Corp v. City of Shreveport*, 397 F.3d 297, 301 n.3 (5th Cir. 2005).  That is, venue cannot depend on the presence of a plaintiff as to whom the court never had jurisdiction in the first place.  Here, Plaintiffs allege that venue is proper in this district because Texas resides in this district.  Am. Compl. ¶ 23.  They must therefore establish Texas's standing to sue, but have failed to do so.  Accordingly, venue here is improper.[9]

## III.   PLAINTIFFS FAIL TO STATE A SEPARATION-OF-POWERS CLAIM

### A. There Is No Conflict Between the Political Branches' Exercise of Their Respective Authorities.

Defendants' opening brief demonstrated that Plaintiffs have failed to state a separation-of-powers claim challenging the President's revocation decision, because there

---

[9] Although Plaintiffs previously also alleged that "a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District," Am. Compl. ¶ 23, they made no attempt to contest Defendants' contrary argument, *see* MTD at 37.

is no conflict between the President's and Congress's exercise of their respective constitutional powers. *See* MTD at 48-52.

In response, Plaintiffs devote significant energy to establish Congress's authority over foreign commerce, including "the authority to authorize, prohibit, and regulate a transnational oil pipeline cross-border permit." Opp'n at 41; *see also id.* at 48-50. The argument is beside the point because Defendants do not dispute that Congress has such authority. In fact, President Grant, the first President to regulate physical extensions into the United States (*i.e.*, submarine telegraphic cables), explicitly urged Congress to enact legislation governing such extensions. *See* Ex. 1 to MTD, ECF 98-2. Congress chose not to act for almost 50 years, and when it did enact the Kellogg Act, the law affirmed the President's authority, providing that the President could grant a permit over transnational cables if doing so would assist in "maintaining the rights or interests of the United States or of its citizens in foreign countries, or [would] promote the security of the United States." Act of May 27, 1921, ch. 12, 42 Stat. 8, § 2 (1921); *see also* MTD at 45-46. This allocation of power between the political branches has remained the same, with the President exercising permitting authority and Congress either expressly affirming the President's authority, *see, e.g.*, the International Bridge Act of 1972, Pub. L. No. 92-434, 86 Stat. 731 (1972), 33 U.S.C. § 535b (requiring Presidential approval for international bridges), or otherwise acquiescing in the President's exercise of authority, *see* MTD at 47, 52-55.

Plaintiffs concede that the President "possesses certain implied Article II powers over foreign affairs," Opp'n at 41, and "also has broad authority to protect national security," *id.* at 42. Their primary argument is that the President's Article II authority "does not displace that of Congress—specifically when it relates to questions of foreign commerce." *Id.* But the President did not displace Congress's exercise of foreign commerce power because his revocation did not conflict with any duly enacted law—the

prerequisite to a separation-of-powers claim, as underscored by the separation-of-powers cases Plaintiffs cite.  *See* Opp'n at 42 (citing *Zivotofsky v. Kerry*, 576 U.S. 1, 21, 31-32 (2015) (conflict between an Executive policy of declining to recognize any country's claim of sovereignty over Jerusalem and a statute intended to override that policy), *Youngstown*, 343 U.S. at 586-87 & n.5 (conflict between President Truman's seizure of the nation's steel mills and duly enacted statutes governing when seizure could be used to remedy labor disputes), and *Medellin v. Texas*, 552 U.S. 491, 527 (2008) (conflict between the President's attempt to enforce a non-self-executing treaty and the Senate's ratification of the treaty as one without any domestic effect of its own force)[10]).

Although Plaintiffs cite Section 501 of the Tax Cut Act of 2011 as presenting such a conflict, *see* Opp'n at 43-45, Defendants have shown that no such conflict exists, *see* MTD at 50-51; *see also id.* at 8-9.  That law required President Obama to act on TC Energy's "application filed on September 19, 2008 (including amendments)" within 60 days of enactment, Tax Cut Act § 501(a), and provided that if he did not grant the application or deny it as against the national interest, then the permit "shall be in effect by operation of law," *id.* § 501(b)(3), with certain terms and conditions, *see id.* § 501(c), (d). President Obama denied the application as against the national interest—and without prejudice—because he found 60 days inadequate to conduct the necessary analysis in light of TC Energy's plan to change the pipeline route.  *See* Dep't of State Report to Congress on the Tax Cut Act, at 1, 5, Ex. 5 to MTD, ECF No. 98-6.

---

[10] Although *Medellin* did not involve a duly enacted statute, it concerned the Senate's constitutional role to advise and consent in the ratification of treaties, U.S. Const. art. II, § 2, cl. 2, which is one of four "explicit and unambiguous" exceptions to the rules of Bicameralism and Presentment, *see INS v. Chadha*, 462 U.S. 919, 955 (1983).

Plaintiffs ignore the fact that § 501(a) mandated action on only the September 19, 2008 application, which was superseded by TC Energy's 2012 application proposing a different pipeline route. *See* MTD at 51. Indeed, the Executive Branch under the prior administration issued two successive permits without regard to the terms and conditions Congress identified in the Tax Cut Act were the permit to become operative, § 501(c), (d). Plaintiffs' only argument is that because President Obama did not make "a judgment on the merits of the pipeline," he purportedly violated the reporting requirement in § 501(b)(2) ("Report"), making the permit effective by operation of § 501(b)(3) ("Effect of No Finding or Action"). *See* Opp'n at 45. But Plaintiffs fail to explain why compliance with the reporting requirement under § 501(b)(2)[11] is relevant to the application of § 501(b)(3). In fact, it is not. Section 501(b)(3) does not mention § 501(b)(2), but provides that the permit shall be effective by operation of law only if President Obama *both* did not grant the 2008 application and did not deny the application. *See* MTD at 44-45.

And with respect to the reporting requirement of the Act, Congress clearly is the best judge of whether its reporting requirement has been met and the appropriate consequences if not. *Cf. Nat'l Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) (congressional reporting requirements are "committed to congressional discretion in measuring the fidelity of the Executive Branch action to legislatively mandated requirements"); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882 (D.D.C. 1991) ("the Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress. The subsection of the statute is labeled 'Report to Congress'…. It is

---

[11] Section 501(b)(2) provides that "[i]f the President determines that the Keystone XL pipeline is not in the national interest … the President shall … submit to the [various congressional committees and leaders] a report that provides a justification for determination, including consideration of economic, employment, energy security, foreign policy, trade, and environmental factors."

for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted.") (internal citation omitted). Here, a purported failure to comply with the reporting requirement is too thin a reed to rest Plaintiffs' claim that Tax Cut Act presents a separation-of-powers problem with respect to the President's revocation of the permit.

In fact, Plaintiffs do not explain why, if the Keystone XL permit had been effective by operation of the 2011 Act, TC Energy still submitted two more applications, the prior administration still issued two successive permits, and Congress still passed the (ultimately vetoed) Keystone XL Pipeline Approval Act of 2015, S. 1, 114th Cong., § 2(a), Ex. 6 to MTD, ECF No. 98-7, attempting to directly grant a subsequent, 2012 application.

### B. The President Has Authority to Revoke the Keystone XL Permit.

Plaintiffs next argue that the President lacked constitutional authority to revoke the permit because, again, cross-border facilities purportedly implicate only foreign commerce within the exclusive province of Congress. *See* Opp'n at 48-54. Analogizing the Foreign Commerce Clause to the doctrine of the "Dormant Commerce Clause," Plaintiffs argue that when Congress does not regulate a cross-border facility, it is "a conscious decision to promote the free flow of commerce." *Id.* at 47. The Dormant Commerce Clause "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). But Plaintiffs cite no authority for the proposition that there is a similar "dormant" Foreign Commerce Clause governing international commerce.

Plaintiffs' theory is also refuted by historical practice. Congress has legislated as to the permitting of only two types of cross-border facilities—transnational submarine cables and international bridges—and in both instances, Congress merely endorsed the need for a Presidential permit. *See* MTD at 45-46. Under Plaintiffs' theory, all other cross-border facilities would be free to cross our Nation's border without the U.S. Government's express

consent.  But since 1869 and except for a brief interruption, Presidents have exercised authority over cross-border facilities to protect the Nation's territorial integrity and foreign policy interests.  *See* MTD at 38-48.  As Defendants previously demonstrated, this historical gloss on the President's Article II authority deserves decisive weight here.  *See id.* at 40-41; *see also NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President.") (citation omitted).  In other words, this Court "need not consider whether, as an original question," the President's Article II authority encompasses the power to control border-crossing facilities because the Executive has long exercised such power.  *United States v. Midwest Oil Co.*, 236 U.S. 459, 469 (1915).

Plaintiffs point to the brief break in history when two Secretaries of State during President Cleveland's second term disclaimed the authority, resulting in the landing of two cables on U.S. shores in 1893 and 1896, respectively, without the U.S. Government's express consent.  *See* Opp'n at 51-52; *see also* Foreign Cables, 22 Op. Atty. Gen. 13, 25 (1898).  But those two isolated episodes from more than a hundred years ago shed no light on today's dispute, especially given the consistent practice before and since.  *See Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) ("[E]ven if the pre–1952 [practice] should be disregarded, congressional acquiescence in [a practice] since that time supports the President's power to act here").  Nor does 100-year-old dicta in *United States v. Western Union Tel.*, 272 F. 311, 318-20 (S.D.N.Y. 1921), cited by Plaintiffs, expressing doubt about the Executive's authority over transnational submarine cables, change the constitutional analysis here.  The Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute."  *Noel Canning*, 573 U.S. at 525; *see also Mistretta v. United States*, 488 U.S. 361, 400-01 (1989) ("While

30

these [practices] spawned spirited discussion and frequent criticism, ... 'traditional ways of conducting government ... give meaning' to the Constitution") (citation omitted).

Plaintiffs argue that the President had no national security authority to revoke the Keystone XL permit because he did not mention any such concerns related to the pipeline. *See* Opp'n at 54, 58.[12]  But that argument conflates the source of the President's Article II authority—which is long established, *see, e.g.*, EO 11423, 33 Fed. Reg. 11,741 (Aug. 16, 1968) (first Executive Order setting forth the permitting process for oil pipelines)—with the President's rationale for the revocation.  Moreover, the President clearly was exercising the same authorities President Trump exercised in issuing the 2019 permit—he revoked the permit according to its plain terms, *see* 2019 Permit, Art. 1(1) (permit "may be … revoked … at any time at the sole discretion of the President"), 84 Fed. Reg. 13101.

Plaintiffs attempt to distinguish *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)—a case Defendants cited in support of the President's independent constitutional power, *see* MTD at 39—on the basis that the President's denial of a U.S. air carrier's request to engage in foreign commercial air transportation in that case implicated national security concerns.  *See* Opp'n at 54.  But there is no indication that the President, in denying the application at issue in *Waterman*, actually articulated any national security or foreign policy reasons.  Regardless, the Supreme Court's observations in that case that "aerial navigation routes and bases" could be correlated to "our own national

---

[12] Plaintiffs' argument also ignores the national security interest inherent in every cross-border permitting decision.  The 2019 permit, like others before it, reflects this understanding, by providing for the contingency that the United States may take possession of the cross-border facilities should national security require it.  *See* 2019 Permit, Art. 4, 84 Fed. Reg. at 13102; *see also* U.S.-Canada oil pipeline permit issued by President John F. Kennedy, Oct. 18, 1962, Art. 6, Ex. 9 to MTD, ECF No. 98-10 (similar language).  And every physical intrusion into the United States necessarily implicates the Nation's territorial integrity, which the President has the Commander-in-Chief authority to protect.

defenses" and that they also "raise[d] new problems in conduct of foreign relations," *Waterman*, 333 U.S. at 108, were an exercise to determine whether the President had the constitutional power to act in the first place, much like this Court's examination of the President's authority here.

Finally, Plaintiffs improperly ascribe to Defendants the "view that the President's independent constitutional powers give him plenary control over foreign affairs." Opp'n at 47; *see id.* at 56. Defendants are merely following the Supreme Court's teaching, which is that the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003). The President exercised that power here to revoke the Keystone XL permit.

## C. Congress Has Acquiesced in the President's Claim of Authority Over Cross-Border Oil Pipelines.

Plaintiffs further argue that "it is impossible to conclude that Congress acquiesced to the President's revocation order," again citing the Tax Cut Act, § 501. Opp'n at 55. As an initial matter, if the Court finds that the President had the constitutional authority to revoke the permit and there is no conflict between the political branches' exercise of their respective powers, then it should dismiss the separation-of-powers claim for failure to state a claim and need not delve into the issue of congressional acquiescence.

In any event, as Defendants have demonstrated, *see* MTD at 44, the Tax Cut Act actually affirmed the President's permitting authority—it expressly referred to the then-applicable Executive permitting process in Executive Order No. 13337, *see* Tax Cut Act § 501(a), and recognized the President's expansive discretion in making a national interest determination, providing that "[t]he President shall not be required to grant the permit … if the President determines that the Keystone XL pipeline would not serve the national

interest." *Id.* § 501(b)(1).  While Congress clearly wished to expedite President Obama's decision-making on TC Energy's 2008 application, it by no means questioned the President's *authority* in the area—which is the key issue in any acquiescence analysis. Congress expressed a preference that the application be granted only *if* the President chose not to act.  *See id.* § 501(b)(3).  This deference to the President's authority is conclusive here, and Plaintiffs' opposition brief tellingly has no response to this argument.

Instead, Plaintiffs seek to rely on un-enacted bills and the vetoed Keystone Pipeline Approval Act of 2015 to show the *lack* of congressional acquiescence.  *See* Opp'n at 56. But, as Defendants have shown, *see* MTD at 52-55, such activities reflect Congress's knowledge of the Executive's exercise of authority and the opportunity to act on that knowledge.  If, despite such knowledge and opportunity, Congress does not duly enact a law that conflicts with Executive action, then a court may find congressional acquiescence. *See id.*  Plaintiffs agree that "[o]f course, congressional actions short of enacted laws shed light on Congress's views when undertaking an acquiescence analysis."  Opp'n at 56.  But they further contend that such actions could reflect Congress's disapproval sufficient to create a conflict with Executive action.  That is not the law.  Instead, the Constitution requires Congress to express its will through a "finely wrought and exhaustively considered, procedure" as set forth in Article I, §§ 1 and 7 of the Constitution.  *Chadha*, 462 U.S. at 951.  The Constitution draws the line at enactment, and there is no other principled way to measure congressional disapproval, whether a bill is merely one vote short of overriding Presidential veto or far from passing either House of Congress.

Plaintiffs fault Defendants for not acknowledging that in *Dames & Moore*, the Supreme Court noted, in the context of finding congressional acquiescence, that "Congress has not enacted legislation, or even passed a resolution, indicating its displeasure with the [Executive's Iranian] Agreement," 453 U.S. at 687.  *See* Opp'n at 56.  Plaintiffs suggest

that "resolutions (which Presidents don't sign) were salient evidence of congressional intentions." Opp'n at 56. But the Supreme Court's passing reference to "a resolution" indicating displeasure was not made in the context of assesing a separation-of-powers claim, and nothing in the opinion suggests that a mere concurrent resolution would be sufficient to override Presidential authority long accepted by Congress. Moreover, this sentence in *Dames & Moore* is most naturally read as referring to joint resolutions, which are in fact subject to the constitutional requirements of Bicameralism and Presentment and have the full force of law. *See* U.S. Const. art. I, § 7.

### D. The President's Exercise of Discretion is Unreviewable.

The remainder of Plaintiffs' arguments against the validity of the President's decision to revoke the permit is not justiciable. Plaintiffs concede that "the President has authority to prevent border intrusions," Opp'n at 58, but argue that the exercise of such authority is inappropriate here because Canada is not a "hostile power," *id.* at 59; we are "in a time of peace," *id.* at 48; and the proposed Keystone XL Pipeline "raises no legitimate national security concerns," *id.* at 58. But as Defendants previously explained, *see* MTD at 55-58, the basis for the President's judgment in the conduct of foreign affairs and national security policy is not properly subject to judicial second-guessing.

Plaintiffs also argue that the President's climate change rationale is not a sufficient foreign policy reason. *See* Opp'n at 59. Resolution of this argument again would require judicial oversight of the President's determination, including that diplomatic engagement on climate change "is more necessary and urgent than ever," that "[t]he United States must be in a position to exercise vigorous climate leadership in order to achieve a significant increase in global climate action," and that "[l]eaving the Keystone XL permit in place" would disserve the U.S. national interest. EO 13990, § 6 (d). Plaintiffs argue that reliance

on "the global politics of climate change" lacks an "intelligible limiting principle."  Opp'n at 60.  Even Plaintiffs themselves do not articulate any "limitation principles" but merely express their view that "President Biden's decision ultimately weakens U.S. national security."  *Id.* at 59 n.29.  Such a policy disagreement is not reviewable.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Defendants' opening brief, Defendants respectfully request that the Court grant their motion to dismiss.

Dated:  September 20, 2021

> Respectfully submitted
>
> BRIAN M. BOYNTON
> Acting Assistant Attorney General
>
> BRIAN D. NETTER
> Deputy Assistant Attorney General
>
> ANTHONY J. COPPOLINO
> Deputy Director, Federal Programs Branch
>
> /s/ *Jean Lin*
> JEAN LIN, Attorney in Charge
> NY Bar 4074530, admitted *pro hac vice*
> Special Litigation Counsel
> STUART J. ROBINSON
> KEVIN M. SNELL
> Trial Attorneys
> U.S. Dept. of Justice, Civil Division
> Federal Programs Branch
> 1100 L Street, N.W.
> Washington, DC 20530
> Phone: (202) 514-3716
> Fax: (202) 616-8202
> Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2021, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN