United States District Court
Southern District of Texas
**ENTERED**
January 06, 2022
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:21-cv-65

THE STATE OF TEXAS, ET AL., *PLAINTIFFS*,

v.

JOSEPH R. BIDEN JR., ET AL., *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

> [T]he text of the Constitution . . . extends the judicial power only "to all Cases" and "to Controversies." It follows that courts . . . may not decide non-cases, which are not adversary situations and in which nothing of immediate consequence to the parties turns on the results.[1]

Before the court is the defendants' motion to dismiss the plaintiffs' amended complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). Dkt. 98. The court grants the motion.

## I.   Background

The plaintiffs—Texas and 22 other states—have sued President Biden and ten agency heads (the Cabinet Defendants) challenging the President's

---

[1] ALEXANDER M. BICKEL, *The Supreme Court 1960 Term Foreword: The Passive Virtues*, 75 HARV. L. REV. 40, 42 (1961).

authority to revoke a permit granted for the construction of the Keystone XL pipeline. The plaintiffs maintain the permitting decision concerns only international and interstate commerce and so is committed exclusively to Congress under the Commerce Clause of the Constitution. Dkt. 71. ¶¶ 1–6.

### a. Keystone Pipeline

TC Energy (formerly TransCanada) is a Canadian public energy company based in Calgary, Alberta. TC Energy owns 2,687 miles of interconnected petroleum pipelines in the United States and Canada, often called "the Keystone System." Dkt. 71 ¶ 29. The Keystone Pipeline (Keystone I) is the main artery of this system; it originates in Alberta, Canada, runs east into Manitoba, and enters the United States in North Dakota. *Id.* From the border, Keystone I travels south, through South Dakota, reaching a junction in Steele City, Nebraska. *Id.* From Steele City, Keystone I's primary spur runs east through Missouri until arriving at delivery and refining points in Illinois. *Id.* The other spur from Steele City runs through Cushing, Oklahoma, and southward to refineries on the Gulf Coast, including in Houston and Port Arthur. *Id.*

This case concerns the Keystone XL project, a venture TC Energy put forward in 2008. Keystone XL, as proposed, would originate in Alberta and travel through Montana, South Dakota, Nebraska, Kansas, and Oklahoma

before reaching refineries on the Texas Gulf Coast. *Id.* ¶ 30. At capacity, Keystone XL would transport 830,000 barrels of crude oil per day from Canada to the Gulf Coast. *Id.*

At issue is the federal authorization TC Energy requires to build facilities in northern Montana where the pipeline crosses the border from Alberta. *Id.* The authorization would span 1.2 miles from the United States-Canada border into Montana and would include the first pipeline isolation valve. *Id.* This 1.2-mile stretch of pipeline, "though a tiny piece of the larger Keystone project, [] is the fulcrum around which Keystone XL turns." *Id.*

### b. TC Energy's Permit Applications

In 2008, TC Energy applied for its first permit to build the cross-border facilities in Phillips County, Montana. Dkt. 71 ¶¶ 30, 33. In reviewing the application, the State Department considered the project's potential effects on environmental and cultural resources in a manner consistent the National Environmental Policy Act of 1969, the National Historic Preservation Act of 1966, and the Endangered Species Act of 1973. *See* Record of Decision and National Interest Determination for Keystone XL Pipeline, at 6–7 (Nov. 3, 2015) [hereinafter 2015 ROD].[2]

---

[2] *Available at* https://2012-keystonepipeline-xl.state.gov/documents/organization/249450.pdf.

As originally proposed, the pipeline would have "traverse[d] a substantial portion of the Sand Hills Region of Nebraska," Record of Decision and National Interest Determination for Keystone XL Pipeline, at 9 (Mar. 23, 2017) [hereinafter 2017 ROD],[3] which boasts a high concentration of wetlands, Dkt. 98 at 26. Because of widespread opposition to the proposed route, TC Energy agreed to change it. *Id.* The State Department then announced it would need information about possible alternative routes to fully evaluate the 2008 application. 2017 ROD at 9.

In December 2011, Congress passed legislation requiring the President to "grant a permit under Executive Order No. 13337"—within 60 days of enactment—"for the Keystone XL pipeline project application filed on September 19, 2008 (including amendments)," unless the "President determine[d] that the Keystone XL pipeline would not serve the national interest." Temporary Payroll Tax Cut Continuation Act of 2011, Pub. L. No. 112-78, § 501, 125 Stat. 1289, 1289–90. The next month, President Obama denied the application without prejudice. Dkt. 98 at 26. He explained that granting the permit would not serve the national interest because 60 days was not enough time to do the necessary analysis. *Id.*

---

[3] *Available at* https://www.state.gov/wp-content/uploads/2019/02/Record-of-Decision-and-National-Interest-Determination.pdf.

4/5

Despite the hiccups in procuring a permit for the cross-border link, TC Energy went ahead to construct the portion of the pipeline between Cushing, Oklahoma, and Nederland, Texas, as that stretch enjoyed independent economic utility and required no presidential permit. *Id.* This portion, called the Gulf Coast Pipeline, was completed in 2014 and began transporting oil to refining facilities in Port Arthur, near the Nederland terminus. *Id.* at 27. Later an extension to the Houston refining market was added. *Id.*

### c. 2012 Renewed Application

In May 2012, TC Energy renewed its application for a cross-border permit, Dkt. 71 ¶ 37, proposing a route that avoided the Sand Hills. 2017 ROD at 9. In reviewing the revised application, the State Department cast a wide net, consulting state, local, tribal, and foreign governments, as well as other federal agencies. 2017 ROD at 2; *see id.* at 6–7. It also solicited public comments, ultimately receiving more than 4.5 million. *See id.* at 5.

In January 2015, while that review was under way, Congress passed the Keystone XL Pipeline Approval Act, S. 1, 114th Cong. (2015)—an attempt to sidestep Executive Branch review and directly approve the permit. But President Obama vetoed the legislation. Dkt. 27 at 9. Similar subsequent

attempts to bypass presidential permitting or outright authorize the permit also failed.[4] *Id.* at 28.

The State Department continued its review, examining the application from foreign-policy and energy-security angles and considering its environmental, cultural, and economic impacts. Dkt. 71 ¶ 44; 2015 ROD at 2–3, 8–32. Ultimately, in November 2015, Secretary of State John Kerry denied the permit. *Id.* Secretary Kerry surmised the project would have "negligible-to-limited benefit to energy security" and a "minimal" effect on prices for refined petroleum products. *Id.* at 29. He also declared that whatever advantage the project might bring would not offset its damage to "the United States' successful foreign policy engagement in efforts to combat climate change on a global scale." *Id.* at 30. Even if the pipeline "by itself is unlikely to significantly impact the level of [greenhouse gas]-intensive extraction of oil sands crude or the continued demand for heavy crude oil at refineries in the United States," Secretary Kerry insisted that "it is critical for

---

[4] *See* American Energy Renaissance Act of 2015, S. 791 and H.R. 1487, 114th Cong.; Keystone for a Secure Tomorrow Act, H.R. 28, 114th Cong. (2015); North American Energy Infrastructure Act, S. 1228, 114th Cong. (2015); H.R. 5682, 113th Cong., 2d Sess. § 1 (2014); American Energy Solutions for Lower Costs and More American Jobs Act, H.R. 2, 113th Cong., 2d Sess. § 103 (2014); Northern Route Approval Act, H.R. 3, 113th Cong., 1st Sess. § 3 (2013); North American Energy Access Act, H.R. 3548, 112th Cong., 2d Sess. (2012).

the United States to prioritize actions that are not perceived as enabling further [greenhouse gas] emissions globally." *Id.* at 29.

### d. 2017 and 2019 Permits

Within days of assuming office in 2017, President Trump invited TC Energy to resubmit its application for the cross-border permit and ordered his administration to expedite its consideration. Dkt. 71 ¶ 45. TC Energy reapplied on January 26 and the State Department granted the permit on March 23. *Id.* ¶¶ 46–48.

But in November 2018, a federal district court enjoined the 2017 permit. *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018). So, on March 29, 2019, President Trump issued a new one. Dkt. 71 ¶ 49. This permit revoked and superseded the 2017 permit. *Id.*; Presidential Permit Authorizing TransCanada Keystone Pipeline, 84 Fed. Reg. 13101 (Apr. 3, 2019) [hereinafter 2019 Permit]. The 2019 Permit also provided that it "may be terminated, revoked, or amended at any time" at the sole discretion of the President. 2019 Permit, Art. 1(1). And it specified that "[u]pon the termination, revocation, or surrender of this permit, unless otherwise decided by the President, the permittee, at its own expense, shall remove the Border facilities within such time as the President may specify."

*Id.* Art. 3. Legal challenges to that permit are still pending. *See Indigenous Envtl. Network v. Biden*, 4:19-cv-00028-BMM (D. Mont.).

The portion of the Keystone XL pipeline that crosses the United States' northern border with Canada was substantially completed by the end of 2020. Dkt. 71 ¶ 51.

### e.  Revocation of the 2019 Permit

On January 20, 2021, his first day in office, President Biden ordered the revocation of the 2019 Permit. Exec. Order No. 13,990, 86 Fed. Reg. 7037, § 6(a) (2021). The President proclaimed that Keystone XL "disserves the U.S. national interest" because the "United States and the world face a climate crisis," and leaving the permit in place "would not be consistent with [the] Administration's economic and climate imperatives." *Id.* § 6(d). The Executive Order cites both the "exhaustive review" by the State Department in 2015 and President Obama's pronouncement that "approval of the proposed pipeline would undermine U.S. climate leadership by undercutting the credibility and influence of the United States in urging other countries to take ambitious climate action." *Id.* § 6(b).

### f.  Termination of the Keystone XL Project

On June 9, 2021, TC Energy announced that "after a comprehensive review of its options, and in consultation with its partner, the Government of

Alberta, it has terminated the Keystone XL Pipeline Project." TC Energy News Release (June 9, 2021).[5] In a report it filed with the court in *Indigenous Environmental Network*, the company stated that because "it has definitively terminated" the project, it "will not pursue any permits for the Project, nor will it perform any construction activities in furtherance of the Project now or at any time in the future." 4:19-cv-00028-BMM (D. Mont. June 9, 2021), Status Report, Dkt. 167 at 3. Instead, the company announced that it would work to ensure a safe termination of and exit from the project. *Id.* It added that no President would ever be able to issue another permit for the Keystone XL project—because it "no longer exists." *Id.*

### g. This Lawsuit

The plaintiffs have now sued President Biden and the Cabinet Defendants challenging the President's authority to revoke the permit. Dkt. 71 ¶¶ 1–6. The plaintiffs seek declarations by this court that: (1) the President's revocation of the permit violates the U.S. Constitution's separation of powers; (2) the President may not unilaterally revoke the permit because Congress expressly granted it by operation of law; (3) the Cabinet Defendants' implementation of the revocation of the permit exceeds

---

[5] *Available at* https://www.tcenergy.com/announcements/2021-06-09-tc-energy-confirms-termination-of-keystone-xl-pipeline-project/.

their statutory authority; (4) revocation of the permit violates the nondelegation doctrine; (5) the revocation was arbitrary and capricious; and (6) the Cabinet Defendants' revocation is void for failure to go through notice-and-comment rulemaking. *Id.* ¶¶ 85–136.

The defendants have moved to dismiss, arguing lack of jurisdiction, improper venue, and failure to state a claim. Dkt. 98.

## II.   Standard of Review

Rule 12(b)(1) requires dismissal if the court "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting jurisdiction bears the burden of proof. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. U.S. Const. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001). "The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

To test whether the party asserting jurisdiction has met its burden, a court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

## III.   Analysis

### a. Mootness

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies," and do not have "the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citation omitted). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 67 (1997). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

In other words, "[m]ootness applies when intervening circumstances render the court no longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013). A defendant claiming mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

The defendants argue that the case should be dismissed under Rule 12(b)(1) because there is no Article III case or controversy, so the court has no jurisdiction. They contend that TC Energy's unequivocal announcement that it "has terminated the Keystone XL Pipeline Project" following a "comprehensive review of its options" moots the case because it precludes the court from providing meaningful relief to the plaintiffs. Dkt. 98 at 33 (quoting TC Energy News Release (June 9, 2021)).[6] According to TC Energy—which is not a party to this lawsuit—it "will not pursue any permits for the Project, *nor will it perform any construction activities in furtherance of the Project now or at any time in the future.*" *Indigenous Envtl. Network*,

---

[6] *Available at* https://www.tcenergy.com/announcements/2021-06-09-tc-energy-confirms-termination-of-keystone-xl-pipeline-project/.

4:19-cv-00028-BMM (D. Mont. June 09, 2021), Dkt. 167, Status Report at 3 (emphasis added).

In its amicus brief in support of mootness, TC Energy states it has obtained state and federal approval to remove the 1.2-mile border-crossing segment of the pipeline. Dkt. 133 at 6. The removal of the segment had already begun when TC Energy filed its brief and was expected to be complete by November 2021. *Id.* TC Energy has also "relinquished a number of critical approvals it had obtained for the Project, including all of the federal rights-of-ways necessary for construction on federal lands in Montana, save for the one right-of-way tract that TC Energy must retain until the border crossing segment is removed." *Id.* at 6–7. In TC Energy's eyes, the project is "dead," and even if the court were to "invalidate President Biden's revocation of the Presidential permit for the Project, there would be no [Keystone XL pipeline] to be constructed or taken over by another company." *Id.* at 7.

The plaintiffs disagree, arguing that the case is very much alive because a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Intl Union, Loc. 1000*, 567 U.S. 298, 307 (2012). The plaintiffs contend that a favorable judgment will redress their injuries because "[i]t will certainly lead to the resurrection of the [Keystone XL Pipeline] by TC Energy or another

entity." Dkt. 107 at 17. Until the court provides such relief, the "Executive Order's looming presence will prevent the completion and operation of the Keystone XL." *Id.* at 17–18. In the plaintiffs' eyes, the court can grant relief dispelling any notion of mootness—a declaration that the President's order is unlawful and an injunction against enforcing it. *Id.* at 18. With that relief in place, the plaintiffs argue, the "business reality" is that the Keystone XL pipeline "will transport oil." *Id.* at 21.

But the court takes TC Energy at its word that Keystone XL is dead. And because it is dead, any ruling this court makes on whether President Biden had the authority to revoke the permit would be advisory. Thus, the court has no jurisdiction and the case must be dismissed as moot. *See McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").

### b. Mootness Exception

The plaintiffs also argue that an exception to the mootness doctrine applies, as the situation they face is one "capable of repetition, yet evading review." *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1447 (5th Cir. 1991). This deviation from the mootness doctrine

"applies only in exceptional situations," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), "where the following two circumstances [are] simultaneously present: '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.'" *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482 (1982) (*per curiam*)) (internal quotation omitted); *see, e.g., Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 126–27 (1974) (labor strike); *Roe v. Wade*, 410 U.S. 113, 125 (1973) (pregnancy); *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974) (election law).

The plaintiffs cannot show that either of the required circumstances are present in this case. First, they have failed to demonstrate that the permitting process is of such short duration that it would be "virtually impossible to litigate the validity of the order prior to its [termination]." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).[7] It is true that once President Biden mandated the revocation of the permit, it did not take long

---

[7] An analogous case is *Bayou Liberty Association, Inc. v. U.S. Army Corps of Engineers*, 217 F.3d 393, 395 (5th Cir. 2000), which concerns the permitting of a retail complex consisting of a Wal-Mart, a Sam's Club, and a Home Depot. In that case, the Fifth Circuit held that the plaintiff had not met the durational requirement because it was no sure thing that the "period of time between issuance of a Corps permit and substantial completion of construction [was] too short to allow a challenge to the permit to be fully litigated." *Id.* at 398.

for TC Energy to give up and abandon the project. Evidently the 2021 Executive Order was the last straw. TC Energy's seemingly abrupt surrender was actually the chagrined culmination of many years of effort and the outlay of countless resources striving to make the pipeline a reality. The fact that once it ended, it ended quickly does not mean its duration was too short to be fully litigated.[8]

Even if the plaintiffs could meet the durational element, they have failed to establish a reasonable expectation that they will face the same unlawful action again. *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). TC Energy's amicus brief illustrates the tedious decade-long process it endured to obtain the necessary federal, state, and local permits to construct the pipeline. Dkt. 137 at 7. Such obstacles cast a dark shadow of doubt on the plaintiffs' insistence that the relief they seek will induce TC Energy, or any other company, to "undertake the complex and lengthy process of commercializing, financing, developing, and permitting a new project from scratch." *Id.*

---

[8] To the extent the duration was short, it was short only because TC Energy did not itself challenge the Executive Order. Of course, had it challenged the President's action and sought to keep the project alive, the claims the plaintiffs have asserted would not be moot, and no exception to the mootness doctrine would be required.

As the defendants point out, but for the court's actions in reviving Keystone XL by "interjecting itself into this relationship of the parties and *becoming a participant in spurring the repetition of the dispute*," this case would remain moot. Hr'g Tr. at 42:25–43:2 (Dec. 8, 2021). In other words, only a favorable judicial ruling—and an advisory one at that—keeps this dispute alive. Such bootstrapping cannot satisfy the mootness exception.

Unlike this case, cases that meet the requirement—showing a reasonable expectation the same complaining party will face the same action again—do so without the aid of judicial intervention. For example, in perhaps the best-known mootness-exception case, *Roe v. Wade*, the fleeting nature of pregnancy speaks for itself in presenting an expected-to-recur short-duration event likely to escape judicial review. By intervening, the Court affected the potential relief available to the plaintiff should the event recur; it did not bring about the recurrence. Here, on the other hand, the plaintiffs hope the court will spark the recurrence so their challenge may be heard now.

In none of the cases applying the exception to the mootness doctrine did judicial intervention revive an otherwise dead controversy, unlikely to recur, as the plaintiffs seek here. The exception does not apply.

\* \* \*

Because the plaintiffs seek to revive a project that its owner has permanently abandoned, they "lack a legally cognizable interest in the outcome," *Already*, 568 U.S. at 91, and the court is not "capable of providing [them] meaningful relief," *Ctr. for Biological Diversity*, 704 F.3d at 425. Because the court cannot grant any relief that would not be purely advisory, the case is moot.[9] *See Texas Dep't of Fam. & Protective Servs. v. Azar*, 476 F. Supp. 3d 570, 580 (S.D. Tex. 2020) ("Without a live controversy, 'it is impossible for a court to grant any effectual relief whatever to the prevailing party.'") (internal quotation omitted). For the reasons stated above, the court grants the defendants' motion to dismiss. Dkt. 98.

SIGNED on Galveston Island this 6th day of January, 2022.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE

---

[9] *See, e.g.*, *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001) (First Amendment challenge to licensing scheme for adult businesses became moot when the company "ceased to operate as an adult business and no longer [sought] to renew its license"); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 331 (7th Cir. 1993) (lawsuit seeking to enjoin Army Corps from granting permit for radio tower construction was moot, where radio tower operator "decided not to go forward with the project"); *Lichterman v. Pickwick Pines Marina, Inc.*, No. 1:07-cv-256, 2010 WL 717840, at *5 (N.D. Miss. Feb. 22, 2010) (challenge to agency action and environmental assessment of project became moot when the project was terminated). *Cf. JSLG, Inc. v. City of Waco*, 504 F. App'x 312, 318 (5th Cir. 2012) ("Here, because JSLG closed its business and became a defunct corporation unable to apply for an SOB license, it no longer has a cognizable interest in declaring the City of Waco's SOB ordinance facially unconstitutional").